| | |
|---|---|
| Alan A. Meda (#009213)<br>BURCH & CRACCHIOLO, P.A.<br>702 E. Osborn Rd., Suite 200<br>Phoenix, AZ 85014<br>Tel: 602.274.7611<br>ameda@bcattorneys.com<br><br>*Attorneys for Defendant* | |

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>PAUL OLIVA PARADIS,<br><br>Debtor. | Chapter 7<br><br>Case No.: 2:20-bk-06724-PS |
| CITY OF LOS ANGELES,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL OLIVA PARADIS,<br><br>Defendant. | **Adversary No.: 2:21-ap-00171-PS**<br><br>**MOTION TO DISMISS** |

Defendant Paul Oliva Paradis ("Paradis"), through counsel, hereby files a Motion to Dismiss the City of Los Angeles' (the "City") adversary proceeding, which is captioned, "*Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6)*" (the "Motion to Dismiss"). The Motion to Dismiss is based upon the following Memorandum of Points and Authorities, the files and records in this case, and such further evidence as the Court may permit.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Paul Oliva Paradis ("Paradis") hereby moves to dismiss the City of Los Angeles (the "City") Adversary Complaint (the "Complaint) pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure and Rule 12(b)(6) of the Federal Rules of Civil Procedure and respectfully submits this memorandum of law in support thereof.

## II. STATEMENT OF FACTS and SUMMARY OF ARGUMENT

The Complaint alleges that Paradis, a consultant whose company was retained by the City of Los Angeles (the "City"), engaged in fraudulent conduct in June 2017 in order to procure a consulting contract (the "Contract") for Aventador Utility Solutions, LLC ("Aventador"), a company then owned by Paradis. Specifically, the City contends that, in order to procure the Contract for Aventador, Paradis falsely informed the City that the LADWP "lacked internal resources to provide adequate project management and oversee IT changes." Cplt. ¶ 17. Similarly, the Complaint alleges that Paradis falsely informed the City that "…the loss of numerous senior managers, combined with an inability to replace these managers has resulted in a drastic loss of institutional knowledge that has only intensified the challenges that the LADWP is facing." Cplt. ¶¶ 18, 20. The Complaint alleges that, because Paradis made these allegedly false statements, the City was purportedly induced by Paradis and, therefore, awarded the Contract to Aventador. Cplt. ¶ 21.

Based on the foregoing allegations, the City claims that Paradis violated California Government Code Sections 1090 ("Section 1090") and 12650 ("Section 12650") and that the City is entitled to at least $21.9 million, the amount paid to Aventador (not Paradis) under the Aventador Contract. Cplt. ¶¶ 34, 35. The City further seeks to have this Court find that the purported debt of $21.9 million is non-dischargeable by Paradis' bankruptcy under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6) ("Section 523") because such debt purportedly arises out of alleged fraudulent conduct. Cplt. ¶¶ 38-40 (First Claim alleging

fraud); Cplt. ¶¶ 45-46 (Second Claim alleging fraud); Cplt. ¶¶ 54 (Third Claim alleging fraud).

As set forth below, the Complaint must be dismissed in its entirety because the City has not stated and cannot state a claim for fraud under Section 523. In particular, the City has failed to allege that Paradis made any false or material misrepresentations. Although the City claims that Paradis misrepresented the state of the City's IT needs, the very statements that the City alleges were fraudulently made, *i.e.* that the City lacked critical IT project management capabilities and necessary IT resources, are ***true, public statements of fact***, which the City repeatedly, frequently and openly acknowledged in documents that are part of a public record ***years*** before the City and Aventador ever even crossed paths.

In fact, as recently September 14, 2021 –***two months ago*** – the City, by and through the President of LADWP's Board of Commissioners, Ms. Cynthia McClain-Hill, openly admitted at a public Board meeting, that the City lacks critical IT project management capabilities and necessary IT resources – the very information that the City claims Paradis misrepresented to induce the City to award the Contract to Aventador.

