Michael N. Feuer (State Bar No. 111529)
City Attorney
mike.feuer@lacity.org
Kathleen A. Kenealy (State Bar No. 212289)
Chief Deputy City Attorney
kathleen.kenealy@lacity.org
**LOS ANGELES CITY ATTORNEY'S OFFICE**
221 N. Figueroa Street, Suite 1000
Los Angeles, California 90012
*Attorneys for Plaintiff City of Los Angeles*

Guy C. Nicholson (State Bar No. 106133)
gnicholson@bgrfirm.com
**BROWNE GEORGE ROSS O'BRIEN ANNAGUEY & ELLIS LLP**
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
*Attorneys for Plaintiff City of Los Angeles*

Michael A. Jones, State Bar #27311
Cody D. Vandewerker, State Bar #33385
**ALLEN BARNES & JONES, PLC**
1850 N. Central Ave., Suite 1150
Phoenix, Arizona 85004
Telephone: (602) 256-6000
Facsimile: (602) 252-4712
mjones@allenbarneslaw.com
cvandewerker@allenbarneslaw.com
*Attorneys for Plaintiff City of Los Angeles*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>PAUL OLIVA PARADIS,<br><br>    Debtor. | Chapter 7<br><br>Case No. 2:20-bk-06724-PS |
| CITY OF LOS ANGELES,<br><br>    Plaintiff,<br><br>v.<br><br>PAUL OLIVA PARADIS,<br><br>    Defendant/Debtor. | **Adv No. 2:21-ap-00171-PS**<br><br>**AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6)** |

Plaintiff, the City of Los Angeles, alleges:

## PARTIES, JURISDICTION AND VENUE

1.  This Amended Complaint is brought pursuant to Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure. As alleged herein below, by this action

1843903.2 {00347070 2}

Plaintiff seeks a judgment that the Debtor's indebtedness to Plaintiff is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

2.      Plaintiff the City of Los Angeles ("**City**") is, and at all times mentioned herein was, a municipal corporation acting by and through its Department of Water and Power ("**LADWP**").

3.      Debtor Paul O. Paradis ("**Paradis**") is an individual who now resides in Maricopa County, Arizona.

4.      Paradis is the debtor in Chapter 7 bankruptcy case no. 2:20-bk-06724-PS ("**Paradis Case**"), initiated on June 3, 2020 and pending before this Court.

5.      Paradis is also the sole owner and managing member and owner of Ardent Cyber Solutions LLC f.k.a. Aventador Utility Solutions, LLC ("**Ardent**" or "**Aventador**").  Ardent is the debtor in Chapter 7 bankruptcy case no. 2:20-bk-06722-PS ("**Ardent Case**"), initiated on June 3, 2020 and pending before this Court.

6.      On November 29, 2021, Paradis plead guilty to federal charges of conspiracy, honest services fraud, and bribery.  In connection with his sworn plea, Paradis admitted, among other things, he "devised, participated in, and executed a scheme to defraud LADWP ratepayers" with the "intent to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit, by using [Wright]'s position as General Manager of LADWP to enrich both defendant Paradis and [Wright] through procurement of a $30,000,000 no-bid LADWP contract for a company which . . . Paradis had an overt financial interest."  Plea Agreement for Defendant Paul O. Paradis ("**Paradis' Plea**"), attached as **Exhibit A** at pp. 31-32; *see also United States v. Alexander*, 543 F.3d 819, 824 (6th Cir. 2008) (taking judicial notice of defendant's criminal history records that were maintained online with state offender tracking systems); F. R. Evid. 201(b), (c)(1) ("A judicially noticed fact must be one not subject to reasonable dispute," including facts "capable of accurate and

ready determination by resort to sources whose accuracy cannot reasonably be questioned," and "[t]he court may take judicial notice on its own.").[1]

7.     On January 28, 2022, Paradis attended a hearing before the U.S. District Court for the Central District of California where he plead guilty to the charges stated in the Paradis' Plea, and he attested to the accuracy and truth of the factual statements in the Paradis' Plea.  Paradis Hearing Transcript at p. 15, attached as **Exhibit B**.  The Central District found Mr. Paradis guilty, incorporated the Paradis' Plea into the record, and will conduct Mr. Paradis' sentencing hearing on July 19, 2022.  Paradis Hearing Transcript at pp. 27-28.

8.     On December 6, 2021, David H. Wright ("**Wright**"), the terminated General Manager of LADWP, plead guilty to federal charges of conspiracy, honest services fraud, and bribery, among other things.  In connection with his plea, Wright admitted Paradis' bribery arrangement with him whereby in exchange for working with Paradis' fraudulent scheme to defraud the LADWP in connection with obtaining the Aventador Contract, Wright was to receive significant future financial benefits, including a future financial interest in Aventador and a job as CEO of Aventador with an annual salary of approximately $1,000,000.  *See* Plea Agreement for David H. Wright ("**Wright Plea**"), attached as **Exhibit C**.

