# EXHIBIT 4

# ATTORNEY MISCONDUCT COMPLAINT

**To:**     **State Bar of Arizona**

**Complainant:**  **Paul O. Paradis**

**Date:**     **April 29, 2022**

**Re:**     **Complaint Alleging Violations of**
       **Arizona Rules of Professional Conduct**
       **Rule 3.3, Rule 3.1, Rule 1.3 and Rule 8.4 By**
       <u>**Los Angeles City Attorney Michael N. Feuer**</u>

## INTRODUCTION

1.  This Attorney Misconduct Complaint ("Complaint") is filed by Paul O. Paradis ("Paradis" or "Complainant") to respectfully request that the State Bar of Arizona[1] ("Arizona State Bar") conduct an investigation of Los Angeles City Attorney Michael N. Feuer ("Feuer"), to determine whether Feuer: (i) should be disbarred; (ii) have his *pro hac vice* admission to the United States Bankruptcy Court for the District of Arizona revoked; and/or (iii) be otherwise sanctioned for violating Arizona Rules of Professional Conduct Rule 1.3, Rule 3.1, Rule 3.3 and Rule 8.4 by having knowingly and intentionally filed a false pleading with the United States Bankruptcy Court for the District of Arizona on March 28, 2022.[2]

2.  Complainant is the debtor in *In re Paul O. Paradis*, Case No. 2:20-bk-06724-PS (Br. D. Az.) (the "Bankruptcy Action"). Complainant served as one of two Special Counsel to the City of Los Angeles and the Los Angeles Department of Water and Power (the "City" and

---

[1]  Los Angeles City Attorney Feuer was admitted to practice *pro hac vice*, before the United States Bankruptcy Court for the District of Arizona on June 24, 2021. *See* Ex. A hereto.

[2]  Los Angeles City Attorney Feuer is a member of the State Bar of California and his State Bar number is #111529. Accordingly, a courtesy copy of this Attorney Misconduct Complaint against attorney Feuer is also being provided to the Office of the Chief Trial Counsel for the State Bar of California.

"LADWP"), from January 2015 through March 2019, in a lawsuit filed in the Los Angeles County Court Superior Court that was captioned, *City of Los Angeles v. PricewaterhouseCoopers, LLP*, BC574690 (the "*PwC Action*").

3.     In the Bankruptcy Action, the City of Los Angeles (the "City"), by and through Feuer, filed an adversary complaint on or about June 24, 2021. Complainant moved to dismiss the City's adversary complaint on December 7, 2021. On February 24, 2022, the United States Bankruptcy Court granted Complainant's motion to dismiss and dismissed the City's adversary complaint, with leave to amend.

4.     On March 28, 2022, the City, by and through Feuer, filed an amended adversary complaint (the "Amended Adversary Complaint") in the Bankruptcy Action. In an apparent attempt to depict Paradis in the worst possible light to United States Bankruptcy Judge Paul Sala, Feuer caused the City to file the Amended Adversary Complaint with knowledge that the City's Amended Adversary Complaint contained numerous patently false allegations that were known to Feuer to be false at the time Feuer caused the City to file the Amended Adversary Complaint.

5.     Specifically, in ¶¶ 65-78 of the Amended Adversary Complaint, Feuer knowingly and falsely informed the United States Bankruptcy Court that Paradis had committed numerous criminal and fraudulent acts.

6.     In reality, however, at the time Feuer caused the City to file the Amended Adversary Complaint, Feuer had actual knowledge that *all of the criminal and fraudulent acts alleged against Paradis in ¶¶ 65-78 of the Amended Adversary Complaint were undertaken by Paradis at the direction of the Federal Bureau of Investigation ("FBI"), with whom Paradis was working in a covert and undercover capacity at the times Paradis undertook these acts*.

7.     As factual support for his false allegations against Paradis, Feuer purports to rely on and quote extensively from the *Plea Agreement for Defendant David F. Alexander ("Alexander Plea Agreement")* filed by the United States Department of Justice ("DOJ") in the United States District Court for the Central District of California on December 13, 2021 in a matter entitled, *United States of America v. David F. Alexander*, Case No. CR 2:21-CR-00572-FMO. Attached as Exhibit A to the *Alexander Plea Agreement* is the criminal Information to which Alexander pled

2

guilty (the *"Alexander Information"*). *See Alexander Plea Agreement* at ¶ 2 a. The *Alexander Plea Agreement* and *Alexander Information* (collectively hereinafter, the "DOJ Filings") were first made publicly available on December 13, 2021 and are electronically linked to the DOJ's *Alexander Press Release*. These three documents are Exhibits B, C and D hereto.

8.      However, the very DOJ Filings on which Feuer purports to rely as support for the allegations in ¶¶ 65-78 of the City's Amended Adversary Complaint unequivocally admit that Paradis began working in a covert and undercover capacity with the FBI with respect to Mr. Alexander on April 5, 2019 and that, *"in all subsequent interactions . . . Paradis was acting at the direction of the FBI."* *See* Ex. C at 12.

9.      Because the DOJ Filings plainly admit that the actions undertaken by Paradis that are alleged in ¶¶ 65-78 of the City's Amended Adversary Complaint were undertaken by Paradis at the direction of the FBI, the City's allegations that Paradis engaged in criminal and illegal conduct when he committed these acts are completely false and were known to Feuer to be completely false at the time Feuer authorized and caused the City's Amended Adversary Complaint to be filed with the United States Bankruptcy Court for the District of Arizona on March 28, 2022.

10.     Complainant has therefore filed this Complaint with the State Bar of Arizona ("Arizona State Bar") to respectfully request that the Arizona State Bar conduct an investigation of Los Angeles City Attorney Feuer, to determine whether Feuer: (i) should be disbarred; (ii) have his *pro hac vice* admission to the United States Bankruptcy Court for the District of Arizona revoked; and/or (iii) be otherwise sanctioned for having violated Arizona Rules of Professional Conduct Rule 1.3, Rule 3.1, Rule 3.3 and Rule 8.4 by filing the City's Amended Adversary Complaint, which was known to Feuer to contain numerous patently false allegations concerning Complainant's conduct at the time it was filed with the United States Bankruptcy Court for the District of Arizona on March 28, 2022.

\\

\\

**STATEMENT OF FACTS**

3

11.    In March 2019, Paradis voluntarily began actively cooperating with and providing evidence to the FBI in connection with a federal Grand Jury investigation being lead by the Public Corruption Section of the United States Attorney's Office for the Central District of California ("USAO") and the Los Angeles, California Field Office of the FBI that involves the Los Angeles Department of Water and Power ("LADWP") and the Los Angeles City Attorney's Office.

12.    Among other things, Paradis' work on this investigation involved providing evidence of corruption, contract bid-rigging and cyber security violations involving the LADWP and certain high ranking officials in Mayor Eric Garcetti's Office.  Paradis' work on the investigation also involved providing evidence of corruption related crimes, including, but not limited to, extortion, aiding and abetting extortion and perjury, committed by various individuals and attorneys employed in and/or by the Los Angeles City Attorney's Office.

13.    One aspect of Paradis' work on this federal criminal investigation involved Paradis working in a covert and undercover capacity with FBI agents and the USAO.  In doing so, Paradis conducted a multitude of covert, undercover operations as authorized and directed by FBI agents from the Los Angeles California Field Office, Palm Springs, California Field Office and Phoenix, Arizona Field Office and federal prosecutors in the Public Corruption Section and Environmental and Community Safety Crimes Section of the USAO.

14.    In addition to being authorized and supervised by the FBI, the undercover operations conducted by Paradis were secretly recorded by video and/or audio means, or both.  Certain of these undercover operations were also monitored, in-person in real time, by FBI agents and an Assistant United States Attorney from the USAO.

15.    The secretly recorded undercover operations conducted by Paradis spanned a period of approximately fifteen (15) months and, during a portion of this period of time, were conducted on the following individuals, among others:

      i.     current Los Angeles Department of Water and Power Board President, Cynthia McClain-Hill;

     ii.     former Los Angeles Department of Water and Power Board President, Meldon E. Levine;

iii.        former Los Angeles Department of Water and Power General Manager, David Wright;

iv.        former Los Angeles Department of Water and Power Chief Cyber Risk Officer, David Alexander;

v.        current Los Angeles Department of Water and Power Chief Information Security Officer, Stephen Kwok; and

vi.        attorney, registered lobbyist and close personal adviser and friend to Mayor Eric Garcetti, Joshua Perttula, who is the founder and President of lobbying firm, Kirra, LLC.

16.      Although the covert undercover operations conducted by Paradis began in March 2019, the fact that Paradis had acted in a covert, undercover capacity and was working cooperatively with the FBI was not publicly revealed by the USAO until Monday, December 6, 2021.

17.      On June 3, 2020, Paradis initiated a personal bankruptcy proceeding in the United States Bankruptcy Court for the District of Arizona. Paradis is the debtor in the Chapter 7 bankruptcy case 2:20-bk-06724-PS, which is currently pending before the Hon. Paul Sala.

18.      On June 24, 2021, the City filed an Adversary Complaint naming Paradis as a defendant in an Adversary Proceeding, Adv. No. 2:21-ap-00171-PS.

19.      On November 29, 2021, the USAO issued a press release disclosing that Paradis had agreed to plead guilty to accepting a financial kick-back for having arranged a collusive lawsuit, known as the *Jones v. City* matter, at the direction of the Los Angeles City Attorney's Office and on behalf of the City of Los Angeles.

20.      On December 7, 2021, Paradis moved to dismiss the City's Adversary Complaint.

21.      On February 24, 2022, Judge Sala granted Paradis' Motion To Dismiss and granted the City until March 28, 2022 to file an Amended Adversary Complaint.

22.      On March 28, 2022, the City filed its *Amended Complaint To Determine Dischargeability of Debt Pursuant To 11 U.S.C. §§ 523(2)(2)(A), (a)(4), and (a)(6)* (the "City's Adversary Complaint") naming Paradis as a defendant. *See* Ex. E. Los Angeles City Attorney Feuer appears on the caption page and the signature page of the City's Amended Adversary Complaint as the senior-most counsel for the City of Los Angeles and, as Los Angeles City

5

Attorney, Feuer authorized the filing of the Amended Adversary Complaint.

23.     On the afternoon of April 25, 2022, the DOJ issued a press release titled, *"Former Head of LADWP Sentenced to Six Years in Federal Prison."* In this press release, the DOJ once again highlighted the fact that, *"Paradis is cooperating with the ongoing investigation into the collusive litigation and corruption at LADWP."* (Emphasis added).

A.     **Beginning In March 2019, Paradis Was Operating Covertly and Undercover At the Direction of the FBI and Conducted Numerous Undercover Operations Involving Senior Ranking Los Angeles City Officials and Attorneys**

24.     On December 13, 2021, the United States Attorney's Office for the Central District of California issued a press release that bore the headline, **"Ex-LADWP Executive Agrees to Plead Guilty to Lying to FBI About Agreeing to Accept Job in Exchange for 'Guarantees' to Contractor,"** (the *Alexander Press Release*). The press release states in relevant part,

\*          \*          \*

*On April 5, 2019,* the SCPPA Cybersecurity Working Group informed Ardent [Cyber Solutions, LLC] that it would recommend Ardent for the SCPPA contract. Later that day, *Alexander met with Paradis, who by that time was covertly cooperating with the FBI.* During that meeting, Alexander told Paradis that he had used the SCPPA bidding process to get LADWP's "desired outcome," that is, a contract with Ardent, but in a manner that falsely appeared "completely transparent." Alexander also boasted that he was the one who had secured the contract for Ardent, informing Paradis, "that was me driving it."

On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of approximately $17 million.

In June and July of 2019, Alexander further manipulated in Ardent's favor an RFP process from LADWP for the award of a three-year, $82.5 million cybersecurity consulting services contract. Alexander was one of the RFP drafters and he solicited Paradis's edits to the drafts to enhance Ardent's ability to gain the contract over the dozen-plus other vendors.

On July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result...

6

[winking face emoji]." Alexander responded via text message, "I know my job [crying-laughing emoji]."

During a meeting in mid-July 2019, Alexander told Paradis that, in violation of his obligation to keep his scores strictly confidential, he provided his score sheet to two other evaluators to influence them to give Ardent a high score. At this lunch meeting, Alexander informed Paradis that he was interested in working at Ardent as its business manager.

By the end of that week, Alexander solicited and agreed to accept from Paradis a future job as the chief administrative officer of Ardent, a to-be-determined executive-level annual salary, a sign-on bonus, and recompense of $60,000 per year for 30 years for his early retirement penalty from LADWP. Alexander did so intending to be influenced and rewarded in connection with his ongoing assistance in securing the award of a multimillion-dollar LADWP contract to Ardent and use of his position to guarantee more than $10 million in future task orders for Ardent under the anticipated LADWP contract.

Alexander also asked for a secret Ardent email address and laptop computer to communicate with Paradis and to secretly perform work for Ardent while he was employed at LADWP.

\*     \*     \*

*See* Ex. D. (Emphasis added).

25.     Also on December 13, 2021, the United States Attorney's Office publicly filed the *Alexander Information* and *Alexander Plea Agreement* in the United States District Court for the Central District of California in the criminal matter captioned, *United States of America v. David F. Alexander*, CR No. 2:21-CR-00572-FMO.

26.     The *Alexander Information* was authored by the United States Attorney's Office for the Central District of California and signed by the Chief of the Criminal Division. *See* Ex. C at 15.

27.     Paragraph 12 of the *Alexander Information* states in relevant part:

12.     *On April 5, 2019, defendant ALEXANDER met with Paradis at a restaurant in Los Angeles. During this meeting and in all subsequent interactions with defendant ALEXANDER referenced herein, Paradis was acting at the direction of the FBI.*

*Id.* (Emphasis added).

7

28.     On the basis of this admission by the United States Attorney's Office, it is undisputed that Paradis began working covertly in an undercover capacity with the FBI with respect to interactions involving Alexander on April 5, 2019, "*during this meeting and in all subsequent interactions with defendant ALEXANDER referenced [in the Alexander Information], Paradis was acting at the direction of the FBI. Id.* (Emphasis added).

**Contemporaneous Video and Audio Recordings
And Written Summaries of Every Undercover
Operation Conduct By Paradis Confirm That The
Acts Undertaken By Paradis That Are Pled In
Paragraphs 65-78 of the City's Amended Adversary
<u>Complaint Were Undertaken At the Direction of the FBI</u>**

29.     Every undercover operation conducted by Paradis was memorialized in at least two forms.  First, Paradis used a number of electronic video and audio recording devices issued to him by the FBI to secretly make video and/or audio recordings of the conversations and events that took place during each of the undercover operations that Paradis conducted.  All of the video and audio recordings made by Paradis were delivered by Paradis to FBI Agents in the Los Angeles, Palm Springs or Phoenix Field Offices, depending on where the particular undercover operation was conducted.  These video and audio recordings remain in the possession of the FBI.

30.     Second, promptly following the conclusion of each undercover operation Paradis conducted, the FBI required Paradis to provide the FBI with a written summary detailing the conversations and events that had transpired during each just completed undercover operation.

31.     While Feuer and the City have alleged that Paradis committed numerous criminal and fraudulent acts as set forth in ¶¶ 65-78 of the Amended Adversary Complaint, the eighteen (18) documents annexed as Exhibits F through W hereto, conclusively demonstrate the patent falsity of the claims asserted by Feuer and the City in ¶¶ 65-78 of the City's Amended Adversary Complaint.

32.     Exhibits F through W hereto are written summaries of numerous undercover operations conducted by Paradis involving the Ardent Contract, the illegal and fraudulent manner in which the Ardent Contract was awarded, and the roles played by various Los Angeles City officials and others in that illegal process.  These 18 Exhibits were prepared promptly following

8

Paradis having conducted these undercover operations involving the Ardent Contract and provided to the FBI. The truthfulness and accuracy of the information contained in each of these 18 Exhibits is capable of being confirmed by viewing the video recordings and/or listening to the audio recordings of each such undercover operation.

33. The following are relevant excerpts from each of the 18 Exhibits that clearly demonstrate the falsity of Feuer's and the City's allegations in ¶¶ 65-78 of the City's Amended Adversary Complaint:

#### a. April 4, 2019 Undercover Operation
#### Target of Operation: Stephen Kwok

On April 4, 2019 at 6:27 pm, Paradis conducted an undercover operation by way of a telephone conversation with current LADWP Chief Information Security Officer Stephen Kwok, which was audio recorded. Exhibit F hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 4, 2019, and states in relevant part:

> *On the call tonight, Kwok said that Mel and Cynthia's plan to proceed with awarding Ardent a contract through SCPPA is on track and the timing of implementing that plan has only moved back one day* from our conversation last night because of an issue with one City Council meeting being moved back one day.

> Not much new information from *Kwok* tonight other than he *confirmed the amount of the contract that Mel and Cynthia are planning to have the LADWP Board approved have the LADWP has a 6 month term and is for $17 million. Significantly, Kwok said that Mel and Cynthia have already determined that Ardent will be paid 88% of the $17 million (approximately $14.96 million). This works out to be roughly $2.49 million per month over the 6 month term – which is the current approximate monthly burn rate.*

*See* Ex. F. (Emphasis added).

#### b. April 5, 2019 Undercover Operation
#### Target of Operation: David Alexander

On April 5, 2019, Paradis conducted an undercover operation by way of taped lunch meeting with David Alexander, LADWP's former Chief Cyber Risk Officer. Exhibit G hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on

9

April 5, 2019, and states in relevant part:

> Just finished lunch with **David Alexander**. Entire conversation is taped.
>
> He **admitted to fixing the SCPPA process to select Ardent as the vendor for DWP and also admitted that DWP has been falsifying regulatory records since 2007 to cover up its non-compliance with CIP standards and other regulatory requirements**.
>
> He went so far as to tell me that he believes the Senior LADWP leadership on the power side actually budgets $ every year for fines because they pay lesser amounts in fines and self-report violations so that they can avoid regulators discovering the numerous critical conditions that exist that would cause LADWP to be fined millions of $ if discovered by regulators.

*See* Ex. G. (Emphasis added).

        **c.**      **April 5, 2019 Undercover Operation**
               **Targets of Operation: Cynthia McClain-Hill and <u>Meldon Levine</u>**

On April 5, 2019 at 3:30 pm, Paradis conducted an undercover operation by secretly participating in and audio recording a telephone conversation with Cynthia McClain-Hill, the current President of the LADWP Board of Commissioners and Meldon Levine, the former President of the LADWP Board of Commissioners. At the time of this undercover operation, Levine was the LADWP Commission Board President and McClain-Hill was the LADWP Commission Board Vice President. Exhibit H hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 5, 2019, and states in relevant part:

> *I was on a 36 minute call with Mel and Cynthia* . . . that started at 3:30 pm PT. Call is taped.
>
> [T]his tape . . . will demonstrate the fact that *DWP used the SCPPA contract process to make it appear as though DWP engaged in a competitive bid review process when in fact, there was no competitive bid process at all*.
>
> *Both Mel and Cynthia stated that Ardent had already been selected by them to perform Cyber Work for LADWP despite the fact that the SCPPA board is only set to vote on April 18th*.

*See* Ex. H. (Emphasis added).

#### d. April 7, 2019 Undercover Operation
#### Target of Operation: Stephen Kwok

On April 7, 2019 at 11:30 am, Paradis conducted an undercover operation by way of a telephone conversation with current LADWP Chief Information Security Officer Stephen Kwok, which was audio recorded. Exhibit I hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 7, 2019, and states in relevant part:

> *During the call Kwok again stated that both Mel and Cynthia (President and Vice President of the LADWP Board of Commissioners) have actual knowledge that the SCPPA process is being used to falsely create the appearance that the contract that will soon be awarded to Ardent Cyber Solutions was awarded on the basis of a competitive evaluation process when, in fact, it was not.*
>
> *He then got into a number of issues that he asked me for help with.* I tried to defer answering those questions until we can meet with your team and discuss how they want me to proceed. *Kwok wants to meet with me sometime before Wednesday or Thursday this week so I can review documents relating to the soon to be awarded contract with him. I told him to let me know when and where he wants to meet. I need to know the approach your team wants me to take with him before I meet with him.*

*See* Ex. I. (Emphasis added).

#### e. April 9, 2019 Undercover Operation
#### Target of Operation: Stephen Kwok

On April 9, 2019, Paradis conducted an undercover operation by way of a telephone conversation with current LADWP Chief Information Security Officer Stephen Kwok, which was audio recorded. Exhibit J hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 9, 2019, and states in relevant part:

> I *just finished a 34 minute conversation with Kwok about the SCPPA contract award, etc. He re-affirmed a number of things that he has previously stated about the process by which Ardent is going to be awarded a contract for approximately $14-$15 mm out of a total of $17 mm.*
>
> *He requested that I meet him on Friday morning to walk through the allocation of work among vendors and the creation of several task orders for Ardent and the other two vendors (two other vendors are also being "selected" in order to create the appearance that a "competitive" selection process was employed).*

11

> *The two other vendors who are being selected are Archer and Dragos. It is worth noting that I have now repeatedly been told the names of all 3 vendors who will be selected by the purportedly competitive selection process used by SCPPA despite the fact that the SCPPA Board is only going to vote on the approvals on April 18th.*

*See* Ex. J. (Emphasis added).

### f. April 16, 2019 Undercover Operation
<u>Target of Operation: Stephen Kwok</u>

On April 16, 2019, Paradis conducted an undercover operation by way of a taped lunch meeting with Stephen Kwok, LADWP's current Chief Information Security Officer. Exhibit K hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 16, 2019, and states in relevant part:

> *Just finished up lunch with Kwok - ran from 1:06 pm to 3:42 pm. We walked through edits to each of the task orders that Kwok has been directed to prepare for each of the 3 vendors who will be awarded contracts when the LADWP Board meets and votes on April 23rd.*

> Interestingly, *Kwok told me for the first time today that the head of purchasing at LADWP, Erin Henning, told Donna Stevener (one of two CAOs at LADWP) that Kwok could speak directly to the vendors who will be awarded the contracts next week as long as there was no written evidence that he had done so. This is in clear violation of the LADWP and SCPPA rules governing the contracting process.*

> *I was able to get hard copies of each of the draft task orders from him for Ardent and for Archer and Dragos as well and will give them to you when I see you.*

> Kwok is going to do revisions to the task orders that were discussed during the lunch and said he will give me revised hard copy versions reflecting those changes late tomorrow.

> The entire lunch was videotaped and audio recorded using the small recorder as a back up.

> *Many of the prior admissions that have been made were repeated during this meeting and he reconfirmed that Mel and Cynthia are clearly at the helm of using the SCPPA process to create the artificial appearance that the SCPPA contract that is going to be voted on by SCPPA on 4/18 was "competitively" awarded.*

*See* Ex. K. (Emphasis added).

12

### g. April 18, 2019 Undercover Operation
### Target of Operation: David Wright

On April 18, 2019, Paradis conducted an undercover operation by way of a telephone conversation with former LADWP General Manager David Wright, which was audio recorded. Exhibit L hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 18, 2019, and states in relevant part:

> *Just had approx 15-20 minute conversation with Wright. Mayor's office knows about bid rigging to steer Ardent contract and is actively involved in setting pricing strategy. Call recorded.*

See Ex. L. (Emphasis added).

