1  Michael N. Feuer (State Bar No. 111529)   Guy C. Nicholson (State Bar No. 106133)
   City Attorney                              gnicholson@egcfirm.com
2  mike.feuer@lacity.org                      **ELLIS GEORGE CIPOLLONE**
   Kathleen A. Kenealy (State Bar No. 212289) **O'BRIEN ANNAGUEY LLP**
3  Chief Deputy City Attorney                 2121 Avenue of the Stars, 30th Floor
   kathleen.kenealy@lacity.org                Los Angeles, California 90067
4  **LOS ANGELES CITY ATTORNEY'S**           Telephone: (310) 274-7100
   **OFFICE**                                 Facsimile: (310) 275-5697
5  221 N. Figueroa Street, Suite 1000         *Attorneys for Plaintiff City of Los Angeles*
   Los Angeles, California 90012
6  *Attorneys for Plaintiff City of Los Angeles*

7  Michael A. Jones, State Bar #27311
   David B. Nelson, State Bar #34100
8  **ALLEN BARNES & JONES, PLC**
   1850 N. Central Ave., Suite 1150
9  Phoenix, Arizona 85004
   Telephone: (602) 256-6000
10 Facsimile: (602) 252-4712
   mjones@allenbarneslaw.com
11 *Attorneys for Plaintiff City of Los Angeles*

12

13              **UNITED STATES BANKRUPTCY COURT**

14                    **DISTRICT OF ARIZONA**

15 In re:                                   Chapter 7

16 PAUL OLIVA PARADIS,                      Case No. 2:20-bk-06724-PS

17          Debtor.

18 CITY OF LOS ANGELES,                     **Adv No. 2:21-ap-00171-PS**

19          Plaintiff,

20 v.                                       **MOTION TO STRIKE CERTAIN**
                                            **RESPONSES IN ANSWER TO**
21 PAUL OLIVA PARADIS,                      **AMENDED COMPLAINT, AND**
                                            **ALLEGED AFFIRMATIVE**
22          Defendant/Debtor.               **DEFENSES**

23

24      Plaintiff, the City of Los Angeles ("**City**"), hereby requests that the Court strike

25 from the *Answer to Amended Complaint* [ECF No. 98] ("**Answer**") Defendant Paul

26 Oliva Paradis' ("**Paradis**") numerous nonresponsive and evasive responses, and his

twelve purported affirmative defenses. Throughout the Answer, Paradis asserts incomplete blanket denials of the allegations of the *Amended Complaint* [ECF No. 54] ("**Amended Complaint**"), along with implausible or non-existent legal defenses to somehow excuse him from actually addressing those allegations. For example, to justify denying significant portions of the Amended Complaint, and to dodge providing a fair response to many of the City's allegations, Paradis resorts to claiming to have been an FBI informant and/or alleging that a declaration he provided to the City, and signed under oath, is somehow void because he purportedly signed it under duress. Paradis should not be permitted to evade the allegations in the Amended Complaint in this way, and accordingly, paragraphs 32, 36-37, 39, 44-46, 60-61, 63, and 67-78 of the Answer should be stricken and the City's allegations deemed admitted.

The Court should also strike Paradis' twelve alleged affirmative defenses, none of which pertain to acts by the City *against Paradis related to the actual issues in this non-discharge litigation.* Instead, Paradis spends 63 pages spouting wholly immaterial, impertinent, and scandalous conspiracy theories. This is a crystal-clear attempt to massively expand the scope of the parties' dispute and the scope of discovery. Seven of Paradis' alleged affirmative defenses fail as a matter of law. And, Paradis' remaining alleged affirmative defenses rely on his 63 pages of accusations having nothing whatsoever to do with the instant non-discharge action.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND

1.    On March 28, 2022, the City filed the Amended Complaint against Paradis thereby seeking a judgment that Paradis' indebtedness to the City is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

2.    The focus of this lawsuit is the manner in which Ardent Cyber Solutions LLC f.k.a. Aventador Utility Solutions, LLC ("**Ardent**" or "**Aventador**") obtained

consulting contracts from the City. While purporting to act in the City's best interests, Paradis led a fraudulent criminal scheme to, among other things, bribe City officials and improperly influence the City to award a $30 million no-bid consulting contract to his wholly owned entity, Aventador, on an expedited basis ("**Aventador Contract**"). Moreover, after a California state court ordered that the City not make any further payments to Paradis or any Paradis entity, he brazenly defrauded the City by providing it with a false declaration concerning his purported sale of his ownership of Aventador and stating in no uncertain terms that he would have no post-sale involvement with the company, which later changed its name to Ardent. With Ardent still (but secretly) under Paradis' ownership and control, Paradis proceeded to entice a City official into assisting him with pursuing lucrative contracts with the City for Ardent. In these ways, Paradis violated California Government Code section 1090 (conflicts of interest in government contracting), which independently also constituted a violation of California Government Code sections 12650 *et seq.*, (California's false claims act) as a matter of law.

3.      On June 30, 2022, the Court conducted a hearing regarding Paradis' Motion to Dismiss the Amended Complaint and his request that the Court take judicial notice of numerous documents allegedly related to the City's alleged IT problems and how those alleged IT problems came to be. During the hearing, the Court made clear that this case was not about how the City's alleged IT problems arose and were dealt with in the *Jones* litigation. In that regard, the Court stated, among other things:

> I don't think this case is about whether the City knew it had IT problems. I think the case is about whether Mr. Paradis did something wrong in assisting Aventador -- and now called Ardent -- in getting those contracts.

/ / /

/ / /

/ / /

Hearing Transcript (June 30, 2022), attached as **Exhibit A**, at p. 4.

> But when you cut down to what this case is about, isn't it the City saying Mr. Paradis had some special relationship . . . and that in that position, and with the help of City employees, all of whom have been convicted of criminal activity, that what happened is the City ended up with a no-bid contract situation, where ostensibly it might have been better, it might have been more appropriate, for the City to bid that out . . . I don't understand their argument to be, we didn't need IT services. I understand their argument to be, we shouldn't have done it this way. We shouldn't have been advised to do it this way. We shouldn't have fall into the trap to do it this way. That's what I understand their argument to be.

*Id.* at pp. 5-6.

4.     On July 28, 2022, the Court entered an order focusing the City's claims against Paradis to those under 11 U.S.C. § 523(a)(2)(A) related to Paradis' fraud, false pretenses, and false representations to the City.

5.     On September 12, 2022, Paradis filed his Answer which only partially answers, or evades answering, paragraph nos. 32, 36, 37, 39, 44, 45, 46, 60, 61, 63, and 67 through 78 of the Amended Complaint. The Answer also included no less than 63 pages of utterly absurd allegations of "fraud" against the City and City officials having zero relevance to the actual issues at hand, along with twelve purported affirmative defenses that are not actually defenses, are clearly inapplicable here, or do not have any nexus to the actual issues before the Court.

## II.  <u>LEGAL ANALYSIS</u>

A court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

### A. Certain of Paradis' Denials Should Be Stricken as Evasive or Immaterial

Rule 8 of the Rules of Civil Procedure requires a defendant, in answering a complaint, to "admit or deny the allegations" and otherwise must "fairly respond to the substance of the allegation." Fed. R. Civ. P. 8(b)(1)(B) and (b)(2). If the defendant "intends in good faith to deny only part of an allegation," it "must admit the part that is true and deny the rest." *Id.* at (b)(4). A response may be stricken where a response is "a sham, evasive, ambiguous, and uncertain, and constitutes no denial." *Peacock v. United States,* 125 F. 583 (9th Cir. 1903). Under these guidelines, paragraphs 32, 36, 37, 39, 44, 45, 46, 60, 61, 63, and 67 through 78 of the Answer should be stricken.

In *Peacock*, 125 F. 583, plaintiff alleged that defendant took an oath that he was a United States citizen, he owned a ship, and no non-U.S. citizen had an interest in the ship or its profits, but, at the time of taking that oath, defendant was not a citizen. Defendant filed an answer which contained evasive denials, including denying,

> that at the time of taking the oath in said petition averred, if in fact taken by him, it was within the knowledge of the said defendant, although it was within his supposition, that in truth and in fact he was not a citizen of the United States of America, or that he was a subject or a citizen of a foreign power; and as to whether in fact or in law he took the oath in said petition mentioned this defendant has no information or belief upon the subject sufficient to enable him to answer the averment of said petition of that behalf; and therefore, placing his denial on the ground, he denies that he took the oath in said petition averred.

*Id.* at 584.

The trial court struck these denials on the ground that the denials were "sham[s], evasive, ambiguous, and uncertain." *Id.* In affirming, the appellate court stated that "[a] bare reading of the statement of facts will carry conviction to the mind that [the] contention [that the allegations were sufficient] cannot be sustained. The averments in the answer were clearly evasive, and in several respects were ambiguous and uncertain."

*Id.* at 586. The allegations were not only matters of public record, which defendant could have examined, but also "[i]t further appears that he was directly connected with the transactions set forth in the petition, and must have known what did occur in relation thereto." *Id.*; *see also Cook v. Mountain America Federal Credit Union*, No. 2:18-cv-1548-HRH, 2018 WL 4539973, at **1-3 (D. Ariz. September 21, 2018) (granting motion to strike paragraphs of answer where defendant denied allegations "based on the way" the allegations were "characterized," holding that the answers "do not comport with the spirit of Rule 8" because defendant should have "explained what characterizations . . . it took issue with.").

Likewise, in *Schmitz*, 2022 WL 2340614, at *20, plaintiff alleged that a prison warden had certain job responsibilities. The warden admitted that he was the former warden and he "performed all the regular administrative and supervisory duties of a warden," but denied the remaining allegations. *Id.* In opposing plaintiff's motion to strike, defendant contended that his responses were proper because, *inter alia*, he was not "legally responsible" for the duties alleged under certain legal theories such as *respondeat superior* and qualified immunity. *Id.* The court rejected that argument and struck those paragraphs, stating that the denials based on legal theories "are better raised as affirmative defenses, or in a motion for summary judgment – not as a basis for denying plaintiffs' factual allegations of the warden's job duties." *Id.* at **20-21.

Many of Paradis' denials suffer from similar or even more serious defects. Paradis denied fifteen (15) factual allegations of the Amended Complaint addressing his actions as well as those of his co-conspirators Wright and Alexander, and then repeatedly asserts that because he supposedly was acting at the FBI's direction, he could not have acted as part of a fraudulent scheme. Answer, ¶¶ 36-37, 63, 67-78.

As but one example, paragraph 71 of the Amended Complaint alleges:

> Among other similar communications, on July 9, 2019, Paradis told Alexander, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result . . . [winking face emoji]." Alexander responded via text message, 'I know my job [crying-laughing emoji].'" [Alexander Information] ¶ [21].

Paradis responded as follows:

> Denied. As stated in ¶¶ 31-32 of the Wright Information, "on or about March 29, 2019, Paradis began actively cooperating with the FBI in a Grand Jury investigation involving the Aventador Contract and related matters." Additionally, as stated in ¶ 12 of the Alexander Information, the actions alleged in ¶ 71 of the Amended Complaint were taken by Debtor while Debtor "was working at the direction of the FBI," and were not undertaken in connection with any wrongful or fraudulent scheme by Debtor as intentionally falsely pled by Plaintiff.