These public statements, which the City has openly acknowledged as true facts (as recently as two months ago) are ***not*** material misrepresentations. Therefore, the City has failed to plead the elements required to state a claim for fraud necessary for nondischargeability purposes.

Furthermore, the City has failed to allege violations of both Sections 1090 and 12650; conduct which the City claims forms the basis of the alleged fraud, and therefore, its nondischargeability claims. Because the City has failed to adequately allege these purported underlying violations, the City cannot satisfy its obligations for nondischargeability purposes.

Accordingly, Paradis respectfully requests that this Court dismiss the City's Complaint in its entirety.

## III. ARGUMENT

### A. The City Cannot State A Claim For Fraud Because The City Has Failed to Allege Any Misrepresentation of Material Fact

A party alleging nondischargeability of debt for fraud, as the City is attempting to do, here, must allege all of elements of actual fraud incident to creation of debt including: 1) a misrepresentation, concealment, or non-disclosure of a *material* fact; 2) defendant's knowledge that what he was saying was false; 3) defendant intended to induce plaintiff's reliance; 4) plaintiff justifiably relied; and 5) plaintiff suffered damage as a result. *Urban v. BSC West, LLC (In re Urban)*, 2014 Bankr. LEXIS 1669, *43 (9th Cir. 2014) (emphasis added).

It is axiomatic - "true representations are not actionable as fraud." *Thompson v. Waltz*, 1989 Minn. App. LEXIS 363, *7(1989) (citing *Davis v. Re-Tree Manufacturing Corp.*, 276 Minn. 116, 117 (Sup. Ct. 1967). *See also Apin v. Saxon Mortg. Servs.*, 2012 U.S. Dist. LEXIS 199691, *8 (CD Ca. 2012). ("Any true statements made by Bank of America about its lack of servicing authority over Plaintiffs' loan thus cannot give rise to actionable claims for fraud or negligent misrepresentation."); *Southwest Props. v. Brinker Int'l*, 1997 Tex. App. LEXIS 3782, *10. ("A true representation cannot support a claim of fraud or negligent misrepresentation"); *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 9-10 (1st Cir. 1991) ("indisputedly true, and wholly true" statements not actionable).

Furthermore, "materiality" cannot be demonstrated when the purported misrepresentation (or omitted information) is already disclosed to the public, at large. *See, e.g., White v. H & R Block, Inc.,* Civ. 02-8965 MBM, 2004 U.S. Dist. LEXIS 14522, 2004 WL 1698628, *12 (S.D.N.Y. July 28, 2004) (dismissing claims because the allegedly omitted fact was disclosed in the press); *Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 721 (E.D. Va. 2003) (considering news articles directly related to the defendant and observing that "[d]isclosure of information already publicly available does not materially alter the 'total mix' of available information," citing *Cooke v. Manufactured Homes,*

*Inc.,* 998 F.2d 1256, 1262-63 (4th Cir. 1993) (disclosure of company's fiscal problems by third parties in newspaper articles and analyst's reports "more than cured any omission by [the company]")); *In re Integrated Resources Real Estate Ltd. Partnerships Securities Litig.,* 815 F.Supp. 620, 640 (S.D.N.Y. 1993) (describing *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 987-88 (S.D.N.Y. 1989), where court determined that defendants' alleged omissions were not material given that "the disclosure of the omitted information would not have affected the 'total mix' of available information because plaintiffs already should have known of such matters from general publicity accorded Federated in the media.)

Here, the City has failed to allege the elements necessary to state a claim for fraud because the City has failed to allege that even a single representation purportedly made by Paradis is false. Additionally, all of the information that the City claims was misrepresented by Paradis was already disclosed to the public, years earlier. Numerous documents that are part of the public record make clear that, by at least as early as 2009, the City had been informed of and openly admitted that it lacked critical IT project management capabilities and necessary IT resources. These public sources (the "Sources")[1] include the following:

---

[1] Paradis has respectfully requested that this Court take judicial notice of the Sources, which are attached as Exhibits A-F to Paradis' Request for Judicial Notice ("RJN")(concurrently filed). As explained in the RJN, judicial notice of each of the Sources is appropriate because each Source is a matter of public record and has been made available to the public by the government, including the City, itself. *See* Rule 201 of the Federal Rules of Evidence. *See, e.g.*, *Indep. Living Ctr. of S. Cal. v. City of Los Angeles*, 205 F. Supp. 3d 1105, 1110 (C.D. Ca. 2016) (taking judicial notice of City council file. "Under Rule 201(b) of the Federal Rules of Evidence, the court may take judicial notice of matters of public record, including official records such as this one."); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 n. 2 (9th Cir. 2007) (taking judicial notice of public report). Accordingly, the Court may consider the Sources in connection with this instant Motion to Dismiss. *Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 772 (9th Cir. 2007) (explaining that a court need not "blindly accept the allegations in the pleadings as true if these allegations are contradicted by uncontested facts set forth in (1) exhibits to the nonmoving party's pleading, (2) documents that are referred to in the non-moving party's pleading, or (3) facts that are included in materials that can be judicially noticed").

(i) February 1, 2009 *Industrial, Economic and Administrative Survey of the Department of Water and Power,* prepared for and provided to the Los Angeles City Council, Mayor, Controller and the Board of Water & Power Commissioners by the PA Consulting Group on or about February 3, 2009;

(ii) PowerPoint Presentation entitled, *Customer Information System Implementation – Why the New System Had Problems . . . and What We're Doing About It*, prepared for and provided to the Energy & Environmental Committee of the Los Angeles City Council by LAWDP Executive Management, on or about December 3, 2014;

(iii) July 1, 2015, report entitled, *Learning from the Department of Water & Power's Billing System Challenges,* authored by the Office of Public Accountability / Ratepayer Advocate of the City of Los Angeles, that was simultaneously published and provided to the Los Angeles City Council, Mayor Garcetti, the Board of Commissioners of the LADWP and the General Manager of the LADWP on July 1, 2015;

(iv) December 8, 2015 *Industrial, Economic and Administrative Survey of the Department of Water and Power,* prepared for and provided to the Los Angeles City Council, Mayor, Controller and the Board of Water & Power Commissioners by Navigant Consulting, Inc. on or about December 8, 2015;

(v) March 28, 2017 Los Angeles City Controller's Report on the "*Audit of the Department of Water and Power's Training Programs*"; and

(vi) statements made by the City, by and through the President and Commissioner McClain-Hill at a September 14, 2021 Board meeting concerning the City's lack of critical IT capabilities and necessary IT resources.

In light of the fact that the City was publicly informed by various external agencies and internal departments years before awarding the Contract to Aventador that the City lacked critical IT project management capabilities and necessary IT resources, information that was and is true -the City cannot state a claim for fraud for purposes of nondischargeability.

### 1. The February 2009 Industrial, Economic and Administrative Survey of the Department of Water and Power

On or about February 9, 2009 -- **more than five years before Paradis ever performed any services for the City** -- the City received a copy of the *Industrial, Economic and Administrative ("IEA") Survey of the Department of Water and Power* authored by the PA Consulting Group (the "2009 *IEA Survey*"). In describing **The Current Environment**, the *2009 IEA Survey* informed the City:

> *[T]he Department is confronted with a significant number of challenges that must be addressed … including:*
>
> - *Severely outdated Information Technology (IT) infrastructure across most areas of the Department*
> - *Broad human capital challenges, exacerbated by cumbersome union and civil service rules and mandates*

2009 *IEA Survey* (RJN Ex. A) at 2-1. (Emphasis added).

In the section of the *2009 IEA Survey* entitled, **Assessment of Strategic Issues** under the heading, **IT Systems Infrastructure / Information Management**, the City was informed of certain IT challenges that it was facing, including:

> - ***Aging IT workforce.*** The IT *workforce* is competent in older technologies, such as mainframe and COBOL. . . .
>
> - ***IT Workforce untrained in modern technologies. The current IT workforce has little experience with n-tiered architectures, languages and tools that will be needed to implement these applications. LADWP will most likely have to rely heavily on contractors to plan, manage and implement these applications***
>
>   \* \* \*
>
> - Unraveling a complex application architecture. ***Because of the age of most of these applications, it is highly probable that the interface points between them are numerous and highly complex. It is also probable that many of the interfaces are not documented and that their "authors" are no longer at LADWP.*** These interfaces most likely contain a good deal of business process logic. As the applications are replaced overtime BIS will have to devote significant effort to understanding and re-engineering these interfaces for the new applications.