9.     On January 25, 2022, Wright attended a hearing before the U.S. District Court for the Central District of California where he plead guilty to the charges stated in the Wright Plea, and he attested to the accuracy and truth of the factual statements in the Wright Plea.  Wright Hearing Transcript at p. 14, attached as **Exhibit D**.  The Central District found Wright guilty, incorporated the Wright Plea into the record, and will

---

[1] In all quotations from the Paradis Plea, Wright Plea, and Alexander Plea, all references to "defendant" before the individuals' names have been removed to avoid confusion in this Amended Complaint.  And, all citations and quotations in this Amended Complaint from the Paradis Plea, Wright Plea, and Alexander Plea are plead by the City upon information and belief.

{00347070 2}

conduct Wright's sentencing hearing on April 26, 2022.  Wright Hearing Transcript at p. 24.

10.     On December 13, 20201, David F. Alexander ("**Alexander**"), former Chief Information Security Officer of LADWP, signed a plea agreement with the Government where he provided significant detail regarding his work with Paradis to improperly influence the LADWP request for proposal process in Ardent's favor.  *See* Plea Agreement for David F. Alexander ("**Alexander Plea**"), attached as **Exhibit E**.

11.     On February 8, 2022, Alexander attended a hearing before the U.S. District Court for the Central District of California where he plead guilty to making false statements in violation of 18 U.S.C. § 1001(a)(2), and he attested to the accuracy and truth of the factual statements in the Alexander Plea.  Alexander Hearing Transcript at p. 13, attached as **Exhibit F**.  The Central District found Alexander guilty, incorporated the Alexander Plea into the record, and will conduct Alexander's sentencing hearing on June 7, 2022.  Alexander Hearing Transcript at p. 25, 27.

12.     This is a core proceeding and this Court has jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2).

13.     Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTS COMMON TO ALL COUNTS

14.     The focus of this lawsuit is the manner in which consulting contracts were awarded to Aventador.  Specifically, while purporting to act in the City's best interests, Paradis led a fraudulent criminal scheme to, among other things, bribe City officials and improperly influence the City to award a $30 million no-bid consulting contract to his wholly owned entity, Aventador, on an expedited basis ("**Aventador Contract**").  Moreover, after a California state court ordered that the City not make any further payments to Paradis or any Paradis' controlled entities, Paradis defrauded the City by providing it with a false declaration regarding the alleged sale of his ownership of

Aventador and how he would have no further involvement with the company, which later changed its name to Ardent. With Ardent still under Paradis' ownership and control, Paradis proceeded to coerce a City official into assisting him with pursuing lucrative contracts with the City for Ardent. Therefore, Paradis violated California Government Code section 1090 (conflicts of interest in government contracting), which independently also constituted a violation of California Government Code sections 12650 *et seq.*, as a matter of law.

15.     In 2010, the City, through its Department of Water and Power retained PricewaterhouseCoopers, LLP ("**PwC**") to modernize and implement its Customer Care and Billing System ("**CC&B System**"). The new CC&B System went "live" in September 2013. Unfortunately, the new CC&B System had a number of defects resulting in, among other things, inaccurate and untimely bills.

16.     At all times relevant to the events alleged herein, Paradis was an attorney at law licensed to practice in the State of New York and, on information and belief, the sole owner of Paradis Law Group, PLLC ("**PLG**"). The City retained PLG as special counsel, to investigate and, if warranted, commence litigation against PwC. Litigation was filed against PwC in the lawsuit known as *The City of Los Angeles v. PricewaterhouseCoopers, LLP*, Los Angeles Superior Court Case No. BC574690 ("**PwC Action**").

17.     The CC&B System deficiencies resulted in the filing of multiple class action lawsuits against the City by ratepayers alleging, *inter alia*, that they had been overbilled for utility services. One of those lawsuits, filed in April 2015, was known as *Antwon Jones v. The City of Los Angeles*, Los Angeles Superior Court Case No. BC577267 ("**Jones Action**").

18.     The Jones Action was settled in or about August 2015. Among other settlement terms, the City voluntarily agreed to take the actions necessary to remediate

defects in the CC&B System to ensure ratepayers would receive accurate invoices for water and power.

### Self-Dealing and Violation of Cal. Gov't Code 1090

19.     Section 1090 of the California Government Code strictly prohibits certain individuals from participating in the award of a government contract in favor of any entity in which that individual has a financial interest. Contracts violating Section 1090 are void.

20.     Per the settlement agreement in the Jones Action ("**Jones Settlement Agreement**"), the City willingly agreed, among other terms, to correct system defects within 18 months and to the appointment of a billing system monitor to, among other tasks, validate the queries developed to identify potential class members and the amounts owed to each. The Court in the Jones Action appointed Paul Bender of Bender Consulting, Inc. as the Independent CC&B System Monitor ("**Independent Monitor**").