### h. April 18, 2019 Undercover Operation
### Target of Operation: Joshua Perttula

On April 18, 2019, Paradis conducted an undercover operation by way of taped breakfast meeting with attorney and registered lobbyist, Joshua Perttula, one of Mayor Garcetti's closest advisors and personal friends. Exhibit M hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 18, 2019, and states in relevant part:

> As I mentioned when we spoke earlier, *both Wright and Josh have now repeatedly admitted on recordings (and Josh on video) that the Mayor's office, including the Mayor's Chief of Staff Ana Guerrero and Deputy Mayor Barbara Romero, is actively involved in the fraudulent scheme to award the SCPPA contract to Ardent and that these two individuals are particularly involved in setting the $ amount of the contract to be awarded because of their "concern over the optics."*

> *As of yesterday, I had been told by Wright and Kwok that the total SCPPA award was for $17 million and Ardent would be getting $15 million of the $17.*

> *Today both Josh and Wright told me that the Mayor's Office has balked at Ardent receiving that large a cut and are looking to cut the amount awarded to Ardent to roughly the $10+ million range so as not to draw attention.*

> Separately, *Kwok just told me that he has approximately $10.3 million earmarked for Ardent and that he will push this number on a call with Wright, Donna, Cynthia and Mel that is scheduled for 2 pm today.* Kwok also said that he has

13

specifically avoided allocation any "OT" (SCADA/operational technology) work to either of the other two vendors to prevent these two vendors from uncovering the long running regulatory violations that DWP has lied to regulators about or completely failed to report to regulators. Kwok said he spoke with Donna Stevener about his having done this and that she was in agreement so as to prevent discovery of the undisclosed regulatory violations.

*Significantly, Josh also admitted on the video that the Mayor's office and DWP Board all have actual knowledge that DWP is using the SCPPA contracting process to create the false appearance that the contracts to be awarded to Ardent and the other two vendors were the result of a competitive evaluation process when they all have actual knowledge that this is not true in actuality.*

\*   \*   \*

*Josh told me he would keep me posted on the activity involving the Ardent contract and amount to be awarded Ardent and wants to meet in person again next week to discuss a number of other business topics that we hit on during our meeting today.*

See Ex. M. (Emphasis added).

### i.   April 23, 2019 Undercover Operation
### Target of Operation: David Wright

On April 23, 2019, Paradis conducted an undercover operation by way of a taped meeting with former LADWP General Manager David Wright from 3:45 pm to 5:23 pm. Exhibit N hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on April 23, 2019, and states in relevant part:

Meeting with Dave Wright at his apartment . . . . in Unit 438 of Building B at the DaVinci Complex behind LADWP ran from approximately 3:45 pm to 5:23 pm. Meeting is recorded but not videoed . . . .

Primary purpose of the meeting was supposed to be to review Wright's draft resignation letter which is addressed to Mayor Garcetti with copies to Mel Levine and the Mayor's Chief of Staff, Ana.

Also attached as an addendum to the resignation letter is a 6-7 page "addendum" that details how LADWP Commissioner Cynthia McClain-Hill has sexually harassed Wright and discriminated against him on the basis of his sexual orientation. I will give you a copy of all of this tomorrow when we meet.

\*   \*   \*

14

*Wright then turned the conversation to the approval of the Ardent contract by Board vote at today's LADWP Board meeting. The contract was approved and Wright said that the two additional contracts will also be approved and that the Board adhered to the strategy set by the Mayor's office late Friday of having 3 contracts for approximately $3.6 million each - with each contract having a 60 day term (total for 3 contracts remains $10.8 million as of today).*

*         *         *

Wright then turned the remainder of the conversation to the new cyber company that will eventually replace Ardent. He said he wants to be the second largest owner and sent me a text on the burner phone this weekend. (I did not receive that text for some reason, so I took 2 pics of the lengthy text on my burner and the original text remains on Wright's burner). In that text he said he wants a sign on bonus of $600K and he will use $500K to buy into the new cyber company. He said he views it as important that he be an owner of the new company and not just an employee.

He also talked about needing a name for the new company (which we are currently referring to as Newco during our conversations) and how he plans to spend most of his remaining time as the General Manager of LADWP traveling to various conference such as the LPPC Council Conference and the APPA Conference in order to actively promote Newco to other utilities in order to convince them to retain Newco to provide cyber security services.

See Ex. N. (Emphasis added).

### j. April 30, 2019 Undercover Operation
### Target of Operation: David Wright

On April 30, 2019, Paradis conducted an undercover operation by way of a taped dinner meeting with former LADWP General Manager, David Wright. Exhibit O hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI in the early morning hours of May 1, 2019, and states in relevant part:

*I had a 2 hour dinner with Wright tonight. Dinner was audio recorded and video recorded . . . .*

Wright described his meeting earlier today with Mel Levine in great detail. According to Wright, the primary focus of their discussion was Wright's retirement notice and sexual harassment/hostile work place claim against Commissioner Cynthia McClain-Hill.

15

Wright stated that Mel was extremely happy to learn that Wright was going to inform the Mayor of Cynthia's behavior. Wright stated repeatedly that Mel told Wright that Mel "hates" Cynthia and would like to see her removed from the LADWP Board. Wright continued on this topic for at least 20-30 minutes and came back to it several times during during the dinner. Wright claimed that Mel had recently spoken with two LAPD Commissioners about Cynthia and that they had informed Mel of their strong dislike for her as well.

*      *      *

*I was able to discuss the behaviors of other Commissioners during dinner and got Wright to acknowledge everything I previously told your team about how Bill Funderburk had demanded contributions and free legal work from me - including the work he had me perform right before the vote on the Aventador contract occurred.*

*Wright commented on how he felt there is a general level of corruption that exists at DWP . . . .*

I raised the topic of David Alexander being very concerned about having a task order assigned to him once the Ardent contract is finally awarded on it about May 8th so that he can begin to "clean up" the long history of regulatory violations and records falsification that I discussed with Alexander today at lunch and Wright reacted in a very strong but surprising manner.

He told me that I need to tell Alexander to "shut the fuck up and stop complaining" or Wright would personally demote Alexander back to his prior position to insure Alexander receives no further raises during his remaining time at DWP.

*When I reacted with surprise and suggested Alexander was trying to insure that the long history of regulatory records falsification and cover-up was cleaned up so that regulators would not eventually learn of it, Wright commented that he did not "give a fuck about the regulatory issues" because no one knows about them and no one is looking.*

When I pressed and *asked whether Wright was concerned that Alexander could possibly turn in Wright and others in senior management and report them to regulators for the long running records falsification and false reporting scheme, Wright said he was not at all concerned because Alexander does not have the courage to do so and would be turning himself in too because it had long been Alexander's job to oversee cyber security related compliance and since Alexander had failed to do his job for years, Alexander would be harming himself by making such a report to regulators.*

When I asked Wright whether Wright was the DWP official who had top line signing authority for CIP Compliance at DWP, Wright confirmed he was in fact the senior-most DWP official with such responsibility. *When I asked him if he was*

16

*concerned that he might have some liability or legal exposure if Wright directed that no portion of the contract that is about to be awarded was allocated to cleaning up the regulatory reporting/compliance situation, Wright again said he did not "give a fuck" because he was so done with DWP and that no one was looking and therefore no one would uncover the long running records falsification scheme before Wright retired.*

*Wright then asked me to work with Stephen Kwok to insure that Kwok drafted on two or three task orders for the new contract that requires Ardent to work only on those issues that pose the greatest cyber risk at this point in time. I told Wright I would do so* and he reiterated that we were not to identify any Governance/Risk/Compliance work to be performed in the next 6 months even if Alexander was demanding that we do so.

*Wright commented on the Kiesel article in the Daily Journal and confirmed that the City Attorney's Office had lied when they denied having directed and had knowledge of the Jones case filing and litigation strategy. Wright also confirmed his memory of his having participated in numerous conversations with Jim Clark in particular because Clark was the author or that strategy and managed the entire settlement process of that case very closely.*

See Ex. O. (Emphasis added).

### k. May 21, 2019 Undercover Operation
### Target of Operation: Stephen Kwok

On May 21, 2019, Paradis conducted an undercover operation by way of a taped lunch meeting with LADWP Chief Information Security Officer Stephen Kwok. Exhibits P and Q hereto evidence Paradis expressly requesting and receiving written authorization from the USAO to conduct this undercover operation and state in relevant part:

*Stephen Kwok is asking me to meet him for lunch downtown today at noon to start working with him on the next Cyber RFP as Wright directed me last Saturday.*

*Please let me know if you want me to go and do this and audio and video record* so I can get back to Kwok. Thank you.

See Ex. P. (Emphasis added).

17

Shortly thereafter, the USAO responded, stating in relevant part:

thanks for the call just now. ***Just confirming that we authorize Paul to go forward with the recorded meeting with Kwok and to assist DWP with the current RFP cyber bid, despite the fact that the RFP process being utilized by DWP may not be compliant with rules, regulations, or laws.*** Please let me know if that's unclear or if there are other questions. . . .

See Ex. Q. (Emphasis added).

I.   **May 22, 2019 Undercover Operation**
     **Targets of Operation: David Alexander and Stephen Kwok**

On May 22, 2019, Paradis conducted an undercover operation by way of a video and audio taped meeting with former LADWP Chief Cyber Risk Officer, David Alexander and LADWP Chief Information Security Officer Stephen Kwok that took place from 2:40 pm to 4:28 pm. Exhibit R hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on May 22, 2019, and states in relevant part:

***Summary of meeting with David Alexander and Stephen Kwok on May 22, 2019*** from approximately 2: 40 pm to approximately 4:28 pm at Disney Music Hall in dining area. Meeting was audio and video recorded.

***Primary purpose of today's meeting was to continue providing assistance to Alexander and Kwok concerning the new Cyber Security RFP that LADWP is going to issue.***

The secondary purpose of the meeting was to obtain an encrypted USB drive from Alexander that he claims contains approximately 2 GB of data that supposedly contains the entirety of the LADWP CIP Compliance directory from the CIP Compliance Office.

***Prior to the meeting, both Kwok and Alexander separately provided me (via email) with different versions of the draft Statement of Work for me to review and comment on.***

***During the meeting, we discussed several aspects of the draft Statement of Work for the RFP. These included:***

1. the number of categories that will be included,

2. ***the total $ amount of the proposed contract – currently proposed to be between $81 mm to $82.5 mm total for 3 years,***

18

3. the manner in which the $ amount will be determined,

4. the amounts to be allocated to each of the 4 categories for which qualified vendors are being sought,

5. allocation of vendor personnel to be embedded among LADWP personnel for mentoring purposes,

6. *the $ amounts allocated to the two types of training and in particular, they both stated that people at DWP, including the Union leadership, very much want to make sure that Cyber Gym training is available and they asked what it is estimated to cost annually and I responded that it was estimated that it would cost LADWP $5 mm per year (same information I had previously discussed with Wright and he agreed to)*

7. Specific deliverables for each of the categories and how they will vary,

8. *Specific evaluation criteria that Kwok and Alexander want to use to control the outcome of the RFP selection process,*

9. Membership and size of the RFP evaluation committee,

10. The RFP timeline,

11. Whether this draft will need review and approval by the Mayor's office before the RFP is approved.

*At the conclusion of the meeting, they both asked if I would edit the latest draft tonight and email it back to them tonight and Kwok emailed me the latest version of the Statement of Work to edit.*

*Please advise if I am authorized to edit and send them the draft as they have requested. I am saving copies of the documents and emails they send me and will provide them along with any documents I edit or draft for them. . . .*

See Ex. R. (Emphasis added).

Exhibit S is the confirmation of the FBI authorizing Paradis to edit the draft Statement of Work for the RFP as Alexander and Kwok had requested – once again clearly demonstrating that Paradis was acting at the direction and under the supervision of the FBI. Ex. S states in relevant part:

19

Andy,

You are correct that the further edits they are requesting are similar in nature to what I have already done. *Now that you have authorized this next round, I will edit tonight as they requested and send them the revised document and keep you and Melissa updated.*

See Ex. S. (Emphasis added).

### m.  June 12, 2019 Undercover Operation
### Target of Operation: David Alexander

On June 12, 2019, Paradis conducted an undercover operation by way of a telephone conversation with former LADWP Chief Cyber Risk Officer David Alexander, which was audio recorded.  Exhibit T hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on June 12, 2019, and states in relevant part:

*I received a text from David Alexander this morning asking me to call him.*

*I called him back and recorded the call.  Call was 12 minutes.*

*Alexander told me that he had received a call from John Kwon from SCPPA late yesterday during which Kwon informed Alexander that Kwon has received a call yesterday from an investigator from the City of LA asking Kwon for production of all documents relating to the SCPPA RFP and Contracting process involving the contracts that were recently awarded to Ardent, Dragos and a 3rd vendor.*

Alexander had not yet spoken with Kwon and had only exchanged voicemails with him.

I took the opportunity to have *Alexander confirm several times on the call that these contracts were not competitively awarded, but rather, were awarded as a result of the rigged process that we have previously discussed.  Alexander also confirmed that Mel Levine, Cynthia McClain-Hill, David Wright, Donna Stevener, David Alexander, Steven Kwok and Jim (last name unknown from Burbank utility) all had actual knowledge that this process was rigged and that the contracts were not competitively awarded despite the fact that they were publicly represented as such. . . .*

See Ex. T. (Emphasis added).

### n. July 5, 2019 Undercover Operation
### Target of Operation: David Alexander

On July 5, 2019, Paradis conducted an undercover operation by way of a meeting with former LADWP Chief Cyber Risk Officer David Alexander, which was recorded. Exhibit U hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on July 5, 2019, and states in relevant part:

> *[D]avid Alexander has requested to meet with me this morning to discuss the draft of Ardent's response to the LADWP Cyber RFP that is due on July 10th.*
>
> *I agreed to meet him at the Disney Center to review the draft and will record the meeting. I will also forward you the draft document that I will use at the meeting as well as the email Alexander sent me from his "Tazmeister" email in advance of this meeting in which Alexander is clearly coaching me in how to respond to the RFP.*
>
> If I make any notes on the draft response during our meeting, I will also provide you with a complete copy of the notated document as well next week. . . .

See Ex. U. (Emphasis added).

### o. July 16, 2019 Undercover Operation
### Target of Operation: David Alexander

On July 16, 2019, Paradis conducted an undercover operation by way of a lunch meeting with former LADWP Chief Cyber Risk Officer David Alexander, which was recorded. Exhibit V hereto is the written summary of this undercover operation prepared by Paradis and provided to the FBI on July 16, 2019, and states in relevant part:

> As I discussed with Andy and Tony earlier today, *I met with David Alexander for lunch from approximately noon to 1:35 pm today* at The Palm Restaurant on South Flower Street in DTLA. *The primary purpose of the meeting was to continue our discussion of the bid rigging for the current Cyber Security Consulting RFP that was issued by LADWP.* The meeting was audio recorded using two recorders.
>
> Meeting began by Alexander informing me that DWP has received 15 responses to the RFP and 1 had been disqualified almost immediately. The RFP is for the purpose of establishing a "bench" of Cyber Consultants that can be called upon to perform 4 basic cyber services.

DWP is hoping to be able to contract with 3 consultants for each of the 4 categories so that they have a "bench" comprised of a total of no more than 12 Cyber Consultants.

*Alexander told me that DWP has, for the first time ever to his knowledge, made each of the 5 evaluators sign an agreement saying that the evaluators would not speak to each other about their scores or grading of the RFP responses.*

*Despite having signed this agreement, Alexander told me that he had prepared a single color coded grading score sheet grid that reflected his scores for each of the 14 respondents and had shared his scoring grid with two other evaluators, Louis Carr and Flora Chang to influence them to score Ardent high. Alexander said that both Louis and Flora understood the goal is to make sure that Ardent is scored high enough to insure that Ardent is among the top 3 scoring respondents - which would insure Ardent is awarded a portion of the contract to perform cyber remediation.*

*Alexander also said that he was out concerned with either Flora or Louis letting management know Alexander has violated the "no discussion" agreement because they both were playing ball with Alexander to help him get Ardent hired.*

*Alexander said that he is working behind the scenes to help manage the contracting process through DWP's Supply Chain Service Department to insure Ardent is hired again.*

I told him today's lunch was to thank him for the help he had already provided and *asked him what his future employment plans were at DWP given Dave Wright's impending retirement.*

Alexander responded that he had 3 options at this point. He had applied for a Customer Service job at Edison which is currently in process but he does not feel his odds are very strong because he lacks the necessary background in Customer Service. His second option involved applying for the CISO position at East - West Bank. However, Alexander recently learned that this position was recently filled by another current employee of the bank. *He then said his third option was to become the business and operations manager for Ardent.*

*I then asked him what salary he wanted and told him I liked the idea based on the work he had done in connection with helping Ardent on the current RFP by re-writing Ardent's proposal over the July 4th holiday weekend.*

*Alexander told me he would think about the salary and would let me know. He then discussed benefits and the cost of medical insurance. Finally, he told me he had also thought about some part of his pay coming in the form of a new car....*

22

*We then discussed possible start dates and I told him that August 1st was probably too soon given that we are already in mid August and he agreed and said September 1st was more realistic. As we were walking away from the restaurant, however, Alexander abruptly said that he could not start with Ardent until October 1st. When I asked him why, he reminded me that the LADWP Board meeting to approve the 3 year contract that is the subject of the RFP was likely going to be voted on by the LADWP Board in late September, so Alexander needed to stick around to Shepard the contract through the Board process to make Ardent certain that Ardent got hired. I agreed and said that October 1st was a very reasonable start date.* When we parted ways, I asked when we would get together again to discussed the job description/plan that I asked Alexander to write up and he says he was going to speak with his wife tonight and would be back in touch with me either tonight or tomorrow.

*Later this afternoon he texted me and told me he had already started scoping out his new job responsibilities and wanted to know if I was agreeable to him having the title of Chief Administrative Officer at Ardent. I texted back and told him I was ok with him having that title. . . .*

See Ex. V. (Emphasis added).

      **p.**     **July 22, 2019 Undercover Operation**
               **Target of Operation: David Alexander**

On July 22, 2019, Paradis provided the FBI with information that Paradis first became aware of in the afternoon of July 22, 2022. This new information related to information that Paradis had previously learned and related to the FBI concerning SCPPA's involvement in fictitious RFP processes during a recorded conversation with former LADWP Chief Cyber Risk Officer David Alexander that occurred during the week of July 15th – 19th. Exhibit W hereto is the written summary prepared by Paradis and provided to the FBI on July 22, 2019, and states in relevant part:

Please see the article link at the very end of this text. I just learned of this article late this afternoon.

*I am bringing this article to your attention because it involves SCPPA* and as I mentioned to Andy last week, *David Alexander informed me (during one of my many recorded conversations with him last week) that the City of Pasadena is currently utilizing SCPPA to conduct a bid rigged RFP process to hire a pre-selected NERC/CIP consultant similar to the rigged process LADWP used with SCPPA to secure the 6 month cyber security contract that Mel and Cynthia and*

23

*the Mayor's Office were involved in.*

I also bring to your attention the fact that three of the five current officers of SCPPA are current or former LADWP personnel. These three include:

Mike Webster - Mike is the current Executive Director of SCPPA. He is the former head of Power at LADWP and an Engineer by training. The SCPPA website also lists Webster as one of five current SCPPA Officers and the Treasurer and Auditor.

*At LADWP, Wright was Webster's boss and they enjoy a close and friendly relationship. From memory, I recall Wright telling me on at least 2 of the taped conversations that you have between me and Wright that Wright was going to speak with Webster about facilitating the current 6 month cyber contract that is in place now at LADWP.*

David Wright - is currently listed on SCPPA's website as another one of SCPPA's 5 officers and the Secretary of SCPPA. As the GM of LADWP, Wright is also automatically a Board Member of the SCPPA Board, as are all of the other GMs of the SCPPA Organization.

Mario Ignacio - is listed as another of the 5 Officers of SCPPA and the Assistant Secretary. Mario is a current employee of LADWP and a senior ranking member of the LADWP Financial Services team.

Finally, another officer of SCPPA is listed on the SCPPA website as the Vice President, Gurcharan Bawa. In addition to being an officer of SCPPA, Mr. Bawa is also the current GM of Pasadena Water and Power.

According to Alexander, Pasadena is the City currently using the SCPPA RFP process to conduct a fictitious RFP process to select a NERC/CIP consultant - who has already been preselected, thereby allowing Pasadena to make it appear as though this consultant will be selected pursuant to a competitive bid process when, in fact, the bid is completely rigged through this pre-selection process.

During a conversation that I had with Brian D'Arcy (the head of the Union at LADWP) before leaving LADWP in March, Brian complained to me that he greatly disapproved of the use of SCPPA by all of the member utilities to secure contracts for projects done by the utilities because SCPPA has far less stringent purchasing and bidding rules and the utilities frequently resort to using SCPPA to circumvent their own City's purchasing rules. . . .

See Ex. W. (Emphasis added).

**B.** **Feuer Made Numerous False Statements To The United States Bankruptcy Court and Falsely Accused Paradis Of Having Engaged In Fraud Involving The Award of the Ardent Contract**

34.     Attorney Feuer violated ER 3.3(a)(1) when Feuer knowingly made the following false statements to the United States Bankruptcy Court for the District of Arizona in the City's Amended Adversary Complaint. In particular, Feuer alleged that the acts in ¶¶ 65-78 of the City's Amended Adversary Complaint were criminal, fraudulent and illegally undertaken by Paradis, despite knowing that Paradis undertook such acts at the direction of the FBI. The City's Amended Adversary Complaint alleges as follows:

**h.**     **The LADWP RFP Process**

65.     On June 17, 2019, LADWP issued the LADWP RFP for the award of three-year, $82.5 million Cybersecurity Consulting Services contract. *See* Alexander Plea, Attachment A Factual Basis ¶ 14. State and local laws and regulations required the LADWP RFP process to be a fully competitive, neutral, and transparent process in order to ensure fair competition amongst the vendors and to ensure that LADWP acquired the services of a qualified vendor that satisfied its requisite criteria. *See id.*

66.     Alexander was one of seven members of the evaluation committee that was responsible for reviewing the proposals submitted in response to the LADWP RFP, and he signed a sworn nondisclosure agreement that he would not discuss their scoring on the proposals with anyone. *See id.* ¶ 15.

67.     In late May 2019, before the LADWP RFP was issued, Alexander began his efforts to also manipulate the LADWP RFP process to favor Ardent. *See id.* ¶ 16.  Alexander shared drafts of the LADWP RFP with Paradis and solicited Paradis's edits to improve Ardent's odds of being awarded the contract. *See id.*

68.     After the LADWP RFP was issued, in June and July 2019, Alexander worked closely with Paradis to help him improve Ardent's proposal for submission, including by reviewing and editing drafts of Ardent's proposal. *See id.* ¶ 17.

69.     On July 10, 2019, Paradis caused Ardent to submit its proposal to the LADWP RFP. *See id.* ¶ 18.

70.     Working in coordination with Paradis, Alexander undertook efforts to influence the other members of the evaluation committee to rate Ardent favorably regarding its proposal for the LADWP RFP. *See id.* ¶ 19.