This response is evasive, as well as irrelevant, and does not "fairly respond to the substance of the allegation." *See* Fed. R. Civ. P. 8(b)(2). Paradis was "directly connected" with the transactions alleged in the Amended Complaint – i.e., Paradis' own texts – so "he must have known what did occur." *Peacock*, 125 F. at 586. If he is unable to recall, he could have, and had an obligation to, review the information in the public record, i.e., the Alexander Information that Paradis himself references in his Answer. Instead, he chose to deny the allegation not because it was incorrect, but because he relies on a non-defense that, as an alleged FBI informant, he supposedly could not have had the requisite intent. This "defense" does not constitute a proper basis for a denial. *Schmitz*, 2022 WL 2340614, at **21-22. Stated another way, Paradis evaded admitting an allegation that he could not reasonably deny – not because the allegation was false, but because he chose to reference a purported defense to Plaintiff's claims. Paragraphs 36-37, 63, 67-70, 72-78 of the Answer suffer from the same infirmity – denying allegations contained in the Alexander Information concerning

Paradis' actions based on his dubious and irrelevant claim to have been an FBI informant. Stated more directly, even if Paradis had truly been working with the FBI, he is not insulated from liability for his misconduct.

Paradis has also denied all allegations referring to his March 14, 2019, declaration confirming, *inter alia*, the sale of his ownership interest in, and complete dissociation from, Aventador, asserting that the declaration is void because LADWP drafted the declaration and he signed it under duress. Answer, ¶¶ 44-46, 60-61, 63. For example, the City alleges in paragraph 45:

> With regard to Ardent, Paradis also attested: "I will not perform any work for the Company or any successors to the Company, or have access to the Company's offices or to those of any successor to the Company." Paradis Declaration ¶ 6.

Paradis' response:

> Denied. The **entirety** of the "Paradis Declaration" was drafted by the City, in particular, former LADWP General Counsel, Joseph Brajevich. The City forced Debtor to sign the Paradis Declaration under threats and, therefore, under economic duress. Furthermore, by forcing Debtor to sign the Paradis Declaration under economic duress, certain City officials, including Brajevich, abused their public positions in contravention of the State Bar Act, California Rules of Professional Conduct and the Los Angeles City Ethics Code. Accordingly, the Paradis Declaration is completely void and without any legal effect.

Similar to Paradis' denials concerning his supposed relationship with the FBI, his response based on the purported invalidity of his declaration are evasive because it deliberately fails to directly address whether the facts stated in his declaration are true or false. In other words, Paradis must fairly address whether he lied under oath and, if so, as to which facts. His responses to paragraphs 44-46, 60-61, and 63 should be stricken and he must amend to provide admissions or denials to these allegations, as appropriate.

Paradis has also improperly denied two allegations of the Amended Complaint, paragraphs 32 and 39, that his "editorial comments" indicate he must admit, at least in part. Paragraph 32 of the Amended Complaint alleges:

> Relying on the Independent Monitor's report that Paradis prepared, the written materials that Wright and Paradis prepared, and Wright's presentation that Paradis prepared with Wright, in or about June 2017, the Board approved entering into the aforementioned sole-source agreement with Aventador awarding it a three-year $30 million contract. *See* Paradis' Plea, Attachment A Factual Basis ¶ 49; *see also* Wright Plea, Attachment A Factual Basis ¶ 21.

Paradis responds to paragraph 32 as follows:

> Denied. As confirmed in ¶¶ 17-18 of the Factual Basis to the Wright Plea, by June 4, 2017 – two days *prior* to Wright's June 6, 2017 presentation to the LADWP Board – "multiple Board members," namely Commissioners Levine, Funderburk and Noonan, had already agreed to vote in favor of the Aventador Contract before Wright had ever uttered a single word of his June 6th presentation concerning the Aventador Contract.

This denial is an obvious non-responsive sham. Paragraph 32 alleges that the Board approved the Aventador agreement in reliance on (1) the Independent Monitor Report, (2) written materials that Wright and Paradis prepared, and (3) Wright's presentation. Paradis denies this allegation based on the statement in the Wright Plea that by June 6, 2017, Wright had already obtained the support of some Board members, and therefore the Board could not have relied on the presentation given on June 6, 2017. Paradis does not mention the other two documents at all – Paradis' response demonstrates that a portion of the allegation, at the very least, should have been admitted. Not only was Paradis involved in the occurrence and therefore "must have known what did occur," *Peacock*, 125 F. at 586, but actually *admitted* in his Plea that the Board relied on the Independent Monitor's report and information he personally drafted. *See* Paradis' Plea, Att. A Factual Basis ¶ 32. This response, therefore, must be stricken.

Paradis' response to paragraph 39 suffers from a similar problem: his response indicates that a blanket denial is simply wrong. As alleged in paragraph 39:

> Consequently, the State Court entered an order, without objection from the City, prohibiting the City from making any further payments to Paradis or to any entity in which he held an interest (which included Aventador) ("**State Court Order**"). **Exhibit G** at p. 2.

Although Paradis denied this allegation, he added:

> On March 19, 2019, during a hearing in the Jones Action, and with respect to monies owed to Ardent, counsel for the City admitted that the City, in fact, did object to the State Court's order and stated in relevant part:

> One thing I do want to provide notice to the Court and everybody, there is an outstanding invoice and the new ownership of [Ardent] has stated it needs payment of that invoice in order to pay its employees and ensure their continued performance. I also understand, your Honor, that this need is fairly immediate. So **the Department would ask this week**, of course in the forthcoming filing, but I want to preview this to everybody and provide this general notice, **for some immediate relief to issue an order to make payment on that invoice.**

*See* Crt. Transcript dated March 19, 2019 at 17.

Given that Paradis' denial addresses only one subordinate clause of the allegation – that the order was entered "without objection from the City" – Paradis must admit the rest, especially because it is based on the State Court Order, attached to the Amended Complaint as Exhibit G. Paradis may not evade having to admit an allegation, or part thereof, by relying on a fact that purportedly is contrary to part of the allegation. For the foregoing reasons, paragraphs 32, 36-37, 39, 44-46, 60-61, 63, and 67-78 must be stricken and Paradis should be compelled to amend his Answer to provide proper denials or admissions, or the City's allegations should be deemed admitted.

## B. Paradis' Alleged Affirmative Defenses Should be Stricken.

Affirmative defenses are held to the heightened pleading standard set forth in *Twombly* and *Iqbal. See Jacobson v. Persolve, LLC,* No. 14-CV-00735-LHK, LEXIS

115601, WL 4090809, at *6-7, (N.D. Cal. Aug. 19, 2014). "A defendant's pleading of affirmative defenses must put a plaintiff on notice of the underlying factual bases of the defense." *Id.* (quoting *Wyshak v. City of National Bank*, 607 F.2d 824, 826 (9th Cir. 1979). If a court determines that a pleading is deficient, it may strike the pleading. *Id.* An affirmative defense fails as a matter of law if it "lacks merit under any set of facts that the defendant might allege." *See Harris v. Chipotle Mexican Grill, Inc.*, 303 F.R.D. 625, 628 (E.D. Cal. 2014).

### 1. **Seven of Paradis' Affirmative Defenses Fail as a Matter of Law**

#### (a). **Claimants' and its Agents' Conduct (Defense No. 4)**

This is not an affirmative defense recognized under Federal Rule 8(c), and the City is not on notice of the legal or factual basis for this alleged defense.

#### (b). **Conduct Contrary to Public Policy (Defense No. 6)**

This is not an affirmative defense recognized Federal Rule 8(c), and the City is not on notice of the legal or factual basis for this alleged defense.

#### (c). **Failure to Join an Indispensable Party (Defense No. 7)**

"Failure to Join an Indispensable Party" is not an affirmative defense in this context. A person must be joined as a party in litigation if in that person's absence, the Court cannot accord complete relief among the existing parties. Fed R. Civ. P. 19(a)(1)(A). Given that Paradis is the only debtor in this bankruptcy proceeding and the City is pursuing a claim to have its debt against Paradis, ***and no one else***, deemed non-dischargeable, this Court undoubtedly will be able to accord complete relief.

#### (d). **Acquiescence (Defense No. 9)**

Acquiescence is a defense relating to trademark disputes, not the non-discharge issues in this case. Specifically, "[t]he doctrine of acquiescence, closely related to laches, limits a party's right to bring a ***trademark infringement lawsuit*** following an affirmative act implying consent to the other." *Godigital Media Grp., LLC v. Godigital,*

*Inc.*, No. LACV 17-07796-VAP (MRWx), 2019 U.S. Dist. LEXIS 76415, at *16 (C.D. Cal. Mar. 13, 2019) (emphasis added). This alleged affirmative defense therefore fails as a matter of law.

### (e). <u>Unjust Enrichment (Defense No. 10)</u>

This is not an affirmative defense recognized under Federal Rule 8(c), and the City is not on notice of the legal or factual basis for this alleged defense.

### (f). <u>Spoliation (Defense No. 11)</u>

Spoliation is not an affirmative defense, and this alleged affirmative defense fails a matter of law. *See Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F. Supp. 2d 1184, 1198 (C.D. Cal. 2007) (a defendant need not plead spoliation as an affirmative defense because spoliation is not a defense, but rather is an evidentiary and discovery remedy); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-56 (4th Cir. 1995) (reasoning that spoliation is "not an affirmative defense, but a rule of evidence").

### (g). <u>Failure to State a Claim (Defense No. 12)</u>

"Failure to State a Claim" is not an affirmative defense, and this alleged affirmative defense also fails a matter of law. *See Edwards v. Cty. of Modoc*, No. 2:14-cv-02646-MCE-KJN, 2015 U.S. Dist. LEXIS 94216, at *3-4 (E.D. Cal. July 17, 2015) (reasoning that asserting a plaintiff's complaint fails to state a claim is not an affirmative defense, and striking such alleged affirmative defense) *citing Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense.").

### 2. <u>Paradis' Remaining Affirmative Defenses are Inapplicable</u>

### (a). <u>Fraud (Defense No. 1)</u>

Despite his lengthy recitation of purported facts, Paradis fails to articulate the alleged fraud that the City somehow committed against him related to his actions in obtaining the Aventador and Ardent Contracts. Of course, Paradis' fraud allegation is

especially ironic because, in his criminal plea agreement, Paradis repeatedly admitted to defrauding the City related to the issues asserted against him in the Amended Complaint in this case. *See* Amended Complaint, Exhibit A at pp. 31-32, 67-70. "Elements of actual fraud consist of: (1) a misrepresentation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by a person and in a manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Kaufman Inv. Corp. v. Johnson*, 623 F.2d 598, 601 (9th Cir. 1980). In all averments of fraud, the circumstances constituting the alleged fraud must be stated with particularity. *Annunziato v. Guthrie*, No. CV 20-11592-RSWL-JPRx, 2021 U.S. Dist. LEXIS 207481, at *26 (C.D. Cal. Oct. 26, 2021). Courts analyzing affirmative defenses note that defenses fail where a party alleges "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986-87 (9th Cir. 2010) (citations omitted) (analyzing defense of unclean hands).

Paradis' purported fraud defense is a textbook example of an affirmative defense that should be stricken. Without pointing to a single alleged fraudulent act ***by the City against Paradis related to the actual issues at hand in this litigation***, Paradis spends 63 pages of his Answer spouting wholly immaterial, impertinent, and scandalous conspiracy theories. Paradis' consistent strategy has been to attempt to defend or justify his admitted fraud and outright criminal conduct (which corrupted nearly everyone Paradis came in contact with) by seeking to massively expand the scope of the parties' dispute with wild allegations against the City and its officials. Paradis' alleged "facts" have nothing to do with, and would never have been an excuse for, the fraud that he

1    committed – nor has Paradis made an offer of proof to the contrary.[1]

2    Of course, as the Court has pointed out numerous times, this case is about

3    Paradis' fraudulent actions to obtain the Aventador Contract and later the Ardent

4    Contract. *See* Exhibit A at pp. 4-6. And, as a consequence, the Court will decide

5    whether Paradis' debt to the City should be held non-dischargeable for those reasons.

6    Again, this case is *not* about Paradis' wild allegations about the City and City officials

7    concerning conduct that supposedly occurred long before Paradis chose to violate the

8    law. *See id.* Accordingly, Paradis' 63-page tirade related to the City's alleged IT issues,

9    the settled *Jones* litigation, and myriad other immaterial and impertinent issues should

10    be stricken in its entirety.