*Id*. at 3-87-88. (Emphasis added).

Finally, in the section of the *2009 IEA Survey* entitled, ***Assessment of Operational Issues*** under the heading, ***IT SYSTEMS INFRASTRUCTURE / INFORMATION MANAGEMENT - Analysis***, the City was informed:

- ***The IT applications portfolio is out of date-to the point that, because of the aging workforce in ITSD, it has become a significant risk to the Department***

  \* \* \*

- ***In general, we believe the Department's IT infrastructure requirements have absolutely reached critical levels. The Department's ability to achieve its strategic objectives is at-risk, given the overall condition of the IT infrastructure. . . .***

*Id*. at 4-170-71. (Emphasis added).

    **2.**    **The 2014 LADWP PowerPoint Presentation Entitled, "*Customer Information System Implementation – Why the New System Had Problems . . . And What We're Doing About It*"**

On or about December 3, 2014, the Energy & Environmental Committee of the Los Angeles City Council was provided with a Power Point Presentation entitled, "*Customer Information System Implementation – Why the New System Had Problems . . . and What We're Doing About It*" (the "*E&E Committee PowerPoint*") authored by LAWDP Executive Management. This PowerPoint presentation provided the City Council with the following facts:

Slide 4 of the twenty-one slide presentation could not be any more clear and states in relevant part:

**What Went Wrong?**

Our outside consultant conducted a root cause analysis and found:

- Three key issues:

  1. ***Inadequate project management***
  2. Vendor inexperience with level of system complexity
  3. ***Unprepared workforce***

*E&E Committee PowerPoint* (RJN Ex. B) at Slide 4. (Emphasis added).

### 3. The July 1, 2015 Report Authored by the Office of Public Accountability of the City of Los Angeles

The Los Angeles City Council, Mayor Garcetti, and the LADWP Board of Commissioners were all informed of the fact that the LADWP lacked IT project management and IT resources in a highly detailed 46 page report authored by the Office of Public Accountability / Ratepayer Advocate of the City of Los Angeles that was published and provided to the Los Angeles City Council, Mayor Garcetti, the Board of Commissioners of the LADWP and the General Manager of the LADWP on July 1, 2015 (the "*OPA Report*"). The **Executive Summary** portion of the *OPA Report* informed the City that:

> The DWP has a deep and abiding problem with the ability to deploy resources. The responsibility for this is dispersed between civil service rules, procurement rules, and work rules that are not within the Board's control. ***In addition, the DWP has high turnover in executive management and a culture that is unlikely to self-correct, all made worse by high retirement rates and churn in positions.***

*OPA Report* (RJN Ex. C) at 4. (Emphasis added).

In announcing a summary of the OPA's key findings, the **Key Findings** portion of the *OPA Report* once again informed the City that the LADWP lacked necessary IT project management and IT resources. In particular, this segment of the OPA Report informed the City that:

- ***The DWP's PMO function was under-supported for addressing conflicts that arose within the firm . . . . The DWP as a whole was pursuing "productivity" by job attrition . . .***

- The ***Joint Services Division lacked sufficiently stable resources for the transition from development to deployment.*** For example, ***it could not fill vacancies left by those staffing the Project. It could not keep Project code testing staff once it launched by extending its letter of agreement with the union. The Joint Services Division today cannot supplement the quality of training, supplement missing subject matter expertise, procure a backup call center, clear one-time collection backlogs on long-closed accounts, or outsource manual bill error correction, even if***

> *staff is overwhelmed or unable to clear backlogs in a reasonable timeframe. Other utilities can and do respond appropriately to a wide variety of unplanned, urgent needs. Due to resource constraints, the DWP cannot.*
>
> - ***There was inadequate delivery of contracted-for post-launch support. The post-launch period has had the same management, vendor and key staff turnover as pre-launch. . . . To this day the PMO lacks adequate control.***

*Id.* at 5-6. (Emphasis added).