21.     On or about October 20, 2015, the City through the LADWP Board of Water and Power Commissioners ("**Board**") approved a contract with PLG ("**PLG Management Contract**") pursuant to which PLG would be paid up to $1.3 million to provide certain "project management services" relating to the CC&B System such as, among other services:

(a) oversight of the "CC&B System and software contracts to remediate the current billing system, and recommend" continuous system improvements,

(b) "[d]evelopment of internal guidelines and procedures to identify, escalate, and manage future complex customer billing increases", and

(c) "assist in the development of requirements for a Chief Project Manager to direct the Project Management

Organization (PMO), support with selection from a nationwide recruiting campaign, and arrange the transition of project management duties to the new Chief Project Manager."

22. Under the PLG Management Contract, Paradis appointed himself as lead Project Manager.

23. Through his work for the City, including litigating the City v. PwC case, Paradis developed specialized knowledge regarding LADWP's billing system. *See* Paradis' Plea, Attachment A Factual Basis ¶ 35.

24. As part of the Independent Monitor's duties, the Court in the Jones Action required the Independent Monitor to file periodic reports with the Court describing, among other things, LADWP's progress its remediation efforts and the benchmarks contained in the Jones Settlement Agreement.

25. Unbeknownst to the Board, Paradis drafted nearly all of the Independent Monitor's reports to the Court. *See* Paradis' Plea, Attachment A Factual Basis ¶ 40.

**b. Paradis' Bribery of Wright to Secure the Aventador Contract**

26. In or around early 2017, Paradis formed Aventador intending to secure a lucrative no-bid contract with LADWP that would include, among other work, remediation services as well as cyber- related services. *See id.* ¶¶ 43-44; Wright Plea, Attachment A Factual Basis ¶ 4-5.

27. In February 2017, Paradis and Wright, then the General Manager of LADWP, began their scheme where Wright would work to ensure that the LADWP Board awarded a contract to Aventador. *See* Paradis' Plea, Attachment A Factual Basis ¶ 44; Wright Plea, Attachment A Factual Basis ¶ 4-5. In exchange, Paradis would provide Wright with significant benefits, including: (1) the title of Chief Executive Officer of Aventador upon Wright's retirement from LADWP; (2) an approximately

1    $1,000,000 annual salary upon joining Aventador; (3) a new Mercedes SL 550 as

2    Wright's company car; and (4) potentially, a signing bonus. *See id.*

3        28.    In May 2017, Paradis and Wright drafted the Independent Monitor's

4    periodic report to the Court in the Jones Action with the primary goal of providing

5    Wright with support for the LADWP Board's vote to award the $30,000,000 no-bid

6    contract to Aventador. *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 46-47; *see also*

7    Wright Plea, Attachment A Factual Basis ¶ 10.

8        c.    **Paradis and Wright Work to Ensure the LADWP's Support for**

9             **the Aventador Contract**

10        29.    In May and June 2017, Paradis and Wright worked together to position

11   Aventador to secure the $30,000,000 no-bid contract with LADWP by, among other

12   things: editing drafts of a letter that was ultimately sent to the LADWP Board

13   summarizing the purpose and terms of the proposed Aventador contract and explaining

14   why alternatives to awarding the contract on a no-bid basis were unsatisfactory,

15   preparing and refining Wright's oral and written presentation to the LADWP Board

16   touting the Aventador contract, strategizing to remove impediments to Aventador

17   receiving the contract, omitting Paradis' ownership of Aventador from Wright's oral and

18   written presentation, and Wright worked to convince LADWP Board members to vote in

19   favor of the contract in favor of Aventador. *See* Paradis' Plea, Attachment A Factual

20   Basis ¶ 48; *see also* Wright Plea, Attachment A Factual Basis ¶¶ 13-18.

21        30.    On June 6, 2017, the LADWP Board met to consider the Aventador

22   contract. During his presentation to the LADWP Board immediately before the vote,

23   Wright cited the Independent Monitor's report drafted by Paradis, told the LADWP

24   Board that LADWP could not meet its obligations under the *Jones v. City* settlement

25   agreement unless it contracted with Aventador, and conveyed a sense of urgency to

26

approve the Aventador contract. *See* Paradis' Plea, Attachment A Factual Basis ¶ 49; *see also* Wright Plea, Attachment A Factual Basis ¶ 20.

31. Wright did not disclose to the LADWP Board, that Wright had solicited, and Paradis had agreed to give Wright, an annual salary of approximately $1,000,000, a luxury company Mercedes, and the title of Aventador's CEO once Wright retired from LADWP. *See id.*

32. Relying on the Independent Monitor's report that Paradis prepared, the written materials that Wright and Paradis prepared, and Wright's presentation that Paradis prepared with Wright, in or about June 2017, the Board approved entering into the aforementioned sole-source agreement with Aventador awarding it a three-year $30 million contract. *See* Paradis' Plea, Attachment A Factual Basis ¶ 49; *see also* Wright Plea, Attachment A Factual Basis ¶ 21.