25

71. Among other similar communications, on July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result...[winking face emoji]." Alexander responded via text message, 'I know my job [crying-laughing emoji].'" *Id.* ¶ 20.

      i.      **Paradis' Bribery of Alexander in Exchange for Future Task Orders for Ardent**

72. In July 2019, Alexander and Paradis discussed a proposed job for Alexander as Ardent's Chief Administrative Officer with "platinum-level health insurance benefits" and a prospective start date of in October 2019 so that Alexander could continue to improperly influence the LADWP RFP Process in Ardent's favor. *See id.* ¶¶ 24-25. At Paradis's suggestion, Alexander agreed to create a written job description of Alexander's intended role at Ardent, along with his terms and conditions for the job. *See id.*

73. Upon discovering that retiring early from the LADWP would cause him to lose retirement income, Alexander and Paradis discussed that Paradis would guarantee additional compensation from Ardent to make up for Alexander's loss in LADWP retirement income. *See id.* ¶ 28.

74. In exchange for Alexander's additional compensation from Ardent, Alexander and Paradis discussed that while Alexander remained at LADWP, he would provide certain guarantees to Paradis and Ardent in the form of future task orders from LADWP that assigned work for which Ardent could be compensated. *See id.* Alexander would also procure task orders for Ardent's cybersecurity work under the anticipated LADWP contract, and he would also guarantee Ardent task orders for cybersecurity training. *See id.*

75. Specifically, Alexander told Paradis that he would "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors. *Id.* Additionally, Alexander stated that he would help to push work towards Ardent in a third sector, namely remediation. *See id.*

76. Alexander and Paradis discussed the need for Alexander to stay on longer at LADWP to deliver on these guarantees. In exchange for Alexander's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time Alexander stayed on at LADWP "from our deal on." *Id.*

77. Consistent with their bribery arrangement, Alexander continued his efforts to manipulate the LADWP RFP process in Ardent's favor. *See id.* ¶ 30.

26

78.    In July 2019, to further implement and conceal their bribery scheme, Paradis and Alexander agreed that Ardent would issue Alexander a laptop and a secret Ardent email address for Alexander's use. *See id.* ¶ 32.

*See* Ex. E ¶¶ 65-78.

35.    At the time City Attorney Feuer caused the City's Amended Adversary Complaint to be filed in the United States Bankruptcy Court for the District of Arizona, Feuer knew that the acts alleged in ¶¶ 65-78 therein were undertaken by Paradis while Paradis was working covertly, in an undercover capacity with and, at the direction of, the FBI. *See* Ex. C at ¶ 12.

36.    Despite knowing that Paradis engaged in the conduct alleged in ¶¶ 65-78 of the City's Amended Adversary Complaint at the direction of the FBI while acting in a covert, undercover capacity, Feuer and the City, nevertheless, knowingly and intentionally falsely alleged that Paradis engaged in these acts in order to perpetrate a criminal fraud, and Feuer was, therefore, knowingly and intentionally not truthful with the United States Bankruptcy Court.  Accordingly, Feuer violated ER 3.3(a)(1).  *See Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, *14, 2005 Ariz. LEXIS 19, ***28 (2005)(holding "lawyers face severe jeopardy for deceit in litigation" and recognizing ER 3.3(a) prohibits a lawyer from making a false statement of fact to a tribunal).

**Feuer Violated ER 3.1, Which Requires Meritorious Claims and Contentions**

37.    In addition to violating ER 3.3(a)(1) as detailed above, by knowingly making the false statements contained in ¶¶ 35-37 and ¶¶ 65-78 of the City's Amended Adversary Complaint, Feuer also violated ER 3.1 which requires attorneys to assert "meritorious claims and contentions."

38.    By knowingly alleging a total of at least fourteen paragraphs (¶¶ 65-78) that set forth patently false allegations that were intentionally intended to mislead the United States Bankruptcy Court by creating the false impression that Paradis had engaged in a number of criminal and fraudulent activities concerning the awarding of the Ardent contract in April 2019, Feuer clearly violated ER 3.1.  *See Frye v. Pena* CIV 97-10-TUC-RMB (D. Ariz. 1997)(holding Respondent violated ER 3.1 by filing frivolous and baseless claims and ER 3.3(a)(1) when he made material misrepresentations to the court).  *See also In re Smith*, 2002 Ariz. LEXIS 113, *15, *citing In re Levine*, 174 Ariz. 146, 847 P.2d 1093 (1993)(finding frivolous lawsuits without any

27

good faith basis violated ER 3.1).

**Feuer Violated ER 1.3, Which Requires That Counsel Act With Diligence**

39. By failing to inform the United States Bankruptcy Court for the District of Arizona that Paradis' actions, as alleged in ¶¶ 65-78 of the Amended Adversary Complaint, were undertaken *at the direction of the FBI* while Paradis was working cooperatively with the FBI in a covert and undercover capacity, and misleading Judge Sala to believe that Paradis' actions, as alleged in these paragraphs, amounted to criminal fraud engaged in by Paradis with Alexander, Los Angeles City Attorney Feuer failed to act with diligence and thereby violated ER 1.3. *See In re Brown,* 175 Ariz. 134, *136, 1993 Ariz. LEXIS 50, ***7 (holding that action was frivolous and that Respondent had failed to act with reasonable diligence in violation of ER 1.3).

**Feuer Violated ER 8.4, Which Governs Misconduct By Counsel**

40. ER 8.4(c) states that "it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation," and ER 8.4(d) states that "it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice."

41. Feuer violated ER 8.4(c) and ER 8.4(d) when Feuer filed the City's Amended Adversary Complaint which he knew contained patently false allegations at ¶¶ 65-78 in which Feuer and the City falsely accused Paradis of having committed criminally fraudulent acts with Alexander, despite knowing that Paradis had undertaken all of these actions *at the direction of the FBI* while Paradis was working cooperatively with the FBI in a covert and undercover capacity.

42. ER 8.4(a) states that "it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."

43. Feuer violated ER 8.4(a) by engaging in the conduct detailed herein, all of which violated ER 3.3(a)(1), ER 3.1, ER 1.3, ER 8.4(c) and ER 8.4(d).

28

## CONCLUSION

44.     This Complaint is filed with the State Bar of Arizona[3] to respectfully request that the State Bar conduct an investigation of Feuer's conduct to determine whether Feuer: (i) should be disbarred; (ii) have his *pro hac vice* admission to the United States Bankruptcy Court for the District of Arizona revoked; and/or (iii) be otherwise sanctioned for violating Arizona Rules of Professional Conduct Rule 1.3, Rule 3.1, Rule 3.3 and Rule 8.4 by having knowingly and intentionally filed a false pleading with the United States Bankruptcy Court for the District of Arizona on March 28, 2022.

Dated: April 29, 2022          By:    _____

                                      Paul O. Paradis
                                      *Complainant*

**Courtesy Copy To:**

Office of Chief Trial Counsel
State Bar of California (via First Class Mail)

---

[3]     On January 21, 2022, Complainant was informed that the State Bar of California is currently conducting investigations into wrongful acts engaged in by: (i) Los Angeles City Attorney, Michael N. Feuer – Case No.:22-O-00978; (ii) former Chief of Staff to the Los Angeles City Attorney, Leela Ann Kapur – Case No.:22-O-00979; (iii) former Los Angeles Chief Deputy City Attorney, James P. Clark – Case No.:22-O-00980; (iv) former Chief of the Civil Litigation Branch of the Los Angeles City Attorney's Office, Thomas H. Peters – Case No.:22-O-00981; (v) Los Angeles Department of Water and Power General Counsel, Joseph A. Brajevich – Case No.:22-O-00983; (vi) Los Angeles Department of Water and Power Assistant General Counsel, Richard S. Tom – Case No.:22-O-00985; (vii) Deputy Los Angeles City Attorney, Deborah Dorny – Case No.:22-O-00986; (iix) former President of the Board of Commissioners of the Los Angeles Department of Water and Power, Meldon E. Levine – Case No.:22-O-00987; and (ix) attorney Maribeth Annaguey, Partner at Ellis George Cipollone O'Brien Annaguey LLP – Case No.:22-O-00988 (formerly known as Browne George Ross & Annaguey LLP).

Complainant is further informed that the State Bar of California has requested production of evidence and related materials gathered by the FBI and the USAO during an ongoing federal criminal investigation to aid the State Bar of California in its investigation of these nine attorneys.

29

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 |
| PAUL OLIVA PARADIS, | Case No. 2:20-bk-06724-PS |
| Debtor. | |
| CITY OF LOS ANGELES, | **Adv No. 2:21-ap-00171-PS** |
| Plaintiff, | |
| v. | **ORDER APPROVING APPLICATION FOR ADMISSION PRO HAC VICE – MICHAEL N. FEUER** |
| PAUL OLIVA PARADIS, | |
| Defendant/Debtor. | |

This matter having come before the Court on the *Application for Admission Pro Hac Vice – Michael N. Feuer* ("**Application**") [ECF No. 3], and good cause appearing therefor,

**IT IS HEREBY ORDERED** that the Application is granted; and

**IT IS FURTHER ORDERED** Michael N. Feuer, on behalf of the City of Los Angeles, is hereby granted *pro hac vice* admission in the above-captioned matter.

## DATED AND SIGNED ABOVE

# EXHIBIT B

1 TRACY L. WILKISON
  United States Attorney
2 SCOTT M. GARRINGER
  Assistant United States Attorney
3 Chief, Criminal Division
  MELISSA MILLS (Cal. Bar No. 248529)
4 J. JAMARI BUXTON (Cal. Bar No. pending)
  SUSAN S. HAR (Cal. Bar No. 301924)
5 Assistant United States Attorneys
  Public Corruption and Civil Rights Section
6     1500 United States Courthouse
      312 North Spring Street
7     Los Angeles, California 90012
      Telephone: (213) 894-0627
8     Facsimile: (213) 894-7631
      E-mail:   Melissa.Mills@usdoj.gov
9               Jamari.Buxton@usdoj.gov
                Susan.Har@usdoj.gov
10
  Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,        No. CR  2:21-CR-00572-FMO

15          Plaintiff,              PLEA AGREEMENT FOR DEFENDANT
                                    DAVID F. ALEXANDER
16          v.

17 DAVID F. ALEXANDER,

18          Defendant.

19

20      1.   This constitutes the plea agreement between defendant DAVID

21 F. ALEXANDER ("defendant") and the United States Attorney's Office

22 for the Central District of California (the "USAO") in the above-

23 captioned case.  This agreement is limited to the USAO and cannot

24 bind any other federal, state, local, or foreign prosecuting,

25 enforcement, administrative, or regulatory authorities.

26                     DEFENDANT'S OBLIGATIONS

27      2.   Defendant agrees to:

28

FILED
CLERK, U.S. DISTRICT COURT
12/13/2021
CENTRAL DISTRICT OF CALIFORNIA
BY:      VM      DEPUTY

a. At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to the single-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with making false statements in violation of 18 U.S.C. § 1001(a)(2).

b. Not contest facts agreed to in this agreement.

c. Abide by all agreements regarding sentencing contained in this agreement.

d. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g. Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h. Give up the right to indictment by a grand jury.

THE USAO'S OBLIGATIONS

3. The USAO agrees to:

a. Not contest facts agreed to in this agreement.

b. Abide by all agreements regarding sentencing contained in this agreement.

c. Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C.

2

§ 371), not further criminally prosecute defendant for conduct described in the agreed-to factual basis set forth in Attachment A. Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement. Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

d. At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

<u>NATURE OF THE OFFENSE</u>

4. Defendant understands that for defendant to be guilty of the crime charged in the single-count information, that is, making false statements in violation of Title 18, United States Code, Section 1001(a)(2), the following must be true:

a. The defendant made a false statement;

b. The statement was made in a matter within the jurisdiction of the Federal Bureau of Investigation;

c. The defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and

3

d.   The statement was material to the activities or decisions of the Federal Bureau of Investigation; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

PENALTIES

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1001(a)(2), is: five years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences,

4

1  including but not limited to revocation of probation, parole, or
2  supervised release in another case and suspension or revocation of a
3  professional license. Defendant understands that unanticipated
4  collateral consequences will not serve as grounds to withdraw
5  defendant's guilty plea.

6      8.  Defendant understands that, if defendant is not a United
7  States citizen, the felony conviction in this case may subject
8  defendant to: removal, also known as deportation, which may, under
9  some circumstances, be mandatory; denial of citizenship; and denial
10 of admission to the United States in the future. The Court cannot,
11 and defendant's attorney also may not be able to, advise defendant
12 fully regarding the immigration consequences of the felony conviction
13 in this case. Defendant understands that unexpected immigration
14 consequences will not serve as grounds to withdraw defendant's guilty
15 plea.

16                            FACTUAL BASIS

17     9.  Defendant admits that defendant is, in fact, guilty of the
18 offense to which defendant is agreeing to plead guilty. Defendant
19 and the USAO agree to the statement of facts provided in Attachment A
20 hereto and agree that this statement of facts is sufficient to
21 support a plea of guilty to the charge described in this agreement
22 and to establish the Sentencing Guidelines factors set forth in
23 paragraph 11 below but is not meant to be a complete recitation of
24 all facts relevant to the underlying criminal conduct or all facts
25 known to either party that relate to that conduct.

26                          SENTENCING FACTORS

27     10.  Defendant understands that in determining defendant's
28 sentence the Court is required to calculate the applicable Sentencing

                                   5

Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

11. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:     14    [U.S.S.G. §§ 2C1.1(a)(1); 2B1.1(c)(3)]

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. In particular, the USAO reserves the right to argue for applicability of enhancements pursuant to U.S.S.G. §§ 2C1.1(b)(3) and 3C1.1, and the parties reserve the right to argue for the appropriate enhancement pursuant to U.S.S.G. § 2B1.1(b)(1).

12. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

13. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

6

## WAIVER OF CONSTITUTIONAL RIGHTS

2     14.  Defendant understands that by pleading guilty, defendant

3  gives up the following rights:

4          a.   The right to persist in a plea of not guilty.

5          b.   The right to a speedy and public trial by jury.

6          c.   The right to be represented by counsel -- and if

7  necessary have the Court appoint counsel -- at trial.  Defendant

8  understands, however, that, defendant retains the right to be

9  represented by counsel -- and if necessary have the Court appoint

10  counsel -- at every other stage of the proceeding.

11          d.   The right to be presumed innocent and to have the

12  burden of proof placed on the government to prove defendant guilty

13  beyond a reasonable doubt.

14          e.   The right to confront and cross-examine witnesses

15  against defendant.

16          f.   The right to testify and to present evidence in

17  opposition to the charges, including the right to compel the

18  attendance of witnesses to testify.

19          g.   The right not to be compelled to testify, and, if

20  defendant chose not to testify or present evidence, to have that

21  choice not be used against defendant.

22          h.   Any and all rights to pursue any affirmative defenses,

23  Fourth Amendment or Fifth Amendment claims, and other pretrial

24  motions that have been filed or could be filed.

## WAIVER OF RETURN OF DIGITAL DATA

26     15.  Understanding that the government has in its possession

27  digital devices and/or digital media seized from defendant, defendant

28  waives any right to the return of digital data contained on those

digital devices and/or digital media and agrees that if any of these
digital devices and/or digital media are returned to defendant, the
government may delete all digital data from those digital devices
and/or digital media before they are returned to defendant.

WAIVER OF APPEAL OF CONVICTION

16. Defendant understands that, with the exception of an appeal
based on a claim that defendant's guilty plea was involuntary, by
pleading guilty defendant is waiving and giving up any right to
appeal defendant's conviction on the offense to which defendant is
pleading guilty. Defendant understands that this waiver includes,
but is not limited to, arguments that the statute to which defendant
is pleading guilty is unconstitutional, and any and all claims that
the statement of facts provided herein is insufficient to support
defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK</u>

17. Defendant agrees that, provided the Court imposes a total
term of imprisonment on the count of conviction of no more than the
statutory maximum of five years, defendant gives up the right to
appeal all of the following: (a) the procedures and calculations used
to determine and impose any portion of the sentence; (b) the term of
imprisonment imposed by the Court; (c) the fine imposed by the Court,
provided it is within the statutory maximum; (d) to the extent
permitted by law, the constitutionality or legality of defendant's
sentence, provided it is within the statutory maximum; (e) the term
of probation or supervised release imposed by the Court, provided it
is within the statutory maximum; and (f) any of the following
conditions of probation or supervised release imposed by the Court:
the conditions set forth in Second Amended General Order 20-04 of

8

1  this Court; the drug testing conditions mandated by 18 U.S.C.

2  §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions

3  authorized by 18 U.S.C. § 3563(b)(7).

4      18.  Defendant also gives up any right to bring a post-

5  conviction collateral attack on the conviction or sentence, except a

6  post-conviction collateral attack based on a claim of ineffective

7  assistance of counsel, a claim of newly discovered evidence, or an

8  explicitly retroactive change in the applicable Sentencing

9  Guidelines, sentencing statutes, or statutes of conviction.

10 Defendant understands that this waiver includes, but is not limited

11 to, arguments that the statute to which defendant is pleading guilty

12 is unconstitutional, and any and all claims that the statement of

13 facts provided herein is insufficient to support defendant's plea of

14 guilty.

15     19.  The USAO agrees that, provided all portions of the sentence

16 are at the statutory maximum of five years specified above, the USAO

17 gives up its right to appeal any portion of the sentence.

18         <u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

19     20.  Defendant agrees that if, after entering a guilty plea

20 pursuant to this agreement, defendant seeks to withdraw and succeeds

21 in withdrawing defendant's guilty plea on any basis other than a

22 claim and finding that entry into this plea agreement was

23 involuntary, then (a) the USAO will be relieved of all of its

24 obligations under this agreement; and (b) should the USAO choose to

25 pursue any charge that was either dismissed or not filed as a result

26 of this agreement, then (i) any applicable statute of limitations

27 will be tolled between the date of defendant's signing of this

28 agreement and the filing commencing any such action; and

9

(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

21.  Defendant agrees that if the count of conviction is
vacated, reversed, or set aside, both the USAO and defendant will be
released from all their obligations under this agreement.

EFFECTIVE DATE OF AGREEMENT

22.  This agreement is effective upon signature and execution of
all required certifications by defendant, defendant's counsel, and an
Assistant United States Attorney.

BREACH OF AGREEMENT

23.  Defendant agrees that if defendant, at any time after the
signature of this agreement and execution of all required
certifications by defendant, defendant's counsel, and an Assistant
United States Attorney, knowingly violates or fails to perform any of
defendant's obligations under this agreement ("a breach"), the USAO
may declare this agreement breached.  All of defendant's obligations
are material, a single breach of this agreement is sufficient for the
USAO to declare a breach, and defendant shall not be deemed to have
cured a breach without the express agreement of the USAO in writing.
If the USAO declares this agreement breached, and the Court finds
such a breach to have occurred, then: (a) if defendant has previously
entered a guilty plea pursuant to this agreement, defendant will not
be able to withdraw the guilty plea, and (b) the USAO will be
relieved of all its obligations under this agreement.

10

24. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

25. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing

11

recommendations or the parties' agreements to facts or sentencing factors.

26. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 11 are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

27. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

12

## NO ADDITIONAL AGREEMENTS

28.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

///
///
///

13

29. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

TRACY L. WILKISON
United States Attorney

_____    12/13/2021
MELISSA MILLS                       Date
Assistant United States Attorney

_____    11/29/2021
DAVID F. ALEXANDER                  Date
Defendant

_____    11/29/21
NINA MARINO                         Date
Attorney for Defendant DAVID F.
ALEXANDER

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those

14

contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     11/29/2021
DAVID F. ALEXANDER                   Date
Defendant

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am DAVID F. ALEXANDER's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____     11/29/21
NINA MARINO                          Date
Attorney for Defendant DAVID F.
ALEXANDER

15

<u>ATTACHMENT A</u>

<u>FACTUAL BASIS</u>

I.  **BACKGROUND**

1.   The Los Angeles Department of Water and Power ("LADWP") is the largest municipal utility in the United States.  At all relevant times, LADWP received federal funds and benefits in excess of $10,000 annually.

2.   From May 29, 2017, until February 25, 2019, defendant DAVID F. ALEXANDER was the Chief Information Security Officer of LADWP. From February 25, 2019, until on or about August 12, 2019, defendant ALEXANDER was the Chief Cyber Risk Officer of LADWP.  In both capacities, defendant ALEXANDER reported directly to the Chief Administrative Officer of LADWP, who reported directly to the LADWP General Manager.  At all relevant times, defendant ALEXANDER was an agent of LADWP and a public official.

3.   Starting around 2017, defendant ALEXANDER developed a professional relationship with Paul O. Paradis, a New York lawyer who, among other things, represented LADWP as counsel in a lawsuit against PricewaterhouseCoopers over a dispute regarding LADWP's faulty billing system.  Paradis also had a company known as Aventador Utility Solutions, LLC ("Aventador"), which performed remediation work on the faulty billing system, as well as certain cybersecurity-related work for LADWP, pursuant to a $30 million contract with LADWP.

4.   In or around March 2019, Paradis purportedly sold Aventador to an employee, and Aventador officially changed its name to Ardent Cyber Solutions, LLC ("Ardent").  Paradis was to have no financial interest in, or control over, Aventador and its successor, Ardent.

5.     At all relevant times, the Southern California Public Power Authority ("SCPPA") was a collective group of eleven municipal utilities that included LADWP.  At the request of a member utility, SCPPA had the ability to facilitate joint service contracts.

## II.   THE AVENTADOR/ARDENT BRIBERY SCHEME

### A.     Defendant ALEXANDER Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Paradis's Aventador/Ardent

#### 1.     The SCPPA Request for Proposal Process

6.     On February 8, 2019, SCPPA issued a Request for Proposal ("RFP") for a cybersecurity services contract (the "SCPPA RFP") at the request of LADWP's then-General Manager, David Wright.  Defendant ALEXANDER, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP.  The SCPPA RFP solicited proposals from vendors to provide cybersecurity services in eleven defined areas.  The SCPPA RFP contemplated that multiple vendors would be awarded a cybersecurity services contract with SCPPA under a master agreement, under which individual member utilities, like LADWP, could independently engage a vendor's services.

7.     Defendant ALEXANDER was one of four members of the scoring committee for the SCPPA RFP, which was responsible for conducting a preliminary review and assessment of the proposals submitted in response to the SCPPA RFP and then presenting its scores and recommendations to the SCPPA Cybersecurity Working Group.

8.     Defendant ALEXANDER knew and understood that the SCPPA RFP process was intended to be a competitive, neutral, and transparent process in order to ensure the integrity of the cybersecurity bench. Defendant ALEXANDER, however, manipulated the SCPPA RFP process with the goal of securing future cybersecurity work for Aventador.  After

Defendant's initials: ___ ___    2

Aventador became Ardent, defendant ALEXANDER sought to secure future work for Ardent. Defendant ALEXANDER should have known, and knew no later than July 16, 2019, that Paradis was supposed to have no role in or involvement with Aventador or Ardent. Nonetheless, defendant ALEXANDER knew and understood that Paradis was actually serving as the principal of Ardent, including by pursuing the cybersecurity services contract for Ardent through the SCPPA RFP.