11    ### (b).    In Pari Delicto/Unclean Hands (Defense Nos. 2 and 3)

12    Unclean hands and the doctrine of *in pari delicto* are substantially similar under

13    applicable California law. *See Jacobs v. Universal Dev. Corp.*, 53 Cal. App. 4th 692,

14    699, 62 Cal. Rptr. 2d 446, 449 (1997). "The party seeking the application of the unclean

15    hands doctrine generally bear the burden of proving each element." *Still v. Arakelyan*

16    *(In re Still)*, 393 B.R. 896, 919 (Bankr. C.D. Cal. 2008). Unclean hands is a fact

17    dependent affirmative defense requiring inequitable conduct by a plaintiff in connection

18    with the matter in controversy and applies only where it would be inequitable to grant

19    the plaintiff *any* relief. *Id.* "The court must consider both the degree of harm caused by

20    the plaintiff's misconduct and the extent of the plaintiff's alleged damages." *Id.* It is

21    fundamental to operation of the doctrine of unclean hands that "the alleged misconduct

22    by the [party] ***relate directly to the transaction concerning which the complaint is***

23    _____

24    [1]    If such a "defense" were allowed, it would at least potentially encourage Paradis
to attempt to conduct sweeping and irrelevant discovery (which this Court disallowed in
25    the Ardent bankruptcy case), leading to significant discovery law and motion practice
and ultimately serve Paradis' goal of slowing down an inevitable ruling that his admitted
26    fraud against the City is non-dischargeable.

*made*." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ.,_Inc.*, 621 F.3d 981, 986-87 (9th Cir. 2010) (emphasis added). "Unclean hands does not constitute misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." *Id.* (quotation omitted).

Like Paradis' improperly pled fraud defense, Paradis' alleged affirmative defenses of *in pari delicto* and unclean hands should be stricken. Paradis' alleged "facts" simply do not comport with the inflexible requirement that alleged unclean hands have a direct connection to the actual transactions at issue: e.g., Paradis' actions related to obtaining the subject contracts.

### (c). Equitable Estoppel/Ratification (Defense Nos. 5, 8)

The City is not on notice of the bases for these alleged defenses. "Estoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *DRG/Beverly Hills, Ltd. v, Chopstix Dim Sum Café and Takeout, III, Ltd.*, 30 Cal. App. 4th 54, 59, 35 Cal. Rptr. 2d 515 (1994) (quotations omitted). Ratification as an affirmative defense involves rescission of an agreement and "that the rescinding party had notice of the grounds for rescission." *Bourbeau v. Cognitive Code Corp.*, 693 F. App'x 499, 502 (9th Cir. 2017) (quotation omitted). Paradis has not provided support for these alleged affirmative defenses, and they should not be permitted.

**WHEREFORE**, the City respectfully requests that the Court enter an order:

  i. Striking Answer paragraph nos. 32, 36-37, 39, 44-46, 60-61, 63, and 67-78, and providing Paradis' with a short time period to amend the Answer to fully and properly respond to the Amended Complaint, or the City's allegations in such paragraphs should be deemed admitted;

  ii. Striking Paradis' affirmative defenses in the Answer; and

  iii. For such other relief that the Court deems appropriate.

1    DATED: September 28, 2022.

2                                          **ALLEN BARNES & JONES, PLC**

3                                          */s/ MAJ #27311*
                                           Michael A. Jones
4                                          David B. Nelson
                                           1850 N. Central Ave. Suite 1150
5                                          Phoenix, Arizona 85004
                                           Attorneys for the City of Los Angeles
6

7                                          **LOS ANGELES CITY ATTORNEY'S
                                           OFFICE**
8
                                           */s/ Kathleen A. Kenealy (with permission)*
9                                          Michael N. Feuer
                                           Kathleen A. Kenealy
10                                         221 N. Figueroa Street, Suite 1000
                                           Los Angeles, CA 90012
11                                         Attorneys for the City of Los Angeles

12
                                           **ELLIS GEORGE CIPOLLONE O'BRIEN
13                                         ANNAGUEY LLP**

14                                         */s/ Guy C. Nicholson (with permission)*
                                           Guy C. Nicholson
15                                         2121 Avenue of the Stars, 30th Floor
                                           Los Angeles, CA 90067
16                                         Attorneys for the City of Los Angeles

17

18   **E-FILED** on September 28, 2022 with the
     U.S. Bankruptcy Court and copies served
19   via ECF notice on all parties that have
     appeared in the case.
20
     **COPY** e-mailed the same date to:
21
     Edward K. Bernatavicius          Alan A. Meda
22   United States Trustee            Burch & Cracchiolo PA
     230 N 1st Ave, Suite 204         1850 N. Central Ave., Suite 1700
23   Phoenix, AZ 85003                Phoenix, AZ 85004
     edward.k.bernatavicius@usdoj.gov  ameda@bcattorneys.com
24   *U.S. Trustee*                   *Attorneys for Defendant Paul Paradis*

25

26   */s/ Melissa Morgan*

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

_____

In re:                                    )
                                          )
PAUL OLIVA PARADIS         CH: 7          )    2:20-BK-06724-PS
                                          )
CITY OF LOS ANGELES vs PAUL OLIVA         )    ADV: 2-21-00171
PARADIS                                   )
                                          )
DEFENDANT'S MOTION TO DISMISS COMPLAINT   )
AND REQUEST FOR JUDICIAL NOTICE           )
_____   )

                              U.S. Bankruptcy Court
                              230 N. First Avenue, Suite 101
                              Phoenix, AZ 85003-1706

                              June 30, 2022
                              10:02 a.m.

            BEFORE THE HONORABLE PAUL SALA, Judge

APPEARANCES:

 For the City of Los Angeles:  Michael A. Jones
                               ALLEN BARNES & JONES, PLC
                               1850 North Central Avenue
                               Suite 1150
                               Phoenix, AZ 85004

 For Paul Oliva Paradis:       Alan A. Meda
                               BURCH & CRACCHIOLO, P.A.
                               1850 North Central Avenue
                               Suite 1700
                               Phoenix, AZ 85004

 For the City of Los Angeles:  Guy Nicholson
                               BROWNE GEORGE ROSS O'BRIEN
                               ANNAGUEY
                               2121 Avenue of the Stars
                               Suite 2800
                               Los Angeles, CA 90067

Proceedings recorded by electronic sound technician, Ruth
Carmona; transcript produced by eScribers, LLC.

1             THE CLERK:  20-06724, Paul Paradis, Adversary

2   21-0171, City of Los Angeles v. Paul Paradis.

3             THE COURT:  Okay.  Appearances for the City of Los

4   Angeles, please.

5             MR. JONES:  Thank you, Your Honor.  Michael Jones,

6   Allen Barnes & Jones, for the City of Los Angeles.  With us in

7   the courtroom is Ryan Deutsch, our summer associate.  With us

8   on the telephone line is Guy Nicholson, co-counsel.

9             THE COURT:  Okay.  Thank you.

10            And for Mr. Paradis.

11            MR. MEDA:  Good morning, Your Honor.  Alan Meda with

12   Burch & Cracchiolo on behalf of the Defendant, Mr. Paul

13   Paradis.  It is my pleasure to introduce you to Mr. Paradis,

14   who is here in the courtroom with me.

15            THE COURT:  Okay.  Good morning, Mr. Paradis.

16            MR. PARADIS:  Good morning, Your Honor.

17            THE COURT:  Okay.  So we don't have anybody on Zoom.

18   We set it up just in case anyone wanted it.  Let me close that

19   out.

20            This is the first time back in the court in some

21   time, so give me a second to make sure I've got all the

22   technology working the way we need it to work.  Sort of.  It's

23   funny; the technology has improved so much that it's, in some

24   respects, easier to do this from home or from a desk.  Okay.

25            Okay.  So we are here on a couple matters:

1  Mr. Paradis's motion to dismiss the first amended complaint --

2  the City's first amended complaint, and also Mr. Paradis'

3  motion for the Court to take judicial notice.

4      Couple things that are preliminary matter.  I've

5  granted extensions of page limits and such in this case.  I'm

6  not doing that anymore, so just be aware of that.  In the

7  future, we'll keep it to the page limits, unless, long before

8  the document is due, a request is made, and good cause is show.

9  Not to say that what you've given me isn't great reading and

10  great legal work.  It is, on both sides.  However, I think

11  we -- we don't need quite as much as we've got.

12      Let's deal with the judicial notice, and I'll listen

13  with interest to any arguments, but here are my thoughts.  As

14  Mr. Meda's aware from the pleadings. but wasn't at the hearing

15  in the Ardent case, the way I look at judicial notice is

16  judicial notice is that I can take notice of a nondisputable

17  fact.  Yesterday was a Wednesday.  The sun came up at a certain

18  time.  That kind of thing.

19      I can also take judicial notice of items in the

20  record.  I can note that there is a pleading that's been filed.

21  I can even take note that there was a newspaper article that

22  was published.  But I can't take judicial notice of what's in

23  there.

24      And in this case, what it seems to me is the 500-and-

25  so pages that Mr. Paradis would like me to take judicial notice

1  of stands for the proposition he wants to introduce into the

2  record 500-plus pages of documents, and we're not going to do

3  that.   I think what the judicial notice was sought for is to

4  establish that the City of Los Angeles Department of Water --

5  LADWP -- I'm going to call it the City as we move on, just so

6  everyone's clear -- that the City knew it had an IT problem

7  that came to light later, or at least it came to the point

8  where it had to be dealt with in the <u>Jones</u> lawsuit.

9          I don't know that there is even a dispute about that

10  issue, but I'm not taking judicial notice of 500-and-some-odd

11  pages, and I don't think this case is about whether the City

12  knew it had IT problems.  I think the case is about whether

13  Mr. Paradis did something wrong in assisting Aventador -- and

14  now called Ardent -- in getting those contracts.

15          So like I said before, I can take judicial notice of

16  items, the fact that this issue is out there.  But I think in

17  the end, there's going to be factual determinations in this

18  case.  I'm not making a ruling today that the City knew they

19  had a problem.  I think it's pretty clear that that's where the

20  facts are going to go.  But I'm just not going to take judicial

21  notice of 500 pages of documents.  That's my preliminary

22  thoughts.

23          So I'll listen with interest, Mr. Meda, if you want

24  to add to the motion or the argument.

25          MR. MEDA:  Thank you, Your Honor.  Alan Meda on

1  behalf of Mr. Paradis.

2        I don't really have much more to add.  It was never

3  our intent for the Court to take judicial notice of all the

4  underlying data that was cited to.  The point of the request

5  for judicial notice was to highlight the fact that the City has

6  acknowledged, admitted, not only the need for the cyber

7  security IT-related services, but the exigent circumstances

8  that existed and have been acknowledged by the City relative to

9  those needed services.  And that is what the Aventador contract

10  was really all about.

11        And so from our perspective, that acknowledgement is

12  significant.  It's significant because it really goes to either

13  the materiality of the alleged misrepresentations and false

14  pretenses or any damages that might have been incurred by the

15  City relative to those representations and pretenses.

16        THE COURT:  But when you cut down to what this case

17  is about, isn't it the City saying Mr. Paradis had some special

18  relationship -- he was a consultant, whatever he was -- and

19  that in that position, and with the help of City employees, all

20  of whom have been convicted of criminal activity, that what

21  happened is the City ended up with a no-bid contract situation,

22  where ostensibly it might have been better, it might have been

23  more appropriate, for the City to bid that out.

24        Whether that gets them to their claims, that's -- I

25  don't understand their argument to be, we didn't need IT

1  services.  I understand their argument to be, we shouldn't have

2  done it this way.  We shouldn't have been advised to do it this

3  way.  We shouldn't have fall into the trap to do it this way.