In the segment of the *OPA Report* entitled, "**THE OPA's PERSPECTIVE**," the OPA informed the City that:

> \* \* \*
>
> The DWP's current retirement rate is putting further pressure on the old and unresolved problems of not having its own civil service system to manage personnel. . . . ***The existing civil service system cannot meet the DWP's needs for IT staff given the high rate of technology change and specialization in information systems. The staffing challenge fails to provide the Joint Services*** Division ***with the flexibility to hire the missing IT expertise at all wage levels of the organization, so that training can be supported as DWP staff undertake the next decade of large IT changes. . . . the existing DWP resourcing constraints are abnormal for a utility . . . ."***

*Id.* at 17-22. (Emphasis added).

In the "**CONCLUSIONS**" portion of the *OPA Report,* the OPA made a number of damning admissions – each of which serve to establish the City's knowledge of the fact that the City lacked necessary IT project management capabilities and IT resources. The following statements clearly demonstrate the City's knowledge of these facts as of July 2015 – nearly two years *before* the Aventador contract was awarded:

21. ***The turnover of key management personnel during the multi-year development of this Project was not offset by a mature and fully developed Program Management Office***.

22. ***The turnover of key management personnel during the post deployment period to date of this Project was not offset by a mature and fully developed Program Management Office.***

23. Both the Great Recession starting in 2008 and the turnover in key DWP management, led to critical civil service lists expiring. As such, in fall

of 2013 the DWP did not have viable candidates to hire, and thus did not meet utility standards of customer service. . . .

\* \* \*

33. ***The DWP's human resource constraints are a hazard and impediment to the flexibility required for successful large scale IT projects. Better scoping activity in large IT projects is unlikely to remedy the existing organizational and cultural challenges to large scale IT management. . . .***

*Id.* at 31-33. (Emphasis added).

### 4. The December 2015 Industrial, Economic and Administrative Survey of the Department of Water and Power

The Los Angeles City Council, Mayor Garcetti, and the LADWP Board of Commissioners were all informed that LADWP lacked necessary IT project management and IT resources in a highly detailed 82-page report authored by the Navigant Consulting, Inc. that was published on December 8, 2015 in connection with Navigant's Industrial, Economic and Administrative Survey of the Los Angeles Department of Water and Power (the "*2015 IEA Survey*"). In addressing the LADWP's "**Governance Challenges**," Navigant informed the City:

> **Inadequate Hiring Process:** Human Resources is one area in which the Department does not benefit from centralized City authority. ***The current hiring process does not meet the utility's need to be more responsive and nimble. Moreover, it does not adequately address the aging workforce challenge. It is cited as a major impediment to every program initiated by the Department and has a significant impact on basic operations. It is a critical issue that, if not addressed, could prevent the Department from meeting its goals.***

*2015 IEA Survey* (RJN Ex. D) at 34. (Emphasis added).

In the segment of the *2015 IEA Survey* entitled "**Technology Infrastructure – Portfolio and Project Management**," Navigant delivered a scathing assessment of the DWP's repeated failures and stated:

> ***Portfolio and project management are critical components to successfully maintaining existing information systems and effectively managing new technology initiatives . . . . However, an overall IT Portfolio Management and Project Management Office has not been implemented at LADWP, although an effort has been made to do so. The ITSD is allocated limited and almost non-existent resources around project management. For***

> *example, there is only on Project Management Office (PMO) position on staff, which is also currently vacant.*

*Id.* at 63. (Emphasis added).

In the segment of the *2015 IEA Survey* entitled "**Recommendations,**" Navigant stated:

> High Priority Recommendations
>
> - ***Ensure that ITSD has the staff and contracting resources to address its current system challenges as well as future upgrades and platform implementations.***
>
> Medium Priority Recommendations
>
> - ***Establish a formal project management office for technology infrastructure to ensure that projects are monitored and completed.***

*Id.* at 66. (Emphasis added).