33. The June 2017 Board materials related to awarding Aventador the contract stated, among other things, that:

> Significantly, the Monitor informed the Court of the Monitor's belief that "LADWP lacks well-qualified IT project management personnel and the Department therefore lacks the capability required to successfully manage very large scale IT implementation projects." The Monitor further informed the Court that, "because the Department lacks these internal resources, it must procure such services on a contracted basis and, in the past, has often failed to do so."
>
> . . . This proposed contract is also intended to ameliorate any concerns the Monitor may have concerning "LADWP's (i) lack of well-qualified IT project management personnel and (ii) prior failures to procure such services on a contracted basis.

**d.** **Paradis and Wright Expand their Aventador Scheme**

34. During the remainder of 2017, throughout 2018, and into early 2019, Wright continued to collaborate with Paradis to build and market Aventador, and to seek

1  additional lucrative business opportunities for Aventador.  Wright Plea, Attachment A

2  Factual Basis ¶ 23.

3      35.    In reaffirming his commitment to secretly lobby for Aventador during his

4  remaining tenure at LADWP, Wright requested a substantial sign-on bonus from Paradis

5  and an increase in his ownership position. *See id.* ¶ 32.

6      36.    Because he could not receive money for his work for Aventador while at

7  LADWP, Wright and Paradis discussed compensation to Wright with retroactive money

8  after he retired from LADWP.  *Id.*  In discussing this illicit payment arrangement,

9  Wright referred to Paradis as his "ATM," or "automatic teller machine."  *Id.*

10     37.    To further implement and conceal their bribery scheme, Paradis and

11 Wright used burner phones, "secure laptops", Paradis provided Wright with an

12 Aventador email address to use, and Paradis conducted an orchestrated "dead drop"

13 encounter so that Wright could secretly obtain his wiped phone and a burner phone from

14 Paradis. *Id.* ¶ 23, 30.

15     **e.**    **Termination of the Aventador Contract**

16     38.    During a public hearing in the PwC and Jones Actions on March 4, 2019,

17 the California State Court ("**State Court**") inquired of Jack Landskroner, counsel for the

18 Jones class, whether he had shared any portion of the attorneys' fees (in excess of $10

19 million) paid by the City to his law firm as part of the Jones settlement with any attorney

20 representing the City.  Landskroner asserted his Fifth Amendment rights and refused to

21 respond to the State Court's inquiry.

22     39.    Consequently, the State Court entered an order, without objection from the

23 City, prohibiting the City from making any further payments to Paradis or to any entity

24 in which he held an interest (which included Aventador) ("**State Court Order**").

25 **Exhibit G** at p. 2.

26 / / /

40.     Also on March 4, 2019, the State Court ordered that Paradis immediately appear for deposition at the courthouse.  *See id.* at p. 2.  As Landskroner did, Paradis also asserted his rights against self-incrimination and did not provide any substantive testimony respecting the aforementioned subject matter generally and, specifically, whether he illegally received a portion of the attorneys' fees paid by the City to Landskroner upon settlement of the Jones Action.

41.     Shortly thereafter, Paradis withdrew as the City's special counsel in the PwC Action.

42.     As of March 4, 2019, Aventador had received at least $21.9 million in public funds under the Aventador Contract.

43.     On March 14, 2019, the City formally notified Aventador that it was terminating the Aventador Contract effective as of April 13, 2019.

## THE ARDENT BRIBERY SCHEME

### f.     Paradis Deceives the City Regarding His Ownership and Affiliation with Ardent

44.     On March 14, 2019, under penalty of perjury, Paradis purported to divest himself of ownership in, and affiliation with, Aventador by signing a declaration ("**Paradis Declaration**") attesting that he had transferred his interest therein to one of Aventador's employees, Ryan Clarke who, in turn, changed the company's name to Ardent.  Paradis Declaration, **Exhibit H** ¶¶ 2, 3, 5.

45.     With regard to Ardent, Paradis also attested: "I will not perform any work for the Company or any successors to the Company, or have access to the Company's offices or to those of any successor to the Company."  Paradis Declaration ¶ 6.

46.     And, Paradis stated: "I will not receive any remuneration of any nature whatsoever arising out the work performed by the Company or any successors to the Company after March 14, 2019."  *Id.* ¶ 8.

47.    In his Bankruptcy Schedules, executed under penalty of perjury, Paradis revealed that he supposedly sold his membership interest in Aventador to Ryan Clarke in exchange for "an antique coin valued at $1,057.00." Paradis Case ECF No. 1 at p. 61.

48.    Several months after the sale of Aventador to Clarke, Paradis (in his words) "reversed" this purported transaction, once again becoming Ardent's (f.k.a. Aventador) sole owner and managing member. *See* Paradis Case ECF No. 1 at p. 61; *see also* Ardent Case ECF No. 17 at p. 20 (listing Paradis as Ardent's managing member).

49.    As the managing member of Ardent (f.k.a. Aventador), Paradis executed the Bankruptcy Schedules in the Ardent Case also under penalty of perjury, which state, among other things, Paradis owns Ardent as its sole member and serves as its managing member. *See* Ardent Case ECF No. 17 at pp. 1, 21, and 22.