9.    Between late February 2019 and April 2019, defendant ALEXANDER used his position and influence as the LADWP Chief Cyber Risk Officer and the Vice-Chair of the SCPPA Cyber Security Working Group to manipulate the SCPPA RFP process, including by influencing the composition of the scoring committee to include individuals whom he could persuade to rank Ardent favorably and by sharing his scores for the SCPPA proposals with other members of the committee in an effort to persuade them to score Ardent favorably.

10.   On April 5, 2019, the SCPPA Cybersecurity Working Group informed Ardent that it would recommend Ardent for the SCPPA contract.

11.   On April 5, 2019, defendant ALEXANDER met with Paradis at a restaurant in Los Angeles. During this meeting, defendant ALEXANDER told Paradis that he had used the SCPPA bidding process to get LADWP's "desired outcome," that is, a contract with Ardent, but in a manner that falsely appeared "completely transparent." Defendant ALEXANDER boasted that he was the one who had secured the contract for Ardent, informing Paradis, "that was me driving it."

12.   On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of

Defendant's initials: _DA_ __   3

1  approximately $17,000,000.

2      13.  Shortly after SCPPA awarded the contracts, the City

3  instructed LADWP to re-bid the contracts through the standard LADWP

4  procurement process (the "LADWP RFP"), instead of through SCPPA.  In

5  the interim, the LADWP Board of Commissioners approved short-term

6  "bridge" contracts for Ardent and the other two vendors.

7          2.  The LADWP RFP Process

8      14.  On June 17, 2019, LADWP issued the LADWP RFP for the award

9  of a three-year, $82.5 million Cybersecurity Consulting Services

10  contract, with a submission deadline of July 10, 2019.  Defendant

11  ALEXANDER knew and understood that state and local laws and

12  regulations required the LADWP RFP process to be a fully competitive,

13  neutral, and transparent process in order to ensure fair competition

14  amongst the vendors and to ensure that LADWP acquired the services of

15  a qualified vendor that satisfied its requisite criteria.

16      15.  Defendant ALEXANDER was one of seven members of the

17  evaluation committee that was responsible for reviewing the proposals

18  submitted in response to the LADWP RFP.  All evaluators, including

19  defendant ALEXANDER, signed a sworn nondisclosure agreement that they

20  would not discuss their scoring on the proposals with anyone.

21      16.  In late May 2019, before the LADWP RFP was issued,

22  defendant ALEXANDER began his efforts to also manipulate the LADWP

23  RFP process to favor Ardent.  Defendant ALEXANDER was one of the

24  drafters of the anticipated LADWP RFP, and he shared drafts of the

25  LADWP RFP with Paradis and solicited Paradis's edits.  By these

26  actions, defendant ALEXANDER intended to craft and crafted the LADWP

27  RFP to correspond with Ardent's specific strengths and to improve

28

Defendant's initials: _____  4

1 Ardent's odds of being awarded the contract.

2     17. After the LADWP RFP was issued, between in or around June

3 and July 2019, defendant ALEXANDER worked closely with Paradis to

4 help him improve Ardent's proposal for submission, including by

5 reviewing and editing drafts of Ardent's proposal.

6     18. On July 10, 2019, Paradis caused Ardent to submit its

7 proposal to the LADWP RFP. In total, over a dozen vendors submitted

8 proposals for the LADWP RFP.

9     19. Defendant ALEXANDER also undertook efforts to influence the

10 other members of the evaluation committee to rate Ardent favorably,

11 notwithstanding the sworn nondisclosure agreement. For example, on

12 July 9, 2019, the day before the submission deadline for proposals

13 for the LADWP RFP, defendant ALEXANDER told Paradis, via text

14 message, that he would "handle" another individual on the evaluation

15 committee because he believed that he and the other individual could

16 work well together "toward our desired goals." In response, Paradis

17 asked if defendant ALEXANDER was confident that the individual would

18 "cooperate with you and rank Ardent with a very high overall score."

19 Defendant ALEXANDER responded, "Very...."

20     20. On July 9, 2019, Paradis told defendant ALEXANDER, via text

21 message, that after he submitted the Ardent proposal, "it will be up

22 to you to 'manage' the evaluators the same way you did for the SCPAA

23 [sic] process so that we get the correct result... 😉 [winking face

24 emoji]." Defendant ALEXANDER responded via text message, "I know my

25 job 😂 [crying-laughing emoji]."

26     21. On July 12, 2019, defendant ALEXANDER told Paradis, via

27 text message, about the required sworn nondisclosure agreement.

28

Defendant's initials: ___ 5

1    Defendant ALEXANDER remarked that this requirement "seriously limits
2    me," which was a reference to his planned efforts to influence the
3    other evaluators to rate Ardent favorably.  Paradis responded that he
4    was not concerned about defendant ALEXANDER being "limited" because,
5    as defendant ALEXANDER had told Paradis earlier, defendant ALEXANDER
6    "know[s] his job."

7         22.  On July 15, 2019, defendant ALEXANDER, via text message,
8    advised Paradis that he had provided two of the evaluators with
9    "'cliff notes' on my proposal thoughts."

10        **B.    Defendant ALEXANDER Seeks Employment at Ardent from
11              Paradis, and Paradis Agrees to Hire Him**

12        23.  On July 16, 2019, defendant ALEXANDER met with Paradis for
13   lunch at a restaurant in Los Angeles.  During this meeting, defendant
14   ALEXANDER again told Paradis that he and the other evaluators for the
15   LADWP RFP had been required to sign an agreement attesting that they
16   would not speak to each another about their scores for the LADWP RFP
17   responses.  Defendant ALEXANDER explained that, notwithstanding this
18   signed agreement, he had provided his score sheet to two other
19   evaluators in order to influence them to give Ardent a high score.
20   Defendant ALEXANDER stated that he was working to speak with other
21   evaluators for the same purpose.  Paradis thanked defendant ALEXANDER
22   for his help securing the LADWP RFP for Ardent.

23        24.  During this same lunch meeting, Paradis asked defendant
24   ALEXANDER what his future employment plans were.  Defendant ALEXANDER
25   responded that he was considering multiple options outside of LADWP
26   and informed Paradis that he was interested in working at Ardent as
27   its business manager.  Defendant ALEXANDER and Paradis discussed this

28   Defendant's initials: ___      6

proposed job, including the general scope of job responsibilities for
defendant ALEXANDER, the future location and growth of Ardent, and
Ardent's "platinum-level" health insurance benefits. Defendant
ALEXANDER and Paradis also discussed a prospective start date of
September 1, 2019. At Paradis's suggestion, defendant ALEXANDER
agreed to create a written job description of defendant ALEXANDER's
intended role at Ardent, along with his terms and conditions for the
job. Defendant ALEXANDER told Paradis that he needed to confirm the
terms of his retirement package from LADWP, since the contemplated
Ardent start date would require him to leave LADWP two years before
reaching the retirement age.

25. Near the end of the lunch meeting, defendant ALEXANDER told
Paradis that he would make sure that the LADWP RFP evaluation for
Ardent "stays in order," meaning that he would continue his efforts
to improperly influence the LADWP RFP process in Ardent's favor.
Defendant ALEXANDER told Paradis that he would need to remain at
LADWP at least until he had secured the LADWP contract for Ardent.
Accordingly, defendant ALEXANDER told Paradis that he could not start
on September 1, 2019, and that he would need to stay at LADWP until
at least October 2019. Paradis agreed.

26. After the lunch meeting, defendant ALEXANDER, via text
message, asked Paradis who Ardent employed as its Chief Financial
Officer. Paradis responded that it was someone he had known for over
12 years and inquired why defendant ALEXANDER was asking. Defendant
ALEXANDER replied that he was "scoping" his role and responsibilities
"for my new job." Paradis responded via text message that defendant
ALEXANDER's job duties "will be what we discussed, namely operations

Defendant's initials: ____  ____  7

1  and business management." Defendant ALEXANDER stated, "So I am
2  thinking essentially a Chief Administrative Officer," to which
3  Paradis replied, "I agree completely."

4
        C.    Defendant ALEXANDER Guarantees Future Task Orders for
5             Ardent in Return for Additional Compensation from Paradis

6       27.  On July 17, 2019, defendant ALEXANDER, via text message,
7  told Paradis that he had "[j]ust finished my conversation with the
8  retirement group. Not good at all. We need to talk to discuss
9  options, when you have a chance."

10      28.  Later that same day, defendant ALEXANDER and Paradis met at
11 a coffee shop in Los Angeles. During the meeting, defendant
12 ALEXANDER and Paradis discussed the following:

13          a.    Defendant ALEXANDER relayed to Paradis that he had
14 learned from an LADWP retirement analyst that if he retired before
15 the age of 55, he would lose what amounted to $60,000 a year "for 30
16 years" or "for the rest of [his] life." During his conversation with
17 Paradis, defendant ALEXANDER repeatedly referred to the retirement
18 penalty as a loss of $60,000 a year over 30 years, or "for the rest
19 of [his] life."

20          b.    Paradis responded that the retirement penalty was
21 "easily handled," but that if Paradis was going to "guarantee"
22 additional compensation to make up for defendant ALEXANDER's loss in
23 LADWP retirement income, defendant ALEXANDER would also need to
24 "guarantee certain things." In exchange for the additional
25 compensation, defendant ALEXANDER told Paradis that he while he
26 remained at LADWP, he could provide certain guarantees to Paradis and
27 Ardent in the form of future task orders from LADWP that assigned

28
Defendant's initials: ____    8

specific work for which Ardent could be compensated.

      c.   Specifically, as the Chief Cyber Risk Officer at LADWP, defendant ALEXANDER communicated to Paradis that he could procure task orders for Ardent's cybersecurity work under the anticipated LADWP contract. Defendant ALEXANDER calculated for Paradis the amount of money defendant ALEXANDER could allocate in a task order to Ardent. Defendant ALEXANDER stated that he could also guarantee Ardent task orders for cybersecurity training.

      d.   Defendant ALEXANDER told Paradis that he could "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors. Additionally, defendant ALEXANDER stated that he could help to push work towards Ardent in a third sector, namely remediation.

      e.   Defendant ALEXANDER and Paradis discussed the need for defendant ALEXANDER to stay on longer at LADWP to deliver on these guarantees. In exchange for defendant ALEXANDER's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time defendant ALEXANDER stayed on at LADWP "from our deal on." Defendant ALEXANDER agreed and commented that the payment amounted to a "signing bonus."

      f.   Near the end of their meeting, defendant ALEXANDER confided that he would tell no one about his corrupt arrangement with Paradis, stating that "[a]s far as what I do and when I can execute against that contract is between you, me, and the wall." Defendant ALEXANDER added that "[his] wife is not even going to know. She has to be able to attest."

    29.  By his actions, defendant ALEXANDER solicited and agreed to

Defendant's initials: _A̷N̷_ __ 9

accept from Paradis a future job as the Chief Administrative Officer
of Ardent, a to-be-determined executive-level annual salary, a sign-
on bonus, and recompense for his early retirement penalty from LADWP.
Defendant ALEXANDER did so intending to be influenced and rewarded in
connection with his ongoing assistance in securing the award of a
multi-million dollar LADWP contract to Ardent and use of his position
to guarantee over $10,000,000 in future task orders for Ardent under
the anticipated LADWP contract.

**D. Defendant ALEXANDER Asks for a Secret Ardent E-Mail Address and Laptop to Communicate with Paradis and to Secretly Perform Work for Ardent**

30. Following his meeting with Paradis on July 17, 2019, and
consistent with their illegal arrangement, defendant ALEXANDER
continued his efforts to manipulate the LADWP RFP process in Ardent's
favor.

31. Defendant ALEXANDER also began advising Paradis more
broadly about business plans for Ardent, consistent with their secret
agreement for defendant ALEXANDER to be the Chief Administrative
Officer for Ardent. For example, on July 18, 2019, defendant
ALEXANDER told Paradis via text message that, "we need to build some
artwork and [collateral] for our RFPs, going forward." On that same
day, defendant ALEXANDER provided Paradis with information about
another SCPPA RFP in which Paradis had indicated an interest in
applying for Ardent and advised Paradis that it was such a small
amount that it was not worth it "for us to even fucking bother."

32. During a phone call on July 18, 2019, defendant ALEXANDER
asked Paradis for a secret e-mail account with Ardent that did not
have his name on it. Paradis responded that he could provide the

Defendant's initials: _DA_ __  10

1 requested e-mail address, as well as a laptop, for defendant
2 ALEXANDER's use. Defendant ALEXANDER agreed that an Ardent-issued
3 laptop would be helpful so that he could "do all that work with no
4 evidence anywhere else" and because "if anything happens, I just give
5 you the laptop back and it's lock, stock, and barrel, and I don't
6 have anything anywhere else." Paradis agreed to drop off the laptop
7 for defendant ALEXANDER the following day.

8     33. On July 19, 2019, defendant ALEXANDER, via text message,
9 asked Paradis if he was still planning to deliver the Ardent-issued
10 laptop that day. On a phone call that same day, defendant ALEXANDER
11 and Paradis agreed on a secret e-email address of
12 "FrancesW@ardent.com."

13 **III. Defendant ALEXANDER's Lies to the FBI**

14     34. On July 22, 2019, the Federal Bureau of Investigation
15 ("FBI") executed search warrants at LADWP as part of its ongoing
16 investigation into LADWP and the Los Angeles City Attorney's Office.

17     35. On July 24, 2019, defendant ALEXANDER participated in a
18 voluntary interview with the FBI. During that interview, defendant
19 ALEXANDER falsely stated that he had declined any employment
20 opportunity with Ardent and that he had not expected any compensation
21 from Paradis.

22     36. Defendant ALEXANDER knowingly, willfully, and deliberately
23 made these materially false statements and representations to the FBI
24 during the July 24, 2019 interview knowing that these statements and
25 representations were untrue and that his conduct was unlawful.
26 Defendant ALEXANDER's false statements were made in a matter within
27 the jurisdiction of the FBI and were material to the activities and

28 Defendant's initials: _____ 11

1  decisions of the FBI.

2        37.  On July 26, 2019, defendant ALEXANDER participated in

3  another voluntary interview with the FBI.  During that interview,

4  defendant ALEXANDER falsely stated that he had declined any

5  employment opportunity with Ardent and that he had never provided any

6  guarantees to Ardent or to Paradis.

7        38.  Defendant ALEXANDER knowingly, willfully, and deliberately

8  made these materially false statements and representations to the FBI

9  during the July 26, 2019 interview knowing that these statements and

10 representations were untrue and that his conduct was unlawful.

11 Defendant ALEXANDER's false statements were made in a matter within

12 the jurisdiction of the FBI and were material to the activities and

13 decisions of the FBI.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's initials: _____  12

# EXHIBIT C

1
2
3
4
5
6
7

**FILED**
CLERK, U.S. DISTRICT COURT
12/13/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ VM ___ DEPUTY

8      UNITED STATES DISTRICT COURT

9      FOR THE CENTRAL DISTRICT OF CALIFORNIA

10    UNITED STATES OF AMERICA,          CR No. 2:21-CR-00572-FMO

11              Plaintiff,               I N F O R M A T I O N

12              v.                       [18 U.S.C. § 1001(a)(2): False
                                          Statements]
13    DAVID F. ALEXANDER,

14              Defendant.

15

16          The United States Attorney charges:

                      INTRODUCTORY ALLEGATIONS

17          At times relevant to this Information:

18    A.    RELEVANT PERSONS AND ENTITIES

19          1.   The Los Angeles Department of Water and Power ("LADWP") was

20    the largest municipal utility in the United States, and provided

21    water and electricity services to approximately 4 million residents

22    in and around the City of Los Angeles (the "City"). LADWP was

23    governed by a five-member Board of Commissioners (the "LADWP Board").

24    LADWP was a City agency that received more than $10,000 per year in

25    funds from the United States, including for the years 2017 through

26    2019, in the form of grants, contracts, subsidies, loans, guarantees,

27    insurance, and other forms of federal assistance.

28

2. Defendant DAVID F. ALEXANDER was the Chief Information Security Officer of LADWP from on or about May 29, 2017, until on or about February 25, 2019. From on or about February 25, 2019, until on or about August 12, 2019, defendant ALEXANDER was the Chief Cyber Risk Officer of LADWP. In both capacities, defendant ALEXANDER reported directly to the Chief Administrative Officer of LADWP, who reported directly to the LADWP General Manager.

3. The Southern California Public Power Authority ("SCPPA") was a collective group of eleven municipal utilities that included LADWP. At the request of a member utility, SCPPA had the ability to facilitate joint service contracts.

B. THE GRAND JURY INVESTIGATION

4. Beginning in March 2019, the United States Attorney's Office ("USAO") and the Federal Bureau of Investigation ("FBI"), via a federal Grand Jury, were conducting an investigation to determine whether criminal violations had been committed related to, among other things, collusive litigation involving the Los Angeles City Attorney's Office stemming from LADWP's failed billing system (the "Grand Jury investigation"). This investigation sought to identify the persons who had committed, caused, and conspired to commit federal criminal violations.

C. THE BRIBERY SCHEME

1. **Background**

5. Starting around 2017, defendant ALEXANDER developed a professional relationship with Paul O. Paradis, a New York lawyer who, among other things, represented LADWP as Special Counsel in an affirmative lawsuit alleging that PricewaterhouseCoopers ("PwC") —— the vendor of LADWP's billing system —— was to blame for LADWP's

2

misbilling of hundreds of thousands of ratepayers. In 2017, Paradis created a company known as Aventador Utility Solutions, LLC ("Aventador"), which obtained a three-year, $30,000,000 no-bid contract with LADWP to perform remediation work on the faulty billing system. Aventador also performed certain cybersecurity-related work for LADWP.

6. In or around March 2019, Paradis resigned as Special Counsel for LADWP in the PwC lawsuit. Later that month, Paradis purportedly sold Aventador to an employee, and Aventador officially changed its name to Ardent Cyber Solutions, LLC ("Ardent"). Paradis represented to LADWP and the City of Los Angeles (the "City") that he had no financial interest in, or control over, Aventador and its successor, Ardent.

**2. Defendant ALEXANDER Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Paradis's Aventador/Ardent**

(a) The SCPPA Request for Proposal Process

7. On February 8, 2019, SCPPA issued a Request for Proposal ("RFP") for a cybersecurity services contract (the "SCPPA RFP") at the request of LADWP's then-General Manager, David Wright. Defendant ALEXANDER, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP. The SCPPA RFP solicited proposals from vendors to provide cybersecurity services in eleven defined areas. The SCPPA RFP contemplated that multiple vendors would be awarded a cybersecurity services contract with SCPPA under a master agreement, under which individual member utilities, like LADWP, could independently engage a vendor's services.

8. Defendant ALEXANDER was one of four members of the scoring committee for the SCPPA RFP, which was responsible for conducting a

3

preliminary review and assessment of the proposals submitted in
response to the SCPPA RFP and then presenting its scores and
recommendations to the SCPPA Cybersecurity Working Group.

9. Defendant ALEXANDER knew and understood that the SCPPA RFP
process was intended to be a competitive, neutral, and transparent
process in order to ensure the integrity of the cybersecurity bench.
Defendant ALEXANDER, however, manipulated the SCPPA RFP process with
the goal of securing future cybersecurity work for Aventador. After
Aventador became Ardent, defendant ALEXANDER sought to secure future
work for Ardent. Defendant ALEXANDER should have known, and knew no
later than July 16, 2019, that Paradis was supposed to have no role
in or involvement with Aventador or Ardent. Nonetheless, defendant
ALEXANDER knew and understood that Paradis was actually serving as
the principal of Ardent, including by pursuing the cybersecurity
services contract for Ardent through the SCPPA RFP.

10. Between late February 2019 and April 2019, defendant
ALEXANDER used his position and influence as the LADWP Chief Cyber
Risk Officer and the Vice-Chair of the SCPPA Cyber Security Working
Group to manipulate the SCPPA RFP process by influencing the
composition of the scoring committee to include individuals whom he
could persuade to rank Ardent favorably and sharing his scores for
the SCPPA proposals with other members of the committee in an effort
to persuade them to score Ardent favorably.

11. On April 5, 2019, the SCPPA Cybersecurity Working Group
informed Ardent that it would recommend Ardent for the SCPPA
contract.

12. On April 5, 2019, defendant ALEXANDER met with Paradis at a
restaurant in Los Angeles. During this meeting and in all subsequent

4

interactions with defendant ALEXANDER referenced herein, Paradis was acting at the direction of the FBI. During this meeting, defendant ALEXANDER told Paradis that he had used the SCPPA bidding process to get LADWP's "desired outcome," that is, a contract with Ardent, but in a manner that falsely appeared "completely transparent." Defendant ALEXANDER boasted that he was the one who had secured the contract for Ardent, informing Paradis, "that was me driving it."

13. On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of approximately $17,000,000.

14. Shortly after SCPPA awarded the contracts, the City instructed LADWP to re-bid the contracts through the standard LADWP procurement process (the "LADWP RFP"), instead of through SCPPA, to ensure an extra layer of transparency and maximum competition. In the interim, the LADWP Board of Commissioners approved short-term "bridge" contracts for Ardent and the other two vendors.

(b) The LADWP RFP Process

15. On June 17, 2019, LADWP issued the LADWP RFP for the award of a three-year, $82.5 million Cybersecurity Consulting Services contract, with a submission deadline of July 10, 2019. Defendant ALEXANDER knew and understood that state and local laws and regulations required the LADWP RFP process to be a fully competitive, neutral, and transparent process in order to ensure fair competition amongst the vendors and to ensure that LADWP acquired the services of a qualified vendor that satisfied its requisite criteria.

16. Defendant ALEXANDER was one of seven members of the evaluation committee that was responsible for reviewing the proposals submitted in response to the LADWP RFP. All evaluators, including

5

defendant ALEXANDER, signed a sworn nondisclosure agreement that they

would not discuss their scoring on the proposals with anyone.

17. In late May 2019, before the LADWP RFP was issued, defendant ALEXANDER began his efforts to also manipulate the LADWP RFP process to favor Ardent. Defendant ALEXANDER was one of the drafters of the anticipated LADWP RFP, and he shared drafts of the LADWP RFP with Paradis and solicited Paradis's edits. By these actions, defendant ALEXANDER intended to craft and crafted the LADWP RFP to correspond with Ardent's specific strengths and to improve Ardent's odds of being awarded the contract.

18. After the LADWP RFP was issued, between in or around June and July 2019, defendant ALEXANDER worked closely with Paradis to help him improve Ardent's proposal for submission, including by reviewing and editing drafts of Ardent's proposal.

19. On July 10, 2019, Paradis caused Ardent to submit its proposal to the LADWP RFP. In total, over a dozen vendors submitted proposals for the LADWP RFP.

20. Defendant ALEXANDER also undertook efforts to influence the other members of the evaluation committee to rate Ardent favorably, notwithstanding the sworn nondisclosure agreement. For example, on July 9, 2019, the day before the submission deadline for proposals for the LADWP RFP, defendant ALEXANDER told Paradis, via text message, that he would "handle" another individual on the evaluation committee because he believed that he and the other individual could work well together "toward our desired goals." In response, Paradis asked if defendant ALEXANDER was confident that the individual would "cooperate with you and rank Ardent with a very high overall score." Defendant ALEXANDER responded, "Very...."