4  That's what I understand their argument to be.

5        MR. MEDA:  I understand, but the point that I'm

6  making is -- and we have a lot of issues with the alleged

7  represent --

8        THE COURT:  Well, you guys have a lot of issues on

9  both sides, I agree.

10        MR. MEDA:  Right.  Fair enough.  But the point is

11  that the City was going to award this contract to someone.

12  Whether it was Mr. Paradis or someone else, there was going to

13  be a contract.  And that goes to the damage issue.

14        THE COURT:  I don't disagree with you on that, but

15  I'm not sure -- one, I need to take judicial notice of even the

16  fact that you're seeking judicial notice for, which is the City

17  knew it had IT problems.  We'll see what Mr. Jones has to say

18  about that.  But even if I were to take judicial notice of

19  that, I'm not going to do it in the context of here's 500-and-

20  something pages, Judge, take notice of it.  That would create

21  an appellate nightmare in this case, not to mention a trial

22  nightmare.  I'm just not going to open the record up to that --

23        MR. MEDA:  I --

24        THE COURT:  -- level of scrutiny.

25        MR. MEDA:  I understand.



1          THE COURT:  Okay.

2          MR. MEDA:  As I said, I think the important point

3   with regard to that was the -- what we consider to be the

4   City's admissions that there was not only a need for the

5   services, but there were exigent services surrounding that

6   need.

7          THE COURT:  Okay.  Mr. --

8          MR. MEDA:  Which, by the way, has been acknowledged

9   by the City going all the way back to, like, 2006.  So it's not

10  like this was a new circumstance.

11         THE COURT:  Right.  I understand.

12         MR. MEDA:  Thank you.

13         THE COURT:  So Mr. Jones, if we can cut through

14  this -- and maybe we can't -- can the City acknowledge that

15  they knew prior to the Aventador contract that they needed IT

16  services for this cyber security -- I don't know if it's a

17  database, app, program, whatever it is -- and that there was an

18  exigent circumstance, probably from the Jones litigation, that

19  you got to dealt with?

20         MR. JONES:  Here is what I'll say about that.  It's

21  not an issue for today, and the reason why I say that, we're

22  going to almost certainly litigate that issue, specifically the

23  conditions by which this contract came to be and the need for

24  it came to be, which were precipitated by Mr. Paradis' work

25  with Mr. Wright, for which there are now federal crimes that

1  have been pled guilty to.

2          THE COURT:  But that gets more to the exigent

3  circumstance aspect of what Mr. Meda was asking, not so much

4  that the City needed to do something with its software.  I'm a

5  layman here, but --

6          MR. JONES:  Sure.  Did the City need to conduct

7  updates to software and things like that?  Likely, yes.  Did it

8  need to award a $30-million no-bid contract --

9          THE COURT:  Oh, I --

10          MR. JONES:  -- on an emergency basis?  Absolutely

11  not.

12          THE COURT:  I get it.

13          MR. JONES:  Yeah.

14          THE COURT:  I understand --

15          MR. JONES:  Yeah.

16          THE COURT:  I understand the latter to be your beef

17  here.  This --

18          MR. JONES:   Understood.

19          THE COURT:  This isn't what we needed to do.  This

20  isn't --

21          MR. JONES:  Right.

22          THE COURT:  -- how we needed to do it.

23          MR. JONES:  Right.

24          THE COURT:  We were misled.  We were defrauded.  I

25  get all that.  But I guess -- and I'm not sure it's necessary,

1   other than because of the way I suspect this litigation will

2   go, that narrowing things would be helpful.  So what you're

3   telling me --

4           MR. JONES:  Yeah.

5           THE COURT:  -- is the City won't take the -- oh.  Is

6   that Mr. Nicholson?

7           MR. NICHOLSON:  Yes.  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MR. NICHOLSON:  I'm just listening.

10          THE COURT:  Did you have something to add, or did we

11  just catch a blip?

12          MR. NICHOLSON:  No, you just (audio interference).

13          THE COURT:  I think you're getting a lot of feedback,

14  Mr. Nicholson.  I don't know if you've got both the Zoom feed

15  on for video and phone for feed, but we're getting a lot of

16  feedback from you.

17          MR. NICHOLSON:  Oh, well.  Maybe that's (audio

18  interference).

19          THE COURT:  Didn't catch any of that.  Why don't we

20  let Mr. Jones continue?

21          MR. JONES:  I guess where I'll leave it with regard

22  to the IT issues is, to the extent we're trying to narrow

23  issues as we had passed the motion to dismiss stage and into

24  the actual Aventador issues, we'll work in good faith on that.

25  I'll work with the client.  I'll see to the extent something

1   like that could be narrowed.  Of course, we'll try to do that.

2          For today's purpose, I think Your Honor's hit on the

3   exact issue.  Judicial notice is inappropriate.  We agree for

4   the reasons that you stated, and we're glad to hear that that

5   motion will not be granted and that we're going to actually,

6   for today, argue just the motion to dismiss issues, rather than

7   trying to conduct a mini trial.  So --

8          THE COURT:  Okay.

9          MR. JONES:  Thank you.

10         THE COURT:  So let me give the parties my ruling on

11  the motion for judicial notice.

12         Mr. Paradis has filed a motion for judicial notice,

13  which contained exhibits of over 500 pages, for the proposition

14  that the Court could take judicial notice of, one, the City's

15  need for IT infrastructure improvements; and two, for the

16  proposition that exigent circumstances existed.

17         As I indicated, judicial notice is appropriate for

18  nondisputable facts.  The sun came up at 5 or 5:15 a.m.  A

19  document was filed at docket number 63.  It's not to be used to

20  establish the actual facts in a case.

21         I hear from the City that I don't think, generally,

22  they're going to dispute that there were IT issues.  But as

23  cautious lawyers, the City is concerned that some type of an

24  admission here or a notice here would improperly tie the City's

25  hands in the litigation.  I don't know what the City knew or

1  didn't know.  It's pretty clear to me, it seems, that the City

2  knew they had some computer issues.  That's what the <u>Jones</u>

3  lawsuit, I think, was about at some level.  But I don't think

4  it's appropriate here to make findings on a judicial notice

5  basis that may be burdensome to the parties.

6          What the City knew, particularly when it knew it, how

7  it knew it, how it fits into the materiality of what's been

8  alleged here, where I think the gravamen of the complaint is

9  really getting to Mr. Paradis's involvement in the granting of

10  the $30-million Aventador contract, I don't think it's

11  appropriate to just take judicial notice of these things.

12          So I'm going to deny the motion, but I hope the

13  parties understand that I have a pretty good sense -- although

14  I may not understand IT world, I have a pretty good sense of

15  what went on and what we're fighting about.  And I'm just going

16  to ask the parties to keep that in mind as we move forward in

17  terms of stipulated facts and so that we're fighting the issues

18  that need to be fought and not the issues that don't need to be

19  fought.

20          So for those reasons, I'm going to deny the request

21  for judicial notice, and we'll deal with the issues of what the

22  City knew and when in a proper factual context if we ever get

23  there.

24          So now let's move to the motion to dismiss, Mr. Meda.

25  There is a whole lot in there, so I'll give you some of my

1    preliminary thoughts and just to make sure I kind of understand

2    all that you're seeking.  It seemed to me that Mr. Paradis is

3    seeking to dismiss the complaint under Section 523(a)(2) for a

4    couple of grounds.

5          One is the assertion that there is no alleged

6    material missed representation regarding the facts that gave

7    rise to the Aventador contract.  And by that, I am making a

8    distinction between the initial $30-million contract and the

9    subsequent -- I'm not quite sure what the number was -- 6- to

10   $12-million Ardent contract.  And I know there may be a dispute

11   whether it's the same company or not.  We'll deal with that on

12   another day.

13         But as I looked at your motion, it looked like, on

14   the one hand, you're saying as to the Aventador contract, there

15   is no allegation of a misrepresentation, ergo 523(a)(2)(A)

16   claims can't stand.

17         Secondly, you're saying, as to the facts and

18   circumstances arising relating to the Ardent contract, that the

19   523(a)(2)(A) claim fails because Mr. Paradis was working with

20   the FBI at the time.  And then more globally, even if I were to

21   find there was a representation in either of those two

22   instances, that it's not material and that it is -- and it

23   wasn't reasonably relied on, even if there were a statement.

24         That's what I understand your argument on (a)(2)(A).

25         On (a)(4), I understand your argument to be there's

1   been -- the Ninth Circuit law requires the determination that

2   there is an express or technical trust.  And no matter what the

3   relationship is, without an allegation of an express or

4   technical trust, an (a)(4) claim for fraud or defalcation in a

5   fiduciary capacity fails.

6           And your (a)(6) claim, as I understand it, is that

7   they have not properly alleged a willful conduct on behalf of

8   Mr. Paradis; willful being defined in the case law as an actual

9   intent to injure the City or an action that was intended that

10  had a substantially foreseeable injury to someone, and it just

11  happened to be the City.  That's how I understand that

12  argument.

13          I then understand that you'd like the complaint

14  dismissed, essentially, as a spoilation sanction.

15          And I think that's what I had out of your motion.

16          Was there anything else in there that you thought we

17  were fighting about?

18          MR. MEDA:  I think you've covered the bases, and I'm

19  happy to address those --

20          THE COURT:  Okay.

21          MR. MEDA:  -- when the Court's ready.

22          THE COURT:  I just wanted to make sure I had

23  everything in order.  Okay.  I'll listen with interested,

24  Mr. Meda, but rest assured, I have read everything,

25  Ms. Hendricks (phonetic) has read everything, and we've spent

1  hours going through it.  So I'm very well familiar with it.

2          MR. MEDA:  Well, thank you for your time and for

3  reviewing everything.  I know there's been a lot of pleadings

4  filed.  Very --

5          THE COURT:  The binders were, like, that thick, and

6  there were two of them.

7          MR. MEDA:  I understand, and it certainly required a

8  lot of reading and patience.  And I wish we could have

9  condensed it a little bit for the benefit of the Court, but we

10  did want you to have the benefit of what we thought was

11  pertinent.

12          As the Court is well aware, we're dealing with an

13  adversary complaint dealing with an attempt by the City to

14  object to Mr. Paradis' discharge under 523(a)(2), (a)(4), and

15  (a)(6).  The basis for the claim of objection to discharge, as

16  the Court noted, really relates to the award of two contracts,

17  two separate and distinct contracts.  The first contract was

18  awarded to Aventador, and the second contract is really

19  unrelated to the first contract, which it was awarded to

20  Ardent.  Right?

21          So I could be a little bit off on the numbers.  It

22  doesn't really matter.  But my understanding is the first

23  contract, Aventador, was about 28 million -- a little over 28

24  million, and the second contract, the Ardent contract, was

25  about a million-and-a-half, maybe up to $2 million, somewhere

1  in that range.

2          THE COURT:  Okay.

3          MR. MEDA:  And I think that's how we get to $30

4  million.

5          THE COURT:  Okay.

6          MR. MEDA:  So as the Court is aware, the allegations

7  essentially underlying all this is that these contracts were

8  secured based on fraud, false representations, false pretenses.

9  In any event, the City is alleging that Mr. Paradis made up

10  either statements or circumstances that encouraged the City to

11  enter into this contract with him -- contracts, plural, with

12  him.

13          Now, we initially filed a motion to dismiss

14  previously in December.

15          THE COURT:  Which you indicated I granted in your

16  motion, but I went back.  I don't believe I granted it.  I

17  think I said, go amend.