Finally, in the "Conclusion" portion of the *2015 IEA Survey*, Navigant once again made clear that the LADWP lacked the necessary project management and IT resources when Navigant stated:

> Navigant also identified a number of global issues that negatively impact the Department's ability to carry out its current and planned operations and activities. Global issues include the following:
>
> - **Program Implementation at Scale:** *Navigant found that the Department does not currently have the policies, processes and personnel in place to support the full implementation of its large-scale plans. . . . .*

*Id.* at 81. (Emphasis added).

### 5. The March 28, 2017 Los Angeles City Controller's Audit Report

The Los Angeles City Council, Mayor Garcetti, Deputy Mayor Barbara Romero, Mayor Garcetti's recently suspended Chief of Staff, Ana Guerrero, Ratepayer Advocate, Dr. Frederick Pickel, the LADWP Board of Commissioners (the majority of whom voted to approve the Aventador Contract) and other City Officials too numerous to list here were all informed of the fact that the City lacked necessary project management and IT resources in a highly detailed 42 page report authored by the Office of the Los Angeles City Controller entitled, "***Audit of the Department of Water and Power's Training***

*Programs*," published on March 28, 2017 – *three months before the Aventador contract was awarded*.

The City Controller's Audit Report, issued by one of only three elected Los Angeles City officials, is notable because it contains numerous admissions made by the *City, itself,* that demonstrate the fact that the City had actual knowledge of, and openly admitted the fact that, the City lacked necessary IT project management capabilities and IT resources prior to the City contracting with Aventador.

The **Executive Summary** portion of the City Controller's Audit Report unequivocally states:

> *In the next seven years, LADWP expects to lose between 1,200 and 1,700 of its approximately 9,100 employees to retirement. A workforce gap, particularly for skilled craft employees, has been cited as a problem. Trained employees are needed to meet the Department's challenges, which include eroding infrastructure*, new environmental regulations *and new technologies.*

City Controller's Audit Report (RJN Ex. E) at iv. (Emphasis added).

In the "*Findings, Observations & Recommendations*" section of the City Controller's Audit Report, the City Controller repeated this admission by stating:

> *LADPW has an aging workforce and expects to lose thousands of employees to retirement in the next seven years. These retirements mean trained employees are needed to handle the Department's future challenges, such as* eroding infrastructure, new environmental regulations and *new technologies. For LADWP to deliver on its mission* to provide "clean, reliable water and power in a safe, environmentally responsible, and cost-effective manner . . ." *the Department needs to fill this workforce gap.*
>
>                   \*      \*      \*
>
> *This should reasonably be deemed a priority since the IHRP discusses the Department's need to fill anticipated workforce gaps in the future and identifies attrition as a cause of vacancies.*

*Id.* at 15, 23. (Emphasis added).

### 6. Public Statements Made By LADWP Board President McClain-Hill During A September 2014 Board of Commissioner's Meeting

As recently September 14, 2021 – *less than two months ago and more than four years after the execution of the Aventador Contract*– the City, by and through President McClain-Hill, openly admitted, as a true fact, at a LADWP Board meeting, that the City lacks critical IT management capabilities and necessary IT resources – the very information that the City claims Paradis misrepresented to induce the City to award the Contract to Aventador.

During this September 2021 meeting, President McClain Hill addressed the state of the City's IT hiring situation, referring to it as "mission critical." In particular, President McClain-Hill noted, that, as of today, hiring necessary IT resources "continues to be a struggle" that has "persist[ed]," citing the fact that, out of 610 fully funded positions in the City's IT department, 108 remain open and unfilled, an amount equal to almost 20%. *See* http://ladwp.granicus.com/MediaPlayer.php?view_id=2&clip_id=1814 at 1:19 – 1:35.

President McClain-Hill openly acknowledge that this almost 20% gap in IT personnel is the "lynchpin" to the success of the City's IT operations and without these critical resources the City's needs for "knowledge transfer," "session planning," and additional "hiring" cannot be satisfied. *Id*.