50.    According to Ardent's Bankruptcy Schedules, in December 2019, Paradis took a draw of $1,500 from Debtor. *Id.* at p. 20.

**g.    Paradis Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Ardent**

51.    From May 29, 2017 until February 25, 2019, Alexander was the Chief Information Security Officer of LADWP. *See* Alexander Plea, Attachment A Factual Basis ¶ 2. From February 25, 2019 until on or about August 12, 2019, Alexander was the Chief Cyber Risk Officer of LADWP. *See id.*

52.    Beginning in 2017, Alexander developed a professional relationship with Paradis. *See id.* ¶ 3.

53.    At all relevant times, the Southern California Public Power Authority ("**SCPPA**") was a collective group of eleven municipal utilities that included LADWP. *See id.* ¶ 5.

/ / /

54. On February 8, 2019, the SCPPA issued a Request for Proposal ("**RFP**") for a cybersecurity services contract ("**SCPPA RFP**") at the request of LADWP's then-General Manager, David Wright. *See id.* ¶ 6. Alexander, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP and one of the four members of the scoring committee for the SCPPA RFP. *See id.*

55. Alexander manipulated the SCPPA RFP process with the goal of securing future cybersecurity work for Aventador. *See id.* ¶ 8. After Aventador became Ardent, Alexander sought to secure future work for Ardent because he knew and understood that Paradis was serving as Ardent's principal, despite that he was supposed to have no role or involvement with Ardent at that point. *See id.*

56. On April 5, 2019, the SCPPA Cybersecurity Working Group informed Ardent that it would recommend Ardent for the SCPPA Contract. *See id.* ¶ 10.

57. On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of $17,000,000. *See id.* ¶ 12.

58. Shortly after SCPPA awarded the contracts, the City instructed LADWP to re-bid the contracts through the standard LADWP procurement process ("**LADWP RFP**"), instead of through SCPPA. *See id.* ¶ 13. In the interim, the LADWP Board of Commissioners approved short-term 'bridge' contracts for Ardent and the other two vendors. *See id.*

59. Specifically, following entry of the State Court Order on March 4, 2019 and to avoid a potential lapse of critical services, in or about April 2019, the City agreed to a limited, short-term contract with Ardent, on a strictly interim basis ("**Ardent Contract**").

60. At the time the City entered into the Ardent Contract, it relied upon Paradis' sworn statements in the Paradis Declaration that he would no longer own Ardent, conduct any work for Ardent, or receive any compensation from Ardent. *See*

Paradis Declaration.

61. It was critically important to the City that Paradis' statements in the Paradis Declaration were true and that the City could rely on such statements to comply with the State Court Order, and the City did rely on such statements in proceeding with the Ardent Contract.

62. The City ultimately paid Ardent the amount of $1,777,775 under the Ardent Contract.

63. As discussed herein, through the statements on Ardent's Bankruptcy Schedules and the Alexander Plea, the City has discovered that Paradis' statements in the Paradis Declaration were false.

64. Contrary to the sworn statements in the Paradis Declaration, at all times relevant to the events alleged herein, Ardent was, and to this day is, wholly owned and controlled by Paradis. The City would not have entered into the Ardent Contract had it been aware of the Paradis' false statements in the Paradis Declaration.

**h.    The LADWP RFP Process**

65. On June 17, 2019, LADWP issued the LADWP RFP for the award of a three-year, $82.5 million Cybersecurity Consulting Services contract. *See* Alexander Plea, Attachment A Factual Basis ¶ 14. State and local laws and regulations required the LADWP RFP process to be a fully competitive, neutral, and transparent process in order to ensure fair competition amongst the vendors and to ensure that LADWP acquired the services of a qualified vendor that satisfied its requisite criteria. *See id.*

66. Alexander was one of seven members of the evaluation committee that was responsible for reviewing the proposals submitted in response to the LADWP RFP, and he signed a sworn nondisclosure agreement that he would not discuss their scoring on the proposals with anyone. *See id.* ¶ 15.

/ / /

67.     In late May 2019, before the LADWP RFP was issued, Alexander began his efforts to also manipulate the LADWP RFP process to favor Ardent.  *See id.* ¶ 16. Alexander shared drafts of the LADWP RFP with Paradis and solicited Paradis's edits to improve Ardent's odds of being awarded the contract.  *See id.*

68.     After the LADWP RFP was issued, in June and July 2019, Alexander worked closely with Paradis to help him improve Ardent's proposal for submission, including by reviewing and editing drafts of Ardent's proposal.  *See id.* ¶ 17.

69.     On July 10, 2019, Paradis caused Ardent to submit its proposal to the LADWP RFP.  *See id.* ¶ 18.

70.     Working in coordination with Paradis, Alexander undertook efforts to influence the other members of the evaluation committee to rate Ardent favorably regarding its proposal for the LADWP RFP.  *See id.* ¶ 19.