6

21. On July 9, 2019, Paradis told defendant ALEXANDER, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result... 😉 [winking face emoji]." Defendant ALEXANDER responded via text message, "I know my job 😂 [crying-laughing emoji]."

22. On July 12, 2019, defendant ALEXANDER told Paradis, via text message, about the required sworn nondisclosure agreement. Defendant ALEXANDER remarked that this requirement "seriously limits me," which was a reference to his planned efforts to influence the other evaluators to rate Ardent favorably. Paradis responded that he was not concerned about defendant ALEXANDER being "limited" because, as defendant ALEXANDER had told Paradis earlier, defendant ALEXANDER "know[s] his job."

23. On July 15, 2019, defendant ALEXANDER, via text message, advised Paradis that he had provided two of the evaluators with "'cliff notes' on my proposal thoughts."

### 3. Defendant ALEXANDER Seeks Employment at Ardent from Paradis, and Paradis Represents That Ardent Will Hire Him

24. On July 16, 2019, defendant ALEXANDER met with Paradis for lunch at a restaurant in Los Angeles. During this meeting, defendant ALEXANDER again told Paradis that he and the other evaluators for the LADWP RFP had been required to sign an agreement attesting that they would not speak to each another about their scores for the LADWP RFP responses. Defendant ALEXANDER explained that, notwithstanding this signed agreement, he had provided his score sheet to two other evaluators in order to influence them to give Ardent a high score. Defendant ALEXANDER stated that he was working to speak with other

7

evaluators for the same purpose. Paradis thanked defendant ALEXANDER for his help securing the LADWP RFP for Ardent.

25. During this same lunch meeting, Paradis asked defendant ALEXANDER what his future employment plans were. Defendant ALEXANDER responded that he was considering multiple options outside of LADWP and informed Paradis that he was interested in working at Ardent as its business manager. Defendant ALEXANDER and Paradis discussed this proposed job, including the general scope of job responsibilities for defendant ALEXANDER, the future location and growth of Ardent, and Ardent's "platinum-level" health insurance benefits. Defendant ALEXANDER and Paradis also discussed a prospective start date of September 1, 2019. At Paradis's suggestion, defendant ALEXANDER agreed to create a written job description of defendant ALEXANDER's intended role at Ardent, along with his terms and conditions for the job. Defendant ALEXANDER told Paradis that he needed to confirm the terms of his retirement package from LADWP, since he was considering leaving two years before reaching the retirement age.

26. Near the end of the lunch meeting, defendant ALEXANDER told Paradis that he would make sure that the LADWP RFP evaluation for Ardent "stays in order," meaning that he would continue his efforts to improperly influence the LADWP RFP process in Ardent's favor. Defendant ALEXANDER told Paradis that he would need to remain at LADWP at least until he had secured the LADWP contract for Ardent. Accordingly, defendant ALEXANDER told Paradis that he could not start on September 1, 2019, and that he would need to stay at LADWP until at least October 2019.

27. After the lunch meeting, defendant ALEXANDER, via text message, asked Paradis who Ardent employed as its Chief Financial

8

Officer. Paradis responded that it was someone he had known for over 12 years and inquired why defendant ALEXANDER was asking. Defendant ALEXANDER replied that he was "scoping" his role and responsibilities "for my new job." Paradis responded via text message that defendant ALEXANDER's job duties "will be what we discussed, namely operations and business management." Defendant ALEXANDER stated, "So I am thinking essentially a Chief Administrative Officer," to which Paradis replied, "I agree completely."

**4. Defendant ALEXANDER Guarantees Future Task Orders for Ardent in Return for Additional Compensation from Paradis**

28. On July 17, 2019, defendant ALEXANDER, via text message, told Paradis that he had "[j]ust finished my conversation with the retirement group. Not good at all. We need to talk to discuss options, when you have a chance."

29. Later that same day, defendant ALEXANDER and Paradis met at a coffee shop in Los Angeles. During the meeting, defendant ALEXANDER and Paradis discussed the following:

a. Defendant ALEXANDER relayed to Paradis that he had learned from an LADWP retirement analyst that if he retired before the age of 55, he would lose what amounted to $60,000 a year "for 30 years" or "for the rest of [his] life." During his conversation with Paradis, defendant ALEXANDER repeatedly referred to the retirement penalty as a loss of $60,000 a year over 30 years, or "for the rest of [his] life."

b. Paradis responded that the retirement penalty was "easily handled," but that if Paradis was going to "guarantee" additional compensation to make up for defendant ALEXANDER's loss in LADWP retirement income, defendant ALEXANDER would also need to

9

"guarantee certain things." In exchange for the additional compensation, defendant ALEXANDER told Paradis that while he remained at LADWP, he could provide certain guarantees to Paradis and Ardent in the form of future task orders from LADWP that assigned specific work for which Ardent could be compensated.

c. Specifically, as the Chief Cyber Risk Officer at LADWP, defendant ALEXANDER communicated to Paradis that he could procure task orders for cybersecurity work under the anticipated LADWP contract. Defendant ALEXANDER calculated for Paradis the amount of money defendant ALEXANDER could allocate in a task order to Ardent. Defendant ALEXANDER stated that he could also guarantee Ardent task orders for cybersecurity training.

d. Defendant ALEXANDER told Paradis that he could "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors. Additionally, defendant ALEXANDER stated that he could help to push work towards Ardent in a third sector, namely remediation.

e. Defendant ALEXANDER and Paradis discussed the need for defendant ALEXANDER to stay on longer at LADWP to deliver on these guarantees. In exchange for defendant ALEXANDER's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time defendant ALEXANDER stayed on at LADWP "from our deal on." Defendant ALEXANDER agreed and commented that the payment amounted to a "signing bonus."

f. Near the end of their meeting, defendant ALEXANDER confided that he would tell no one about his corrupt arrangement with Paradis, stating that "[a]s far as what I do and when I can execute against that contract is between you, me, and the wall." Defendant

10

ALEXANDER added that "[his] wife is not even going to know. She has to be able to attest."

30. By his actions, defendant ALEXANDER solicited and agreed to accept from Paradis a future job as the Chief Administrative Officer of Ardent, a to-be-determined executive-level annual salary, a sign-on bonus, and recompense for his early retirement penalty from LADWP. Defendant ALEXANDER did so intending to be influenced and rewarded in connection with his ongoing assistance in securing the award of a multi-million dollar LADWP contract to Ardent and use of his position to guarantee over $10,000,000 in future task orders for Ardent under the anticipated LADWP contract.

**5. Defendant ALEXANDER Asks for a Secret Ardent E-Mail Address and Laptop to Communicate with Paradis and to Secretly Perform Work for Ardent**

31. Following his meeting with Paradis on July 17, 2019, and consistent with their illegal arrangement, defendant ALEXANDER continued his efforts to manipulate the LADWP RFP process in Ardent's favor.

32. Defendant ALEXANDER also began advising Paradis more broadly about business plans for Ardent, consistent with their secret agreement for defendant ALEXANDER to be the Chief Administrative Officer for Ardent. For example, on July 18, 2019, defendant ALEXANDER told Paradis via text message that, "we need to build some artwork and [collateral] for our RFPs, going forward." On that same day, defendant ALEXANDER provided Paradis with information about another SCPPA RFP in which Paradis had indicated an interest in applying for Ardent and advised Paradis that it was such a small amount that it was not worth it "for us to even fucking bother."

33. During a phone call on July 18, 2019, defendant ALEXANDER

11

asked Paradis for a secret e-mail account with Ardent that did not have his name on it. Paradis responded that he could provide the requested e-mail address, as well as a laptop, for defendant ALEXANDER's use. Defendant ALEXANDER agreed that an Ardent-issued laptop would be helpful so that he could "do all that work with no evidence anywhere else" and because "if anything happens, I just give you the laptop back and it's lock, stock, and barrel, and I don't have anything anywhere else." Paradis agreed to drop off the laptop for defendant ALEXANDER the following day.

34. On July 19, 2019, defendant ALEXANDER, via text message, asked Paradis if he was still planning to deliver the Ardent-issued laptop that day. On a phone call that same day, defendant ALEXANDER and Paradis agreed on a secret e-mail address of "FrancesW@ardent.com."

**6. Defendant ALEXANDER's Lies to the FBI**

35. On July 22, 2019, the FBI executed search warrants at LADWP as part of its ongoing investigation into LADWP and the City Attorney's Office.

36. On July 24, 2019, defendant ALEXANDER participated in a voluntary interview with the FBI regarding the Grand Jury Investigation during which he lied about his conversations and agreements with Paradis.

37. On July 26, 2019, defendant ALEXANDER participated in another voluntary interview with the FBI. During that interview, defendant ALEXANDER falsely stated that he had declined any employment opportunity with Ardent and that he had never provided any guarantees to Ardent or to Paradis.

12

1    38.   These Introductory Allegations are incorporated into the
2  sole count of this Information.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13

COUNT ONE

[18 U.S.C. § 1001(a)(2)]

39.   On or about July 24, 2019, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI, defendant DAVID F. ALEXANDER knowingly and willfully made materially false statements and representations to the FBI, knowing that these statements and representations were untrue. Specifically, defendant ALEXANDER falsely stated: (a) that he had declined any future employment opportunity with Ardent and (b) that he had not expected any compensation from Paul O. Paradis.  In fact, as defendant ALEXANDER then knew, defendant ALEXANDER had solicited and agreed to accept from Paradis a future job as the Chief Administrative Officer of Ardent, an executive-level annual salary, and an additional annual payment of $60,000, and defendant ALEXANDER

///

///

///

14

expected these benefits as compensation, including for his assistance in securing LADWP's award of the Cybersecurity Consulting Services contract and future task orders for Ardent.

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption
and Civil Rights Section

MELISSA MILLS
J. JAMARI BUXTON
SUSAN S. HAR
Assistant United States Attorneys
Public Corruption and Civil
Rights Section

15

# EXHIBIT D



THE UNITED STATES ATTORNEY'S OFFICE

# CENTRAL DISTRICT *of* CALIFORNIA

U.S. Attorneys » Central District of California » News

**Department of Justice**

U.S. Attorney's Office

Central District of California

FOR IMMEDIATE RELEASE                                                    Monday, December 13, 2021

## Ex-LADWP Executive Agrees to Plead Guilty to Lying to FBI About Agreeing to Accept Job in Exchange for 'Guarantees' to Contractor

INFORMATION    PLEA AGREEMENT

　　*LOS ANGELES* – A former Los Angeles Department of Water and Power (LADWP) executive has agreed to plead guilty to a federal criminal charge for lying to the FBI about a lucrative job offer he secretly solicited and agreed to accept in exchange for providing "guarantees" of additional LADWP contract money to a lawyer who held a bribery-fueled contract with the department, the Justice Department announced today.

　　David F. Alexander, 54, of Arcadia, agreed to plead guilty to one felony charge of making false statements, a crime that carries a statutory maximum sentence of five years in federal prison.

　　A one-count information charging Alexander and his plea agreement were both filed today in United States District Court. Alexander is expected to make his initial court appearance in the coming weeks.

　　According to his plea agreement, Alexander was LADWP's chief information security officer from May 2017 until February 2019, and then he served as the department's chief cyber risk officer for the next six months.

　　Beginning in 2017, Alexander developed a professional relationship with Paul O. Paradis, 58, a New York lawyer who represented LADWP in a lawsuit against PricewaterhouseCoopers (PwC), the vendor it blamed for a major billing debacle. In 2017, Paradis created a downtown Los Angeles-based company known as Aventador Utility Solutions LLC, which obtained a three-year, $30 million no-bid contract with LADWP to perform remediation work on the faulty billing system. Aventador also performed certain cybersecurity-related work for LADWP.

　　In March 2019, Paradis – who simultaneously had represented a ratepayer suing LADWP while he represented the department itself – resigned as special counsel for LADWP's billing lawsuit and, later that month, purportedly sold Aventador to an employee. Aventador then changed its name to Ardent Cyber Solutions LLC, and Paradis was to have no financial interest in or control over the Aventador or its successor company.

　　In February 2019, the Southern California Public Power Authority (SCPPA) – a collective of 11 municipal utilities, including LADWP – issued a request for proposal (RFP) for a cybersecurity services contract at the request of LADWP's then-general manager, David H. Wright. Alexander, the RFP's primary drafter, was one of four members of the scoring committee for the SCPPA RFP, which was responsible for presenting its scores and recommendations to the SCPPA's Cybersecurity Working Group.

　　Alexander knew the SCPPA RFP process was intended to be a competitive, neutral and transparent process. But he manipulated that process with the goal of securing future cybersecurity work for Aventador, and, later, Ardent.

　　From late February 2019 to April 2019, Alexander used his position as the LADWP chief cyber risk officer and the vice-chair of the SCPPA's Cyber Security Working Group to influence the composition of the scoring committee to include individuals whom he could persuade to rank Ardent favorably and shared his confidential scores for the SCPPA proposals with other members of the committee to persuade them to score Ardent favorably.

　　On April 5, 2019, the SCPPA Cybersecurity Working Group informed Ardent that it would recommend Ardent for the SCPPA contract. Later that day, Alexander met with Paradis, who by that time was covertly cooperating with the FBI. During that meeting, Alexander told Paradis that he had used the SCPPA bidding process to get LADWP's "desired outcome," that is, a contract with Ardent, but in a manner that falsely appeared "completely transparent." Alexander also boasted that he was the one who had secured the contract for Ardent, informing Paradis, "that was me driving it."

On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of approximately $17 million.

In June and July of 2019, Alexander further manipulated in Ardent's favor an RFP process from LADWP for the award of a three-year, $82.5 million cybersecurity consulting services contract. Alexander was one of the RFP drafters and he solicited Paradis's edits for the drafts to enhance Ardent's ability to gain the contract over the dozen-plus other vendors.

On July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result... [winking face emoji]." Alexander responded via text message, "I know my job [crying-laughing emoji]."

During a meeting in mid-July 2019, Alexander told Paradis that, in violation of his obligation to keep his scores strictly confidential, he provided his score sheet to two other evaluators to influence them to give Ardent a high score. At this lunch meeting, Alexander informed Paradis that he was interested in working at Ardent as its business manager.

By the end of that week, Alexander solicited and agreed to accept from Paradis a future job as the chief administrative officer of Ardent, a to-be-determined executive-level annual salary, a sign-on bonus, and recompense of $60,000 per year for 30 years for his early retirement penalty from LADWP. Alexander did so intending to be influenced and rewarded in connection with his ongoing assistance in securing the award of a multimillion-dollar LADWP contract to Ardent and use of his position to guarantee more than $10 million in future task orders for Ardent under the anticipated LADWP contract.

Alexander also asked for a secret Ardent email address and laptop computer to communicate with Paradis and to secretly perform work for Ardent while he was employed at LADWP.

On July 22, 2019, the FBI executed search warrants at LADWP as part of its ongoing investigation into the department and the Los Angeles City Attorney's Office. Two days later during a voluntary interview, Alexander lied to the FBI about his conversations and agreements with Paradis. On July 26, 2019, Alexander met again with the FBI and again lied, falsely stating that he had declined any employment opportunity with Ardent and that he had never provided any guarantees to Ardent or to Paradis.

Paradis has underlined agreed to plead guilty to a bribery charge for accepting an illicit kickback of nearly $2.2 million for getting another attorney to purportedly represent his ratepayer client in a collusive lawsuit against LADWP related to the billing debacle. Paradis is cooperating with the ongoing investigation into the collusive litigation and corruption at LADWP. Paradis is expected to make his initial court appearance on December 16.

Wright, LADWP's former general manager, has underlined agreed to plead guilty to a federal criminal charge for accepting bribes from Paradis in exchange for his official action to secure a three-year, $30 million no-bid LADWP contract for Aventador. His change-of-plea hearing is expected to occur in the coming weeks.

The FBI is investigating this matter. Any member of the public who has information related to this or any other public corruption matter in the City of Los Angeles is encouraged to send information to the FBI's email tip line at pctips-losangeles@fbi.gov or to contact the FBI's Los Angeles Field Office at (310) 477-6565.

Assistant United States Attorneys Melissa Mills, Jamari Buxton and Susan Har of the Public Corruption and Civil Rights Section are prosecuting this case.

---

**Attachment(s):**
Download INFORMATION
Download PLEA AGREEMENT

**Topic(s):**
Public Corruption

**Component(s):**
USAO - California, Central

**Contact:**
Ciaran McEvoy
Public Information Officer
United States Attorney's Office
Central District of California (Los Angeles)
ciaran.mcevoy@usdoj.gov
(213) 894-4465

**Press Release Number:**
21-256

Case 2:21-ap-00171-PS    Doc 68-4    Filed 04/29/22    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 9 of 167

4/28/22, 1:10 PM          Ex-LADWP Executive Agrees to Plead Guilty to Lying to FBI About Agreeing to Accept Job in Exchange for 'Guarantees' to Contractor | USA...

Updated December 13, 2021

https://www.justice.gov/usao-cdca/pr/ex-ladwp-executive-agrees-plead-guilty-lying-fbi-about-agreeing-accept-job-exchange

# EXHIBIT E

| | |
|---|---|
| 1 | Michael N. Feuer (State Bar No. 111529)<br>City Attorney<br>mike.feuer@lacity.org |
| 2 | Kathleen A. Kenealy (State Bar No. 212289) |
| 3 | Chief Deputy City Attorney<br>kathleen.kenealy@lacity.org |
| 4 | **LOS ANGELES CITY ATTORNEY'S OFFICE** |
| 5 | 221 N. Figueroa Street, Suite 1000<br>Los Angeles, California 90012 |
| 6 | *Attorneys for Plaintiff City of Los Angeles* |

Guy C. Nicholson (State Bar No. 106133)
gnicholson@bgrfirm.com
**BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP**
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
*Attorneys for Plaintiff City of Los Angeles*

Michael A. Jones, State Bar #27311
Cody D. Vandewerker, State Bar #33385
**ALLEN BARNES & JONES, PLC**
1850 N. Central Ave., Suite 1150
Phoenix, Arizona 85004
Telephone: (602) 256-6000
Facsimile: (602) 252-4712
mjones@allenbarneslaw.com
cvandewerker@allenbarneslaw.com
*Attorneys for Plaintiff City of Los Angeles*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

In re:

PAUL OLIVA PARADIS,

Debtor.

CITY OF LOS ANGELES,

Plaintiff,

v.

PAUL OLIVA PARADIS,

Defendant/Debtor.

Chapter 7

Case No. 2:20-bk-06724-PS

Adv No. 2:21-ap-00171-PS

**AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6)**

Plaintiff, the City of Los Angeles, alleges:

### PARTIES, JURISDICTION AND VENUE

1. This Amended Complaint is brought pursuant to Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure. As alleged herein below, by this action

1843903.2 {00347070 2}

Case 2:21-ap-00171-PS   Doc 54   Filed 03/28/22   Entered 03/28/22 16:33:58   Desc
Main Document   Page 1 of 25
Case 2:21-ap-00171-PS   Doc 68-4   Filed 04/29/22   Entered 04/29/22 13:02:54   Desc
Exhibit 4   Page 82 of 167

1    Plaintiff seeks a judgment that the Debtor's indebtedness to Plaintiff is non-
2    dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

3        2.    Plaintiff the City of Los Angeles ("**City**") is, and at all times mentioned
4    herein was, a municipal corporation acting by and through its Department of Water and
5    Power ("**LADWP**").

6        3.    Debtor Paul O. Paradis ("**Paradis**") is an individual who now resides in
7    Maricopa County, Arizona.

8        4.    Paradis is the debtor in Chapter 7 bankruptcy case no. 2:20-bk-06724-PS
9    ("**Paradis Case**"), initiated on June 3, 2020 and pending before this Court.

10       5.    Paradis is also the sole owner and managing member and owner of Ardent
11   Cyber Solutions LLC f.k.a. Aventador Utility Solutions, LLC ("**Ardent**" or
12   "**Aventador**").  Ardent is the debtor in Chapter 7 bankruptcy case no. 2:20-bk-06722-PS
13   ("**Ardent Case**"), initiated on June 3, 2020 and pending before this Court.

14       6.    On November 29, 2021, Paradis plead guilty to federal charges of
15   conspiracy, honest services fraud, and bribery.  In connection with his sworn plea,
16   Paradis admitted, among other things, he "devised, participated in, and executed a
17   scheme to defraud LADWP ratepayers" with the "intent to obtain money and property
18   by means of materially false and fraudulent pretenses, representations and promises, to
19   wit, by using [Wright]'s position as General Manager of LADWP to enrich both
20   defendant Paradis and [Wright] through procurement of a $30,000,000 no-bid LADWP
21   contract for a company which . . . Paradis had an overt financial interest."  Plea
22   Agreement for Defendant Paul O. Paradis ("**Paradis' Plea**"), attached as **Exhibit A** at
23   pp. 31-32; *see also United States v. Alexander*, 543 F.3d 819, 824 (6th Cir. 2008) (taking
24   judicial notice of defendant's criminal history records that were maintained online with
25   state offender tracking systems); F. R. Evid. 201(b), (c)(1) ("A judicially noticed fact
26   must be one not subject to reasonable dispute," including facts "capable of accurate and

{00347070 2}                                    -2-

1  ready determination by resort to sources whose accuracy cannot reasonably be

2  questioned," and "[t]he court may take judicial notice on its own.").[1]

3      7.    On January 28, 2022, Paradis attended a hearing before the U.S. District

4  Court for the Central District of California where he plead guilty to the charges stated in

5  the Paradis' Plea, and he attested to the accuracy and truth of the factual statements in

6  the Paradis' Plea.  Paradis Hearing Transcript at p. 15, attached as **Exhibit B**.  The

7  Central District found Mr. Paradis guilty, incorporated the Paradis' Plea into the record,

8  and will conduct Mr. Paradis' sentencing hearing on July 19, 2022.  Paradis Hearing

9  Transcript at pp. 27-28.

10     8.    On December 6, 2021, David H. Wright ("**Wright**"), the terminated

11 General Manager of LADWP, plead guilty to federal charges of conspiracy, honest

12 services fraud, and bribery, among other things.  In connection with his plea, Wright

13 admitted Paradis' bribery arrangement with him whereby in exchange for working with

14 Paradis' fraudulent scheme to defraud the LADWP in connection with obtaining the

15 Aventador Contract, Wright was to receive significant future financial benefits,

16 including a future financial interest in Aventador and a job as CEO of Aventador with an

17 annual salary of approximately $1,000,000.  *See* Plea Agreement for David H. Wright

18 ("**Wright Plea**"), attached as **Exhibit C**.

19     9.    On January 25, 2022, Wright attended a hearing before the U.S. District

20 Court for the Central District of California where he plead guilty to the charges stated in

21 the Wright Plea, and he attested to the accuracy and truth of the factual statements in the

22 Wright Plea.  Wright Hearing Transcript at p. 14, attached as **Exhibit D**.  The Central

23 District found Wright guilty, incorporated the Wright Plea into the record, and will

24

25  [1] In all quotations from the Paradis Plea, Wright Plea, and Alexander Plea, all references to "defendant" before the individuals' names have been removed to avoid confusion in this Amended Complaint.  And, all citations and
26  quotations in this Amended Complaint from the Paradis Plea, Wright Plea, and Alexander Plea are plead by the City upon information and belief.