18          MR. MEDA:  Okay.  And --

19          THE COURT:  So the record's clear, there was never a

20  granting of the motion that would have resulted --

21          MR. MEDA:  Right.

22          THE COURT:  -- in a dismissal.

23          MR. MEDA:  I believe the City made reference to that

24  as well.  I apologize, but --

25          THE COURT:  That's okay.



1        MR. MEDA:  -- I appreciate the correction.

2        THE COURT:  Just wanted it --

3        MR. MEDA:  Yes.

4        THE COURT:  Just wanted it clarified.

5        MR. MEDA:  But in briefing, and at oral argument in

6   February, we suggested that dismissal was appropriate because

7   the City had failed to allege with specificity any

8   misrepresentations or false pretenses.  The City has now

9   amended the complaint.  And our position, as evident from the

10  second motion to dismiss, is that the amended complaint, like

11  the initial complaint, fails to again allege the specific

12  representations and pretenses which were allegedly false when

13  they were made.

14        Now, we feel that this is particularly significant

15  concerning the fact that this is essentially a complaint for

16  fraud that has a heightened specificity requirement, right.

17  And also, the fact that this is the second attempt that the

18  City has had to plead these allegations.

19        Now, the closest that the City gets to alleging or

20  creating a pretense or alleging a pretense or a

21  misrepresentation is the suggestion that Mr. Paradis falsely

22  created exigent circumstances.  And as we talked about, oh, a

23  minute ago, the problem here is that there were exigent

24  circumstances with the City's cyber security systems.

25        THE COURT:  But isn't that a factual issue --

1          MR. MEDA:  Well, here's the thing, though --

2          THE COURT:  -- the level of exigent circumstances?

3 You say it's exigent.  They had to get this fixed.  The <u>Jones</u>

4 lawsuit was out there.  The city had to move.  The City says

5 yeah, we had to move, but we relied on Mr. Paradis and some

6 other City employees, all of whom have admitted to criminal

7 activity, and we gave up a no-bid contract.

8          I don't know what that makes damages as to

9 Mr. Paradis, but it seems to me that that's enough, at least to

10 get beyond a motion to dismiss.

11          MR. MEDA:  Well -- okay.  So two things I want to say

12 about that.  And I appreciate the Court's input there.

13          First of all, as I said before, for years, the City

14 has admitted that it lacked the internal resources to provide

15 adequate project management and IT services.  But perhaps more

16 importantly, nowhere in the complaint, the amended complaint,

17 or any of the pleadings -- admittedly, voluminous pleadings --

18 does the City deny that there were exigent circumstances.  The

19 City has never denied that, and I think that's significant

20 here.

21          We have expressed our view of the world, right?  We

22 have pleaded to this Court that there were exigent

23 circumstances.  And I get the fact that at some point the Court

24 could look at that as some kind of fact determination.  But

25 before you get to a fact determination, the City has to deny

1  that the circumstances existed.

2         THE COURT:  Well, let me ask you this, Mr. Meda.

3  Let's say, today, I found the City had exigent circumstances to

4  get in a consultant to fix their project management and IT

5  services.  Let's say I found that.  Is that game, set, match?

6  There's no potential cause of action here?

7         MR. MEDA:  Well, here is the problem.  Of course,

8  maybe there could be under some scenario a cause of action, but

9  the problem, as we have stated over and over again, is that the

10  City has not properly pled its cause of action.  It has not

11  pled to this Court what is the underlying misrepresentations.

12  What is the underlying false pretenses?  I mean, we're shooting

13  in the dark here.

14         They haven't provided us with anything.  And as I

15  said before, I think that's particularly important in the

16  context of a fraud action that forms the basis of an objection

17  to discharge.  We have the right to know what the allegations

18  are, the underlying factual allegations that supposedly support

19  this fraud claim.  And we don't have that here.

20         And the City was advised of that previously, and the

21  City was given an opportunity to amend its complaint.  And the

22  City told you, Judge, that the reason the first complaint

23  didn't have all that in it was because of the government's

24  investigation, and it was handcuffed, and it couldn't properly

25  plead matters.  And now the handcuffs came off, and the City

1  filed an amended complaint.  And we still have the same

2  deficiencies.

3          THE COURT:  Well, what about the citation to the plea

4  agreement where Mr. Paradis agreed that he had defrauded the

5  City?  Why isn't that, in and of itself, enough?

6          MR. MEDA:  Because the plea agreement is essentially

7  conclusory.  Now, conclusory statements, without any really

8  underlying factual determinations that would support an

9  objection to discharge, that's really the problem.

10          THE COURT:  But do -- I understand the argument that

11  it's conclusory, but your client made it.

12          MR. MEDA:  No.  He --

13          THE COURT:  So --

14          MR. MEDA:  He did.

15          THE COURT:  -- you're saying if I have a defendant

16  who has admitted to fraudulent activity, the City saying, the

17  defendant has admitted to fraudulent activity is not enough to

18  stand for a fraud complaint at the motion to dismiss phase?

19          MR. MEDA:  It's -- well, first of all, we don't feel

20  it's enough, because the plea does not contain what we view as

21  sufficient bases to justify a objection to discharge judgment.

22          THE COURT:  Okay.

23          MR. MEDA:  Okay.  So the fact that there were

24  conclusory admissions made doesn't meet the standard necessary,

25  in our opinion, to rule that Mr. Paradis' discharge should be

1  denied.

2        We also would assert to the Court that, certainly,

3  the standards for a plea in criminal court are much different

4  than the standards of evidence for a nondischargeability

5  proceeding.

6        THE COURT:  You think the criminal plea standard is a

7  lesser standard than the Bankruptcy 523 standard?

8        MR. MEDA:  Well, maybe I'm not saying it the right

9  way.  Maybe it's not a standard issue.  Maybe it's simply a

10  level of evidence issue.  And the problem here is that we don't

11  have any assertions -- there is no factual allegations made by

12  the City, specifically, to support objection to discharge under

13  523(a)(2).  There's no -- and by the way, the plea bargain --

14  remember, I want to -- let me go back a minute, because it's

15  important to understand that Mr. Paradis admitted to bribery,

16  okay.  That's what the plea bargain is all about, right?  It's

17  not -- the admission of liability does not relate to fraud.  It

18  does not relate to, really, any of the allegations in the

19  complaint.  What it relates to is that there is an admission

20  and a plea that Mr. Paradis committed bribery.  And --

21        THE COURT:  And injured the City.

22        MR. MEDA:  Well, I don't know about the injury, but

23  he clearly admitted that there was bribery.

24        THE COURT:  Okay.

25        MR. MEDA:  And injury is actually an important issue,

1  as we've talked about --

2          THE COURT:  I agree.

3          MR. MEDA:  -- previously, right?

4          THE COURT:  And I agree with you.

5          MR. MEDA: Yeah.  And I would just, I guess, emphasize

6  that the plea agreement certainly does not establish any

7  particular injury to the City, nor does it really, in my

8  opinion, evidence any particular intent to harm the City.  I

9  know that you mentioned that just a minute ago.  But the fact

10 of the matter --

11         THE COURT:  It was just bribing to bribe for --

12         MR. MEDA:  Well --

13         THE COURT:  -- fun's sake?  What?

14         MR. MEDA:  Clearly, there was a self-interest

15 involved in the contract.  I understand that.  But as I said

16 before, a contract was going to be entered into, no matter

17 what.

18         THE COURT:  Right.  And that get to damages.

19         MR. MEDA:  Whether it was Mr. Paradis or somebody

20 else --

21         THE COURT:  Right.  IBM --

22         MR. MEDA:  -- right?

23         THE COURT:  -- might do the job.

24         MR. MEDA:  So --

25         THE COURT:  I understand that distinction.  I'm

1   having a hard time, Mr. Meda, with the idea, particularly post-

2   Husky, that on an (a)(2)(A) claim, where the Defendant has

3   admitted to criminal liability in connection with the very

4   contract we're talking about, that they haven't put you on fair

5   notice of a fraud claim.

6       It may not be a misrepresentation.  I don't know.  It

7   may be an omission.  It may just be fraud.  And Husky says

8   that's enough.  So I'm having a hard time seeing how I do what

9   you want and blow out an (a)(2)(A) claim given what the Supreme

10  Court says in Husky.

11      It doesn't narrow fraud to a misrepresentation --

12  that sidesteps all the prior Ninth Circuit law that seemed to

13  require that -- and allegations here that Mr. Paradis, by

14  virtue of his pela agreement, has defrauded the City.

15      I have a hard time, given those allegations, of

16  saying that cause of action or (a)(2)(A) goes away.  It doesn't

17  mean it's conclusive.  It doesn't mean they've established

18  damages.  And there may be defenses, like you're talking about

19  here, down the road.  I'm not foreclosing any of those.  I'm

20  not saying, just because he did this, he's going to -- he's

21  going to have an (a)(2)(A) judgment against him.  But I think

22  it's enough to have alleged fraud, as I read Husky, to survive

23  a motion to dismiss a 523(a)(2)(A) defense.

24      MR. MEDA:  So I've struggled with this myself.  But

25  at the end of the day, I go back to the bases for objection to

eScribers

1   discharge.  And regardless of the plea bargain, it's still the

2   City's obligation to plead and establish, in some manner, the

3   underlying bases for the alleged fraud.  Even in a res judicata

4   perspective, the City still has to establish findings of the

5   underlying bases.  And my point is that the City hasn't alleged

6   the underlying bases for the objection under 523(a)(2).

7           And again, remember, this isn't our first go-around,

8   right.  The City has had its opportunity to amend the

9   complaint, and it continues to not only not provide us with any

10  factual bases, but it -- for the fraud, but it actually hasn't

11  provided us with any factual detail about its so-called

12  justifiable reliance and, perhaps more importantly, its actual

13  damages.

14          All it says -- in a conclusory way, it says, we

15  entered into a contract, $30 million, that's our damage.  I

16  don't think that's enough, not under a fraud complaint.  And

17  again, remember, these deficiencies, I think, are significant,

18  considering that the City has already had its opportunity to

19  amend.

20          Now, we talked about the fact that there were two

21  contracts, right?  So let's talk about Aventador contract for a

22  minute, right.  So the Aventador contract was basically a

23  remediation of the City's billing system.  And this contract

24  really related to and was necessary to implement the Jones

25  settlement that the Court has heard all about.  And that -- the

 1  remediation was actually necessary, not only to implement the

 2  settlement but, importantly, to comply with the Court-ordered

 3  deadline.

 4        And that gets to the exigent circumstances, right?

 5  That was a Court-ordered deadline.  Now, we believe that the

 6  Department of Justice has now uncovered evidence that --

 7  including, by the way, admissions from the City officials

 8  themselves -- but evidence confirming that this whole Jones

 9  settlement was all part of a collusive litigation scheme really

10  initiated by the City attorney's office.  And what you're going

11  to find out is that's what this was all about.

12        This is not about Mr. Paradis.  This is not about

13  what Mr. Paradis did or didn't do or what he represented or

14  didn't represent.  What you are going to find out is this was

15  all about the City trying to cover itself with regard to this

16  collusive litigation scheme.  And maybe that's not important

17  today, but that's what we're going to eventually get to the

18  bottom of.

19        And remember what I mentioned before.  This whole

20  collusive litigation scheme, this was the scheme that was

21  discussed at that December 2017 meeting with the City attorney,

22  Mr. Feurer.  That was a meeting that Mr. Feurer initially

23  denied.  There was no meeting, or I can't remember any such

24  meeting.  And --

25        THE COURT:  But Mr. Feurer's not a debtor in

1  bankruptcy in this court.  So I understand, long view, one of

2  your affirmative defenses here is that it was somebody else's

3  fault.  It's somebody else's problem, not Mr. Paradis'.  That's

4  not for today at a motion to dismiss.

5         MR. MEDA:  I understand.  I just think that --

6         THE COURT:  There has been too much educating the

7  Court and educating the court of public opinion in this case

8  from both sides, which is why I thought it should be mediated.