In further describing the critical IT personnel situation at the LADWP, President McClain-Hill stated:

> I am very curious as to what it is that ***we are going to do that's different than what we have been doing that continues to keep us in this state of under-resourced from a people perspective***?
>
> ***This is a very serious issue and it is not just in IT. It's in Power and other parts of the organization but as it relates to IT, which is mission critical***, we have been first waiting for a leader, we now have that … so ***how are we going to deal with what is a critical deficiency in terms of staff***?

> This [vacancies in IT] is something that I do actually want to track independently because everything else is pie in the sky if you don't have the human capital to get it done. So… ***right now … we have a number of things that are on the table as things that we intend to achieve that, frankly, we don't have the people frankly to achieve. . . . So the inability to staff the Department in positions that are not just positions that exist, but positions that are funded, is something that we do have to be able to get beyond***, and to get beyond in a very concentrated way.

*See* Sept. 14, 2021 meeting video available at http://ladwp.granicus.com/MediaPlayer.php?view_id=2&clip_id=1814 (RJN Ex. F) at 1:19 – 1:35.

The foregoing demonstrates that information concerning the City's lack of IT resources – information that the City claims Paradis misrepresented – was: (i) true, (ii) already widely disseminated to the public long before the Aventador Contract was awarded and (iii) "persist" to this very day. Accordingly, the City has failed to state a claim for fraud for purposes of nondischargeability. *See also Apin,* 2012 U.S. Dist. LEXIS 199691, *8 (true statements cannot give rise to actionable claims for fraud); *Southwest Props.*, 1997 Tex. App. LEXIS 3782, *10 (same); *Capri Optics*, 950 F.2d 5, 9-10 (same). *See also White,* 2004 U.S. Dist. LEXIS 14522, 2004 WL 1698628, *12 (dismissing claims because the allegedly omitted fact was previously disclosed in the press).

### B. The City has Failed to Allege Violations of Sections 1090 and 12650

Section 1090 *et seq*. prohibits public officials and certain independent contractors from "making" government contracts in which the official has a financial interest. Although one remedy for a violation of Section 1090 may be disgorgement of contractual profits, such remedy is only available from the entity with whom the contract is made. *Klistoff v. Superior Court,* 157 Cal. App. 4th 469, 481-482 (2007) (holding that "the remedy provided by section 1092 does not extend to persons or entities who were not parties to the contract with the City and to whom the City did not pay public money pursuant to a public contract.") Here, the City has admitted that the Contract was awarded to Aventador, not to Paradis. Cplt. ¶¶ 8,20. Because the Contract was awarded to

Aventador and not Paradis, as the City's Complaint readily admits, the City cannot state a claim for violations of Section 1090 against Paradis or seek disgorgement of monies paid under the Aventador Contract to Aventador from Paradis. *Klistoff,* 157 Cal. App. 4th 469, 481-482. Furthermore, in the absence of its Section 1090 predicate violation, the City also cannot state a claim for Section 12650 or for fraud under Section 523 for purposes of nondischargeability.[2]

## IV. CONCLUSION

Based on the foregoing, Paradis requests that the Court dismiss the Adversary Complaint in its entirety.

Dated this 7th day of December 2021.

**BURCH & CRACCHIOLO, P.A.**

By /s/ Alan A. Meda (#009213)
Alan A. Meda
*Attorney for Defendant*

Served via ECF on CM/ECF users this 7th day of December 2021, which constitutes service pursuant to L.R. Bankr. P. 9076-1:

/s/ Tracy Dunham
Tracy Dunham

---

[2] According to the Complaint, the City claims that Paradis purportedly violated Section 12650 only because Paradis purportedly violated Section 1090. Cplt. ¶ 34. Because the City cannot allege a Section 1090 claim against Paradis, the City cannot also allege a claim against Paradis for violating Section 12650. The City also claims that the purported fraud occurred only because Paradis violated Section 1090. Cplt. ¶ 34. Again, because the City cannot allege a Section 1090 claim against Paradis, the City cannot also allege a claim against Paradis for fraud under Section 523.