71.     Among other similar communications, on July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result...[winking face emoji]." Alexander responded via text message, 'I know my job [crying-laughing emoji].'" *Id.* ¶ 20.

i.      **Paradis' Bribery of Alexander in Exchange for Future Task Orders for Ardent**

72.     In July 2019, Alexander and Paradis discussed a proposed job for Alexander as Ardent's Chief Administrative Officer with "platinum-level health insurance benefits" and a prospective start date of in October 2019 so that Alexander could continue to improperly influence the LADWP RFP Process in Ardent's favor.  *See id.* ¶¶ 24-25.   At Paradis's suggestion, Alexander agreed to create a written job description of Alexander's intended role at Ardent, along with his terms and conditions for the job.  *See id.*

73.     Upon discovering that retiring early from the LADWP would cause him to lose retirement income, Alexander and Paradis discussed that Paradis would guarantee additional compensation from Ardent to make up for Alexander's loss in LADWP retirement income. *See id.* ¶ 28.

74.     In exchange for Alexander's additional compensation from Ardent, Alexander and Paradis discussed that while Alexander remained at LADWP, he would provide certain guarantees to Paradis and Ardent in the form of future task orders from LADWP that assigned work for which Ardent could be compensated. *See id.* Alexander would also procure task orders for Ardent's cybersecurity work under the anticipated LADWP contract, and he would also guarantee Ardent task orders for cybersecurity training. *See id.*

75.     Specifically, Alexander told Paradis that he would "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors. *Id.* Additionally, Alexander stated that he would help to push work towards Ardent in a third sector, namely remediation. *See id.*

76.     Alexander and Paradis discussed the need for Alexander to stay on longer at LADWP to deliver on these guarantees. In exchange for Alexander's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time Alexander stayed on at LADWP "from our deal on." *Id.*

77.     Consistent with their bribery arrangement, Alexander continued his efforts to manipulate the LADWP RFP process in Ardent's favor. *See id.* ¶ 30.

78.     In July 2019, to further implement and conceal their bribery scheme, Paradis and Alexander agreed that Ardent would issue Alexander a laptop and a secret Ardent email address for Alexander's use. *See id.* ¶ 32.

/ / /

/ / /

## PARADIS' ADMISSION TO HIS CRIMES AGAINST THE CITY

79.   As part of the Paradis' Plea, Paradis specifically admitted to his criminal fraud against the City and the acts of bribery that he conducted to obtain the Aventador Contract, including as follows:

### i.   Conspiracy

80.   "Beginning on or about February 15, 2017, and continuing through on or about March 6, 2019, Paradis knowingly and willfully conspired and agreed with [Wright] and others to knowingly and intentionally commit honest services wire fraud and federal program bribery."  Paradis' Plea, Attachment A Factual Basis ¶ 67.

### ii.   Fraud

81.   "Beginning in or around February of 2017, Paradis and [Wright], knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud LADWP ratepayers as to material matters, including by depriving LADWP ratepayers of their right to the honest services of [Wright] and LADWP Board Member." *Id.* ¶ 68.

82.   "Paradis did so with the intent to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit, by using [Wright]'s position as General Manager of LADWP to enrich both Paradis and [Wright] through the procurement of a $30,000,000 no-bid LADWP contract for a company in which [Wright] had a covert financial interest and Paradis had an overt financial interest, and through the concealment of material information . . . ." *Id.* ¶ 69.

### iii.   Bribery

83.   "Between on or about February 10, 2017, and on or about March 6, 2019, Paradis corruptly gave, offered, and agreed to give something of value to [Wright], intending to influence and reward him in connection with a business, transaction, and series of transactions of LADWP having a value of $5,000 or more.  Specifically,

Paradis gave, offered and agreed to give financial benefits to [Wright], including a future financial interest in Aventador, the promise of a future job as the CEO of Aventador with an annual salary of approximately $1,000,000, and related perquisites, meals, travel, and event tickets, intending to influence and reward [Wright] in connection with a $30,000 no-bid LADWP contract award to Aventador, including in: (1) generating and submitting a Board Letter intended to support a vote by the LADWP Board in favor of Aventador's contract; (2) meeting and conferring with individual LADWP Board members to advocate on behalf of the Aventador contract and solicit the Board members' votes; (3) preparing and delivering a presentation to the LADWP Board asserting that there were no viable alternatives to the Aventador contract, that the need for Aventador's services was dire and immediate, and urging the Board to vote in favor of the contract; (4) exerting pressure on LADWP Board members and other LADWP City officials and employees to influence the approval process of the Aventador contract." Paradis' Plea, Attachment A Factual Basis ¶ 70.

## PARADIS' VIOLATION OF CALIFORNIA GOVERNMENT CODE 1090

84. By reason of his advice and participation, on the LADWP's behalf, in the process by which the Board ultimately decided to award the Aventador Contract and Ardent Contract, Paradis was temporarily performing a public function and therefore, violated section 1090 of the California Government Code strictly prohibiting such individuals from participating in the award of a government contract in favor of any entity in which that individual has a financial interest.