{00347070 2}                              -3-

conduct Wright's sentencing hearing on April 26, 2022. Wright Hearing Transcript at p. 24.

10.     On December 13, 20201, David F. Alexander ("**Alexander**"), former Chief Information Security Officer of LADWP, signed a plea agreement with the Government where he provided significant detail regarding his work with Paradis to improperly influence the LADWP request for proposal process in Ardent's favor. *See* Plea Agreement for David F. Alexander ("**Alexander Plea**"), attached as **Exhibit E**.

11.     On February 8, 2022, Alexander attended a hearing before the U.S. District Court for the Central District of California where he plead guilty to making false statements in violation of 18 U.S.C. § 1001(a)(2), and he attested to the accuracy and truth of the factual statements in the Alexander Plea. Alexander Hearing Transcript at p. 13, attached as **Exhibit F**. The Central District found Alexander guilty, incorporated the Alexander Plea into the record, and will conduct Alexander's sentencing hearing on June 7, 2022. Alexander Hearing Transcript at p. 25, 27.

12.     This is a core proceeding and this Court has jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2).

13.     Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTS COMMON TO ALL COUNTS

14.     The focus of this lawsuit is the manner in which consulting contracts were awarded to Aventador. Specifically, while purporting to act in the City's best interests, Paradis led a fraudulent criminal scheme to, among other things, bribe City officials and improperly influence the City to award a $30 million no-bid consulting contract to his wholly owned entity, Aventador, on an expedited basis ("**Aventador Contract**"). Moreover, after a California state court ordered that the City not make any further payments to Paradis or any Paradis' controlled entities, Paradis defrauded the City by providing it with a false declaration regarding the alleged sale of his ownership of

Case 2:21-ap-00171-PS    Doc 54    Filed 03/28/22    Entered 03/28/22 16:33:58    Desc
Case 2:21-ap-00171-PS    Doc Main Document 04/29/22 Page 4 of 25    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 85 of 167

1   Aventador and how he would have no further involvement with the company, which
2   later changed its name to Ardent.  With Ardent still under Paradis' ownership and
3   control, Paradis proceeded to coerce a City official into assisting him with pursuing
4   lucrative contracts with the City for Ardent.  Therefore, Paradis violated California
5   Government Code section 1090 (conflicts of interest in government contracting), which
6   independently also constituted a violation of California Government Code sections
7   12650 *et seq.*, as a matter of law.

8       15.   In 2010, the City, through its Department of Water and Power retained
9   PricewaterhouseCoopers, LLP ("**PwC**") to modernize and implement its Customer Care
10  and Billing System ("**CC&B System**").  The new CC&B System went "live" in
11  September 2013.  Unfortunately, the new CC&B System had a number of defects
12  resulting in, among other things, inaccurate and untimely bills.

13      16.   At all times relevant to the events alleged herein, Paradis was an attorney
14  at law licensed to practice in the State of New York and, on information and belief, the
15  sole owner of Paradis Law Group, PLLC ("**PLG**").  The City retained PLG as special
16  counsel, to investigate and, if warranted, commence litigation against PwC.  Litigation
17  was filed against PwC in the lawsuit known as *The City of Los Angeles v.*
18  *PricewaterhouseCoopers, LLP*, Los Angeles Superior Court Case No. BC574690
19  ("**PwC Action**").

20      17.   The CC&B System deficiencies resulted in the filing of multiple class
21  action lawsuits against the City by ratepayers alleging, *inter alia*, that they had been
22  overbilled for utility services.  One of those lawsuits, filed in April 2015, was known as
23  *Antwon Jones v. The City of Los Angeles*, Los Angeles Superior Court Case No.
24  BC577267 ("**Jones Action**").

25      18.   The Jones Action was settled in or about August 2015.  Among other
26  settlement terms, the City voluntarily agreed to take the actions necessary to remediate

Case 2:21-ap-00171-PS   Doc 54   Filed 03/28/22   Entered 03/28/22 16:33:58   Desc
Case 2:21-ap-00171-PS   Doc Main Document 04/29/22 Page 5 of 25 Entered 04/29/22 13:02:54   Desc
                        Exhibit 4   Page 86 of 167

defects in the CC&B System to ensure ratepayers would receive accurate invoices for water and power.

### Self-Dealing and Violation of Cal. Gov't Code 1090

19. Section 1090 of the California Government Code strictly prohibits certain individuals from participating in the award of a government contract in favor of any entity in which that individual has a financial interest. Contracts violating Section 1090 are void.

20. Per the settlement agreement in the Jones Action ("**Jones Settlement Agreement**"), the City willingly agreed, among other terms, to correct system defects within 18 months and to the appointment of a billing system monitor to, among other tasks, validate the queries developed to identify potential class members and the amounts owed to each. The Court in the Jones Action appointed Paul Bender of Bender Consulting, Inc. as the Independent CC&B System Monitor ("**Independent Monitor**").

21. On or about October 20, 2015, the City through the LADWP Board of Water and Power Commissioners ("**Board**") approved a contract with PLG ("**PLG Management Contract**") pursuant to which PLG would be paid up to $1.3 million to provide certain "project management services" relating to the CC&B System such as, among other services:

(a) oversight of the "CC&B System and software contracts to remediate the current billing system, and recommend" continuous system improvements,

(b) "[d]evelopment of internal guidelines and procedures to identify, escalate, and manage future complex customer billing increases", and

(c) "assist in the development of requirements for a Chief Project Manager to direct the Project Management

1    Organization (PMO), support with selection from a

2    nationwide recruiting campaign, and arrange the transition of

3    project management duties to the new Chief Project

4    Manager."

5        22.    Under the PLG Management Contract, Paradis appointed himself as lead

6    Project Manager.

7        23.    Through his work for the City, including litigating the City v. PwC case,

8    Paradis developed specialized knowledge regarding LADWP's billing system. *See*

9    Paradis' Plea, Attachment A Factual Basis ¶ 35.

10       24.    As part of the Independent Monitor's duties, the Court in the Jones Action

11   required the Independent Monitor to file periodic reports with the Court describing,

12   among other things, LADWP's progress its remediation efforts and the benchmarks

13   contained in the Jones Settlement Agreement.

14       25.    Unbeknownst to the Board, Paradis drafted nearly all of the Independent

15   Monitor's reports to the Court. *See* Paradis' Plea, Attachment A Factual Basis ¶ 40.

16       **b.    Paradis' Bribery of Wright to Secure the Aventador Contract**

17       26.    In or around early 2017, Paradis formed Aventador intending to secure a

18   lucrative no-bid contract with LADWP that would include, among other work,

19   remediation services as well as cyber- related services. *See id.* ¶¶ 43-44; Wright Plea,

20   Attachment A Factual Basis ¶ 4-5.

21       27.    In February 2017, Paradis and Wright, then the General Manager of

22   LADWP, began their scheme where Wright would work to ensure that the LADWP

23   Board awarded a contract to Aventador. *See* Paradis' Plea, Attachment A Factual Basis

24   ¶ 44; Wright Plea, Attachment A Factual Basis ¶ 4-5.  In exchange, Paradis would

25   provide Wright with significant benefits, including: (1) the title of Chief Executive

26   Officer of Aventador upon Wright's retirement from LADWP; (2) an approximately

{00347070 2}                                    -7-

1   $1,000,000 annual salary upon joining Aventador; (3) a new Mercedes SL 550 as

2   Wright's company car; and (4) potentially, a signing bonus. *See id.*

3          28.    In May 2017, Paradis and Wright drafted the Independent Monitor's

4   periodic report to the Court in the Jones Action with the primary goal of providing

5   Wright with support for the LADWP Board's vote to award the $30,000,000 no-bid

6   contract to Aventador. *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 46-47; *see also*

7   Wright Plea, Attachment A Factual Basis ¶ 10.

8          **c.    Paradis and Wright Work to Ensure the LADWP's Support for**

9          **the Aventador Contract**

10         29.    In May and June 2017, Paradis and Wright worked together to position

11  Aventador to secure the $30,000,000 no-bid contract with LADWP by, among other

12  things: editing drafts of a letter that was ultimately sent to the LADWP Board

13  summarizing the purpose and terms of the proposed Aventador contract and explaining

14  why alternatives to awarding the contract on a no-bid basis were unsatisfactory,

15  preparing and refining Wright's oral and written presentation to the LADWP Board

16  touting the Aventador contract, strategizing to remove impediments to Aventador

17  receiving the contract, omitting Paradis' ownership of Aventador from Wright's oral and

18  written presentation, and Wright worked to convince LADWP Board members to vote in

19  favor of the contract in favor of Aventador. *See* Paradis' Plea, Attachment A Factual

20  Basis ¶ 48; *see also* Wright Plea, Attachment A Factual Basis ¶¶ 13-18.

21         30.    On June 6, 2017, the LADWP Board met to consider the Aventador

22  contract. During his presentation to the LADWP Board immediately before the vote,

23  Wright cited the Independent Monitor's report drafted by Paradis, told the LADWP

24  Board that LADWP could not meet its obligations under the *Jones v. City* settlement

25  agreement unless it contracted with Aventador, and conveyed a sense of urgency to

26

approve the Aventador contract. *See* Paradis' Plea, Attachment A Factual Basis ¶ 49; *see also* Wright Plea, Attachment A Factual Basis ¶ 20.

31.     Wright did not disclose to the LADWP Board, that Wright had solicited, and Paradis had agreed to give Wright, an annual salary of approximately $1,000,000, a luxury company Mercedes, and the title of Aventador's CEO once Wright retired from LADWP. *See id.*

32.     Relying on the Independent Monitor's report that Paradis prepared, the written materials that Wright and Paradis prepared, and Wright's presentation that Paradis prepared with Wright, in or about June 2017, the Board approved entering into the aforementioned sole-source agreement with Aventador awarding it a three-year $30 million contract. *See* Paradis' Plea, Attachment A Factual Basis ¶ 49; *see also* Wright Plea, Attachment A Factual Basis ¶ 21.

33.     The June 2017 Board materials related to awarding Aventador the contract stated, among other things, that:

> Significantly, the Monitor informed the Court of the Monitor's belief that "LADWP lacks well-qualified IT project management personnel and the Department therefore lacks the capability required to successfully manage very large scale IT implementation projects." The Monitor further informed the Court that, "because the Department lacks these internal resources, it must procure such services on a contracted basis and, in the past, has often failed to do so."

> . . . This proposed contract is also intended to ameliorate any concerns the Monitor may have concerning "LADWP's (i) lack of well-qualified IT project management personnel and (ii) prior failures to procure such services on a contracted basis.

**d.      Paradis and Wright Expand their Aventador Scheme**

34.     During the remainder of 2017, throughout 2018, and into early 2019, Wright continued to collaborate with Paradis to build and market Aventador, and to seek

1  additional lucrative business opportunities for Aventador. Wright Plea, Attachment A

2  Factual Basis ¶ 23.

3      35.    In reaffirming his commitment to secretly lobby for Aventador during his

4  remaining tenure at LADWP, Wright requested a substantial sign-on bonus from Paradis

5  and an increase in his ownership position. *See id.* ¶ 32.

6      36.    Because he could not receive money for his work for Aventador while at

7  LADWP, Wright and Paradis discussed compensation to Wright with retroactive money

8  after he retired from LADWP. *Id.* In discussing this illicit payment arrangement,

9  Wright referred to Paradis as his "ATM," or "automatic teller machine." *Id.*

10     37.    To further implement and conceal their bribery scheme, Paradis and

11  Wright used burner phones, "secure laptops", Paradis provided Wright with an

12  Aventador email address to use, and Paradis conducted an orchestrated "dead drop"

13  encounter so that Wright could secretly obtain his wiped phone and a burner phone from

14  Paradis. *Id.* ¶ 23, 30.

15     e.    **Termination of the Aventador Contract**

16     38.    During a public hearing in the PwC and Jones Actions on March 4, 2019,

17  the California State Court ("**State Court**") inquired of Jack Landskroner, counsel for the

18  Jones class, whether he had shared any portion of the attorneys' fees (in excess of $10

19  million) paid by the City to his law firm as part of the Jones settlement with any attorney

20  representing the City. Landskroner asserted his Fifth Amendment rights and refused to

21  respond to the State Court's inquiry.

22     39.    Consequently, the State Court entered an order, without objection from the

23  City, prohibiting the City from making any further payments to Paradis or to any entity

24  in which he held an interest (which included Aventador) ("**State Court Order**").

25  **Exhibit G** at p. 2.

26  / / /

1    40.    Also on March 4, 2019, the State Court ordered that Paradis immediately
2    appear for deposition at the courthouse. *See id.* at p. 2. As Landskroner did, Paradis
3    also asserted his rights against self-incrimination and did not provide any substantive
4    testimony respecting the aforementioned subject matter generally and, specifically,
5    whether he illegally received a portion of the attorneys' fees paid by the City to
6    Landskroner upon settlement of the Jones Action.

7    41.    Shortly thereafter, Paradis withdrew as the City's special counsel in the
8    PwC Action.

9    42.    As of March 4, 2019, Aventador had received at least $21.9 million in
10   public funds under the Aventador Contract.

11   43.    On March 14, 2019, the City formally notified Aventador that it was
12   terminating the Aventador Contract effective as of April 13, 2019.

13   **THE ARDENT BRIBERY SCHEME**

14   **f.    Paradis Deceives the City Regarding His Ownership and**
15   **Affiliation with Ardent**

16   44.    On March 14, 2019, under penalty of perjury, Paradis purported to divest
17   himself of ownership in, and affiliation with, Aventador by signing a declaration
18   ("**Paradis Declaration**") attesting that he had transferred his interest therein to one of
19   Aventador's employees, Ryan Clarke who, in turn, changed the company's name to
20   Ardent. Paradis Declaration, **Exhibit H** ¶¶ 2, 3, 5.

21   45.    With regard to Ardent, Paradis also attested: "I will not perform any work
22   for the Company or any successors to the Company, or have access to the Company's
23   offices or to those of any successor to the Company." Paradis Declaration ¶ 6.

24   46.    And, Paradis stated: "I will not receive any remuneration of any nature
25   whatsoever arising out the work performed by the Company or any successors to the
26   Company after March 14, 2019." *Id.* ¶ 8.

{00347070 2}                          -11-

47. In his Bankruptcy Schedules, executed under penalty of perjury, Paradis revealed that he supposedly sold his membership interest in Aventador to Ryan Clarke in exchange for "an antique coin valued at $1,057.00." Paradis Case ECF No. 1 at p. 61.

48. Several months after the sale of Aventador to Clarke, Paradis (in his words) "reversed" this purported transaction, once again becoming Ardent's (f.k.a. Aventador) sole owner and managing member. *See* Paradis Case ECF No. 1 at p. 61; *see also* Ardent Case ECF No. 17 at p. 20 (listing Paradis as Ardent's managing member).

49. As the managing member of Ardent (f.k.a. Aventador), Paradis executed the Bankruptcy Schedules in the Ardent Case also under penalty of perjury, which state, among other things, Paradis owns Ardent as its sole member and serves as its managing member. *See* Ardent Case ECF No. 17 at pp. 1, 21, and 22.

50. According to Ardent's Bankruptcy Schedules, in December 2019, Paradis took a draw of $1,500 from Debtor. *Id.* at p. 20.

### g. Paradis Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Ardent

51. From May 29, 2017 until February 25, 2019, Alexander was the Chief Information Security Officer of LADWP. *See* Alexander Plea, Attachment A Factual Basis ¶ 2. From February 25, 2019 until on or about August 12, 2019, Alexander was the Chief Cyber Risk Officer of LADWP. *See id.*

52. Beginning in 2017, Alexander developed a professional relationship with Paradis. *See id.* ¶ 3.

53. At all relevant times, the Southern California Public Power Authority ("**SCPPA**") was a collective group of eleven municipal utilities that included LADWP. *See id.* ¶ 5.

/ / /

54. On February 8, 2019, the SCPPA issued a Request for Proposal ("**RFP**") for a cybersecurity services contract ("**SCPPA RFP**") at the request of LADWP's then-General Manager, David Wright. *See id.* ¶ 6. Alexander, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP and one of the four members of the scoring committee for the SCPPA RFP. *See id.*

55. Alexander manipulated the SCPPA RFP process with the goal of securing future cybersecurity work for Aventador. *See id.* ¶ 8. After Aventador became Ardent, Alexander sought to secure future work for Ardent because he knew and understood that Paradis was serving as Ardent's principal, despite that he was supposed to have no role or involvement with Ardent at that point. *See id.*

56. On April 5, 2019, the SCPPA Cybersecurity Working Group informed Ardent that it would recommend Ardent for the SCPPA Contract. *See id.* ¶ 10.

57. On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of $17,000,000. *See id.* ¶ 12.

58. Shortly after SCPPA awarded the contracts, the City instructed LADWP to re-bid the contracts through the standard LADWP procurement process ("**LADWP RFP**"), instead of through SCPPA. *See id.* ¶ 13. In the interim, the LADWP Board of Commissioners approved short-term 'bridge' contracts for Ardent and the other two vendors. *See id.*

59. Specifically, following entry of the State Court Order on March 4, 2019 and to avoid a potential lapse of critical services, in or about April 2019, the City agreed to a limited, short-term contract with Ardent, on a strictly interim basis ("**Ardent Contract**").

60. At the time the City entered into the Ardent Contract, it relied upon Paradis' sworn statements in the Paradis Declaration that he would no longer own Ardent, conduct any work for Ardent, or receive any compensation from Ardent. *See*

{00347070 2}    -13-

Case 2:21-ap-00171-PS    Doc 54    Filed 03/28/22    Entered 03/28/22 16:33:58    Desc
Case 2:21-ap-00171-PS    Doc 58-4 Main Document    Filed 04/29/22    Page 13 of 25    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 94 of 167

1 | Paradis Declaration.

2      61.    It was critically important to the City that Paradis' statements in the
3 | Paradis Declaration were true and that the City could rely on such statements to comply
4 | with the State Court Order, and the City did rely on such statements in proceeding with
5 | the Ardent Contract.

6      62.    The City ultimately paid Ardent the amount of $1,777,775 under the
7 | Ardent Contract.

8      63.    As discussed herein, through the statements on Ardent's Bankruptcy
9 | Schedules and the Alexander Plea, the City has discovered that Paradis' statements in
10 | the Paradis Declaration were false.

11      64.    Contrary to the sworn statements in the Paradis Declaration, at all times
12 | relevant to the events alleged herein, Ardent was, and to this day is, wholly owned and
13 | controlled by Paradis. The City would not have entered into the Ardent Contract had it
14 | been aware of the Paradis' false statements in the Paradis Declaration.

15      **h.**     **The LADWP RFP Process**

16      65.    On June 17, 2019, LADWP issued the LADWP RFP for the award of a
17 | three-year, $82.5 million Cybersecurity Consulting Services contract. *See* Alexander
18 | Plea, Attachment A Factual Basis ¶ 14. State and local laws and regulations required the
19 | LADWP RFP process to be a fully competitive, neutral, and transparent process in order
20 | to ensure fair competition amongst the vendors and to ensure that LADWP acquired the
21 | services of a qualified vendor that satisfied its requisite criteria. *See id.*

22      66.    Alexander was one of seven members of the evaluation committee that
23 | was responsible for reviewing the proposals submitted in response to the LADWP RFP,
24 | and he signed a sworn nondisclosure agreement that he would not discuss their scoring
25 | on the proposals with anyone. *See id.* ¶ 15.

26 | / / /

{00347070 2}
-14-

Case 2:21-ap-00171-PS   Doc 54   Filed 03/28/22   Entered 03/28/22 16:33:58   Desc
Case 2:21-ap-00171-PS   Doc 68 Document  04/29/22 Page 14 of 25   Filed 04/29/22 13:02:54   Desc
Exhibit 4   Page 95 of 167

67.     In late May 2019, before the LADWP RFP was issued, Alexander began his efforts to also manipulate the LADWP RFP process to favor Ardent. *See id.* ¶ 16. Alexander shared drafts of the LADWP RFP with Paradis and solicited Paradis's edits to improve Ardent's odds of being awarded the contract. *See id.*

68.     After the LADWP RFP was issued, in June and July 2019, Alexander worked closely with Paradis to help him improve Ardent's proposal for submission, including by reviewing and editing drafts of Ardent's proposal. *See id.* ¶ 17.

69.     On July 10, 2019, Paradis caused Ardent to submit its proposal to the LADWP RFP. *See id.* ¶ 18.

70.     Working in coordination with Paradis, Alexander undertook efforts to influence the other members of the evaluation committee to rate Ardent favorably regarding its proposal for the LADWP RFP. *See id.* ¶ 19.

71.     Among other similar communications, on July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result...[winking face emoji]." Alexander responded via text message, 'I know my job [crying-laughing emoji].'" *Id.* ¶ 20.

i.      **Paradis' Bribery of Alexander in Exchange for Future Task Orders for Ardent**

72.     In July 2019, Alexander and Paradis discussed a proposed job for Alexander as Ardent's Chief Administrative Officer with "platinum-level health insurance benefits" and a prospective start date of in October 2019 so that Alexander could continue to improperly influence the LADWP RFP Process in Ardent's favor. *See id.* ¶¶ 24-25.   At Paradis's suggestion, Alexander agreed to create a written job description of Alexander's intended role at Ardent, along with his terms and conditions for the job. *See id.*

73. Upon discovering that retiring early from the LADWP would cause him to lose retirement income, Alexander and Paradis discussed that Paradis would guarantee additional compensation from Ardent to make up for Alexander's loss in LADWP retirement income. *See id.* ¶ 28.

74. In exchange for Alexander's additional compensation from Ardent, Alexander and Paradis discussed that while Alexander remained at LADWP, he would provide certain guarantees to Paradis and Ardent in the form of future task orders from LADWP that assigned work for which Ardent could be compensated. *See id.* Alexander would also procure task orders for Ardent's cybersecurity work under the anticipated LADWP contract, and he would also guarantee Ardent task orders for cybersecurity training. *See id.*

75. Specifically, Alexander told Paradis that he would "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors. *Id.* Additionally, Alexander stated that he would help to push work towards Ardent in a third sector, namely remediation. *See id.*

76. Alexander and Paradis discussed the need for Alexander to stay on longer at LADWP to deliver on these guarantees. In exchange for Alexander's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time Alexander stayed on at LADWP "from our deal on." *Id.*

77. Consistent with their bribery arrangement, Alexander continued his efforts to manipulate the LADWP RFP process in Ardent's favor. *See id.* ¶ 30.

78. In July 2019, to further implement and conceal their bribery scheme, Paradis and Alexander agreed that Ardent would issue Alexander a laptop and a secret Ardent email address for Alexander's use. *See id.* ¶ 32.

/ / /

/ / /

## PARADIS' ADMISSION TO HIS CRIMES AGAINST THE CITY

79.     As part of the Paradis' Plea, Paradis specifically admitted to his criminal fraud against the City and the acts of bribery that he conducted to obtain the Aventador Contract, including as follows:

### i.     Conspiracy

80.     "Beginning on or about February 15, 2017, and continuing through on or about March 6, 2019, Paradis knowingly and willfully conspired and agreed with [Wright] and others to knowingly and intentionally commit honest services wire fraud and federal program bribery." Paradis' Plea, Attachment A Factual Basis ¶ 67.