9  But I don't need to keep doing that.

10         MR. MEDA:  Right.

11         THE COURT:  So let's stick to this motion.

12         MR. MEDA:  Well, I think what -- I just wanted to

13  highlight that --

14         THE COURT:  Consider it highlighted.

15         MR. MEDA:  Right.  I think what's important here is

16  that this contract was not awarded based on any representation,

17  based on any pretense created by Mr. Paradis, but it was

18  awarded, ostensibly, based on the City's need and urgency --

19         THE COURT:  And if I don't --

20         MR. MEDA:  -- for the cyber-security-related --

21         THE COURT:  And if I don't dismiss the case --

22         MR. MEDA:  -- services.

23         THE COURT:  -- you'll have every opportunity to

24  present that defense.

25         MR. MEDA:  So let's talk about the Ardent contract

1   for a minute.  So the Ardent contract wasn't identified in the

2   first complaint.  This came up in the amended complaint.  And

3   this is particularly troubling because the City knows that

4   Mr. Paradis has been an informant for the government for who

5   knows how long.  But --

6           THE COURT:  Okay.  I'm going to stop you there.  The

7   whole informant-for-the-government issue, that is a factual

8   issue.  I am not going to rule on that at a motion to dismiss.

9   You may be right.  Maybe there's a law that if you're an

10  informant, you get a free pass on fraud.  I don't know.  But

11  all I have are your statements and a few lines from plea

12  agreements that Mr. Paradis was working with the FBI.  That is

13  not enough for me to rule on that issue at a motion-to-dismiss

14  phase.  So --

15          MR. MEDA:  Fair enough.

16          THE COURT:  -- maybe I've played my hand on that one,

17  but that's not going to prevail today.

18          MR. MEDA:  Right.  Okay.  But I would just say that,

19  certainly, the City's never denied that.  So I don't think

20  there is truly a disputed issue of fact.  I think the record is

21  clear --

22          THE COURT:  And when you bring a summary judgment

23  motion, we'll know if there is --

24          MR. MEDA:  Right.

25          THE COURT:  -- a disputed issue of fact.



1          MR. MEDA:  And I also want to emphasize the Ardent

2  contract, not only are the allegations relative to that

3  contract all during the time frame in which Mr. Paradis was

4  acting as an informant, but that contract is completely

5  unrelated to the first contract.

6          THE COURT:  But didn't they allege that, as to the

7  Ardent contract, Mr. Paradis had attested to the City that he

8  was not an owner of Aventador or Ardent and would never be?

9          MR. MEDA:  Well --

10          THE COURT:  They've alleged it.

11          MR. MEDA:  They've alleged it.

12          THE COURT:  You may say --

13          MR. MEDA:  Right.  Right.

14          THE COURT:  -- that's just crazy, Judge.  That's not

15  what happened.

16          MR. MEDA:  Yeah.  Right.  Well --

17          THE COURT:  But that's what they alleged.

18          MR. MEDA:  -- we'll -- right.  We're going to --

19          THE COURT:  And you've even highlighted at a

20  different argument that they may not even be the same entity.

21  And I get that.

22          MR. MEDA:  Judge --

23          THE COURT:  But the allegation is that Mr. Paradis

24  attested to the City -- and I think it was in a document --

25  that he did not own and would not own Ardent --

1          MR. MEDA:  Right.

2          THE COURT:  -- or Aventador.  So at a motion to

3   dismiss, where I have to accept what they've said as truthful,

4   I think, on that, they've got a clear representation.  So I

5   don't see how you get over the hurdle there.

6          MR. MEDA:  So -- you're right.  I do think it's

7   crazy.  I think that the City is making that claim in bad

8   faith.  One day, I hope to be able to remind the Court of this

9   conversation, because, frankly, I am just appalled at the

10  liberties that the City is taking with its pleadings in this

11  particular case.  But I understand what the Court is saying.

12         I think that there are a number of complications

13  relative to that issue.  Not only does it have to do with what

14  the City actually knew, but it also is going to relate to what

15  I've discussed as this collusive litigation scheme initiated by

16  the City's Attorney's Office.  And the Court mentioned this

17  before in terms of spoilation of evidence and documents.

18         And I realize that the Court's not going to take that

19  up today, but I do want to reiterate that that's going to be an

20  issue, and we're going to have to address it.  We're -- we know

21  the documents existed.  And why the City claims that they no

22  longer have these documents is beyond me, but perhaps we will

23  find out.  But the City has unclean hands here, and that's

24  really important to get across.

25         THE COURT:  Well, I think, to a certain extent,

1 that's not hard to see when we've got City employees who have

2 also pled guilty to fraud.

3          MR. MEDA:  Right.

4          THE COURT:  Now, whether that impacts the body

5 politic, the City, from bringing an (a)(2), (a)(4), or (a)(6)

6 claim, I don't know, but there is clearly a lot of blame for a

7 lot of human beings here.  I just don't know how that plays out

8 vis-a-vis the City versus any one of those individuals, because

9 I assume, if the other individuals file bankruptcy somewhere,

10 the City would file very similar complaints against them.

11          MR. MEDA:  Right.

12          THE COURT:  But that's a assumption long before I

13 know how this is going to play out.

14          MR. MEDA:  So --

15          THE COURT:  (a)(4)?

16          MR. MEDA:  Well, I'm going -- I'll get there real

17 quick.

18          THE COURT:  Okay.

19          MR. MEDA:  I just want to point out that -- one more

20 thing about the Ardent contract.  That contract was actually

21 awarded pursuant to an RFP process.  So that's another

22 distinction between that contract and the first one.

23          THE COURT:  Um-hum.  I understand.

24          MR. MEDA:  Now, I just want to mention a brief

25 comment about damages.  And I understand what the Court has

1 already said about that issue.  But I do want to emphasize that

2 services were actually provided by Mr. Paradis, right?  So I

3 don't think there's any dispute about that.  Services were

4 provided under both contracts.

5          THE COURT:  I think I can cut through this pretty

6 quickly for you.  Here is my understanding, since I am sitting

7 as the judge in the Ardent case as well.  The City is relying

8 on California Government Code 1090 for the proposition, vis-a-

9 vis Ardent, that they can -- that they are entitled to their

10 money back because of the bad act.

11          I understand that as to Ardent.  I don't understand

12 necessarily, as to Mr. Paradis, that that is the proper measure

13 of damage in a nondischargeability context.  In a

14 nondischargeability context, cutting through everything, you're

15 basically dealing with bad actors or bad actions.  And one of

16 the components is always damages.

17          And while there may be a statutory entitlement to a

18 refund vis-a-vis the customer, I'm not sure -- I'm not saying

19 it isn't, but I'm not sure, as I sit here today and what I've

20 ready so far, that that is the measure of damages here, because

21 it does occur to me there may have been something done.  There

22 may have been something that was wonderful done.  There may

23 have been nothing done.  I don't know.  But that is how I'm

24 looking at this from a damage perspective down the road.

25          I may be absolutely wrong on that, but I don't think

1    damages are necessarily determined by California Government

2    Code 1090 as to a nondischarge claim against a noncontracting

3    party.

4              MR. MEDA:  Right.

5              THE COURT:  That help?

6              MR. MEDA:  It does.  Thank you for that.  I mean, I

7    think what's important is the fact that they haven't alleged --

8    I mean, regardless of the California Code 1090, the City hasn't

9    alleged that services weren't provided.  The City hasn't

10   alleged that the services were not exemplenary (sic).  The City

11   has not alleged that the services were defective or deficient

12   in any way, right?  The City hasn't alleged that performance of

13   the services caused any damage.  None of these things have been

14   alleged.

15             As it relates to California Civil Code 1090, as we

16   mentioned before at another hearing, it's our position that

17   that code section is not applicable.  Certainly, on its face,

18   that statute only applies to City officials and their

19   employees.  And so what the City wants to do here is apply it

20   to Mr. Paradis as an independent contractor.

21             Now, there is a case, the Sahlolbei case, which we've

22   talked about, 396 P.3d 568 from 2017, that applies California

23   Code 1090 to independent contractors.  But there's a test for

24   that application, and the test is whether the independent

25   contractor is entrusted with transacting on behalf of the

1 government.  There is no allegation here that Mr. Paradis was

2 entrusted or acting with transactional authority for the

3 government, and that's a critical basis to apply 1090 in the

4 context of Mr. Paradis as an independent contractor.  Of

5 course, Mr. Paradis --

6           THE COURT:  Right.  As I'm --

7           MR. MEDA:  -- wasn't the contractor, right?

8           THE COURT:  As I'm sure you'll make clear in an

9 appropriate motion for summary judgment and your closing

10 argument, but it's not part of the motion to dismiss.  I

11 understand the argument.

12           MR. MEDA:  So I'm going to move on to 523(a)(4).  But

13 before I do, I just want to leave the Court with this thought.

14 In the 523(a)(2) cause of action, the City references certain

15 sections of its complaint that supposedly evidence -- false

16 representations or false pretenses.  And if you go through -- I

17 won't take up your --

18           THE COURT:  Or fraud.

19           MR. MEDA:  -- time now.  Or fraud.  And if you go

20 through these paragraphs, I'm confident you're going to find

21 that, in fact, those cited-to paragraphs do not allege properly

22 misrepresentations or false pretenses, other than, perhaps with

23 one exception, the exigent circumstances issue.

24           Now, let's talk about 523(a)(4) for a minute.  So

25 essentially, what the City is alleging is defalcation while

1 acting in a fiduciary capacity.  So let's look at defalcation,

2 right.  Defalcation is the misappropriation of funds by a

3 person entrusted with their charge.  In order to have a cause

4 of action under 523(a)(4), there has to be a trust.  There has

5 to be a race, and that trust or race has to be misappropriated

6 by a fiduciary.

7 And the problem here, in the context of this

8 adversary complaint, is there is no trust.  There's no race.

9 There's no allegation of a trust or a race.  And importantly,

10 there's no fiduciary relationship.

11 Now, our own Judge Marlar has provided us with some

12 guidance on this, right, the In re: Chavez case, at 430 B.R.

13 890, bankruptcy decision from 2010.  And Judge Marlar stated

14 that there must be a trustee relationship before the alleged

15 wrongdoing in a strict or narrow sense.  There must be an

16 actual trust relationship, not just a duty of loyalty.

17 And that is significantly missing in this particular

18 case.  There's no allegation of a trust.  There's no allegation

19 that Mr. Paradis misappropriated funds that were being held in

20 a trust.  And I think that that is -- really mandates dismissal

21 of that particular cause of action.

22 As it relates to 523(a)(6), I think the Court has

23 already laid out the bases needed to obtain relief.  There has

24 to be willful and malicious actions.  There has to be not only

25 intent to do something, but there has to be an intent to cause

escribers

1  harm.  And I would submit to you, Judge, that from Mr. Paradis'

2  standpoint, his motivation was to obtain the contract.

3  Obtaining that contract doesn't create harm in and of itself,

4  and there's been no allegation as to what this alleged harm is.

5  And that's really the problem here.  Again,

6  without -- in the context of a fraud complaint, without telling

7  us what the underlying basis is, what the actual harm that was

8  caused by the City, we really don't have a way of defending

9  ourselves.  So we don't feel -- not only is there no harm, but

10  there's no intent to cause harm sufficient to justify

11  discharge --objection to discharge under 523(a)(6).

12  Judge, I think that's all that I have.  Thank you for

13  the leeway in extending my time.  I would be happy to answer

14  any questions you might have.

15  THE COURT:  I think I asked them all during the

16  presentation.  So if anything else comes up, I'll find you.

17  MR. MEDA:  Thank you.  We -- just -- we don't feel

18  that the City has properly pled its 523 complaint.  It's had an

19  opportunity to fix the deficiencies that existed, and those

20  deficiencies remain.  We don't feel that further leave should

21  be granted, and we'd ask the Court to dismiss the complaint.