85. Moreover, at all relevant times, Wright and Alexander were performing a public function for the City, and their concealed respective financial interests in the Aventador and Ardent Contracts were additional violations of section 1090 of the California Government Code.

/ / /

/ / /

86.     The Aventador Contract and Ardent Contract are void under California Government Code section 1090.  As described below, the same conduct underlying Paradis' violation of California Government Code section 1090 constitutes a violation of the California Government Code sections 12650 *et seq.*, as well as actual fraud, fraud or defalcation while acting in a fiduciary capacity, and/or willful and malicious injury under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Any damages, including those available under California Government Code section 1090 or otherwise, traceable to Paradis' non-dischargeable conduct are non-dischargeable.  *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998).

87.     As a direct and proximate result of the foregoing misconduct, the City is entitled to a non-dischargeable judgment against Paradis consisting of all amounts received by Aventador under the Aventador Contract of no less than $23,677,775, plus interest thereon, as well as the remedies allowable under California Government Code section 12651(a), in an amount not fully ascertained by the City but which the City is informed and believes will be in excess of the aforementioned amount.

88.     Paradis' decision to violate California Government Code section 1090 and, as a consequence thereof, section 12650 *et. seq.* for personal gain constitutes actual fraud, fraud or defalcation while acting in a fiduciary capacity, and/or willful and malicious injury under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Any damages, including those available under the Act, traceable to Paradis' non-dischargeable conduct are non-dischargeable.  *Cohen*, 523 U.S. at 218.

89.     In committing the acts and wrongs described in this Complaint, Paradis has been guilty of oppression, fraud and malice toward the City which further entitles the City to a non-dischargeable judgment for damages, including automatic treble damages under section 12651(a) of the California Government Code, in an amount according to proof.

90.     As set forth herein and admitted by Paradis in the Paradis' Plea, Paradis' actions against the City were performed with an intentional and culpable state of mind. *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 31-32 and 67-70.

91.     As a result and as set forth herein, observing the corporate form to shield Paradis from individual liability for the damages caused by him and Aventador/Ardent to the City would sanction a fraud and/or promote other injustice.

## **FIRST CLAIM FOR RELIEF**

### **(Section 523(a)(2)(A) – Debt Obtained Through Fraud,**

### **False Pretenses, and False Representation)**[2]

92.     The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

93.     As set forth herein and admitted by Paradis in the Paradis' Plea, Paradis, with intent to defraud, devised, participated in, and executed a scheme to defraud the City with the intent to obtain money by means of materially false and fraudulent pretenses, representations, and promises to City officials to enrich himself through the procurement of the $30 million no-bid Aventador Contract and the Ardent Contract, while concealing material information from the City, including his overt financial interests in the Aventador Contract and the Ardent Contract.  *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 31-32 and 67-70.

### a.     **Aventador Contract**

94.     As set forth, among other sections, in paragraph nos. 5-7, 14, 42, and 64 herein, Paradis obtained at least $21.9 million ("**Aventador Funds**") from the City

---

[2] "As the statute is framed in the disjunctive, while a plaintiff asserting a § 523(a)(2)(A) claim must demonstrate that property was obtained by false pretenses, a false representation, or actual fraud, a showing of only one of the three offending conducts is required."  *In re Begun*, 136 B.R. 490, 494 (Bankr. S.D. Ohio 1992) (citation omitted). Here, the City is pursuing its § 523(a)(2)(A) claim against Paradis under fraud, and, in the alternative, false pretenses or false representation.

related to the Aventador Contract, by and through his wholly owned entity Aventador.

95. As set forth, among other sections, in paragraph nos. 5-7, 14, 25-37, 42, 64, 79-83, and 88 herein, Paradis had an overt financial interest in the Aventador Contract and intended to enrich himself through the Aventador Contract.

96. As set forth herein, Paradis, by and through his wholly owned entity Aventador, obtained the Aventador Contract and the resulting Aventador Funds from the City by Paradis' fraud, false pretenses, and false representations to the City.

97. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, and 79-83 herein, Paradis made false material representations and false pretenses to the City.

98. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83, and 88-90 herein, Paradis knew that his false representations and false pretenses to the City were false.

99. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83, and 88-90 herein, Paradis made the false representations and false pretenses to the City with the intention and purpose of deceiving the City.

100. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83, and 88-90 herein, herein, the City relied on Paradis' false representations and false pretenses.

**b.** **Ardent Contract**

101. As set forth, among other sections, in paragraph nos. 5, 10-11, 14, and 44-78 herein, Paradis obtained at least $1,777,775 ("**Ardent Funds**") from the City related to the Ardent Contract, by and through his wholly owned entity Ardent (formerly known as Aventador).

102. As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78, and 88 herein, Mr. Paradis had an overt financial interest in the Ardent Contract and intended to enrich himself through the Ardent Contract.