### ii.     Fraud

81.     "Beginning in or around February of 2017, Paradis and [Wright], knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud LADWP ratepayers as to material matters, including by depriving LADWP ratepayers of their right to the honest services of [Wright] and LADWP Board Member." *Id.* ¶ 68.

82.     "Paradis did so with the intent to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit, by using [Wright]'s position as General Manager of LADWP to enrich both Paradis and [Wright] through the procurement of a $30,000,000 no-bid LADWP contract for a company in which [Wright] had a covert financial interest and Paradis had an overt financial interest, and through the concealment of material information . . . ." *Id.* ¶ 69.

### iii.     Bribery

83.     "Between on or about February 10, 2017, and on or about March 6, 2019, Paradis corruptly gave, offered, and agreed to give something of value to [Wright], intending to influence and reward him in connection with a business, transaction, and series of transactions of LADWP having a value of $5,000 or more. Specifically,

{00347070 2}                                          -17-

Case 2:21-ap-00171-PS    Doc 54    Filed 03/28/22    Entered 03/28/22 16:33:58    Desc
Case 2:21-ap-00171-PS    Main Document    Filed 04/29/22    Page 217 of 225    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 98 of 167

1  Paradis gave, offered and agreed to give financial benefits to [Wright], including a future

2  financial interest in Aventador, the promise of a future job as the CEO of Aventador

3  with an annual salary of approximately $1,000,000, and related perquisites, meals,

4  travel, and event tickets, intending to influence and reward [Wright] in connection with a

5  $30,000 no-bid LADWP contract award to Aventador, including in: (1) generating and

6  submitting a Board Letter intended to support a vote by the LADWP Board in favor of

7  Aventador's contract; (2) meeting and conferring with individual LADWP Board

8  members to advocate on behalf of the Aventador contract and solicit the Board

9  members' votes; (3) preparing and delivering a presentation to the LADWP Board

10 asserting that there were no viable alternatives to the Aventador contract, that the need

11 for Aventador's services was dire and immediate, and urging the Board to vote in favor

12 of the contract; (4) exerting pressure on LADWP Board members and other LADWP

13 City officials and employees to influence the approval process of the Aventador

14 contract." Paradis' Plea, Attachment A Factual Basis ¶ 70.

## PARADIS' VIOLATION OF CALIFORNIA GOVERNMENT CODE 1090

16     84.    By reason of his advice and participation, on the LADWP's behalf, in the

17 process by which the Board ultimately decided to award the Aventador Contract and

18 Ardent Contract, Paradis was temporarily performing a public function and therefore,

19 violated section 1090 of the California Government Code strictly prohibiting such

20 individuals from participating in the award of a government contract in favor of any

21 entity in which that individual has a financial interest.

22     85.    Moreover, at all relevant times, Wright and Alexander were performing a

23 public function for the City, and their concealed respective financial interests in the

Aventador and Ardent Contracts were additional violations of section 1090 of the

24 California Government Code.

25 / / /

26 / / /

{00347070 2}                                                   -18-

1    86.    The Aventador Contract and Ardent Contract are void under California

2  Government Code section 1090.  As described below, the same conduct underlying

3  Paradis' violation of California Government Code section 1090 constitutes a violation of

4  the California Government Code sections 12650 *et seq.*, as well as actual fraud, fraud or

5  defalcation while acting in a fiduciary capacity, and/or willful and malicious injury

6  under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Any damages, including those

7  available under California Government Code section 1090 or otherwise, traceable to

8  Paradis' non-dischargeable conduct are non-dischargeable.  *Cohen v. De La Cruz*, 523

9  U.S. 213, 218 (1998).

10    87.    As a direct and proximate result of the foregoing misconduct, the City is

11 entitled to a non-dischargeable judgment against Paradis consisting of all amounts

12 received by Aventador under the Aventador Contract of no less than $23,677,775, plus

13 interest thereon, as well as the remedies allowable under California Government Code

14 section 12651(a), in an amount not fully ascertained by the City but which the City is

15 informed and believes will be in excess of the aforementioned amount.

16    88.    Paradis' decision to violate California Government Code section 1090 and,

17 as a consequence thereof, section 12650 *et. seq.* for personal gain constitutes actual

18 fraud, fraud or defalcation while acting in a fiduciary capacity, and/or willful and

19 malicious injury under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Any damages,

20 including those available under the Act, traceable to Paradis' non-dischargeable conduct

21 are non-dischargeable.  *Cohen*, 523 U.S. at 218.

22    89.    In committing the acts and wrongs described in this Complaint, Paradis

23 has been guilty of oppression, fraud and malice toward the City which further entitles

24 the City to a non-dischargeable judgment for damages, including automatic treble

25 damages under section 12651(a) of the California Government Code, in an amount

26 according to proof.

{00347070 2}                                    -19-

90.     As set forth herein and admitted by Paradis in the Paradis' Plea, Paradis' actions against the City were performed with an intentional and culpable state of mind. *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 31-32 and 67-70.

91.     As a result and as set forth herein, observing the corporate form to shield Paradis from individual liability for the damages caused by him and Aventador/Ardent to the City would sanction a fraud and/or promote other injustice.

## FIRST CLAIM FOR RELIEF

## (Section 523(a)(2)(A) – Debt Obtained Through Fraud,

## False Pretenses, and False Representation)[2]

92.     The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

93.     As set forth herein and admitted by Paradis in the Paradis' Plea, Paradis, with intent to defraud, devised, participated in, and executed a scheme to defraud the City with the intent to obtain money by means of materially false and fraudulent pretenses, representations, and promises to City officials to enrich himself through the procurement of the $30 million no-bid Aventador Contract and the Ardent Contract, while concealing material information from the City, including his overt financial interests in the Aventador Contract and the Ardent Contract.   *See* Paradis' Plea, Attachment A Factual Basis ¶¶ 31-32 and 67-70.

### a.     Aventador Contract

94.     As set forth, among other sections, in paragraph nos. 5-7, 14, 42, and 64 herein, Paradis obtained at least $21.9 million ("**Aventador Funds**") from the City

---

[2] "As the statute is framed in the disjunctive, while a plaintiff asserting a § 523(a)(2)(A) claim must demonstrate that property was obtained by false pretenses, a false representation, or actual fraud, a showing of only one of the three offending conducts is required." *In re Begun*, 136 B.R. 490, 494 (Bankr. S.D. Ohio 1992) (citation omitted). Here, the City is pursuing its § 523(a)(2)(A) claim against Paradis under fraud, and, in the alternative, false pretenses or false representation.

1 related to the Aventador Contract, by and through his wholly owned entity Aventador.

2 95. As set forth, among other sections, in paragraph nos. 5-7, 14, 25-37, 42,

3 64, 79-83, and 88 herein, Paradis had an overt financial interest in the Aventador

4 Contract and intended to enrich himself through the Aventador Contract.

5 96. As set forth herein, Paradis, by and through his wholly owned entity

6 Aventador, obtained the Aventador Contract and the resulting Aventador Funds from the

7 City by Paradis' fraud, false pretenses, and false representations to the City.

8 97. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, and

9 79-83 herein, Paradis made false material representations and false pretenses to the City.

10 98. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83,

11 and 88-90 herein, Paradis knew that his false representations and false pretenses to the

12 City were false.

13 99. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83,

14 and 88-90 herein, Paradis made the false representations and false pretenses to the City

15 with the intention and purpose of deceiving the City.

16 100. As set forth, among other sections, in paragraph nos. 6-9, 14, 25-37, 79-83,

17 and 88-90 herein, herein, the City relied on Paradis' false representations and false

18 pretenses.

19 **b. Ardent Contract**

20 101. As set forth, among other sections, in paragraph nos. 5, 10-11, 14, and 44-

21 78 herein, Paradis obtained at least $1,777,775 ("**Ardent Funds**") from the City related

22 to the Ardent Contract, by and through his wholly owned entity Ardent (formerly known

23 as Aventador).

24 102. As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78,

25 and 88 herein, Mr. Paradis had an overt financial interest in the Ardent Contract and

26 intended to enrich himself through the Ardent Contract.

1      103.   As set forth herein, Paradis, by and through his wholly owned entity

2   Ardent, obtained the Ardent Contract and the Ardent Funds from the City as a result of

3   Paradis' fraud, false pretenses, and false representations to the City.

4      104.   As set forth, among other sections, in paragraph nos. 5, 10-11, 14, and 44-

5   78 herein, Paradis made false material representations and false pretenses to the City.

6      105.   As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78,

7   and 88-90 herein, Paradis knew that his false representations and false pretenses to the

8   City were false.

9      106.   As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78,

10   and 88-90 herein, Paradis made the false representations and false pretenses to the City

11   with the intention and purpose of deceiving the City.

12      107.   As set forth, among other sections, in paragraph nos. 5, 10-11, 14, 44-78,

13   and 88-90 herein, the City relied on Paradis' false representations and false pretenses.

14   **c.**   **Damages**

15      108.   The City has suffered damages as a direct and proximate result of its

16   reliance on Paradis' fraud, false representations, and false pretenses related to the

17   Aventador Contract and the Ardent Contract.  The City is entitled to a non-dischargeable

18   judgment against Paradis for damages in an amount, according to proof, which has not

19   been fully ascertained but which the City is informed and believes, and thereon alleges,

20   will be in excess of $23,677,775, exclusive of interest.

21      109.   Accordingly, the City is entitled to a judgment determining that the City's

22   debt is non-dischargeable against Paradis under 11 U.S.C. § 523(a)(2)(A).

23   / / /

24   / / /

25   / / /

26   / / /

Case 2:21-ap-00171-PS   Doc 54   Filed 03/28/22   Entered 03/28/22 16:33:58   Desc
Case 2:21-ap-00171-PS   Main Document   Page 22   of 35
Doc 68   Filed 04/29/22   Entered 04/29/22 13:02:54   Desc
Exhibit 4   Page 103 of 167

## SECOND CLAIM FOR RELIEF

### (Section 523(a)(4) – Fraud/Defalcation While

### Acting in a Fiduciary Capacity)

110.    The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

111.    As set forth, among other sections, in paragraph nos. 6-7, 14-33 and 44-89 herein, at all times material to the events alleged in this Complaint, a fiduciary relationship of trust and confidence existed between the City and Paradis by reason of Paradis performing, on a temporary basis, a public function.

112.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-90 herein, Paradis intentionally breached his fiduciary duties by committing the acts and wrongs alleged in this Complaint which, in turn, allowed Paradis to illegally abscond with millions of dollars in public funds while at all times falsely purporting to act in the best interests of the City.

113.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-90 herein, Paradis has intentionally or recklessly failed to account for the public funds taken under false pretenses from the City, or otherwise in violation of California law, which therefore, caused the City to suffer damages and entitles it to a judgment determining that the debt owing to the City is non-dischargeable under 11 U.S.C § 523(a)(4) by reason of Paradis' fraud or defalcation while acting in a fiduciary capacity.

114.    In the alternative, as set forth in Claim One of this Complaint, the City has suffered damages as a result of Paradis committing fraudulent acts while temporarily performing a public function ostensibly on the City's behalf.

115.    Accordingly, the City is entitled to a judgment determining that the City's debt is non-dischargeable for Paradis' fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

Case 2:21-ap-00171-PS    Doc 54    Filed 03/28/22    Entered 03/28/22 16:33:58    Desc
Case 2:21-ap-00171-PS    Document Filed 04/29/22 23:05:25    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 104 of 167

## THIRD CLAIM FOR RELIEF

### (Section 523(a)(6) – Willful and Intentional Injury)

116.    The City realleges and incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

117.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis either had a subjective motive to inflict injury on the City or believed that an injury was substantially certain to occur as a result of his conduct.

118.    As set forth herein, Paradis' actions were wrongful because, among other things, they were in violation of the statutes referenced in paragraph nos. 14 and 84-89.

119.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis' actions were intentional and deliberate.

120.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, and 44-90 herein, Paradis' actions necessarily and proximately caused the City's injury.

121.    As set forth, among other sections, in paragraph nos. 6-7, 10-11, 14, 25-37, 44-83, and 88-90 herein, Paradis' actions were done without just cause or excuse.

122.    In the alternative and as alleged in Claims One and Two of this Complaint, under California law, Paradis' actions constitute, among other things, fraud and breach of fiduciary duty.

123.    Accordingly, the City has suffered damages as a result of Paradis' actions, and the City is entitled to a judgment determining that its debt is non-dischargeable for Paradis' willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, the City requests that this Court enter judgment in favor of the City against Paradis as follows:

A.    Allowing the City's claim in an amount of no less than $23,677,775;

B.    Determining that the City's claim is not discharged as per 11 U.S.C. § 523(a)(2)(A);

Case 2:21-ap-00171-PS    Doc 54    Filed 03/28/22    Entered 03/28/22 16:33:58    Desc
Case 2:21-ap-00171-PS    Main Document    Filed 04/29/22    Page 24 of 25    Entered 04/29/22 13:02:54    Desc
Exhibit 4    Page 105 of 167

1        C.     Determining that the City's claim is not discharged pursuant to 11 U.S.C.

2 § 523(a)(4);

3        D.     Determining that the City's claim is not discharged pursuant to 11 U.S.C.

4 § 523(a)(6);

5        E.     Granting relief from the automatic stay of 11 U.S.C. § 362(a), and any

6 other stays or injunctions in the case, in order for the City to record and enforce a

7 judgment entered pursuant to this Complaint; and

8        F.     For such other further relief as the Court deems just and proper.

9        DATED: March 28, 2022.

10
**ELLIS GEORGE CIPOLLONE**       **ALLEN BARNES & JONES, PLC**
**O'BRIEN ANNAGUEY LLP**

11

12
*/s/ Guy C. Nicholson (with permission)*    */s/ MAJ #27311*
Guy C. Nicholson               Michael A. Jones
2121 Avenue of the Stars, Suite 2800   Cody D. Vandewerker

13
Los Angeles, California 90067      1850 N. Central Ave. Suite 1150
Attorneys for the City of Los Angeles   Phoenix, Arizona 85004

14
                                 Attorneys for the City of Los Angeles

15

16

17

18

19

20

21

22

23

24

25

26

{00347070 2}              -25-

Case 2:21-ap-00171-PS   Doc 54   Filed 03/28/22   Entered 03/28/22 16:33:58   Desc
Case 2:21-ap-00171-PS   Main Document   Filed 04/29/22   Page 225 of 85   Entered 04/29/22 13:02:54   Desc
Exhibit 4   Page 106 of 167

# EXHIBIT F

**Text Message**

From:  Paul Paradis

To:     Andrew Civetti, FBI

Date:  April 4, 2019

Time:  10:09 PM

Also, before I went out to dinner, I sent Kwok Confide message and asked if he had any updates?

He texted back on Confide that he did and would call me later. He called me at 6:27 pm and we spoke for 8 minutes. I taped our conversation.

On the call tonight, Kwok said that Mel and Cynthia's plan to proceed with awarding Ardent a contract through SCPPA is on track and the timing of implementing that plan has only moved back one day from our conversation last night because of an issue with one City Council meeting being moved back one day.

Not much new information from Kwok tonight other than he confirmed the amount of the contract that Mel and Cynthia are planning to have the LADWP Board approved have the LADWP has a 6 month term and is for $17 million.

Significantly, Kwok said that Mel and Cynthia have already determined that Ardent will be paid 88% of the $17 million (approximately $14.96 million).

This works out to be roughly $2.49 million per month over the 6 month term — which is the current approximate monthly burn rate.

After this call, Kwok sent me two Confide messages where he said the one unknown right now is whether the City Council will simply go along with the contract award, or "pull" the item for discussion or some other action by the City Council during the 5 meeting waiting period. Kwok said Mel and Cynthia see this as one of the only risks to Ardent getting this contract at this point. I have video of Kwok's two Confide messages.

# EXHIBIT G

**Text Message**

From:   Paul Paradis

To:     Andrew Civetti, FBI

Date:   April 5, 2019

Time:   1:31 PM

Just finished lunch with David Alexander. Entire conversation is taped.

He admitted to fixing the SCPPA process to select Ardent as the vendor for DWP and also admitted that DWP has been falsifying regulatory records since 2007 to cover up its non-compliance with CIP standards and other regulatory requirements.

He went so far as to tell me that he believes the Senior LADWP leadership on the power side actually budgets $ every year for fines because they pay lesser amounts in fines and self-report violations so that they can avoid regulators discovering the numerous critical conditions that exist that would cause LADWP to be fined millions of $ if discovered by regulators.

He is open to meeting again for lunch or dinner.

# EXHIBIT H

**Text Message**

From:   Paul Paradis

To:       Andrew Civetti, FBI

Date:   April 5, 2019

Time:   4:53 PM

I was on a 36 minute call with Mel and Cynthia and Ryan Clarke and Jeremy that started at 3:30 pm PT. Call is taped.

I think this tape, when combined with the taped lunch conversation with David Alexander from earlier today, will demonstrate the fact that DWP used the SCPPA contract process to make it appear as though DWP engaged in a competitive bid review process when in fact, there was no competitive bid process at all.

Both Mel and Cynthia stated that Ardent had already been selected by them to perform Cyber Work for LADWP despite the fact that the SCPPA board is only set to vote on April 18th. There are a number of other admissions made by both of them on this call that I believe firmly demonstrate the correctness of the contract bid rigging theory that we have been discussing all week.

I still need to call Kwok and Bender back and will update you after those calls. Thanks.

# EXHIBIT I

**Text Message**

From:  Paul Paradis

To:    Andrew Civetti, FBI

Date:  April 7, 2019

Time:  3:38 PM

After texting back and forth using Confide over the past couple days, Stephen Kwok called me today at 11:30 am. In order to record the call, I did not answer and then called him back. Call lasted 16 minutes and is recorded.

During the call Kwok again stated that both Mel and Cynthia (President and Vice President of the LADWP Board of Commissioners) have actual knowledge that the SCPPA process is being used to falsely create the appearance that the contract that will soon be awarded to Ardent Cyber Solutions was awarded on the basis of a competitive evaluation process when, in fact, it was not.

He then got into a number of issues that he asked me for help with. I tried to defer answering those questions until we can meet with your team and discuss how they want me to proceed. Kwok wants to meet with me sometime before Wednesday or Thursday this week so I can review documents relating to the soon to be awarded contract with him. I told him to let me know when and where he wants to meet. I need to know the approach your team wants me to take with him before I meet with him.

Thanks.

# EXHIBIT J

**Text Message**

From:   Paul Paradis

To:     Andrew Civetti, FBI

Date:   April 9, 2019

Time:   9:25 PM

I just finished a 34 minute conversation with Kwok about the SCPPA contract award, etc. He re-affirmed a number of things that he has previously stated about the process by which Ardent is going to be awarded a contract for approximately $14-$15 mm out of a total of $17 mm.

He requested that I meet him on Friday morning to walk through the allocation of work among vendors and the creation of several task orders for Ardent and the other two vendors (two other vendors are also being "selected" in order to create the appearance that a "competitive" selection process was employed).

The two other vendors who are being selected are Archer and Dragos. It is worth noting that I have now repeatedly been told the names of all 3 vendors who will be selected by the purportedly competitive selection process used by SCPPA despite the fact that the SCPPA Board is only going to vote on the approvals on April 18th.

One of the tasks that Kwok is considering assigning to Dragos is CIP Auditing.

Because we have not discussed how you will want me to handle this topic when I meet with Kwok, I intentionally steered him away from assigning CIP auditing to Dragos until we can discuss further with your team because of the potential impact that a third party auditor might have on the investigation into the LADWP's falsification of regulatory filings as discussed at length by David Alexander during our lunch on April 5th.

We ended the call by agreeing to speak on Thursday night to pick a place to meet around 11 am on Friday April 12th. Kwok suggested that we either meet at my apartment in Santa Monica, or at We Work in the Gas Tower Building downtown.

See you at 8:30 am tomorrow. Thanks.

# EXHIBIT K

**Text Message**

From: Paul Paradis

To: Andrew Civetti, FBI

Date: April 16, 2019

Time: 4:18 PM

Andy,

Just finished up lunch with Kwok — ran from 1:06 pm to 3:42 pm. We walked through edits to each of the task orders that Kwok has been directed to prepare for each of the 3 vendors who will be awarded contracts when the LADWP Board meets and votes on April 23rd.

Interestingly, Kwok told me for the first time today that the head of purchasing at LADWP, Erin Henning, told Donna Stevener (one of two CAOs at LADWP) that Kwok could speak directly to the vendors who will be awarded the contracts next week as long as there was no written evidence that he had done so. This is in clear violation of the LADWP and SCPPA rules governing the contracting process.

I was able to get hard copies of each of the draft task orders from him for Ardent and for Archer and Dragos as well and will give them to you when I see you.

Kwok is going to do revisions to the task orders that were discussed during the lunch and said he will give me revised hard copy versions reflecting those changes late tomorrow.

The entire lunch was videotaped and audio recorded using the small recorder as a back up.

Many of the prior admissions that have been made were repeated during this meeting and he reconfirmed that Mel and Cynthia are clearly at the helm of using the SCPPA process to create the artificial appearance that the SCPPA contract that is going to be voted on by SCPPA on 4/18 was "competitively" awarded.

I will be in touch when I confirm Josh Pertuttla meeting for Thursday morning and Dave Wright meeting for Friday afternoon.

Thanks.

# EXHIBIT L

**Text Message**

From:  Paul Paradis

To:     Andrew Civetti, FBI

Date:  April 18, 2019

Time:  8:29 AM

Heading to meet Josh right now. Just had approx 15-20 minute conversation with Wright. Mayor's office knows about bid rigging to steer Ardent contract and is actively involved in setting pricing strategy. Call recorded. Will call you afterward.

# EXHIBIT M

## Text Message

From:  Paul Paradis

To:      Andrew Civetti, FBI

Date:  April 18, 2019

Time:  1:41 PM

Andy,

Dave Wright's address in Palm Springs is: 891 N. via Miraleste. He now wants me to be at his house tomorrow at 2:30 pm tomorrow afternoon for a "planning session" that he anticipates will last at least 2+ hours. I am still working on getting his son Spencer's address in LA.

I had another conversation with Wright at noon today that was also recorder. I also just had another conversation with Bender that was also recorded. Kwok also just called me and that call is recorded as well.

As I mentioned when we spoke earlier, both Wright and Josh have now repeatedly admitted on recordings (and Josh on video) that the Mayor's office, including the Mayor's Chief of Staff Ana Guerrero and Deputy Mayor Barbara Romero, is actively involved in the fraudulent scheme to award the SCPPA contract to Ardent and that these two individuals are particularly involved in setting the $ amount of the contract to be awarded because of their "concern over the optics."

As of yesterday, I had been told by Wright and Kwok that the total SCPPA award was for $17 million and Ardent would be getting $15 million of the $17.

Today both Josh and Wright told me that the Mayor's Office has balked at Ardent receiving that large a cut and are looking to cut the amount awarded to Ardent to roughly the $10+ million range so as not to draw attention.