22  THE COURT:  Okay.

23  MR. MEDA:  Thank you.

24  THE COURT:  I understand.  Thank you.

25  Mr. Jones.



 1             MR. JONES:  Thank you, Your Honor.  I'm happy to

 2    begin with (a)(2)(A) or wherever you'd like.

 3             THE COURT:  Well, you can start with (a)(2)(A) and --

 4             MR. JONES:  Sure.

 5             THE COURT:  -- explain for me -- tell me what the

 6    theory is.

 7             MR. JONES:  Sure.

 8             THE COURT:  And to the extent it's a

 9    misrepresentation or an omission, tell me what that is and

10    where I find it.

11             MR. JONES:  Sure.  Well, let me start out this way.

12    Your Honor is correct that, certainly, Husky International

13    Envelope (sic) creates a broad standard, and we've met that

14    standard.  Specifically, we pled (a)(2)(A) under three

15    different theories:  false pretense as actual fraud and false

16    representation -- let me just put it to you this way.  With

17    regard to the overarching misrepresentations, there are at

18    least three categories.

19             First, Mr. Paradis worked with Mr. Wright covertly to

20    draft an independent monitor report that was filed with the

21    Court and was given to the LADWP board.  He drafted with

22    Mr. Wright a letter to the board and prepared a presentation to

23    the board, all with the secret motive to obtain the Aventador

24    contract under a no-bid situation, to create -- and how do we

25    know this?  He's admitted to it -- to create a situation where

1 the board believed that there was no alternative other than to

2 award -- to go against their normal process for bidding out

3 contracts and to subvert that process and award Aventador this

4 $30-million contract without a bid.

5 And this is against the City's best interest. And

6 Mr. Paradis has admitted all this, specifically. His plea

7 agreement, I mean, it gives breathtaking detail regarding this

8 scheme here. It is not conclusory. We don't need to argue

9 about that. We can just read it. The idea that we're shooting

10 in the dark is just mind-blowing. The plea agreement reads

11 like a checklist for Section 523.

12 And let me get back, because I want to answer your

13 question. So the second category, where we're asking for -- or

14 we're asserting that there were misrepresentations, is the

15 bribery of David Wright. David Wright was the general manager

16 to LADWP. That's a position that's very high within that

17 institution. Mr. Paradis undertook an effort -- a very

18 detailed effort, which is detailed in his plea agreement, to

19 make it so that Mr. Wright wanted to act in the best interest

20 of Aventador rather than the City.

21 And they took part in a scheme to present to the

22 board a situation where the board was left with, essentially,

23 no choice, other than to award this Aventador contract. And

24 they didn't disclose that they were working together to create

25 a situation that benefited them, financially.

1          How do we know that?  It's in Mr. Paradis' plea

2   agreement.  He's admitted to it, and he's made it part of a

3   court record with the Central District.

4          The third category of misrepresentation is the 2019

5   declaration to the City that Mr. Paradis' executed.  That

6   declaration's attached to the amended complaint.  Your Honor,

7   we can all look at it.  I don't think there's even any dispute

8   that that's what it is.  I'm just hearing general outrage

9   regarding the issue, which is confusing.

10          That declaration says specifically that Mr. Paradis

11  will have nothing to do with Aventador anymore.  Mr. Paradis

12  shall not receive compensation.  He will not own it.  He will

13  not participate.

14          So what does he do?  Well, we can look at his

15  bankruptcy schedule sworn under oath.  He retook ownership of

16  Aventador.  He took draws from Aventador, then known as Ardent.

17  Additionally, we can take a look at plea agreements signed by

18  Mr. Wright, Mr. Alexander.  All this stuff's in the complaint.

19  We don't have to guess.  We don't have to shoot in the dark.

20  He's admitted to it, as have others.

21          The declaration was violated almost immediately.

22  Almost immediately, there are sworn records that -- and it's in

23  our complaint, so they don't have to guess -- that Mr. Paradis

24  continued to work for Ardent, continued to act as Ardent's

25  owner, and continued to take action that financially benefitted

1   Ardent.  That's in direct violation of the declaration, which

2   the City relied upon, to its detriment.  That's fraud.

3          So we've pled at least three categories, and those

4   are broad categories.  I mean, the bribery of Wright, it

5   entails all kinds of different factual issues that could

6   constitute misrepresentations and fraud.  But in any event,

7   false pretense, certainly, here, designed to convey an

8   impression without an oral representation.  A false impression.

9   Absolutely.

10          Actual fraud under Husky purposefully designed to be

11  amorphous.  The Supreme Court tells us that.  The Supreme Court

12  says -- we keep hearing, where is the specific

13  misrepresentation?  I've already walked through them; however,

14  that's not required.  The Supreme Court quoted -- well, we

15  pulled a quote, put it on our complaint.  The Supreme Court

16  said, "A false representation is not necessary for actual fraud

17  under (a)(2)(A)".  So we keep having this strawman argument,

18  and it doesn't make any sense, because the Supreme Court's

19  already told us we don't need to actually have that.

20          And then with regard to false representation, I've

21  walked through the three categories, but silence may constitute

22  materially false misrepresentation.  What was the silence here

23  that created false representation?  Putting all this material

24  to the board and not telling them that you participated in it.

25  Not telling them that you had a financial interest in the $30-

1  milllion contract that they're going to award that subverts the

2  normal process.  That's misrepresentation.

3       THE COURT:  And why did Mr. Paradis have a duty to

4  represent this to you at that time?

5       MR. JONES:  Sure.  And that's under -- and we're

6  going to litigate this probably through a motion for summary

7  judgment, maybe on both sides, it sounds like -- but the

8  California Government Code Section 1090.  It's absolutely

9  applicable to him.  And that's an issue we'll litigate another

10  day, as Your Honor pointed out.

11       But it's applicable to private practice attorneys

12  that work for the City.  That's exactly what he was.  It's

13  applicable to independent contractors, and we'll walk through

14  that he had powers that made it such that he is a City official

15  as defined under Section 1090.  And under 1090, you're required

16  to disclose things like this.  And if you don't do so, then the

17  entire contract is automatically void.  The entire contract is

18  automatically disgorged.

19       And I get that we're going to -- we're going to fight

20  over damages, but that's just a preview, because it's as plain

21  as day under California law.  And that's where we're going with

22  it.

23       But in addition, Mr. Paradis prepared these materials

24  and worked directly with Mr. Wright, so closely that they're

25  exchanging emails and messages and having meetings to connive a

1  way to get this contract.  And then Mr. Wright presents it to

2  the board as if this is on behalf of LADWP.  Mr. Paradis knew

3  what was going on.  He admitted it.  We're not speculating

4  here.  We're way beyond the pleading standard.

5       So this stuff is stated in the complaint.  He has

6  admitted it.  The idea that they can't figure out what the

7  (a)(2)(A) claim is, is mind-blowing.  They can read the plea

8  agreement that he signed, and that's stated right in the

9  complaint here.

10       I'm happy to discuss anything else on (a)(2)(A) or --

11       THE COURT:  No.  Let's go to (a)(4).

12       MR. JONES:  Okay.  With regard to (a)(4) --

13       THE COURT:  Where is the trust?

14       MR. JONES:  Yeah, let's talk about that.  So let's

15  talk about a Ninth Circuit case, because we're hearing about

16  cases from different levels and different jurisdictions, and

17  they didn't like the case that we cited that -- two cases we

18  cited, admittedly, from outside of the District of Arizona, a

19  Ninth Circuit, that stand for the proposition that city

20  officials, if they commit the acts (a)(4) is designed to

21  prevent, they are held to the standard of a trust for a

22  community.  And therefore, if they commit fraud or defalcation,

23  (a)(4) applies.

24       They didn't like those cases, but let's take a look

25  at a Ninth Circuit case.  And it's one cited by them, so it's

1  in the record.  It's the <u>Short</u> case, which is a Ninth Circuit

2  case.  It's 818 F.3d 693 (sic).

3         In that case, the court looked to state law,

4  including case law, to determine whether a fiduciary obligation

5  existed.  They looked at Washington state law, and in that

6  case, the defendant had a fiduciary duty under a joint venture.

7  There was no express trust.  And the court went out of its way

8  to say, look, typically, that's -- we need express trust, but

9  there are other ways to have trusts.  They can be created by

10  state law, and they specifically said -- case law.

11         They cited all the case law that created this

12  Washington State law that -- where if you're -- the debtor

13  defendant in that case had a fiduciary duty under a joint

14  venture.  And he had to act as a trustee for the joint

15  venture's affairs.  That's what the Washington State law says.

16         So where does that leave us, and how does that tie

17  in?  We cited to California law, and it's applicable California

18  law that imposes trust-like obligations on public officials.

19  Public officials are required to account for the benefits and

20  profits related to any void transactions.

21         So what we're arguing here, Your Honor, is that these

22  two contracts are void.  They were void pre-petition.  They are

23  void under Section 1090.  And that's something we'll adjudicate

24  in the <u>Ardent</u> case and in this case.  And as a result of that,

25  under California law, Mr. Paradis had a trust-like obligation

1  under California law, and (a)(4) applies.

2          So that's the premise for it.  It's supported by

3  Ninth Circuit law.  They didn't like the out-of-circuit cases,

4  which stand directly for the premise.  So we cited -- we can

5  take a look at the case they cited to.  And the reason why we

6  had to go out of circuit for those two case that are directly

7  on point -- and have great analysis on the issue that's

8  directly on point -- is because this isn't something that comes

9  up all the time.  You don't typically find a situation where a

10 public official does what happened here and then files

11 bankruptcy, and then everyone litigates an (a)(4) issue to a

12 completed opinion.

13         So there's just not much on it.  We found the two

14 cases that are directly on point.  They both go in our favor.

15 And then if you look at the Ninth Circuit case law, it takes

16 that same analysis.  It just hasn't -- it hasn't come to an

17 opinion on that directly, because it just hasn't been broached

18 yet.

19         THE COURT:  What's the cite again on the Short case?

20         MR. JONES:  Sure.  It's 818 -- 818 -- F.3d 693.  And

21 it's in their brief.  And that analysis I went through is maybe

22 a sentence or two below what they cited.  So --

23         THE COURT:  That's not the cite.

24         MR. JONES:  Oh, I apologize.

25         THE COURT:  It's in their reply?



1          MR. JONES:  Let me find it.

2          THE COURT:  818 693.

3          MR. JONES:  It is in their reply --

4          THE COURT:  Oh, F.2d.

5          MR. JONES:  F.2d; my apologies.  Must have transposed

6    that.  Yes, F.2d.  818 F.2d 693.

7          THE COURT:  Okay.

8          MR. JONES:  I'm happy to answer any questions or if

9    Your Honor would like to review that case, whatever you'd like

10   to do.

11         THE COURT:  Well, I'll probably review it after the

12   hearing.

13         MR. JONES:  Okay.

14         THE COURT:  So I'll tell you my initial reaction,

15   Mr. Jones, was you cited to the Terry (phonetic) case, and I

16   think the Terry case does stand for the proposition that people

17   in the position that you allege Mr. Paradis is owe a

18   fiduciary-type relationship.  Where I am having trouble on the

19   (a)(4) case is the allegation of a trust, because -- and I

20   think you agree with me -- there is no allegation in the

21   complaint of a specific trust.

22             So I'll take a look at the Short case.  But if I

23   disagree with it, I think you're deficient on the (a)(4) claim.

24   I think -- I've already played my hand here.  I think you've

25   pled your case under (a)(6).  I think Husky makes that a broad

1  standard, and I think under a broad standard, the City has

2  alleged, essentially, a conspiracy here to defraud the City.