103.    As set forth herein, Paradis, by and through his wholly owned entity Ardent, obtained the Ardent Contract and the Ardent Funds from the City as a result of Paradis' fraud, false pretenses, and false representations to the City.

104.    As set forth, among other sections, in paragraph nos. 5, 10-11, 14, and 44-78 herein, Paradis made false material representations and false pretenses to the City.

105.    As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78, and 88-90 herein, Paradis knew that his false representations and false pretenses to the City were false.

106.    As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78, and 88-90 herein, Paradis made the false representations and false pretenses to the City with the intention and purpose of deceiving the City.

107.    As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78, and 88-90 herein, the City relied on Paradis' false representations and false pretenses.

**c.    Damages**

108.    The City has suffered damages as a direct and proximate result of its reliance on Paradis' fraud, false representations, and false pretenses related to the Aventador Contract and the Ardent Contract.  The City is entitled to a non-dischargeable judgment against Paradis for damages in an amount, according to proof, which has not been fully ascertained but which the City is informed and believes, and thereon alleges, will be in excess of $23,677,775, exclusive of interest.

109.    Accordingly, the City is entitled to a judgment determining that the City's debt is non-dischargeable against Paradis under 11 U.S.C. § 523(a)(2)(A).

/ / /

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

**(Section 523(a)(4) – Fraud/Defalcation While**

**Acting in a Fiduciary Capacity)**

110. The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

111. As set forth, among other sections, in paragraph nos. 6-7, 14-33 and 44-89 herein, at all times material to the events alleged in this Complaint, a fiduciary relationship of trust and confidence existed between the City and Paradis by reason of Paradis performing, on a temporary basis, a public function.

112. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-90 herein, Paradis intentionally breached his fiduciary duties by committing the acts and wrongs alleged in this Complaint which, in turn, allowed Paradis to illegally abscond with millions of dollars in public funds while at all times falsely purporting to act in the best interests of the City.

113. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-90 herein, Paradis has intentionally or recklessly failed to account for the public funds taken under false pretenses from the City, or otherwise in violation of California law, which therefore, caused the City to suffer damages and entitles it to a judgment determining that the debt owing to the City is non-dischargeable under 11 U.S.C § 523(a)(4) by reason of Paradis' fraud or defalcation while acting in a fiduciary capacity.

114. In the alternative, as set forth in Claim One of this Complaint, the City has suffered damages as a result of Paradis committing fraudulent acts while temporarily performing a public function ostensibly on the City's behalf.

115. Accordingly, the City is entitled to a judgment determining that the City's debt is non-dischargeable for Paradis' fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

## THIRD CLAIM FOR RELIEF

### (Section 523(a)(6) – Willful and Intentional Injury)

116. The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

117. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis either had a subjective motive to inflict injury on the City or believed that an injury was substantially certain to occur as a result of his conduct.

118. As set forth herein, Paradis' actions were wrongful because, among other things, they were in violation of the statutes referenced in paragraph nos. 14 and 84-89.

119. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis' actions were intentional and deliberate.

120. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis' actions necessarily and proximately caused the City's injury.

121. As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-83, and 88-90 herein, Paradis' actions were done without just cause or excuse.

122. In the alternative and as alleged in Claims One and Two of this Complaint, under California law, Paradis' actions constitute, among other things, fraud and breach of fiduciary duty.

123. Accordingly, the City has suffered damages as a result of Paradis' actions, and the City is entitled to a judgment determining that its debt is non-dischargeable for Paradis' willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, the City requests that this Court enter judgment in favor of the City against Paradis as follows:

A. Allowing the City's claim in an amount of no less than $23,677,775;

B. Determining that the City's claim is not discharged as per 11 U.S.C. § 523(a)(2)(A);

1    C.    Determining that the City's claim is not discharged pursuant to 11 U.S.C.

2 § 523(a)(4);

3    D.    Determining that the City's claim is not discharged pursuant to 11 U.S.C.

4 § 523(a)(6);

5    E.    Granting relief from the automatic stay of 11 U.S.C. § 362(a), and any

6 other stays or injunctions in the case, in order for the City to record and enforce a

7 judgment entered pursuant to this Complaint; and

8    F.    For such other further relief as the Court deems just and proper.

9    DATED: March 28, 2022.

10 **ELLIS GEORGE CIPOLLONE**                    **ALLEN BARNES & JONES, PLC**
   **O'BRIEN ANNAGUEY LLP**

11 _/s/ Guy C. Nicholson (with permission)_      _/s/ MAJ #27311_
12 Guy C. Nicholson                              Michael A. Jones
   2121 Avenue of the Stars, Suite 2800         Cody D. Vandewerker
13 Los Angeles, California 90067                 1850 N. Central Ave. Suite 1150
   Attorneys for the City of Los Angeles        Phoenix, Arizona 85004
14                                               Attorneys for the City of Los Angeles

15

16

17

18

19

20

21

22

23

24

25

26