Separately, Kwok just told me that he has approximately $10.3 million earmarked for Ardent and that he will push this number on a call with Wright, Donna, Cynthia and Mel that is scheduled for 2 pm today. Kwok also said that he has specifically avoided allocation any "OT" (SCADA/operational technology) work to either of the other two vendors to prevent these two vendors from uncovering the long running regulatory violations that DWP has lied to regulators about or completely failed to report to regulators. Kwok said he spoke with Donna Stevener about his having done this and that she was in agreement so as to prevent discovery of the undisclosed regulatory violations.

Significantly, Josh also admitted on the video that the Mayor's office and DWP Board all have actual knowledge that DWP is using the SCPPA contracting process to create the false appearance that the contracts to be awarded to Ardent and the other two vendors were the result of a competitive evaluation process when they all have actual knowledge that this is not true in actuality.

Finally, as I mentioned, Josh gave me additional information on the Jose Huizar investigation and named two as-yet unbuilt hotels backed

by Chinese companies that are not yet built that are involved in the bribery scandal that your team asked me about. Josh also confirmed other aspects of that bribery scandal and said he was "100 percent certain" Huizar had engaged in the bribery activity. Josh said he has known Huizar personally a long time and worked with him when they both worked as Deputy City Attorneys years ago.

Josh told me he would keep me posted on the activity involving the Ardent contract and amount to be awarded Ardent and wants to meet in person again next week to discuss a number of other business topics that we hit on during our meeting today.

I will let you know when I am heading to the desert later today as you requested.

# EXHIBIT N

**Text Message**

From:  Paul Paradis

To:    Andrew Civetti, FBI

Date:  April 23, 2019

Time:  6:17 PM

Andy,

Meeting with Dave Wright at his apartment in Unit 438 of Building B at the DaVinci Complex behind LADWP ran from approximately 3:45 pm to 5:23 pm. Meeting is recorded but not videoed as I still need to get the button video camera back from you.

Primary purpose of the meeting was supposed to be to review Wright's draft resignation letter which is addressed to Mayor Garcetti with copies to Mel Levine and the Mayor's Chief of Staff, Ana.

Also attached as an addendum to the resignation letter is a 6-7 page "addendum" that details how LADWP Commissioner Cynthia McClain-Hill has sexually harassed Wright and discriminated against him on the basis of his sexual orientation. I will give you a copy of all of this tomorrow when we meet.

I also have the chronology of events involving the evolution of the billing system failure, my hiring and the discovery of cyber issues that Wright wrote himself on or about March 19, 2019. He gave me this document last Friday at his house in Palm Springs and I will give you a copy of that tomorrow as well.

I made believe I had not seen the addendum when he sent the original email and used this as an excuse to tell him that I would need to read it closely before I could comment. To generate another meeting with him if you want me to have one, I told him I would be ready to meet at the end of the week to discuss as he wants to submit the documents to the Mayor on May 1, 2019. He suggested that we meet in the desert early in the morning either this coming Saturday or Sunday and I told him I should be able to do that (depending on what you guys want to do).

Wright then turned the conversation to the approval of the Ardent contract by Board vote at today's LADWP Board meeting. The contract was approved and Wright said that the two additional contracts will also be approved and that the Board adhered to the strategy set by the Mayor's office late Friday of having 3 contracts for approximately $3.6 million each - with each contract having a 60 day term (total for 3 contracts remains $10.8 million as of today).

Wright added that Ted Ross from the ITA (Head of IT for the City) was particularly helpful in making a presentation during the Board meeting today and that Wright is now going to try to hire him away from the City job to have him work at DWP.

Wright then turned the remainder of the conversation to the new cyber company that will eventually replace Ardent. He said he wants to be the second largest owner and sent me a text on the burner phone this weekend. (I did not receive that text for some reason, so I took 2

pics of the lengthy text on my burner and the original text remains on Wright's burner). In that text he said he wants a sign on bonus of $600K and he will use $500K to buy into the new cyber company. He said he views it as important that he be an owner of the new company and not just an employee.

He also talked about needing a name for the new company (which we are currently referring to as Newco during our conversations) and how he plans to spend most of his remaining time as the General Manager of LADWP traveling to various conference such as the LPPC Council Conference and the APPA Conference in order to actively promote Newco to other utilities in order to convince them to retain Newco to provide cyber security services.

There was other discussion about personnel changes he is contemplating at DWP in the IT and Cyber areas because he feels the current CAO in charge of technology and cyber, Donna Stevener, lacks the knowledge and ability to successfully handle Commissioner McClain-Hill.

Meeting ended with us saying we would meet in the desert this weekend to review the documents concerning his resignation.

I can give you this recorder tomorrow if you want. Thanks.

# EXHIBIT O

**Text Message**

From:  Paul Paradis

To:    Andrew Civetti, FBI

Date:  May 1, 2019

Time:  12:32 AM

Andy,

I had a 2 hour dinner with Wright tonight. Dinner was audio recorded and video recorded (Wright sat to my left instead of across from me so video is likely poor).

Wright described his meeting earlier today with Mel Levine in great detail. According to Wright, the primary focus of their discussion was Wright's retirement notice and sexual harassment/hostile work place claim against Commissioner Cynthia McClain-Hill.

Wright stated that Mel was extremely happy to learn that Wright was going to inform the Mayor of Cynthia's behavior. Wright stated repeatedly that Mel told Wright that Mel "hates" Cynthia and would like to see her removed from the LADWP Board. Wright continued on this topic for at least 20-30 minutes and came back to it several times during during the dinner. Wright claimed that Mel had recently spoken with two LAPD Commissioners about Cynthia and that they had informed Mel of their strong dislike for her as well.

I asked if Wright had informed Mel that Wright and I were talking and Wright said that he had not done so and, in fact, had attempted to lead Mel to believe we had not talked for sometime.

I was able to discuss the behaviors of other Commissioners during dinner and got Wright to acknowledge everything I previously told your team about how Bill Funderburk had demanded contributions and free legal work from me - including the work he had me perform right before the vote on the Aventador contract occurred.

Wright commented on how he felt there is a general level of corruption that exists at DWP and he then commented on how Brian D'Arcy (Head of the largest union at DWP) had paid kick backs to a number of well placed senior executives at DWP. This was an entirely new topic and Wright has never raised this with me before. He appeared to regret having raised it after he did, so I let it alone and will circle back in a future conversation because pursuing the issue would have made me appear to be digging too hard tonight.

I raised the topic of David Alexander being very concerned about having a task order assigned to him once the Ardent contract is finally awarded on it about May 8th so that he can begin to "clean up" the long history of regulatory violations and records falsification that I discussed with Alexander today at lunch and Wright reacted in a very strong but surprising manner.

He told me that I need to tell Alexander to "shut the fuck up and stop complaining" or Wright would personally demote Alexander back to his prior position to insure Alexander receives no further raises during his remaining time at DWP.

When I reacted with surprise and suggested Alexander was trying to insure that the long history of regulatory records falsification and cover-up was cleaned up so that regulators would not eventually learn of it, Wright commented that he did not "give a fuck about the regulatory issues" because no one knows about them and no one is looking.

When I pressed and asked whether Wright was concerned that Alexander could possibly turn in Wright and others in senior management and report them to regulators for the long running records falsification and false reporting scheme, Wright said he was not at all concerned because Alexander does not have the courage to do so and would be turning himself in too because it had long been Alexander's job to oversee cyber security related compliance and since Alexander had failed to do his job for years, Alexander would be harming himself by making such a report to regulators.

When I asked Wright whether Wright was the DWP official who had top line signing authority for CIP Compliance at DWP, Wright confirmed he was in fact the senior-most DWP official with such responsibility. When I asked him if he was concerned that he might have some liability or legal exposure if Wright directed that no portion of the contract that is about to be awarded was allocated to cleaning up the regulatory reporting/compliance situation, Wright again said he did not "give a fuck" because he was so done with DWP and that no one was looking and therefore no one would uncover the long running records falsification scheme before Wright retired.

Wright then asked me to work with Stephen Kwok to insure that Kwok drafted on two or three task orders for the new contract that requires Ardent to
work only on those issues that pose the greatest cyber risk at this point in time. I told Wright I would do so and he reiterated that we were not to identify any Governance/Risk/Compliance work to be performed in the next 6 months even if Alexander was demanding that we do so.

Wright commented on the Kiesel article in the Daily Journal and confirmed that the City Attorney's Office had lied when they denied having directed and had knowledge of the Jones case filing and litigation strategy. Wright also confirmed his memory of his having participated in numerous conversations with Jim Clark in particular because Clark was the author or that strategy and managed the entire settlement process of that case very closely.

Wright hit on a number of other topics including the recent CPRA request by the LA Times for any email authored by or received by former General Manager Marcie Edwards that contains my name it refers to me. This CPRA request was made last week.

Dinner ended with me getting Wright's burner phone so you can add more time to his phone and mine.  I told him I would get the phone back to him on Monday.  I will coordinate with you tomorrow so I can drop both phones off to you.  Thank you.

# EXHIBIT P

**Text Message**

From: Paul Paradis

To:    Melissa Mills, Assistant United States Attorney

Date:  May 21, 2019

Time:  10:36 AM

Melissa,

Stephen Kwok is asking me to meet him for lunch downtown today at noon to start working with him on the next Cyber RFP as Wright directed me last Saturday.

Please let me know if you want me to go and do this and audio and video record so I can get back to Kwok.  Thank you.

Paul

# EXHIBIT Q

**Text Message**

From: Melissa Mills, Assistant United States Attorney

To:     Angela Machala, Esq.

Date:  May 21, 2019

Time:  10:36 AM

Angela, thanks for the call just now. Just confirming that we
authorize Paul to go forward with the recorded meeting with Kwok and
to assist DWP with the current RFP cyber bid, despite the fact that
the RFP process being utilized by DWP may not be compliant with rules,
regulations, or laws. Please let me know if that's unclear or if there
are other questions. Otherwise, we look forward to Paul's report and
recording.
Melissa

# EXHIBIT R

**Text Message**

From: Paul Paradis

To: Andrew Civetti, FBI

Date: May 22, 2019

Time: 4:49 PM

Summary of meeting with David Alexander and Stephen Kwok on May 22, 2019 from approximately 2: 40 pm to approximately 4:28 pm at Disney Music Hall in dining area. Meeting was audio and video recorded.

Primary purpose of today's meeting was to continue providing assistance to Alexander and Kwok concerning the new Cyber Security RFP that LADWP is going to issue.

The secondary purpose of the meeting was to obtain an encrypted USB drive from Alexander that he claims contains approximately 2 GB of data that supposedly contains the entirety of the LADWP CIP Compliance directory from the CIP Compliance Office.

Prior to the meeting, both Kwok and Alexander separately provided me (via email) with different versions of the draft Statement of Work for me to review and comment on.

During the meeting, we discussed several aspects of the draft Statement of Work for the RFP.  These included:

1. the number of categories that will be included,

2. the total $ amount of the proposed contract — currently proposed to be between $81 mm to $82.5 mm total for 3 years,

3. the manner in which the $ amount will be determined,

4. the amounts to be allocated to each of the 4 categories for which qualified vendors are being sought,

5. allocation of vendor personnel to be embedded among LADWP personnel for mentoring purposes,

6.  the $ amounts allocated to the two types of training and in particular, they both stated that people at DWP, including the Union leadership, very much want to make sure that Cyber Gym training is available and they asked what it is estimated to cost annually and I responded that it was estimated that it would cost LADWP $5 mm per year (same information I had previously discussed with Wright and he agreed to)

7.  Specific deliverables for each of the categories and how they will vary,

8. Specific evaluation criteria that Kwok and Alexander want to use to control the outcome of the RFP selection process,

9. Membership and size of the RFP evaluation committee,

10. The RFP timeline,

11. Whether this draft will need review and approval by the Mayor's office before the RFP is approved.

At the conclusion of the meeting, they both asked if I would edit the latest draft tonight and email it back to them tonight and Kwok emailed me the latest version of the Statement of Work to edit.

Please advise if I am authorized to edit and send them the draft as they have requested. I am saving copies of the documents and emails they send me and will provide them along with any documents I edit or draft for them.

I also obtained the encrypted USB drive that Alexander promised to provide that supposedly contains the CIP Compliance Office directory. I will take a look tonight and will report back and will provide the USB drive to Andy when I meet with him.

I again pressed David Alexander on the fact that LADWP does not have records of any self reported CIP violations during the gap period of nearly 3 years between 2013 and 2016 and he eventually acknowledged the existence of the three year gap in the records, but he stated he did not know why the gap existed.

I will wait to hear from Melissa or Andy before editing the Statement of Work as Kwok and Alexander requested. Thank you.

# EXHIBIT S

**Text Message**

From:   Paul Paradis

To:      Andrew Civetti, FBI

Date:   May 22, 2019

Time:   6:45 PM

Andy,

You are correct that the further edits they are requesting are similar in nature to what I have already done. Now that you have authorized this next round, I will edit tonight as they requested and send them the revised document and keep you and Melissa updated.

Thanks.

# EXHIBIT T

**Text Message**

From:   Paul Paradis

To:       Melissa Mills, Assistant United States Attorney
            Andrew Civetti, FBI

Date:   June 12, 2019

Time:   7:28 AM

Melissa and Andy,

I received a text from David Alexander this morning asking me to call him.

I called him back and recorded the call. Call was 12 minutes.


Alexander told me that he had received a call from John Kwon from SCPPA late yesterday during which Kwon informed Alexander that Kwon has received a call yesterday from an investigator from the City of LA asking Kwon for production of all documents relating to the SCPPA RFP and Contracting process involving the contracts that were recently awarded to Ardent, Dragos and a 3rd vendor.

Alexander had not yet spoken with Kwon and had only exchanged voicemails with him.

I took the opportunity to have Alexander confirm several times on the call that these contracts were not competitively awarded, but rather, were awarded as a result of the rigged process that we have previously discussed. Alexander also confirmed that Mel Levine, Cynthia McClain-Hill, David Wright, Donna Stevener, David Alexander, Steven Kwok and Jim (last name unknown from Burbank utility) all had actual knowledge that this process was rigged and that the contracts were not competitively awarded despite the fact that they were publicly represented as such. Alexander made a number of inculpatory statements and mentioned he had already spoken with Donna and was going to speak with Wright. I encouraged him to do so.

This development may give me another reason to reach out to Wright. I am available to discuss today. Please text me before you call so I will know to answer my phone. Thank you.

# EXHIBIT U

**Text Message**

From:  Paul Paradis

To:    Melissa Mills, Assistant United States Attorney
       Andrew Civetti, FBI

Date:  July 5, 2019

Time:  9:23 AM

Melissa and Andy,

As I discussed with Tony earlier this week when we swapped recording equipment, David Alexander has requested to meet with me this morning to discuss the draft of Ardent's response to the LADWP Cyber RFP that is due on July 10th.

I agreed to meet him at the Disney Center to review the draft and will record the meeting. I will also forward you the draft document that I will use at the meeting as well as the email Alexander sent me from his "Tazmeister" email in advance of this meeting in which Alexander is clearly coaching me in how to respond to the RFP.

If I make any notes on the draft response during our meeting, I will also provide you with a complete copy of the notated document as well next week.

Finally, I anticipate that Alexander will ask if I can get the team to run the scan we discussed in the SCADA environment in connection with his effort to identify the oldest network equipment so that he can prioritize his equipment destruction plan at DWP.

I mentioned to Tony when we spoke that, an alternative to running the scan might be for me to share the 2017 report that I showed you the last time we met. Alexander does not know I have that report and I could tell him that this is the most current data that I can get without risking the possibility of attracting attention from too many people within DWP that could result from the team running the scan Alexander wants run.

Please advise if you want me to pursue this strategy, or if you simply want me to continue to delay Alexander until we meet with the FBI Cyber Agent again. Thank you.

# EXHIBIT V

**Text Message**

From:   Paul Paradis

To:     Melissa Mills, Assistant United States Attorney
        Andrew Civetti, FBI

Date:   July 16, 2019

Time:   8:13 PM

Melissa and Andy,

As I discussed with Andy and Tony earlier today, I met with David Alexander for lunch from approximately noon to 1:35 pm today at The Palm Restaurant on South Flower Street in DTLA. The primary purpose of the meeting was to continue our discussion of the bid rigging for the current Cyber Security Consulting RFP that was issued by LADWP. The meeting was audio recorded using two recorders.

Meeting began by Alexander informing me that DWP has received 15 responses to the RFP and 1 had been disqualified almost immediately. The RFP is for the purpose of establishing a "bench" of Cyber Consultants that can be called upon to perform 4 basic cyber services.

DWP is hoping to be able to contract with 3 consultants for each of the 4 categories so that they have a "bench" comprised of a total of no more than 12 Cyber Consultants.

Alexander told me that DWP has, for the first time ever to his knowledge, made each of the 5 evaluators sign an agreement saying that the evaluators would not speak to each other about their scores or grading of the RFP responses.

Despite having signed this agreement, Alexander told me that he had prepared a single color coded grading score sheet grid that reflected his scores for each of the 14 respondents and had shared his scoring grid with two other evaluators, Louis Carr and Flora Chang to influence them to score Ardent high. Alexander said that both Louis and Flora understood the goal is to make sure that Ardent is scored high enough to insure that Ardent is among the top 3 scoring respondents — which would insure Ardent is awarded a portion of the contract to perform cyber remediation.

Alexander also said that he was out concerned with either Flora or Louis letting management know Alexander has violated the "no discussion" agreement because they both were playing ball with Alexander to help him get Ardent hired.

Alexander said that he is working behind the scenes to help manage the contracting process through DWP's Supply Chain Service Department to insure Ardent is hired again.

I told him today's lunch was to thank him for the help he had already provided and asked him what his future employment plans were at DWP given Dave Wright's impending retirement.

Alexander responded that he had 3 options at this point. He had applied for a Customer Service job at Edison which is currently in process but he does not feel his odds are very strong because he lacks the necessary background in Customer Service. His second option

involved applying for the CISO position at East – West Bank. However, Alexander recently learned that this position was recently filled by another current employee of the bank. He then said his third option was to become the business and operations manager for Ardent.

I then asked him what salary he wanted and told him I liked the idea based on the work he had done in connection with helping Ardent on the current RFP by re-writing Ardent's proposal over the July 4th holiday weekend.

Alexander told me he would think about the salary and would let me know. He then discussed benefits and the cost of medical insurance. Finally, he told me he had also thought about some part of his pay coming in the form of a new car. I asked him what car he wanted and he responded that he was really interested in the MERCEDES AMG S63. I asked him the color he wanted and he said either dark green or dark blue. I told him that this vehicle typically comes in Black, Silver or White and he told me that he would prefer the car in Black.

We then discussed possible start dates and I told him that August 1st was probably too soon given that we are already in mid August and he agreed and said September 1st was more realistic. As we were walking away from the restaurant, however, Alexander abruptly said that he could not start with Ardent until October 1st. When I asked him why, he reminded me that the LADWP Board meeting to approve the 3 year contract that is the subject of the RFP was likely going to be voted on by the LADWP Board in late September, so Alexander needed to stick around to Shepard the contract through the Board process to make Ardent certain that Ardent got hired. I agreed and said that October 1st was a very reasonable start date. When we parted ways, I asked when we would get together again to discussed the job description/plan that I asked Alexander to write up and he says he was going to speak with
 his wife tonight and would be back in touch with me either tonight or tomorrow.

Later this afternoon he texted me and told me he had already started scoping out his new job responsibilities and wanted to know if I was agreeable to him having the title of Chief Administrative Officer at Ardent. I texted back and told him I was ok with him having that title.

I will update you further when I hear back from him.

# EXHIBIT W

**Text Message**

From:  Paul Paradis

To:    Melissa Mills, Assistant United States Attorney
       Andrew Civetti, FBI

Date:  July 22, 2019

Time:  9:10 PM

Melissa and Andy,

Please see the article link at the very end of this text. I just learned of this article late this afternoon.

I am bringing this article to your attention because it involves SCPPA and as I mentioned to Andy last week, David Alexander informed me (during one of my many recorded conversations with him last week) that the City of Pasadena is currently utilizing SCPPA to conduct a bid rigged RFP process to hire a pre-selected NERC/CIP consultant similar to the rigged process LADWP used with SCPPA to secure the 6 month cyber security contract that Mel and Cynthia and the Mayor's Office were involved in.

I also bring to your attention the fact that three of the five current officers of SCPPA are current or former LADWP personnel. These three include:

Mike Webster – Mike is the current Executive Director of SCPPA. He is the former head of Power at LADWP and an Engineer by training. The SCPPA website also lists Webster as one of five current SCPPA Officers and the Treasurer and Auditor.

At LADWP, Wright was Webster's boss and they enjoy a close and friendly relationship. From memory, I recall Wright telling me on at least 2 of the taped conversations that you have between me and Wright that Wright was going to speak with Webster about facilitating the current 6 month cyber contract that is in place now at LADWP.

David Wright – is currently listed on SCPPA's website as another one of SCPPA's 5 officers and the Secretary of SCPPA. As the GM of LADWP, Wright is also automatically a Board Member of the SCPPA Board, as are all of the other GMs of the SCPPA Organization.

Mario Ignacio – is listed as another of the 5 Officers of SCPPA and the Assistant Secretary. Mario is a current employee of LADWP and a senior ranking member of the LADWP Financial Services team.

Finally, another officer of SCPPA is listed on the SCPPA website as the Vice President, Gurcharan Bawa. In addition to being an officer of SCPPA, Mr. Bawa is also the current GM of Pasadena Water and Power.

According to Alexander, Pasadena is the City currently using the SCPPA RFP process to conduct a fictitious RFP process to select a NERC/CIP consultant – who has already been preselected, thereby allowing Pasadena to make it appear as though this consultant will be selected pursuant to a competitive bid process when, in fact, the bid is completely rigged through this pre-selection process.

During a conversation that I had with Brian D'Arcy (the head of the

Union at LADWP) before leaving LADWP in March, Brian complained to me
that he greatly disapproved of the use of SCPPA by all of the member
utilities to secure contracts for projects done by the utilities
because SCPPA has far less stringent purchasing and bidding rules and
the utilities frequently resort to using SCPPA to circumvent their own
City's purchasing rules.

At that time, I did not pursue the conversation for any specific
evidence.  However, in light of the fact that I have now learned of
two specific situations where both LADWP (including Mel, Cynthia and
Mayor's Chief of Staff Ana Guerrero and Deputy Mayor Barbara Romero)
and Pasadena have engaged in bid rigging and falsely portrayed
contracts as being awarded as the result of a competitive RFP
selection process, rather than the pre-selected bid rigged process
that is actually being used, I wanted to make sure that I brought the
matter to your attention — especially in light of the article in the
link below.

I also wanted to inquire if you want me to try to have a recorded
conversation with Brian D'Arcy on what evidence, if any, he could
provide me of specific wrongdoing involving utilities utilizing SCPPA
that he might know about.

The link below might provide me with a good starting point for a
discussion with Brian if you want me to pursue that line of
investigation. Please let me know. Thank you.

https://www.google.com/amp/s/www.pe.com/2019/06/28/investigator-
riversides-internal-auditor-had-conflict-of-interest-when-he-audited-
his-life-partner/amp/