3      I have concerns on (a)(4) that, even if there's a

4  fiduciary relationship, that that's not enough.  I will look at

5  the Short case.  I looked at the out-of-state cases.  I don't

6  feel bound by those, and I am reminded by Judge Marlar's

7  admonition that -- in the Chavez case, that you need to --

8  whether we agree with it or not, whether we agree that's what

9  breach of fiduciary means, doesn't matter.  That's what the

10  Ninth Circuit has said it means.

11      So I'll look at the Short case, but I have some

12  concerns there.

13      MR. JONES:  Thank you, Your Honor.

14      THE COURT:  Let's move on to (a)(6).  And I'll tell

15  you, just to kind of cut through it -- and this is where it

16  occurred to me that there is a damage issue in this case, and

17  it gets to the allegations in (a)(6).

18      I understand your allegations.  I understand you

19  think that Mr. Paradis did a bunch of terrible things, that

20  Mr. Paradis should be held liable for those things.  I know

21  that in the Ardent case, the City wants Ardent to pay a big

22  judgment or at least have a big claim against Ardent.

23      Where I'm having trouble under (a)(6) -- because I

24  think of (a)(6) typically as a guy's driving his car and runs

25  you down -- I want to hit Mr. Jones -- or he's driving his car,

1    and he's driving on the sidewalk where there's an outside

2    bistro.  Somebody's going to get hurt.  I get that.

3          Here, the allegation is Mr. Paradis intended to

4    defraud the City.  I get that.  I know that's your allegation.

5    Where I'm having trouble with is that he intended to injure the

6    City, specifically, as opposed to just make money some way; or

7    two, that it was substantially certain that a damage would

8    occur.

9          And that's where I have a disconnect between your

10   arguments, I think, under Government Code Section 1090, which

11   is more of a remedy.  If this occurs, you get your money back,

12   as opposed to (a)(6), where you have to show an intent to

13   injure.  And that -- I think it's easy to see an intent to get

14   the contract.  It's easy to see an intent to make money.  I

15   don't necessarily see that it's easy to injure, and I didn't

16   see even an allegation that you were injured.

17          You want your money back under 1090.  I get it.  But

18   are you injured, separate and apart from that, in that we paid

19   $23 million out, and we should have only paid 2-?

20          MR. JONES:  Sure.

21          THE COURT:  That's where I'm having trouble with

22   (a)(6).  And it kind of cemented in my mind where I'm trying to

23   think, okay, even if he didn't intend to injure the City and

24   the City's saying it's certain they would have been injured,

25   where do I find that in the complaint?

1    MR. JONES:  Sure.  Your comments are well taken, and

2  here's what I would say.

3    THE COURT:  Lawyers always say that to judges.  They

4  don't mean it when they leave.

5    MR. JONES:  When we don't say it, I guess, you could

6  imply that inference.  No.

7    So here's where we come out on that.  So the standard

8  of course is not what we hear in the briefing here from the

9  other side.  It's that there was an -- knew that the injury was

10  substantially likely to occur.  That seems to be the dispute.

11    Here, what I would say is, one, we're very early in

12  the pleading stage, so it's impossible for me to stand here and

13  say, Judge, if this had just gone through the normal bidding

14  process with the Aventador contract, I can tell you that they

15  would have saved $10 million.  That's something an expert

16  witness would attest to or a City official would attest to, and

17  you'd hear that testimony or you'd hear it in a --

18    THE COURT:  You're not telling me somebody at the LA

19  City Water Department hasn't sat back and said, we paid 23

20  million for this, or wow, we got a bargain; let's go under this

21  other theory?  I mean, I don't believe that.

22    MR. JONES:  Yeah.

23    THE COURT:  At some level, I think somebody is going

24  to have to make a decision that this was a good deal or a bad

25  deal, or we're just going to fight to get our money back

1  because the statute says we get it back.  But that's what I

2  think's missing in this complaint.

3         MR. JONES:  Yeah.  Fair enough.  I'll just say the

4  facts here do lead to a conclusion that Mr. Paradis knew that

5  an injury was substantially likely to occur.  So how do I know

6  that?  When you take a look at the extreme detail that went

7  into plotting against the City's best interest to ensure that

8  the bribed City official, David Wright, would go to this

9  meeting with materials that Mr. Paradis had prepared to act

10  against the City's best interest to cause -- I mean, it seems a

11  pretty obvious conclusion here.  We don't need an expert to

12  tell us, if you don't have a bidding process, the contract's

13  going to cost more.

14         THE COURT:  Maybe.  Maybe he just didn't want to

15  compete with IBM or SAP.

16         MR. JONES:  And that's a factual issue, and that's

17  something that should be fleshed out.  I don't think this claim

18  should be killed off at the pleading stage because we don't

19  have before you a completely fleshed-out amount with regard to

20  what the injury is and how we arrived at that conclusion.  To

21  subvert a process of competitive bidding is exactly what causes

22  prices to go up.  I mean, that's obvious.

23         So -- and Mr. Paradis admits in excruciating detail

24  that he did this for himself, to financially benefit himself,

25  to subvert that process, to avoid that there would be

1    competitive bidding so that the contract would be driven to

2    him.  And what you'll find in discovery is that the rates were

3    considerably higher under the contract that was proposed versus

4    rates of other what would have been competitors and that City

5    employees were shocked and appalled at the amount, the process,

6    and that the rates were so considerably high.  And that was all

7    jammed through this big scheme that he knew was substantially

8    likely to cause injury to the city.

9         THE COURT:  And I'm hearing that in the argument.

10   I'm not sure that I see that in the complaint.

11        MR. JONES:  Well, I suppose if you'd like us to amend

12   with regard to that specific (a)(6) issue, we're happy to do

13   that, to provide a little more color in that regard.  But in

14   any event, I think we have met the pleading standard, which is

15   this is not a fraud claim.  This is not a Rule 9 issue.  We

16   don't have to plead with particularity.

17        This is a very low standard.  And I think we've met

18   it.  We put them on notice.  There's a viable claim here, and

19   they have the ability to contest.  We can take discovery and

20   present facts to you, which we'll be prepared to do very

21   quickly on a motion for summary judgment.

22        THE COURT:  So what you're telling me is, to (a)(6),

23   the theory is Mr. Paradis, through is actions, made sure that

24   Aventador was awarded a no-bid contract and that, on the one

25   hand, while that may have rewarded Mr. Paradis and/or

1 Aventador, you're saying it was designed to intentionally

2 injure the City or that the City, because it was a no-bid

3 situation, was going to -- was substantially certain to have

4 paid a higher price?

5          MR. JONES:  I mean, we can take it even a further

6 step back.  He bribed Mr. Wright, so it's not just he was

7 working to obtain this contract.  He bribed a city official, a

8 high ranking at the LADWP city official for his own benefit.

9 And this is someone that was the City's attorney --

10          THE COURT:  Right.  But his --

11          MR. JONES:  -- okay.

12          THE COURT:  -- benefit doesn't matter under (a)(6).

13 It does under (a)(2).

14          MR. JONES:  Right.  I understand.  And the reason I

15 say that -- this is someone that was working for the City as an

16 attorney, someone that is working for the City at a high level

17 with the LADWP to remediate some of the billing issues under

18 this -- we call it the POG management contract.

19          So he knew injury was substantially likely to occur.

20 We don't have to show that he intended to inflict injury.  You

21 have to show that he knew injury was substantially likely to

22 occur.  This is someone that was the City's lawyer.  This is

23 someone that worked inside with the LADWP.  He took someone

24 that should have been giving objective advice to the City,

25 should have been helping the City to save money, to make this

1   as cheap and economical and efficient as a contract as it could

2   have been.  He bribed that person -- he's admitted to it -- and

3   made it such that there was no competitive bidding process.

4         How could you not know that injury is substantially

5   likely to occur?  Of course, it is.  You just took away the

6   process to allow this contract to be competitive and efficient

7   and made it something that's designed just for you, something

8   that's designed to have, here's the number I want.  Here's what

9   it's going to be.  Let's make it that way.

10        That's absolutely going to injure the city, and he

11  knew.  And we've at least pled that, which gets us to the next

12  round.  That's where we come out on it.

13        THE COURT:  Okay.  And let's see.  I don't think --

14  no, I don't have anything further.  Thank you.

15        MR. JONES:  Thank you, Your Honor.

16        THE COURT:  Final words, Mr. Meda?

17        MR. MEDA:  Thank you, Your Honor.

18        Your Honor, Counsel made mention of a comment I made

19  about shooting in the dark.  Counsel points to the plea

20  agreement, essentially saying that that should give them

21  sufficient understanding of what the allegations truly are.

22        From our perspective, that's nothing more than a

23  misdirection, because that doesn't provide us some general

24  reference to the plea agreement, does not address the City's

25  responsibility of alleging the facts with specificity.  And the

1  City, despite having an opportunity to amend its complaint, has

2  failed to do so.

3          As it relates to the services provided by

4  Mr. Paradis, the City says, well, you know, we're going to

5  flesh that out during litigation.  But the problem here is

6  that's actually not the way this is supposed to work.  There is

7  no allegation of the harm to the City.  There is no -- and just

8  like I mentioned earlier, when I was up here before, as it

9  relates to the actual services, there is no allegation that the

10 services were not provided.

11         There is no allegation that the services were not

12 exemplary.  There is no allegation that the services were

13 somehow defective or deficient.  And there's no allegation that

14 the services caused -- or the performances of the services

15 caused any damage, nor is there any allegation that the way the

16 contract was arranged, even on a no-bid basis, caused the City

17 any damage.  So Judge, we think that those are certainly

18 important deficiencies that have not been remedied.

19         I just want to say one last thing before I conclude.

20 Mr. Paradis is dealing with a lot of things on his plate.  I'm

21 not saying that as an excuse for anything.  It's just a

22 reality.  He is dealing with defending this lawsuit.  He has

23 recently lost his job, so he is out there looking for work.  He

24 is also expected to be in Los Angeles every couple of weeks to

25 provide information to the government, and so he has that

eScribers

1    obligation.

2           I only mention this to you because I expect there's

3    going to be a time when we have to answer the complaint in some

4    fashion.  And when that time comes, we would ask your

5    consideration to give us 45 days to file that answer.

6           THE COURT:  Okay.

7           MR. MEDA:  Thank you.

8           THE COURT:  You're welcome.

9           Okay.  I had intended to rule from the bench today,

10   but I think I need to go back and take a look at the Short

11   case.  So what I will probably do is -- because it's going to

12   be fairly lengthy, I think -- I think what I'll probably do,

13   when I go back, is take a look at my calendar and set a time

14   next week where you can just call in, and I'll put the ruling

15   on the record.  And we'll go from there.

16          I don't see that 45 days, Mr. Meda, if we get to an

17   answer, is going to be an issue.  I'd suspect, given the

18   statement I just made, all you'll have to do is talk to

19   Mr. Jones, and there'll be an easy stipulation to get that

20   done.

21          So let me commend the parties on the briefs.  Long as

22   they may have been, they were very good.  The exhibits, I feel

23   like I've been through trial already.  But I really do

24   appreciate the briefs.  I appreciate the arguments.  I

25   appreciate the professionalism.  Too often, these types of

1  hearings turn into shouting matches, so I commend both counsel.

2         And to the junior-most member here, it doesn't always

3  look like this.  So you were at a good day.

4         So thank you all.  I'll be in touch.  It'll probably

5  be Wednesday or Thursday next week I'll give you the ruling.

6  Thank you.

7         MR. MEDA:  Thank you, Judge.

8         MR. JONES:  Your Honor.

9         THE COURT:  Um-hum.

10     (Proceedings Concluded)

11

12

13     I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15

16  Dated: July 10, 2022

       eScribers, LLC
17     7227 N. 16th Street
       Suite #207
18     Phoenix, AZ 85020

19

20

21

22

23

24

25