Michael N. Feuer (State Bar No. 111529)
City Attorney
mike.feuer@lacity.org
Kathleen A. Kenealy (State Bar No. 212289)
Chief Deputy City Attorney
kathleen.kenealy@lacity.org
**LOS ANGELES CITY ATTORNEY'S**
**OFFICE**
221 N. Figueroa Street, Suite 1000
Los Angeles, California 90012
*Attorneys for Plaintiff City of Los Angeles*

Guy C. Nicholson (State Bar No. 106133)
gnicholson@egcfirm.com
**ELLIS GEORGE CIPOLLONE**
**O'BRIEN ANNAGUEY LLP**
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
*Attorneys for Plaintiff City of Los Angeles*

Michael A. Jones, State Bar #27311
David B. Nelson, State Bar #34100
**ALLEN BARNES & JONES, PLC**
1850 N. Central Ave., Suite 1150
Phoenix, Arizona 85004
Telephone: (602) 256-6000
Facsimile: (602) 252-4712
mjones@allenbarneslaw.com
*Attorneys for Plaintiff City of Los Angeles*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>PAUL OLIVA PARADIS,<br><br>    Debtor. | Chapter 7<br><br>Case No. 2:20-bk-06724-PS |
| CITY OF LOS ANGELES,<br><br>    Plaintiff,<br><br>v.<br><br>PAUL OLIVA PARADIS,<br><br>    Defendant/Debtor. | **Adv No. 2:21-ap-00171-PS**<br><br>**MOTION TO STRIKE ALLEGED AFFIRMATIVE DEFENSES IN FIRST AMENDED ANSWER**<br><br>**Hearing Date: January 12, 2023**<br>**Hearing Time: 11:00 a.m.** |

Plaintiff, the City of Los Angeles ("**City**"), hereby requests that the Court strike from the *First Amended Answer to Amended Adversary Complaint* [ECF No. 104] ("**Amended Answer**") Defendant Paul Oliva Paradis' ("**Paradis**") nine purported

affirmative defenses. None of Paradis' alleged affirmative defenses pertain to acts by the City ***against Paradis related to the actual issues in this non-discharge litigation***. Instead, Paradis spends 30 pages spouting wholly immaterial, impertinent, and scandalous conspiracy theories entirely related to the *Jones* litigation and settlement having nothing to do with the means by which Paradis improperly obtained the subject contracts. The *Jones* settlement merely served as the convenient platform that afforded Paradis the opportunity to put into motion his plan to cheat the City through bribery and other fraudulent acts - thereby exposing him to nondischarge liability.

This is a crystal-clear attempt to massively expand the scope of the parties' dispute, the scope of discovery, and ultimately, to delay this lawsuit for as long as possible. Four of Paradis' alleged affirmative defenses fail as a matter of law. And, Paradis' remaining alleged affirmative defenses rely on his 30 pages of accusations regarding the *Jones* litigation having nothing whatsoever to do with the instant non-discharge action. Accordingly, Paradis' affirmative defenses should be stricken from the Amended Answer.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

1. On March 28, 2022, the City filed the *Amended Complaint* [ECF No. 54] ("**Amended Complaint**") against Paradis thereby seeking a judgment that Paradis' indebtedness to the City is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

2. The focus of this lawsuit is the manner in which Ardent Cyber Solutions LLC f.k.a. Aventador Utility Solutions, LLC ("**Ardent**" or "**Aventador**") obtained consulting contracts from the City. While purporting to act in the City's best interests, Paradis led a fraudulent criminal scheme to, among other things, bribe City officials and improperly influence the City to award a $30 million no-bid consulting contract to his wholly owned entity, Aventador, on an expedited basis ("**Aventador Contract**").

Moreover, after a California state court ordered that the City not make any further payments to Paradis or any Paradis entity, he brazenly defrauded the City by providing it with a false declaration concerning his purported sale of his ownership of Aventador and stating in no uncertain terms that he would have no post-sale involvement with the company, which later changed its name to Ardent. With Ardent still (but secretly) under Paradis' ownership and control, Paradis proceeded to entice a City official into assisting him with pursuing lucrative contracts with the City for Ardent. In these ways, Paradis violated California Government Code section 1090 (conflicts of interest in government contracting), which independently also constituted a violation of California Government Code sections 12650 *et seq.*, (California's false claims act) as a matter of law.

3. On June 30, 2022, the Court conducted a hearing regarding Paradis' Motion to Dismiss the Amended Complaint and his request that the Court take judicial notice of numerous documents allegedly related to the City's alleged IT problems and how those alleged IT problems came to be. During the hearing, the Court made clear that this case was not about how the City's alleged IT problems arose and were dealt with in the *Jones* litigation. In that regard, the Court stated, among other things:

> I don't think this case is about whether the City knew it had IT problems. I think the case is about whether Mr. Paradis did something wrong in assisting Aventador -- and now called Ardent -- in getting those contracts.

Hearing Transcript (June 30, 2022), attached as **Exhibit A**, at p. 4.

> But when you cut down to what this case is about, isn't it the City saying Mr. Paradis had some special relationship . . . and that in that position, and with the help of City employees, all of whom have been convicted of criminal activity, that what happened is the City ended up with a no-bid contract situation, where ostensibly it might have been better, it might have been more appropriate, for the City to bid that out . . . I don't understand their argument to be, we didn't need IT services. I understand their argument to be, we shouldn't have done it this way. We shouldn't have been advised to do it this way. We shouldn't have fall into the trap to do it this way. That's what

I understand their argument to be.

*Id.* at pp. 5-6.

4. On July 28, 2022, the Court entered an order focusing the City's claims against Paradis to those under 11 U.S.C. § 523(a)(2)(A) related to Paradis' fraud, false pretenses, and false representations to the City.

5. On September 12, 2022, Paradis filed his initial Answer [ECF No. 98] ("**Initial Answer**") to the Complaint which included no less than 63 pages of utterly absurd allegations of "fraud" against the City and City officials having zero relevance to the actual issues at hand, along with twelve purported affirmative defenses that are not actually defenses, are clearly inapplicable here, or do not have any nexus to the actual issues before the Court.

6. On September 28, 2022, the City filed the Motion to Strike [ECF No. 102] ("**Initial Motion to Strike**") certain responses in the Initial Answer and all of the alleged affirmative defenses. The City's goal was simple: prevent Paradis from needlessly attempting to expand the scope of this action and, in the process, preemptively reduce discovery motion practice. Rather than file a responsive pleading to the Motion to Strike, Paradis filed the Amended Answer.

7. The Amended Answer is a near mirror image of the seriously flawed Initial Answer. Rather than correcting the problems with the Initial Answer, Paradis doubled-down on his litigation tactic by only somewhat reducing to 30 pages his massive alleged "factual" narrative regarding the *Jones* litigation. And, Paradis added boilerplate language to each alleged affirmative defense that purports to tie such affirmative defense ***to the Jones settlement*** and not to the actual issues being litigated in this case.

8. Again, the City is rightfully concerned that Paradis' reliance on the *Jones* litigation and settlement in his 30-page narrative and affirmative defenses is a litigation tactic designed to improperly expand the scope of discovery and cause a never ending

series of discovery disputes.

9.  As the Court made crystal clear at the hearing on November 8, 2022 regarding the Motion to Strike ("**Hearing**"), the *Jones* litigation and settlement are wholly immaterial to the viability of the City's nondischargeable claims, stating among other things: "Now, bigger question, Mr. Meda, explain to me why in the world the *Jones* litigation matters, because I don't see it" and "I don't understand why I have to go back to the beginning of time to deal with that.  And I'm just telling you now this is how I'm looking at this case, and we're not going to be playing those discovery games here." *See* Hearing Transcript (November 8, 2022), attached as **Exhibit B**, at pp. 15-17.

10.  At the Hearing, Paradis agreed- and the Court ordered- that the Amended Answer will be Paradis' answer, there will be no further amendments to the Amended Answer, and the Court set a hearing on January 12, 2023 at 11:00 a.m. to consider this Motion.  *See* Exhibit B at pp. 4, 20.

## II.  LEGAL ANALYSIS

### A.  Paradis' Alleged Affirmative Defenses Should be Stricken.

A court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  Fed. R. Civ. P. 12(f).  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  Affirmative defenses are held to the heightened pleading standard set forth in *Twombly* and *Iqbal*.  *See Jacobson v. Persolve, LLC,* No. 14-CV-00735-LHK, LEXIS 115601, WL 4090809, at *6-7, (N.D. Cal. Aug. 19, 2014).  "A defendant's pleading of affirmative defenses must put a plaintiff on notice of the underlying factual bases of the defense." *Id.* (quoting *Wyshak v. City of National Bank*, 607 F.2d 824, 826 (9th Cir. 1979).  If a court determines that a pleading is deficient, it may strike the pleading.  *Id.*   An affirmative defense fails as a matter of law

if it "lacks merit under any set of facts that the defendant might allege." *See Harris v. Chipotle Mexican Grill, Inc.*, 303 F.R.D. 625, 628 (E.D. Cal. 2014).

### 1. **Four of Paradis' Affirmative Defenses Fail as a Matter of Law.**

#### (a). **Failure to Join an Indispensable Party (Defense No. 5)**

"Failure to Join an Indispensable Party" is not an affirmative defense in this context. A person must be joined as a party in litigation if in that person's absence, the Court cannot accord complete relief among the existing parties. Fed R. Civ. P. 19(a)(1)(A). Given that Paradis is the only debtor in this bankruptcy proceeding and the City is pursuing a claim to have its debt against Paradis, ***and no one else***, deemed non-dischargeable, this Court undoubtedly will be able to accord complete relief.

#### (b). **Acquiescence (Defense No. 7)**

Acquiescence is a defense relating to trademark disputes, not the non-discharge issues in this case. Specifically, "[t]he doctrine of acquiescence, closely related to laches, limits a party's right to bring a ***trademark infringement lawsuit*** following an affirmative act implying consent to the other." *Godigital Media Grp., LLC v. Godigital, Inc.*, No. LACV 17-07796-VAP (MRWx), 2019 U.S. Dist. LEXIS 76415, at *16 (C.D. Cal. Mar. 13, 2019) (emphasis added). This alleged affirmative defense therefore fails as a matter of law.

#### (b). **Unjust Enrichment (Defense No. 8)**

This is not an affirmative defense recognized under Federal Rule 8(c), and the City is not on notice of the legal or factual basis for this alleged defense.

#### (c). **Spoliation (Defense No. 9)**

Spoliation is not an affirmative defense, and this alleged affirmative defense fails a matter of law. *See Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F. Supp. 2d 1184, 1198 (C.D. Cal. 2007) (a defendant need not plead spoliation as an affirmative defense because spoliation is not a defense, but rather is an evidentiary and discovery

remedy); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-56 (4th Cir. 1995) (reasoning that spoliation is "not an affirmative defense, but a rule of evidence").

### 2. Paradis' Remaining Affirmative Defenses are Inapplicable.

#### (a). Fraud (Defense No. 1)

Despite his lengthy recitation of purported facts, Paradis fails to articulate the alleged fraud that the City somehow committed against him related to his actions in obtaining the Aventador and Ardent Contracts. Of course, Paradis' fraud allegation is especially ironic because, in his criminal plea agreement, Paradis repeatedly admitted to defrauding the City related to the issues asserted against him in the Amended Complaint in this case. *See* Amended Complaint, Exhibit A at pp. 31-32, 67-70. "Elements of actual fraud consist of: (1) a misrepresentation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by a person and in a manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Kaufman Inv. Corp. v. Johnson*, 623 F.2d 598, 601 (9th Cir. 1980). In all averments of fraud, the circumstances constituting the alleged fraud must be stated with particularity. *Annunziato v. Guthrie*, No. CV 20-11592-RSWL-JPRx, 2021 U.S. Dist. LEXIS 207481, at *26 (C.D. Cal. Oct. 26, 2021). Courts analyzing affirmative defenses note that defenses fail where a party alleges "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986-87 (9th Cir. 2010) (citations omitted) (analyzing defense of unclean hands).

Paradis' purported fraud defense is a textbook example of an affirmative defense that should be stricken. Without pointing to a single alleged fraudulent act ***by the City against Paradis related to the actual issues at hand in this litigation***, Paradis spends 30 pages of his Amended Answer spouting wholly immaterial, impertinent, and scandalous

conspiracy theories entirely related to the *Jones* litigation and settlement. Paradis' consistent strategy has been to attempt to defend or justify his admitted fraud and outright criminal conduct (which corrupted nearly everyone Paradis came in contact with) by seeking to massively expand the scope of the parties' dispute with wild allegations against the City and its officials. Paradis' alleged "facts" have nothing to do with, and would never have been an excuse for, the fraud that he committed – nor has Paradis made an offer of proof to the contrary.[1]

Of course, as the Court has pointed out numerous times, this case is about Paradis' fraudulent actions to obtain the Aventador Contract and later the Ardent Contract. *See* Exhibit A at pp. 4-6; Exhibit B at 15-17. And, as a consequence, the Court will decide whether Paradis' debt to the City should be held non-dischargeable for those reasons. Again, this case is *not* about Paradis' wild allegations about the City and City officials concerning conduct in the *Jones* litigation that supposedly occurred long before Paradis chose to violate the law. *See id*. Accordingly, Paradis' 30-page tirade related to his warped allegation of the City's IT issues, the settled *Jones* litigation, and myriad other immaterial and impertinent issues should be stricken in its entirety.

### (b).   In Pari Delicto/Unclean Hands (Defense Nos. 2 and 3)

Unclean hands and the doctrine of *in pari delicto* are substantially similar under applicable California law. *See Jacobs v. Universal Dev. Corp.*, 53 Cal. App. 4th 692, 699, 62 Cal. Rptr. 2d 446, 449 (1997). "The party seeking the application of the unclean hands doctrine generally bear the burden of proving each element." *Still v. Arakelyan (In re Still)*, 393 B.R. 896, 919 (Bankr. C.D. Cal. 2008). Unclean hands is a fact dependent

---

[1] If such a "defense" were allowed, it would at least potentially encourage Paradis to attempt to conduct sweeping and irrelevant discovery (which this Court disallowed in the Ardent bankruptcy case), leading to significant discovery law and motion practice and ultimately serve Paradis' goal of slowing down an inevitable ruling that his admitted fraud against the City is non-dischargeable.

affirmative defense requiring inequitable conduct by a plaintiff in connection with the matter in controversy and applies only where it would be inequitable to grant the plaintiff *any* relief. *Id.* "The court must consider both the degree of harm caused by the plaintiff's misconduct and the extent of the plaintiff's alleged damages." *Id.* It is fundamental to operation of the doctrine of unclean hands that "the alleged misconduct by the [party] ***relate directly to the transaction concerning which the complaint is made***." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986-87 (9th Cir. 2010) (emphasis added). "Unclean hands does not constitute misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." *Id.* (quotation omitted).

Like Paradis' improperly pled fraud defense, Paradis' alleged affirmative defenses of *in pari delicto* and unclean hands should be stricken. Paradis' alleged "facts" related to the *Jones* litigation simply do not comport with the inflexible requirement that alleged unclean hands have a direct connection to the actual transactions at issue: e.g., Paradis' actions related to obtaining the subject contracts.

### (c). Equitable Estoppel/Ratification (Defense Nos. 4, 6)

The City is not on notice of the bases for these alleged defenses. "Estoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *DRG/Beverly Hills, Ltd. v, Chopstix Dim Sum Café and Takeout, III, Ltd.*, 30 Cal. App. 4th 54, 59, 35 Cal. Rptr. 2d 515 (1994) (quotations omitted). Ratification as an affirmative defense involves rescission of an agreement and "that the rescinding party had notice of the grounds for rescission." *Bourbeau v. Cognitive Code Corp.*, 693 F. App'x 499, 502 (9th Cir. 2017) (quotation omitted). Paradis has not provided support for these alleged affirmative defenses beyond vague assertions to his irrelevant theories regarding the *Jones* litigation and settlement, and these alleged affirmative defenses should not be permitted.

1     **WHEREFORE**, the City respectfully requests that the Court enter an order:

2          i.     Striking Paradis' affirmative defenses in the Amended Answer; and

3          iii.    For such other relief that the Court deems appropriate.

4     DATED: November 29, 2022.

5                                      **ALLEN BARNES & JONES, PLC**

6                                      */s/ MAJ #27311*
                                       Michael A. Jones
7                                      David B. Nelson
                                       1850 N. Central Ave. Suite 1150
8                                      Phoenix, Arizona 85004
                                       Attorneys for the City of Los Angeles
9

10                                     **LOS ANGELES CITY ATTORNEY'S
                                       OFFICE**
11
                                       */s/ Kathleen A. Kenealy (with permission)*
12                                     Michael N. Feuer
                                       Kathleen A. Kenealy
13                                     221 N. Figueroa Street, Suite 1000
                                       Los Angeles, CA  90012
14                                     Attorneys for the City of Los Angeles

15
                                       **ELLIS GEORGE CIPOLLONE O'BRIEN
16                                     ANNAGUEY LLP**

17                                     */s/ Guy C. Nicholson (with permission)*
                                       Guy C. Nicholson
18                                     2121 Avenue of the Stars, 30th Floor
                                       Los Angeles, CA  90067
19                                     Attorneys for the City of Los Angeles

20

21

22

23

24

25

26

1
**E-FILED** on November 29, 2022 with the
U.S. Bankruptcy Court and copies served
2
via ECF notice on all parties that have
appeared in the case.

3
**COPY** e-mailed the same date to:

4
Edward K. Bernatavicius                          Alan A. Meda
5
United States Trustee                            Burch & Cracchiolo PA
230 N 1st Ave, Suite 204                         1850 N. Central Ave., Suite 1700
6
Phoenix, AZ 85003                                Phoenix, AZ 85004
edward.k.bernatavicius@usdoj.gov                 ameda@bcattorneys.com
7
*U.S. Trustee*                                   *Attorneys for Defendant Paul Paradis*

8

9
*/s/ Stephanie Sheffield*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

_____

In re:                                    )
                                          )
PAUL OLIVA PARADIS         CH: 7          )    2:20-BK-06724-PS
                                          )
CITY OF LOS ANGELES vs PAUL OLIVA         )    ADV: 2-21-00171
PARADIS                                   )
                                          )
DEFENDANT'S MOTION TO DISMISS COMPLAINT   )
AND REQUEST FOR JUDICIAL NOTICE           )
_____ )

                              U.S. Bankruptcy Court
                              230 N. First Avenue, Suite 101
                              Phoenix, AZ 85003-1706

                              June 30, 2022
                              10:02 a.m.

                BEFORE THE HONORABLE PAUL SALA, Judge

APPEARANCES:

 For the City of Los Angeles:  Michael A. Jones
                               ALLEN BARNES & JONES, PLC
                               1850 North Central Avenue
                               Suite 1150
                               Phoenix, AZ 85004

 For Paul Oliva Paradis:       Alan A. Meda
                               BURCH & CRACCHIOLO, P.A.
                               1850 North Central Avenue
                               Suite 1700
                               Phoenix, AZ 85004

 For the City of Los Angeles:  Guy Nicholson
                               BROWNE GEORGE ROSS O'BRIEN
                               ANNAGUEY
                               2121 Avenue of the Stars
                               Suite 2800
                               Los Angeles, CA 90067

Proceedings recorded by electronic sound technician, Ruth
Carmona; transcript produced by eScribers, LLC.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    THE CLERK:  20-06724, Paul Paradis, Adversary

2  21-0171, City of Los Angeles v. Paul Paradis.

3    THE COURT:  Okay.  Appearances for the City of Los

4  Angeles, please.

5    MR. JONES:  Thank you, Your Honor.  Michael Jones,

6  Allen Barnes & Jones, for the City of Los Angeles.  With us in

7  the courtroom is Ryan Deutsch, our summer associate.  With us

8  on the telephone line is Guy Nicholson, co-counsel.

9    THE COURT:  Okay.  Thank you.

10    And for Mr. Paradis.

11    MR. MEDA:  Good morning, Your Honor.  Alan Meda with

12  Burch & Cracchiolo on behalf of the Defendant, Mr. Paul

13  Paradis.  It is my pleasure to introduce you to Mr. Paradis,

14  who is here in the courtroom with me.

15    THE COURT:  Okay.  Good morning, Mr. Paradis.

16    MR. PARADIS:  Good morning, Your Honor.

17    THE COURT:  Okay.  So we don't have anybody on Zoom.

18  We set it up just in case anyone wanted it.  Let me close that

19  out.

20    This is the first time back in the court in some

21  time, so give me a second to make sure I've got all the

22  technology working the way we need it to work.  Sort of.  It's

23  funny; the technology has improved so much that it's, in some

24  respects, easier to do this from home or from a desk.  Okay.

25    Okay.  So we are here on a couple matters:

1  Mr. Paradis's motion to dismiss the first amended complaint --

2  the City's first amended complaint, and also Mr. Paradis'

3  motion for the Court to take judicial notice.

4       Couple things that are preliminary matter.  I've

5  granted extensions of page limits and such in this case.  I'm

6  not doing that anymore, so just be aware of that.  In the

7  future, we'll keep it to the page limits, unless, long before

8  the document is due, a request is made, and good cause is show.

9  Not to say that what you've given me isn't great reading and

10 great legal work.  It is, on both sides.  However, I think

11 we -- we don't need quite as much as we've got.

12       Let's deal with the judicial notice, and I'll listen

13 with interest to any arguments, but here are my thoughts.  As

14 Mr. Meda's aware from the pleadings. but wasn't at the hearing

15 in the Ardent case, the way I look at judicial notice is

16 judicial notice is that I can take notice of a nondisputable

17 fact.  Yesterday was a Wednesday.  The sun came up at a certain

18 time.  That kind of thing.

19       I can also take judicial notice of items in the

20 record.  I can note that there is a pleading that's been filed.

21 I can even take note that there was a newspaper article that

22 was published.  But I can't take judicial notice of what's in

23 there.

24       And in this case, what it seems to me is the 500-and-

25 so pages that Mr. Paradis would like me to take judicial notice

1   of stands for the proposition he wants to introduce into the

2   record 500-plus pages of documents, and we're not going to do

3   that.   I think what the judicial notice was sought for is to

4   establish that the City of Los Angeles Department of Water --

5   LADWP -- I'm going to call it the City as we move on, just so

6   everyone's clear -- that the City knew it had an IT problem

7   that came to light later, or at least it came to the point

8   where it had to be dealt with in the <u>Jones</u> lawsuit.

9           I don't know that there is even a dispute about that

10  issue, but I'm not taking judicial notice of 500-and-some-odd

11  pages, and I don't think this case is about whether the City

12  knew it had IT problems.   I think the case is about whether

13  Mr. Paradis did something wrong in assisting Aventador -- and

14  now called Ardent -- in getting those contracts.

15          So like I said before, I can take judicial notice of

16  items, the fact that this issue is out there.   But I think in

17  the end, there's going to be factual determinations in this

18  case.   I'm not making a ruling today that the City knew they

19  had a problem.   I think it's pretty clear that that's where the

20  facts are going to go.   But I'm just not going to take judicial

21  notice of 500 pages of documents.   That's my preliminary

22  thoughts.

23          So I'll listen with interest, Mr. Meda, if you want

24  to add to the motion or the argument.

25          MR. MEDA:   Thank you, Your Honor.   Alan Meda on

1  behalf of Mr. Paradis.

2        I don't really have much more to add.  It was never

3  our intent for the Court to take judicial notice of all the

4  underlying data that was cited to.  The point of the request

5  for judicial notice was to highlight the fact that the City has

6  acknowledged, admitted, not only the need for the cyber

7  security IT-related services, but the exigent circumstances

8  that existed and have been acknowledged by the City relative to

9  those needed services.  And that is what the Aventador contract

10  was really all about.

11        And so from our perspective, that acknowledgement is

12  significant.  It's significant because it really goes to either

13  the materiality of the alleged misrepresentations and false

14  pretenses or any damages that might have been incurred by the

15  City relative to those representations and pretenses.

16        THE COURT:  But when you cut down to what this case

17  is about, isn't it the City saying Mr. Paradis had some special

18  relationship -- he was a consultant, whatever he was -- and

19  that in that position, and with the help of City employees, all

20  of whom have been convicted of criminal activity, that what

21  happened is the City ended up with a no-bid contract situation,

22  where ostensibly it might have been better, it might have been

23  more appropriate, for the City to bid that out.

24        Whether that gets them to their claims, that's -- I

25  don't understand their argument to be, we didn't need IT

1  services.  I understand their argument to be, we shouldn't have

2  done it this way.  We shouldn't have been advised to do it this

3  way.  We shouldn't have fall into the trap to do it this way.

4  That's what I understand their argument to be.

5          MR. MEDA:  I understand, but the point that I'm

6  making is -- and we have a lot of issues with the alleged

7  represent --

8          THE COURT:  Well, you guys have a lot of issues on

9  both sides, I agree.

10          MR. MEDA:  Right.  Fair enough.  But the point is

11  that the City was going to award this contract to someone.

12  Whether it was Mr. Paradis or someone else, there was going to

13  be a contract.  And that goes to the damage issue.

14          THE COURT:  I don't disagree with you on that, but

15  I'm not sure -- one, I need to take judicial notice of even the

16  fact that you're seeking judicial notice for, which is the City

17  knew it had IT problems.  We'll see what Mr. Jones has to say

18  about that.  But even if I were to take judicial notice of

19  that, I'm not going to do it in the context of here's 500-and-

20  something pages, Judge, take notice of it.  That would create

21  an appellate nightmare in this case, not to mention a trial

22  nightmare.  I'm just not going to open the record up to that --

23          MR. MEDA:  I --

24          THE COURT:  -- level of scrutiny.

25          MR. MEDA:  I understand.



1          THE COURT:  Okay.

2          MR. MEDA:  As I said, I think the important point

3   with regard to that was the -- what we consider to be the

4   City's admissions that there was not only a need for the

5   services, but there were exigent services surrounding that

6   need.

7          THE COURT:  Okay.  Mr. --

8          MR. MEDA:  Which, by the way, has been acknowledged

9   by the City going all the way back to, like, 2006.  So it's not

10  like this was a new circumstance.

11         THE COURT:  Right.  I understand.

12         MR. MEDA:  Thank you.

13         THE COURT:  So Mr. Jones, if we can cut through

14  this -- and maybe we can't -- can the City acknowledge that

15  they knew prior to the Aventador contract that they needed IT

16  services for this cyber security -- I don't know if it's a

17  database, app, program, whatever it is -- and that there was an

18  exigent circumstance, probably from the Jones litigation, that

19  you got to dealt with?

20         MR. JONES:  Here is what I'll say about that.  It's

21  not an issue for today, and the reason why I say that, we're

22  going to almost certainly litigate that issue, specifically the

23  conditions by which this contract came to be and the need for

24  it came to be, which were precipitated by Mr. Paradis' work

25  with Mr. Wright, for which there are now federal crimes that

1  have been pled guilty to.

2          THE COURT:  But that gets more to the exigent

3  circumstance aspect of what Mr. Meda was asking, not so much

4  that the City needed to do something with its software.  I'm a

5  layman here, but --

6          MR. JONES:  Sure.  Did the City need to conduct

7  updates to software and things like that?  Likely, yes.  Did it

8  need to award a $30-million no-bid contract --

9          THE COURT:  Oh, I --

10         MR. JONES:  -- on an emergency basis?  Absolutely

11  not.

12         THE COURT:  I get it.

13         MR. JONES:  Yeah.

14         THE COURT:  I understand --

15         MR. JONES:  Yeah.

16         THE COURT:  I understand the latter to be your beef

17  here.  This --

18         MR. JONES:   Understood.

19         THE COURT:  This isn't what we needed to do.  This

20  isn't --

21         MR. JONES:  Right.

22         THE COURT:  -- how we needed to do it.

23         MR. JONES:  Right.

24         THE COURT:  We were misled.  We were defrauded.  I

25  get all that.  But I guess -- and I'm not sure it's necessary,

1  other than because of the way I suspect this litigation will

2  go, that narrowing things would be helpful. So what you're

3  telling me --

4          MR. JONES: Yeah.

5          THE COURT: -- is the City won't take the -- oh. Is

6  that Mr. Nicholson?

7          MR. NICHOLSON: Yes. Good morning, Your Honor.

8          THE COURT: Good morning.

9          MR. NICHOLSON: I'm just listening.

10         THE COURT: Did you have something to add, or did we

11 just catch a blip?

12         MR. NICHOLSON: No, you just (audio interference).

13         THE COURT: I think you're getting a lot of feedback,

14 Mr. Nicholson. I don't know if you've got both the Zoom feed

15 on for video and phone for feed, but we're getting a lot of

16 feedback from you.

17         MR. NICHOLSON: Oh, well. Maybe that's (audio

18 interference).

19         THE COURT: Didn't catch any of that. Why don't we

20 let Mr. Jones continue?

21         MR. JONES: I guess where I'll leave it with regard

22 to the IT issues is, to the extent we're trying to narrow

23 issues as we had passed the motion to dismiss stage and into

24 the actual Aventador issues, we'll work in good faith on that.

25 I'll work with the client. I'll see to the extent something

1    like that could be narrowed.  Of course, we'll try to do that.

2            For today's purpose, I think Your Honor's hit on the

3    exact issue.  Judicial notice is inappropriate.  We agree for

4    the reasons that you stated, and we're glad to hear that that

5    motion will not be granted and that we're going to actually,

6    for today, argue just the motion to dismiss issues, rather than

7    trying to conduct a mini trial.  So --

8            THE COURT:  Okay.

9            MR. JONES:  Thank you.

10           THE COURT:  So let me give the parties my ruling on

11   the motion for judicial notice.

12           Mr. Paradis has filed a motion for judicial notice,

13   which contained exhibits of over 500 pages, for the proposition

14   that the Court could take judicial notice of, one, the City's

15   need for IT infrastructure improvements; and two, for the

16   proposition that exigent circumstances existed.

17           As I indicated, judicial notice is appropriate for

18   nondisputable facts.  The sun came up at 5 or 5:15 a.m.  A

19   document was filed at docket number 63.  It's not to be used to

20   establish the actual facts in a case.

21           I hear from the City that I don't think, generally,

22   they're going to dispute that there were IT issues.  But as

23   cautious lawyers, the City is concerned that some type of an

24   admission here or a notice here would improperly tie the City's

25   hands in the litigation.  I don't know what the City knew or

1  didn't know.  It's pretty clear to me, it seems, that the City

2  knew they had some computer issues.  That's what the Jones

3  lawsuit, I think, was about at some level.  But I don't think

4  it's appropriate here to make findings on a judicial notice

5  basis that may be burdensome to the parties.

6        What the City knew, particularly when it knew it, how

7  it knew it, how it fits into the materiality of what's been

8  alleged here, where I think the gravamen of the complaint is

9  really getting to Mr. Paradis's involvement in the granting of

10 the $30-million Aventador contract, I don't think it's

11 appropriate to just take judicial notice of these things.

12       So I'm going to deny the motion, but I hope the

13 parties understand that I have a pretty good sense -- although

14 I may not understand IT world, I have a pretty good sense of

15 what went on and what we're fighting about.  And I'm just going

16 to ask the parties to keep that in mind as we move forward in

17 terms of stipulated facts and so that we're fighting the issues

18 that need to be fought and not the issues that don't need to be

19 fought.

20       So for those reasons, I'm going to deny the request

21 for judicial notice, and we'll deal with the issues of what the

22 City knew and when in a proper factual context if we ever get

23 there.

24       So now let's move to the motion to dismiss, Mr. Meda.

25 There is a whole lot in there, so I'll give you some of my

1  preliminary thoughts and just to make sure I kind of understand

2  all that you're seeking.  It seemed to me that Mr. Paradis is

3  seeking to dismiss the complaint under Section 523(a)(2) for a

4  couple of grounds.

5       One is the assertion that there is no alleged

6  material missed representation regarding the facts that gave

7  rise to the Aventador contract.  And by that, I am making a

8  distinction between the initial $30-million contract and the

9  subsequent -- I'm not quite sure what the number was -- 6- to

10  $12-million Ardent contract.  And I know there may be a dispute

11  whether it's the same company or not.  We'll deal with that on

12  another day.

13       But as I looked at your motion, it looked like, on

14  the one hand, you're saying as to the Aventador contract, there

15  is no allegation of a misrepresentation, ergo 523(a)(2)(A)

16  claims can't stand.

17       Secondly, you're saying, as to the facts and

18  circumstances arising relating to the Ardent contract, that the

19  523(a)(2)(A) claim fails because Mr. Paradis was working with

20  the FBI at the time.  And then more globally, even if I were to

21  find there was a representation in either of those two

22  instances, that it's not material and that it is -- and it

23  wasn't reasonably relied on, even if there were a statement.

24       That's what I understand your argument on (a)(2)(A).

25       On (a)(4), I understand your argument to be there's

1  been -- the Ninth Circuit law requires the determination that

2  there is an express or technical trust.  And no matter what the

3  relationship is, without an allegation of an express or

4  technical trust, an (a)(4) claim for fraud or defalcation in a

5  fiduciary capacity fails.

6        And your (a)(6) claim, as I understand it, is that

7  they have not properly alleged a willful conduct on behalf of

8  Mr. Paradis; willful being defined in the case law as an actual

9  intent to injure the City or an action that was intended that

10 had a substantially foreseeable injury to someone, and it just

11 happened to be the City.  That's how I understand that

12 argument.

13        I then understand that you'd like the complaint

14 dismissed, essentially, as a spoilation sanction.

15        And I think that's what I had out of your motion.

16        Was there anything else in there that you thought we

17 were fighting about?

18        MR. MEDA:  I think you've covered the bases, and I'm

19 happy to address those --

20        THE COURT:  Okay.

21        MR. MEDA:  -- when the Court's ready.

22        THE COURT:  I just wanted to make sure I had

23 everything in order.  Okay.  I'll listen with interested,

24 Mr. Meda, but rest assured, I have read everything,

25 Ms. Hendricks (phonetic) has read everything, and we've spent

1       hours going through it.  So I'm very well familiar with it.

2               MR. MEDA:  Well, thank you for your time and for

3       reviewing everything.  I know there's been a lot of pleadings

4       filed.  Very --

5               THE COURT:  The binders were, like, that thick, and

6       there were two of them.

7               MR. MEDA:  I understand, and it certainly required a

8       lot of reading and patience.  And I wish we could have

9       condensed it a little bit for the benefit of the Court, but we

10      did want you to have the benefit of what we thought was

11      pertinent.

12              As the Court is well aware, we're dealing with an

13      adversary complaint dealing with an attempt by the City to

14      object to Mr. Paradis' discharge under 523(a)(2), (a)(4), and

15      (a)(6).  The basis for the claim of objection to discharge, as

16      the Court noted, really relates to the award of two contracts,

17      two separate and distinct contracts.  The first contract was

18      awarded to Aventador, and the second contract is really

19      unrelated to the first contract, which it was awarded to

20      Ardent.  Right?

21              So I could be a little bit off on the numbers.  It

22      doesn't really matter.  But my understanding is the first

23      contract, Aventador, was about 28 million -- a little over 28

24      million, and the second contract, the Ardent contract, was

25      about a million-and-a-half, maybe up to $2 million, somewhere

1  in that range.

2        THE COURT:  Okay.

3        MR. MEDA:  And I think that's how we get to $30

4  million.

5        THE COURT:  Okay.

6        MR. MEDA:  So as the Court is aware, the allegations

7  essentially underlying all this is that these contracts were

8  secured based on fraud, false representations, false pretenses.

9  In any event, the City is alleging that Mr. Paradis made up

10  either statements or circumstances that encouraged the City to

11  enter into this contract with him -- contracts, plural, with

12  him.

13        Now, we initially filed a motion to dismiss

14  previously in December.

15        THE COURT:  Which you indicated I granted in your

16  motion, but I went back.  I don't believe I granted it.  I

17  think I said, go amend.

18        MR. MEDA:  Okay.  And --

19        THE COURT:  So the record's clear, there was never a

20  granting of the motion that would have resulted --

21        MR. MEDA:  Right.

22        THE COURT:  -- in a dismissal.

23        MR. MEDA:  I believe the City made reference to that

24  as well.  I apologize, but --

25        THE COURT:  That's okay.



1          MR. MEDA:  -- I appreciate the correction.

2          THE COURT:  Just wanted it --

3          MR. MEDA:  Yes.

4          THE COURT:  Just wanted it clarified.

5          MR. MEDA:  But in briefing, and at oral argument in

6   February, we suggested that dismissal was appropriate because

7   the City had failed to allege with specificity any

8   misrepresentations or false pretenses.  The City has now

9   amended the complaint.  And our position, as evident from the

10  second motion to dismiss, is that the amended complaint, like

11  the initial complaint, fails to again allege the specific

12  representations and pretenses which were allegedly false when

13  they were made.

14         Now, we feel that this is particularly significant

15  concerning the fact that this is essentially a complaint for

16  fraud that has a heightened specificity requirement, right.

17  And also, the fact that this is the second attempt that the

18  City has had to plead these allegations.

19         Now, the closest that the City gets to alleging or

20  creating a pretense or alleging a pretense or a

21  misrepresentation is the suggestion that Mr. Paradis falsely

22  created exigent circumstances.  And as we talked about, oh, a

23  minute ago, the problem here is that there were exigent

24  circumstances with the City's cyber security systems.

25         THE COURT:  But isn't that a factual issue --

1          MR. MEDA:  Well, here's the thing, though --

2          THE COURT:  -- the level of exigent circumstances?

3    You say it's exigent.  They had to get this fixed.  The <u>Jones</u>

4    lawsuit was out there.  The city had to move.  The City says

5    yeah, we had to move, but we relied on Mr. Paradis and some

6    other City employees, all of whom have admitted to criminal

7    activity, and we gave up a no-bid contract.

8          I don't know what that makes damages as to

9    Mr. Paradis, but it seems to me that that's enough, at least to

10   get beyond a motion to dismiss.

11         MR. MEDA:  Well -- okay.  So two things I want to say

12   about that.  And I appreciate the Court's input there.

13         First of all, as I said before, for years, the City

14   has admitted that it lacked the internal resources to provide

15   adequate project management and IT services.  But perhaps more

16   importantly, nowhere in the complaint, the amended complaint,

17   or any of the pleadings -- admittedly, voluminous pleadings --

18   does the City deny that there were exigent circumstances.  The

19   City has never denied that, and I think that's significant

20   here.

21         We have expressed our view of the world, right?  We

22   have pleaded to this Court that there were exigent

23   circumstances.  And I get the fact that at some point the Court

24   could look at that as some kind of fact determination.  But

25   before you get to a fact determination, the City has to deny

1   that the circumstances existed.

2          THE COURT:  Well, let me ask you this, Mr. Meda.

3   Let's say, today, I found the City had exigent circumstances to

4   get in a consultant to fix their project management and IT

5   services.  Let's say I found that.  Is that game, set, match?

6   There's no potential cause of action here?

7          MR. MEDA:  Well, here is the problem.  Of course,

8   maybe there could be under some scenario a cause of action, but

9   the problem, as we have stated over and over again, is that the

10  City has not properly pled its cause of action.  It has not

11  pled to this Court what is the underlying misrepresentations.

12  What is the underlying false pretenses?  I mean, we're shooting

13  in the dark here.

14         They haven't provided us with anything.  And as I

15  said before, I think that's particularly important in the

16  context of a fraud action that forms the basis of an objection

17  to discharge.  We have the right to know what the allegations

18  are, the underlying factual allegations that supposedly support

19  this fraud claim.  And we don't have that here.

20         And the City was advised of that previously, and the

21  City was given an opportunity to amend its complaint.  And the

22  City told you, Judge, that the reason the first complaint

23  didn't have all that in it was because of the government's

24  investigation, and it was handcuffed, and it couldn't properly

25  plead matters.  And now the handcuffs came off, and the City

1  filed an amended complaint.  And we still have the same

2  deficiencies.

3          THE COURT:  Well, what about the citation to the plea

4  agreement where Mr. Paradis agreed that he had defrauded the

5  City?  Why isn't that, in and of itself, enough?

6          MR. MEDA:  Because the plea agreement is essentially

7  conclusory.  Now, conclusory statements, without any really

8  underlying factual determinations that would support an

9  objection to discharge, that's really the problem.

10          THE COURT:  But do -- I understand the argument that

11  it's conclusory, but your client made it.

12          MR. MEDA:  No.  He --

13          THE COURT:  So --

14          MR. MEDA:  He did.

15          THE COURT:  -- you're saying if I have a defendant

16  who has admitted to fraudulent activity, the City saying, the

17  defendant has admitted to fraudulent activity is not enough to

18  stand for a fraud complaint at the motion to dismiss phase?

19          MR. MEDA:  It's -- well, first of all, we don't feel

20  it's enough, because the plea does not contain what we view as

21  sufficient bases to justify a objection to discharge judgment.

22          THE COURT:  Okay.

23          MR. MEDA:  Okay.  So the fact that there were

24  conclusory admissions made doesn't meet the standard necessary,

25  in our opinion, to rule that Mr. Paradis' discharge should be

1    denied.

2          We also would assert to the Court that, certainly,

3    the standards for a plea in criminal court are much different

4    than the standards of evidence for a nondischargeability

5    proceeding.

6          THE COURT:  You think the criminal plea standard is a

7    lesser standard than the Bankruptcy 523 standard?

8          MR. MEDA:  Well, maybe I'm not saying it the right

9    way.  Maybe it's not a standard issue.  Maybe it's simply a

10   level of evidence issue.  And the problem here is that we don't

11   have any assertions -- there is no factual allegations made by

12   the City, specifically, to support objection to discharge under

13   523(a)(2).  There's no -- and by the way, the plea bargain --

14   remember, I want to -- let me go back a minute, because it's

15   important to understand that Mr. Paradis admitted to bribery,

16   okay.  That's what the plea bargain is all about, right?  It's

17   not -- the admission of liability does not relate to fraud.  It

18   does not relate to, really, any of the allegations in the

19   complaint.  What it relates to is that there is an admission

20   and a plea that Mr. Paradis committed bribery.  And --

21          THE COURT:  And injured the City.

22          MR. MEDA:  Well, I don't know about the injury, but

23   he clearly admitted that there was bribery.

24          THE COURT:  Okay.

25          MR. MEDA:  And injury is actually an important issue,

1  as we've talked about --

2            THE COURT:  I agree.

3            MR. MEDA:  -- previously, right?

4            THE COURT:  And I agree with you.

5            MR. MEDA: Yeah.  And I would just, I guess, emphasize

6  that the plea agreement certainly does not establish any

7  particular injury to the City, nor does it really, in my

8  opinion, evidence any particular intent to harm the City.  I

9  know that you mentioned that just a minute ago.  But the fact

10 of the matter --

11           THE COURT:  It was just bribing to bribe for --

12           MR. MEDA:  Well --

13           THE COURT:  -- fun's sake?  What?

14           MR. MEDA:  Clearly, there was a self-interest

15 involved in the contract.  I understand that.  But as I said

16 before, a contract was going to be entered into, no matter

17 what.

18           THE COURT:  Right.  And that get to damages.

19           MR. MEDA:  Whether it was Mr. Paradis or somebody

20 else --

21           THE COURT:  Right.  IBM --

22           MR. MEDA:  -- right?

23           THE COURT:  -- might do the job.

24           MR. MEDA:  So --

25           THE COURT:  I understand that distinction.  I'm

1   having a hard time, Mr. Meda, with the idea, particularly post-

2   Husky, that on an (a)(2)(A) claim, where the Defendant has

3   admitted to criminal liability in connection with the very

4   contract we're talking about, that they haven't put you on fair

5   notice of a fraud claim.

6        It may not be a misrepresentation. I don't know. It

7   may be an omission. It may just be fraud. And Husky says

8   that's enough. So I'm having a hard time seeing how I do what

9   you want and blow out an (a)(2)(A) claim given what the Supreme

10  Court says in Husky.

11       It doesn't narrow fraud to a misrepresentation --

12  that sidesteps all the prior Ninth Circuit law that seemed to

13  require that -- and allegations here that Mr. Paradis, by

14  virtue of his pela agreement, has defrauded the City.

15       I have a hard time, given those allegations, of

16  saying that cause of action or (a)(2)(A) goes away. It doesn't

17  mean it's conclusive. It doesn't mean they've established

18  damages. And there may be defenses, like you're talking about

19  here, down the road. I'm not foreclosing any of those. I'm

20  not saying, just because he did this, he's going to -- he's

21  going to have an (a)(2)(A) judgment against him. But I think

22  it's enough to have alleged fraud, as I read Husky, to survive

23  a motion to dismiss a 523(a)(2)(A) defense.

24       MR. MEDA: So I've struggled with this myself. But

25  at the end of the day, I go back to the bases for objection to

1  discharge.  And regardless of the plea bargain, it's still the

2  City's obligation to plead and establish, in some manner, the

3  underlying bases for the alleged fraud.  Even in a res judicata

4  perspective, the City still has to establish findings of the

5  underlying bases.  And my point is that the City hasn't alleged

6  the underlying bases for the objection under 523(a)(2).

7         And again, remember, this isn't our first go-around,

8  right.  The City has had its opportunity to amend the

9  complaint, and it continues to not only not provide us with any

10 factual bases, but it -- for the fraud, but it actually hasn't

11 provided us with any factual detail about its so-called

12 justifiable reliance and, perhaps more importantly, its actual

13 damages.

14        All it says -- in a conclusory way, it says, we

15 entered into a contract, $30 million, that's our damage.  I

16 don't think that's enough, not under a fraud complaint.  And

17 again, remember, these deficiencies, I think, are significant,

18 considering that the City has already had its opportunity to

19 amend.

20        Now, we talked about the fact that there were two

21 contracts, right?  So let's talk about Aventador contract for a

22 minute, right.  So the Aventador contract was basically a

23 remediation of the City's billing system.  And this contract

24 really related to and was necessary to implement the Jones

25 settlement that the Court has heard all about.  And that -- the

1  remediation was actually necessary, not only to implement the

2  settlement but, importantly, to comply with the Court-ordered

3  deadline.

4         And that gets to the exigent circumstances, right?

5  That was a Court-ordered deadline.  Now, we believe that the

6  Department of Justice has now uncovered evidence that --

7  including, by the way, admissions from the City officials

8  themselves -- but evidence confirming that this whole Jones

9  settlement was all part of a collusive litigation scheme really

10 initiated by the City attorney's office.  And what you're going

11 to find out is that's what this was all about.

12        This is not about Mr. Paradis.  This is not about

13 what Mr. Paradis did or didn't do or what he represented or

14 didn't represent.  What you are going to find out is this was

15 all about the City trying to cover itself with regard to this

16 collusive litigation scheme.  And maybe that's not important

17 today, but that's what we're going to eventually get to the

18 bottom of.

19        And remember what I mentioned before.  This whole

20 collusive litigation scheme, this was the scheme that was

21 discussed at that December 2017 meeting with the City attorney,

22 Mr. Feurer.  That was a meeting that Mr. Feurer initially

23 denied.  There was no meeting, or I can't remember any such

24 meeting.  And --

25        THE COURT:  But Mr. Feurer's not a debtor in

1  bankruptcy in this court.  So I understand, long view, one of

2  your affirmative defenses here is that it was somebody else's

3  fault.  It's somebody else's problem, not Mr. Paradis'.  That's

4  not for today at a motion to dismiss.

5  　　　　　MR. MEDA:  I understand.  I just think that --

6  　　　　　THE COURT:  There has been too much educating the

7  Court and educating the court of public opinion in this case

8  from both sides, which is why I thought it should be mediated.

9  But I don't need to keep doing that.

10  　　　　　MR. MEDA:  Right.

11  　　　　　THE COURT:  So let's stick to this motion.

12  　　　　　MR. MEDA:  Well, I think what -- I just wanted to

13  highlight that --

14  　　　　　THE COURT:  Consider it highlighted.

15  　　　　　MR. MEDA:  Right.  I think what's important here is

16  that this contract was not awarded based on any representation,

17  based on any pretense created by Mr. Paradis, but it was

18  awarded, ostensibly, based on the City's need and urgency --

19  　　　　　THE COURT:  And if I don't --

20  　　　　　MR. MEDA:  -- for the cyber-security-related --

21  　　　　　THE COURT:  And if I don't dismiss the case --

22  　　　　　MR. MEDA:  -- services.

23  　　　　　THE COURT:  -- you'll have every opportunity to

24  present that defense.

25  　　　　　MR. MEDA:  So let's talk about the Ardent contract

1   for a minute.  So the Ardent contract wasn't identified in the

2   first complaint.  This came up in the amended complaint.  And

3   this is particularly troubling because the City knows that

4   Mr. Paradis has been an informant for the government for who

5   knows how long.  But --

6            THE COURT:  Okay.  I'm going to stop you there.  The

7   whole informant-for-the-government issue, that is a factual

8   issue.  I am not going to rule on that at a motion to dismiss.

9   You may be right.  Maybe there's a law that if you're an

10  informant, you get a free pass on fraud.  I don't know.  But

11  all I have are your statements and a few lines from plea

12  agreements that Mr. Paradis was working with the FBI.  That is

13  not enough for me to rule on that issue at a motion-to-dismiss

14  phase.  So --

15           MR. MEDA:  Fair enough.

16           THE COURT:  -- maybe I've played my hand on that one,

17  but that's not going to prevail today.

18           MR. MEDA:  Right.  Okay.  But I would just say that,

19  certainly, the City's never denied that.  So I don't think

20  there is truly a disputed issue of fact.  I think the record is

21  clear --

22           THE COURT:  And when you bring a summary judgment

23  motion, we'll know if there is --

24           MR. MEDA:  Right.

25           THE COURT:  -- a disputed issue of fact.


(973) 406-2250  operations@escribers.net  www.escribers.net

1          MR. MEDA:  And I also want to emphasize the Ardent

2     contract, not only are the allegations relative to that

3     contract all during the time frame in which Mr. Paradis was

4     acting as an informant, but that contract is completely

5     unrelated to the first contract.

6          THE COURT:  But didn't they allege that, as to the

7     Ardent contract, Mr. Paradis had attested to the City that he

8     was not an owner of Aventador or Ardent and would never be?

9          MR. MEDA:  Well --

10         THE COURT:  They've alleged it.

11         MR. MEDA:  They've alleged it.

12         THE COURT:  You may say --

13         MR. MEDA:  Right.  Right.

14         THE COURT:  -- that's just crazy, Judge.  That's not

15    what happened.

16         MR. MEDA:  Yeah.  Right.  Well --

17         THE COURT:  But that's what they alleged.

18         MR. MEDA:  -- we'll -- right.  We're going to --

19         THE COURT:  And you've even highlighted at a

20    different argument that they may not even be the same entity.

21    And I get that.

22         MR. MEDA:  Judge --

23         THE COURT:  But the allegation is that Mr. Paradis

24    attested to the City -- and I think it was in a document --

25    that he did not own and would not own Ardent --

1           MR. MEDA:  Right.

2           THE COURT:  -- or Aventador.  So at a motion to

3    dismiss, where I have to accept what they've said as truthful,

4    I think, on that, they've got a clear representation.  So I

5    don't see how you get over the hurdle there.

6           MR. MEDA:  So -- you're right.  I do think it's

7    crazy.  I think that the City is making that claim in bad

8    faith.  One day, I hope to be able to remind the Court of this

9    conversation, because, frankly, I am just appalled at the

10   liberties that the City is taking with its pleadings in this

11   particular case.  But I understand what the Court is saying.

12          I think that there are a number of complications

13   relative to that issue.  Not only does it have to do with what

14   the City actually knew, but it also is going to relate to what

15   I've discussed as this collusive litigation scheme initiated by

16   the City's Attorney's Office.  And the Court mentioned this

17   before in terms of spoilation of evidence and documents.

18          And I realize that the Court's not going to take that

19   up today, but I do want to reiterate that that's going to be an

20   issue, and we're going to have to address it.  We're -- we know

21   the documents existed.  And why the City claims that they no

22   longer have these documents is beyond me, but perhaps we will

23   find out.  But the City has unclean hands here, and that's

24   really important to get across.

25          THE COURT:  Well, I think, to a certain extent,

1  that's not hard to see when we've got City employees who have

2  also pled guilty to fraud.

3       MR. MEDA:  Right.

4       THE COURT:  Now, whether that impacts the body

5  politic, the City, from bringing an (a)(2), (a)(4), or (a)(6)

6  claim, I don't know, but there is clearly a lot of blame for a

7  lot of human beings here.  I just don't know how that plays out

8  vis-a-vis the City versus any one of those individuals, because

9  I assume, if the other individuals file bankruptcy somewhere,

10  the City would file very similar complaints against them.

11       MR. MEDA:  Right.

12       THE COURT:  But that's a assumption long before I

13  know how this is going to play out.

14       MR. MEDA:  So --

15       THE COURT:  (a)(4)?

16       MR. MEDA:  Well, I'm going -- I'll get there real

17  quick.

18       THE COURT:  Okay.

19       MR. MEDA:  I just want to point out that -- one more

20  thing about the Ardent contract.  That contract was actually

21  awarded pursuant to an RFP process.  So that's another

22  distinction between that contract and the first one.

23       THE COURT:  Um-hum.  I understand.

24       MR. MEDA:  Now, I just want to mention a brief

25  comment about damages.  And I understand what the Court has

1  already said about that issue.  But I do want to emphasize that

2  services were actually provided by Mr. Paradis, right?  So I

3  don't think there's any dispute about that.  Services were

4  provided under both contracts.

5          THE COURT:  I think I can cut through this pretty

6  quickly for you.  Here is my understanding, since I am sitting

7  as the judge in the Ardent case as well.  The City is relying

8  on California Government Code 1090 for the proposition, vis-a-

9  vis Ardent, that they can -- that they are entitled to their

10  money back because of the bad act.

11          I understand that as to Ardent.  I don't understand

12  necessarily, as to Mr. Paradis, that that is the proper measure

13  of damage in a nondischargeability context.  In a

14  nondischargeability context, cutting through everything, you're

15  basically dealing with bad actors or bad actions.  And one of

16  the components is always damages.

17          And while there may be a statutory entitlement to a

18  refund vis-a-vis the customer, I'm not sure -- I'm not saying

19  it isn't, but I'm not sure, as I sit here today and what I've

20  ready so far, that that is the measure of damages here, because

21  it does occur to me there may have been something done.  There

22  may have been something that was wonderful done.  There may

23  have been nothing done.  I don't know.  But that is how I'm

24  looking at this from a damage perspective down the road.

25          I may be absolutely wrong on that, but I don't think

1   damages are necessarily determined by California Government

2   Code 1090 as to a nondischarge claim against a noncontracting

3   party.

4         MR. MEDA:  Right.

5         THE COURT:  That help?

6         MR. MEDA:  It does.  Thank you for that.  I mean, I

7   think what's important is the fact that they haven't alleged --

8   I mean, regardless of the California Code 1090, the City hasn't

9   alleged that services weren't provided.  The City hasn't

10  alleged that the services were not exemplenary (sic).  The City

11  has not alleged that the services were defective or deficient

12  in any way, right?  The City hasn't alleged that performance of

13  the services caused any damage.  None of these things have been

14  alleged.

15        As it relates to California Civil Code 1090, as we

16  mentioned before at another hearing, it's our position that

17  that code section is not applicable.  Certainly, on its face,

18  that statute only applies to City officials and their

19  employees.  And so what the City wants to do here is apply it

20  to Mr. Paradis as an independent contractor.

21        Now, there is a case, the Sahlolbei case, which we've

22  talked about, 396 P.3d 568 from 2017, that applies California

23  Code 1090 to independent contractors.  But there's a test for

24  that application, and the test is whether the independent

25  contractor is entrusted with transacting on behalf of the

1  government.  There is no allegation here that Mr. Paradis was

2  entrusted or acting with transactional authority for the

3  government, and that's a critical basis to apply 1090 in the

4  context of Mr. Paradis as an independent contractor.  Of

5  course, Mr. Paradis --

6          THE COURT:  Right.  As I'm --

7          MR. MEDA:  -- wasn't the contractor, right?

8          THE COURT:  As I'm sure you'll make clear in an

9  appropriate motion for summary judgment and your closing

10  argument, but it's not part of the motion to dismiss.  I

11  understand the argument.

12          MR. MEDA:  So I'm going to move on to 523(a)(4).  But

13  before I do, I just want to leave the Court with this thought.

14  In the 523(a)(2) cause of action, the City references certain

15  sections of its complaint that supposedly evidence -- false

16  representations or false pretenses.  And if you go through -- I

17  won't take up your --

18          THE COURT:  Or fraud.

19          MR. MEDA:  -- time now.  Or fraud.  And if you go

20  through these paragraphs, I'm confident you're going to find

21  that, in fact, those cited-to paragraphs do not allege properly

22  misrepresentations or false pretenses, other than, perhaps with

23  one exception, the exigent circumstances issue.

24          Now, let's talk about 523(a)(4) for a minute.  So

25  essentially, what the City is alleging is defalcation while

1    acting in a fiduciary capacity.  So let's look at defalcation,

2    right.  Defalcation is the misappropriation of funds by a

3    person entrusted with their charge.  In order to have a cause

4    of action under 523(a)(4), there has to be a trust.  There has

5    to be a race, and that trust or race has to be misappropriated

6    by a fiduciary.

7            And the problem here, in the context of this

8    adversary complaint, is there is no trust.  There's no race.

9    There's no allegation of a trust or a race.  And importantly,

10   there's no fiduciary relationship.

11           Now, our own Judge Marlar has provided us with some

12   guidance on this, right, the In re: Chavez case, at 430 B.R.

13   890, bankruptcy decision from 2010.  And Judge Marlar stated

14   that there must be a trustee relationship before the alleged

15   wrongdoing in a strict or narrow sense.  There must be an

16   actual trust relationship, not just a duty of loyalty.

17           And that is significantly missing in this particular

18   case.  There's no allegation of a trust.  There's no allegation

19   that Mr. Paradis misappropriated funds that were being held in

20   a trust.  And I think that that is -- really mandates dismissal

21   of that particular cause of action.

22           As it relates to 523(a)(6), I think the Court has

23   already laid out the bases needed to obtain relief.  There has

24   to be willful and malicious actions.  There has to be not only

25   intent to do something, but there has to be an intent to cause

1 harm. And I would submit to you, Judge, that from Mr. Paradis'

2 standpoint, his motivation was to obtain the contract.

3 Obtaining that contract doesn't create harm in and of itself,

4 and there's been no allegation as to what this alleged harm is.

5 And that's really the problem here. Again,

6 without -- in the context of a fraud complaint, without telling

7 us what the underlying basis is, what the actual harm that was

8 caused by the City, we really don't have a way of defending

9 ourselves. So we don't feel -- not only is there no harm, but

10 there's no intent to cause harm sufficient to justify

11 discharge --objection to discharge under 523(a)(6).

12 Judge, I think that's all that I have. Thank you for

13 the leeway in extending my time. I would be happy to answer

14 any questions you might have.

15 THE COURT: I think I asked them all during the

16 presentation. So if anything else comes up, I'll find you.

17 MR. MEDA: Thank you. We -- just -- we don't feel

18 that the City has properly pled its 523 complaint. It's had an

19 opportunity to fix the deficiencies that existed, and those

20 deficiencies remain. We don't feel that further leave should

21 be granted, and we'd ask the Court to dismiss the complaint.

22 THE COURT: Okay.

23 MR. MEDA: Thank you.

24 THE COURT: I understand. Thank you.

25 Mr. Jones.



1          MR. JONES:  Thank you, Your Honor.  I'm happy to

2    begin with (a)(2)(A) or wherever you'd like.

3          THE COURT:  Well, you can start with (a)(2)(A) and --

4          MR. JONES:  Sure.

5          THE COURT:  -- explain for me -- tell me what the

6    theory is.

7          MR. JONES:  Sure.

8          THE COURT:  And to the extent it's a

9    misrepresentation or an omission, tell me what that is and

10   where I find it.

11         MR. JONES:  Sure.  Well, let me start out this way.

12   Your Honor is correct that, certainly, Husky International

13   Envelope (sic) creates a broad standard, and we've met that

14   standard.  Specifically, we pled (a)(2)(A) under three

15   different theories:  false pretense as actual fraud and false

16   representation -- let me just put it to you this way.  With

17   regard to the overarching misrepresentations, there are at

18   least three categories.

19         First, Mr. Paradis worked with Mr. Wright covertly to

20   draft an independent monitor report that was filed with the

21   Court and was given to the LADWP board.  He drafted with

22   Mr. Wright a letter to the board and prepared a presentation to

23   the board, all with the secret motive to obtain the Aventador

24   contract under a no-bid situation, to create -- and how do we

25   know this?  He's admitted to it -- to create a situation where

escribers

1  the board believed that there was no alternative other than to

2  award -- to go against their normal process for bidding out

3  contracts and to subvert that process and award Aventador this

4  $30-million contract without a bid.

5      And this is against the City's best interest.  And

6  Mr. Paradis has admitted all this, specifically.  His plea

7  agreement, I mean, it gives breathtaking detail regarding this

8  scheme here.  It is not conclusory.  We don't need to argue

9  about that.  We can just read it.  The idea that we're shooting

10 in the dark is just mind-blowing.  The plea agreement reads

11 like a checklist for Section 523.

12     And let me get back, because I want to answer your

13 question.  So the second category, where we're asking for -- or

14 we're asserting that there were misrepresentations, is the

15 bribery of David Wright.  David Wright was the general manager

16 to LADWP.  That's a position that's very high within that

17 institution.  Mr. Paradis undertook an effort -- a very

18 detailed effort, which is detailed in his plea agreement, to

19 make it so that Mr. Wright wanted to act in the best interest

20 of Aventador rather than the City.

21     And they took part in a scheme to present to the

22 board a situation where the board was left with, essentially,

23 no choice, other than to award this Aventador contract.  And

24 they didn't disclose that they were working together to create

25 a situation that benefited them, financially.

1          How do we know that?  It's in Mr. Paradis' plea

2   agreement.  He's admitted to it, and he's made it part of a

3   court record with the Central District.

4          The third category of misrepresentation is the 2019

5   declaration to the City that Mr. Paradis' executed.  That

6   declaration's attached to the amended complaint.  Your Honor,

7   we can all look at it.  I don't think there's even any dispute

8   that that's what it is.  I'm just hearing general outrage

9   regarding the issue, which is confusing.

10         That declaration says specifically that Mr. Paradis

11  will have nothing to do with Aventador anymore.  Mr. Paradis

12  shall not receive compensation.  He will not own it.  He will

13  not participate.

14         So what does he do?  Well, we can look at his

15  bankruptcy schedule sworn under oath.  He retook ownership of

16  Aventador.  He took draws from Aventador, then known as Ardent.

17  Additionally, we can take a look at plea agreements signed by

18  Mr. Wright, Mr. Alexander.  All this stuff's in the complaint.

19  We don't have to guess.  We don't have to shoot in the dark.

20  He's admitted to it, as have others.

21         The declaration was violated almost immediately.

22  Almost immediately, there are sworn records that -- and it's in

23  our complaint, so they don't have to guess -- that Mr. Paradis

24  continued to work for Ardent, continued to act as Ardent's

25  owner, and continued to take action that financially benefitted

1  Ardent.  That's in direct violation of the declaration, which

2  the City relied upon, to its detriment.  That's fraud.

3          So we've pled at least three categories, and those

4  are broad categories.  I mean, the bribery of Wright, it

5  entails all kinds of different factual issues that could

6  constitute misrepresentations and fraud.  But in any event,

7  false pretense, certainly, here, designed to convey an

8  impression without an oral representation.  A false impression.

9  Absolutely.

10         Actual fraud under Husky purposefully designed to be

11  amorphous.  The Supreme Court tells us that.  The Supreme Court

12  says -- we keep hearing, where is the specific

13  misrepresentation?  I've already walked through them; however,

14  that's not required.  The Supreme Court quoted -- well, we

15  pulled a quote, put it on our complaint.  The Supreme Court

16  said, "A false representation is not necessary for actual fraud

17  under (a)(2)(A)".  So we keep having this strawman argument,

18  and it doesn't make any sense, because the Supreme Court's

19  already told us we don't need to actually have that.

20         And then with regard to false representation, I've

21  walked through the three categories, but silence may constitute

22  materially false misrepresentation.  What was the silence here

23  that created false representation?  Putting all this material

24  to the board and not telling them that you participated in it.

25  Not telling them that you had a financial interest in the $30-

1  milllion contract that they're going to award that subverts the
2  normal process.  That's misrepresentation.

3       THE COURT:  And why did Mr. Paradis have a duty to
4  represent this to you at that time?

5       MR. JONES:  Sure.  And that's under -- and we're
6  going to litigate this probably through a motion for summary
7  judgment, maybe on both sides, it sounds like -- but the
8  California Government Code Section 1090.  It's absolutely
9  applicable to him.  And that's an issue we'll litigate another
10  day, as Your Honor pointed out.

11       But it's applicable to private practice attorneys
12  that work for the City.  That's exactly what he was.  It's
13  applicable to independent contractors, and we'll walk through
14  that he had powers that made it such that he is a City official
15  as defined under Section 1090.  And under 1090, you're required
16  to disclose things like this.  And if you don't do so, then the
17  entire contract is automatically void.  The entire contract is
18  automatically disgorged.

19       And I get that we're going to -- we're going to fight
20  over damages, but that's just a preview, because it's as plain
21  as day under California law.  And that's where we're going with
22  it.

23       But in addition, Mr. Paradis prepared these materials
24  and worked directly with Mr. Wright, so closely that they're
25  exchanging emails and messages and having meetings to connive a

1  way to get this contract.  And then Mr. Wright presents it to

2  the board as if this is on behalf of LADWP.  Mr. Paradis knew

3  what was going on.  He admitted it.  We're not speculating

4  here.  We're way beyond the pleading standard.

5        So this stuff is stated in the complaint.  He has

6  admitted it.  The idea that they can't figure out what the

7  (a)(2)(A) claim is, is mind-blowing.  They can read the plea

8  agreement that he signed, and that's stated right in the

9  complaint here.

10       I'm happy to discuss anything else on (a)(2)(A) or --

11       THE COURT:  No.  Let's go to (a)(4).

12       MR. JONES:  Okay.  With regard to (a)(4) --

13       THE COURT:  Where is the trust?

14       MR. JONES:  Yeah, let's talk about that.  So let's

15  talk about a Ninth Circuit case, because we're hearing about

16  cases from different levels and different jurisdictions, and

17  they didn't like the case that we cited that -- two cases we

18  cited, admittedly, from outside of the District of Arizona, a

19  Ninth Circuit, that stand for the proposition that city

20  officials, if they commit the acts (a)(4) is designed to

21  prevent, they are held to the standard of a trust for a

22  community.  And therefore, if they commit fraud or defalcation,

23  (a)(4) applies.

24       They didn't like those cases, but let's take a look

25  at a Ninth Circuit case.  And it's one cited by them, so it's

1  in the record.  It's the <u>Short</u> case, which is a Ninth Circuit

2  case.  It's 818 F.3d 693 (sic).

3        In that case, the court looked to state law,

4  including case law, to determine whether a fiduciary obligation

5  existed.  They looked at Washington state law, and in that

6  case, the defendant had a fiduciary duty under a joint venture.

7  There was no express trust.  And the court went out of its way

8  to say, look, typically, that's -- we need express trust, but

9  there are other ways to have trusts.  They can be created by

10  state law, and they specifically said -- case law.

11        They cited all the case law that created this

12  Washington State law that -- where if you're -- the debtor

13  defendant in that case had a fiduciary duty under a joint

14  venture.  And he had to act as a trustee for the joint

15  venture's affairs.  That's what the Washington State law says.

16        So where does that leave us, and how does that tie

17  in?  We cited to California law, and it's applicable California

18  law that imposes trust-like obligations on public officials.

19  Public officials are required to account for the benefits and

20  profits related to any void transactions.

21        So what we're arguing here, Your Honor, is that these

22  two contracts are void.  They were void pre-petition.  They are

23  void under Section 1090.  And that's something we'll adjudicate

24  in the <u>Ardent</u> case and in this case.  And as a result of that,

25  under California law, Mr. Paradis had a trust-like obligation

eScribers

1  under California law, and (a)(4) applies.

2        So that's the premise for it.  It's supported by
3  Ninth Circuit law.  They didn't like the out-of-circuit cases,
4  which stand directly for the premise.  So we cited -- we can
5  take a look at the case they cited to.  And the reason why we
6  had to go out of circuit for those two case that are directly
7  on point -- and have great analysis on the issue that's
8  directly on point -- is because this isn't something that comes
9  up all the time.  You don't typically find a situation where a
10 public official does what happened here and then files
11 bankruptcy, and then everyone litigates an (a)(4) issue to a
12 completed opinion.

13       So there's just not much on it.  We found the two
14 cases that are directly on point.  They both go in our favor.
15 And then if you look at the Ninth Circuit case law, it takes
16 that same analysis.  It just hasn't -- it hasn't come to an
17 opinion on that directly, because it just hasn't been broached
18 yet.

19       THE COURT:  What's the cite again on the Short case?
20       MR. JONES:  Sure.  It's 818 -- 818 -- F.3d 693.  And
21 it's in their brief.  And that analysis I went through is maybe
22 a sentence or two below what they cited.  So --

23       THE COURT:  That's not the cite.

24       MR. JONES:  Oh, I apologize.

25       THE COURT:  It's in their reply?



1        MR. JONES:  Let me find it.

2        THE COURT:  818 693.

3        MR. JONES:  It is in their reply --

4        THE COURT:  Oh, F.2d.

5        MR. JONES:  F.2d; my apologies.  Must have transposed

6   that.  Yes, F.2d.  818 F.2d 693.

7        THE COURT:  Okay.

8        MR. JONES:  I'm happy to answer any questions or if

9   Your Honor would like to review that case, whatever you'd like

10  to do.

11       THE COURT:  Well, I'll probably review it after the

12  hearing.

13       MR. JONES:  Okay.

14       THE COURT:  So I'll tell you my initial reaction,

15  Mr. Jones, was you cited to the Terry (phonetic) case, and I

16  think the Terry case does stand for the proposition that people

17  in the position that you allege Mr. Paradis is owe a

18  fiduciary-type relationship.  Where I am having trouble on the

19  (a)(4) case is the allegation of a trust, because -- and I

20  think you agree with me -- there is no allegation in the

21  complaint of a specific trust.

22       So I'll take a look at the Short case.  But if I

23  disagree with it, I think you're deficient on the (a)(4) claim.

24  I think -- I've already played my hand here.  I think you've

25  pled your case under (a)(6).  I think Husky makes that a broad

1  standard, and I think under a broad standard, the City has

2  alleged, essentially, a conspiracy here to defraud the City.

3          I have concerns on (a)(4) that, even if there's a

4  fiduciary relationship, that that's not enough.  I will look at

5  the Short case.  I looked at the out-of-state cases.  I don't

6  feel bound by those, and I am reminded by Judge Marlar's

7  admonition that -- in the Chavez case, that you need to --

8  whether we agree with it or not, whether we agree that's what

9  breach of fiduciary means, doesn't matter.  That's what the

10 Ninth Circuit has said it means.

11         So I'll look at the Short case, but I have some

12 concerns there.

13         MR. JONES:  Thank you, Your Honor.

14         THE COURT:  Let's move on to (a)(6).  And I'll tell

15 you, just to kind of cut through it -- and this is where it

16 occurred to me that there is a damage issue in this case, and

17 it gets to the allegations in (a)(6).

18         I understand your allegations.  I understand you

19 think that Mr. Paradis did a bunch of terrible things, that

20 Mr. Paradis should be held liable for those things.  I know

21 that in the Ardent case, the City wants Ardent to pay a big

22 judgment or at least have a big claim against Ardent.

23         Where I'm having trouble under (a)(6) -- because I

24 think of (a)(6) typically as a guy's driving his car and runs

25 you down -- I want to hit Mr. Jones -- or he's driving his car,

1  and he's driving on the sidewalk where there's an outside

2  bistro.  Somebody's going to get hurt.  I get that.

3         Here, the allegation is Mr. Paradis intended to

4  defraud the City.  I get that.  I know that's your allegation.

5  Where I'm having trouble with is that he intended to injure the

6  City, specifically, as opposed to just make money some way; or

7  two, that it was substantially certain that a damage would

8  occur.

9         And that's where I have a disconnect between your

10 arguments, I think, under Government Code Section 1090, which

11 is more of a remedy.  If this occurs, you get your money back,

12 as opposed to (a)(6), where you have to show an intent to

13 injure.  And that -- I think it's easy to see an intent to get

14 the contract.  It's easy to see an intent to make money.  I

15 don't necessarily see that it's easy to injure, and I didn't

16 see even an allegation that you were injured.

17        You want your money back under 1090.  I get it.  But

18 are you injured, separate and apart from that, in that we paid

19 $23 million out, and we should have only paid 2-?

20        MR. JONES:  Sure.

21        THE COURT:  That's where I'm having trouble with

22 (a)(6).  And it kind of cemented in my mind where I'm trying to

23 think, okay, even if he didn't intend to injure the City and

24 the City's saying it's certain they would have been injured,

25 where do I find that in the complaint?

1    MR. JONES:  Sure.  Your comments are well taken, and

2  here's what I would say.

3    THE COURT:  Lawyers always say that to judges.  They

4  don't mean it when they leave.

5    MR. JONES:  When we don't say it, I guess, you could

6  imply that inference.  No.

7    So here's where we come out on that.  So the standard

8  of course is not what we hear in the briefing here from the

9  other side.  It's that there was an -- knew that the injury was

10  substantially likely to occur.  That seems to be the dispute.

11    Here, what I would say is, one, we're very early in

12  the pleading stage, so it's impossible for me to stand here and

13  say, Judge, if this had just gone through the normal bidding

14  process with the Aventador contract, I can tell you that they

15  would have saved $10 million.  That's something an expert

16  witness would attest to or a City official would attest to, and

17  you'd hear that testimony or you'd hear it in a --

18    THE COURT:  You're not telling me somebody at the LA

19  City Water Department hasn't sat back and said, we paid 23

20  million for this, or wow, we got a bargain; let's go under this

21  other theory?  I mean, I don't believe that.

22    MR. JONES:  Yeah.

23    THE COURT:  At some level, I think somebody is going

24  to have to make a decision that this was a good deal or a bad

25  deal, or we're just going to fight to get our money back

1  because the statute says we get it back.  But that's what I

2  think's missing in this complaint.

3          MR. JONES:  Yeah.  Fair enough.  I'll just say the

4  facts here do lead to a conclusion that Mr. Paradis knew that

5  an injury was substantially likely to occur.  So how do I know

6  that?  When you take a look at the extreme detail that went

7  into plotting against the City's best interest to ensure that

8  the bribed City official, David Wright, would go to this

9  meeting with materials that Mr. Paradis had prepared to act

10  against the City's best interest to cause -- I mean, it seems a

11  pretty obvious conclusion here.  We don't need an expert to

12  tell us, if you don't have a bidding process, the contract's

13  going to cost more.

14          THE COURT:  Maybe.  Maybe he just didn't want to

15  compete with IBM or SAP.

16          MR. JONES:  And that's a factual issue, and that's

17  something that should be fleshed out.  I don't think this claim

18  should be killed off at the pleading stage because we don't

19  have before you a completely fleshed-out amount with regard to

20  what the injury is and how we arrived at that conclusion.  To

21  subvert a process of competitive bidding is exactly what causes

22  prices to go up.  I mean, that's obvious.

23          So -- and Mr. Paradis admits in excruciating detail

24  that he did this for himself, to financially benefit himself,

25  to subvert that process, to avoid that there would be

1  competitive bidding so that the contract would be driven to

2  him.  And what you'll find in discovery is that the rates were

3  considerably higher under the contract that was proposed versus

4  rates of other what would have been competitors and that City

5  employees were shocked and appalled at the amount, the process,

6  and that the rates were so considerably high.  And that was all

7  jammed through this big scheme that he knew was substantially

8  likely to cause injury to the city.

9        THE COURT:  And I'm hearing that in the argument.

10  I'm not sure that I see that in the complaint.

11        MR. JONES:  Well, I suppose if you'd like us to amend

12  with regard to that specific (a)(6) issue, we're happy to do

13  that, to provide a little more color in that regard.  But in

14  any event, I think we have met the pleading standard, which is

15  this is not a fraud claim.  This is not a Rule 9 issue.  We

16  don't have to plead with particularity.

17        This is a very low standard.  And I think we've met

18  it.  We put them on notice.  There's a viable claim here, and

19  they have the ability to contest.  We can take discovery and

20  present facts to you, which we'll be prepared to do very

21  quickly on a motion for summary judgment.

22        THE COURT:  So what you're telling me is, to (a)(6),

23  the theory is Mr. Paradis, through is actions, made sure that

24  Aventador was awarded a no-bid contract and that, on the one

25  hand, while that may have rewarded Mr. Paradis and/or

1  Aventador, you're saying it was designed to intentionally

2  injure the City or that the City, because it was a no-bid

3  situation, was going to -- was substantially certain to have

4  paid a higher price?

5         MR. JONES:  I mean, we can take it even a further

6  step back.  He bribed Mr. Wright, so it's not just he was

7  working to obtain this contract.  He bribed a city official, a

8  high ranking at the LADWP city official for his own benefit.

9  And this is someone that was the City's attorney --

10        THE COURT:  Right.  But his --

11        MR. JONES:  -- okay.

12        THE COURT:  -- benefit doesn't matter under (a)(6).

13  It does under (a)(2).

14        MR. JONES:  Right.  I understand.  And the reason I

15  say that -- this is someone that was working for the City as an

16  attorney, someone that is working for the City at a high level

17  with the LADWP to remediate some of the billing issues under

18  this -- we call it the POG management contract.

19        So he knew injury was substantially likely to occur.

20  We don't have to show that he intended to inflict injury.  You

21  have to show that he knew injury was substantially likely to

22  occur.  This is someone that was the City's lawyer.  This is

23  someone that worked inside with the LADWP.  He took someone

24  that should have been giving objective advice to the City,

25  should have been helping the City to save money, to make this

1  as cheap and economical and efficient as a contract as it could

2  have been.  He bribed that person -- he's admitted to it -- and

3  made it such that there was no competitive bidding process.

4          How could you not know that injury is substantially

5  likely to occur?  Of course, it is.  You just took away the

6  process to allow this contract to be competitive and efficient

7  and made it something that's designed just for you, something

8  that's designed to have, here's the number I want.  Here's what

9  it's going to be.  Let's make it that way.

10         That's absolutely going to injure the city, and he

11 knew.  And we've at least pled that, which gets us to the next

12 round.  That's where we come out on it.

13         THE COURT:  Okay.  And let's see.  I don't think --

14 no, I don't have anything further.  Thank you.

15         MR. JONES:  Thank you, Your Honor.

16         THE COURT:  Final words, Mr. Meda?

17         MR. MEDA:  Thank you, Your Honor.

18         Your Honor, Counsel made mention of a comment I made

19 about shooting in the dark.  Counsel points to the plea

20 agreement, essentially saying that that should give them

21 sufficient understanding of what the allegations truly are.

22         From our perspective, that's nothing more than a

23 misdirection, because that doesn't provide us some general

24 reference to the plea agreement, does not address the City's

25 responsibility of alleging the facts with specificity.  And the

1 City, despite having an opportunity to amend its complaint, has

2 failed to do so.

3          As it relates to the services provided by

4 Mr. Paradis, the City says, well, you know, we're going to

5 flesh that out during litigation.  But the problem here is

6 that's actually not the way this is supposed to work.  There is

7 no allegation of the harm to the City.  There is no -- and just

8 like I mentioned earlier, when I was up here before, as it

9 relates to the actual services, there is no allegation that the

10 services were not provided.

11          There is no allegation that the services were not

12 exemplary.  There is no allegation that the services were

13 somehow defective or deficient.  And there's no allegation that

14 the services caused -- or the performances of the services

15 caused any damage, nor is there any allegation that the way the

16 contract was arranged, even on a no-bid basis, caused the City

17 any damage.  So Judge, we think that those are certainly

18 important deficiencies that have not been remedied.

19          I just want to say one last thing before I conclude.

20 Mr. Paradis is dealing with a lot of things on his plate.  I'm

21 not saying that as an excuse for anything.  It's just a

22 reality.  He is dealing with defending this lawsuit.  He has

23 recently lost his job, so he is out there looking for work.  He

24 is also expected to be in Los Angeles every couple of weeks to

25 provide information to the government, and so he has that

1 obligation.

2       I only mention this to you because I expect there's

3 going to be a time when we have to answer the complaint in some

4 fashion.  And when that time comes, we would ask your

5 consideration to give us 45 days to file that answer.

6       THE COURT:  Okay.

7       MR. MEDA:  Thank you.

8       THE COURT:  You're welcome.

9       Okay.  I had intended to rule from the bench today,

10 but I think I need to go back and take a look at the <u>Short</u>

11 case.  So what I will probably do is -- because it's going to

12 be fairly lengthy, I think -- I think what I'll probably do,

13 when I go back, is take a look at my calendar and set a time

14 next week where you can just call in, and I'll put the ruling

15 on the record.  And we'll go from there.

16       I don't see that 45 days, Mr. Meda, if we get to an

17 answer, is going to be an issue.  I'd suspect, given the

18 statement I just made, all you'll have to do is talk to

19 Mr. Jones, and there'll be an easy stipulation to get that

20 done.

21       So let me commend the parties on the briefs.  Long as

22 they may have been, they were very good.  The exhibits, I feel

23 like I've been through trial already.  But I really do

24 appreciate the briefs.  I appreciate the arguments.  I

25 appreciate the professionalism.  Too often, these types of

1    hearings turn into shouting matches, so I commend both counsel.

2          And to the junior-most member here, it doesn't always

3    look like this.  So you were at a good day.

4          So thank you all.  I'll be in touch.  It'll probably

5    be Wednesday or Thursday next week I'll give you the ruling.

6    Thank you.

7          MR. MEDA:  Thank you, Judge.

8          MR. JONES:  Your Honor.

9          THE COURT:  Um-hum.

10       (Proceedings Concluded)

11

12

13     I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15

16   Dated: July 10, 2022

                                          eScribers, LLC
17                                        7227 N. 16th Street
                                          Suite #207
18                                        Phoenix, AZ 85020

19

20

21

22

23

24

25

# Exhibit B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

_____
In re:                                )
                                      )
PAUL OLIVA PARADIS        CH: 7       )    2:20-BK-06724-PS
                                      )
1) CITY OF LOS ANGELES vs PAUL OLIVA  )    ADV:  2-21-00171
   PARADIS                            )
                                      )
   MOTION TO STRIKE CERTAIN RESPONSES )
   IN ANSWER TO AMENDED COMPLAINT AND )
   ALLEGED AFFIRMATIVE DEFENSES       )
                                      )    ADV:  2-21-00171
2) CITY OF LOS ANGELES vs PAUL OLIVA  )
   PARADIS                            )
                                      )
   EXPEDITED HEARING ON DEFENDANT'S   )
   MOTION FOR LEAVE TO FILE FIRST     )
   AMENDED ANSWER TO AMENDED COMPLAINT )
_____ )

                         U.S. Bankruptcy Court
                         230 N. First Avenue, Suite 101
                         Phoenix, AZ 85003-1706

                         November 8, 2022
                         10:22 a.m.

          BEFORE THE HONORABLE PAUL SALA, Judge

               VIDEO/TELEPHONIC HEARING

APPEARANCES:

 For City of Los Angeles:     Michael A. Jones
                              ALLEN BARNES & JONES, PLC
                              1850 North Central Avenue
                              Suite 1150
                              Phoenix, AZ 85004


 For Paul Oliva Paradis:      Alan A. Meda
                              BURCH & CRACCHIOLO PA
                              1850 North Central Avenue
                              Suite 1700
                              Phoenix, AZ 85004

APPEARANCES: (Continued)

For City of Los Angeles:        Guy Nicholson
                                BROWNE GEORGE ROSS O'BRIEN
                                ANNAGUEY
                                2121 Avenue of the Stars
                                Suite 2800
                                Los Angeles, CA 90067

Proceedings recorded by electronic sound technician, Ruth
Carmona; transcript produced by eScribers, LLC.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE CLERK:  In the case 20-06724, Paul Paradis, with

2     Adversary 21-171.

3          THE COURT:  Okay.  Appearances for Mr. Paradis,

4     please?

5          MR. MEDA:  Good morning, Your Honor.  Alan Meda with

6     Burch & Cracchiolo, on behalf of Defendant Paul Paradis.

7          THE COURT:  Thank you.  And for the City of Los

8     Angeles?

9          MR. JONES:  Good morning, Your Honor.  Michael Jones,

10    Allen Barnes & Jones, for the City of Los Angeles.  And also on

11    the phone is co-counsel, Guy Nicholson.

12         THE COURT:  Thank you.  And do I have any other

13    appearances in the Paradis matter?  There's not.

14         Okay.  So we're here, ostensibly on the City's motion

15    to strike responses in answer to amended complaint and alleged

16    affirmative defenses.  Since that time, there's been an amended

17    answer filed and a motion for leave to amend the answer.  And I

18    granted an expedited consideration on that matter.  So let me

19    hope against all hopes the parties have spoken.  So I'll first

20    hear from Mr. Jones just with an update on whether there's been

21    any communication between the two sides regarding what we ought

22    to do moving forward.

23         MR. JONES:  There has been.  Mr. Meda and I spoke, I

24    believe it was last week.  And we just have fundamental

25    disagreement with regard to the issues here, unfortunately.  So

1  the issues are still before you.

2          THE COURT:  Okay.  And Mr. Meda, answer for me, if

3  you would, if I were to grant your motion for leave to file a

4  first amended answer, is this the end, that would be the last

5  potential answer, and then we can rule on the City's motion

6  based on that amended answer?

7          MR. MEDA:  I believe so, yes, Your Honor.  I think

8  that, you know, we were prepared to proceed with the scheduling

9  order, but obviously that was interrupted by the motion to

10 strike.  And so we really have no choice but to address that

11 now.  So we've tried to do that in the form of the amended

12 answer that's intended to be responsive to the motion to

13 strike.

14         THE COURT:  Okay.  So I didn't see a response to the

15 motion to strike.  You're telling me the amended answer is

16 Mr. Paradis' response?

17         MR. MEDA:  That's correct.  Judge.

18         THE COURT:  Okay.  So Mr. Jones.  Here's -- here are

19 my thoughts.  You can try to talk me out of them.  I'm inclined

20 to grant the motion to file the amended answer so at least we

21 know what it is -- Mr. Paradis' position is.  And then provide

22 a very shortened time period if the City wants to supplement

23 its motion, or at least tie its motion to the amended answer.

24 I would then want some type of response from Mr. Paradis.  I'm

25 assuming he's objecting.  And then we can have a hearing and at

1  least subsequentially deal with the motion to strike.

2           I'll tell you more globally, and this is for

3  everybody's benefit on the phone.  It is striking the level of

4  narrative that I'm getting in every pleading, complaint,

5  answer, motion, in this matter.  It seems to me you're not

6  necessarily all trying to try the case before me, because I've

7  heard all of this.  It seems to me everyone's hoping a reporter

8  kicks something up and reports on it.  And that's unfortunate,

9  but I'm not sure, short of some kind of draconian orders, I can

10 stop that.

11          I'll give you my general thoughts here, and I

12 understand the City's angry at a lot of the narrative provided

13 by Mr. Paradis, but when I went back to the specific paragraph

14 from the original answer, I didn't necessarily try to tie

15 everything back and play the redline game.  In every instance

16 where the City wanted to strike an answer -- a paragraph of the

17 original answer, the first portion of the answer said denied,

18 period, and then gave an explanation.  I'm not sure it's

19 appropriate to strike anything that Mr. Paradis might want to

20 throw into an answer to help explain his position, whether

21 right or wrong.  If he's done what the rules require him to do,

22 which is answer, admit, or deny a allegation in the complaint.

23 So generally speaking, I would be inclined, I think, to deny

24 that type of relief.

25          As to the affirmative defenses, quite frankly, as I

1  was going through the redlines, I'm not sure which ones still

2  stand, and given the additional allegation, I'm not necessarily

3  in a position today to rule on whether to strike an affirmative

4  defense or not.  It does occur to me where there's an item

5  drafted as an affirmative defense, but where you point out,

6  where the City points out, it's actually not an affirmative

7  defense, but some type of a defense or objection to the City's

8  ability to make a fundamental claim.

9         I'm not sure how we move the ball forward wasting

10  time and money on those types of fights.  But I know the least

11  about this case, I know the least about the history, so there

12  may be some benefits here that I don't see.

13         It occurs to me, from what I've heard so far in this

14  case, and it's been a few years now, the City is adamant that

15  it is entitled to relief here, and I think the City's been

16  adamant that there's no factual issues.  So I wonder why we're

17  dealing with these types of skirmishes where it would seem,

18  from the City's arguments throughout the last two years, that

19  this would be, from the City's perspective, a summary judgment

20  type case.

21         But that's a long diatribe, I suppose, to let you

22  know I'm getting a big frustrated with all parties in this

23  case.  I just want to get to something substantive so that we

24  can rule and get ride of things, if that's what we can do, one

25  way or the other.  And if we can't, let's get this thing set

1  for trial.

2  But -- so my inclination here today, to bring my long

3  story short, is I intend to grant the motion to file the

4  amended answer.  I intend to treat the amended answer as the

5  final answer for Mr. Paradis in this matter, and leave it to

6  the City to either re-urge the motion to strike by simply

7  filing a one-sentence matter, if they think that would do it.

8  I re-urge my motion to strike or to file some kind of more

9  robust motion to strike, if they think that's appropriate.  And

10 then require Mr. Paradis file a response, which if he doesn't,

11 I'll grant the motion to strike if I think I can.

12 So that's where I think I'm headed, Mr. Jones, but

13 you have the opportunity to change my mind.

14 MR. JONES:  Thank you, Your Honor, I appreciate that,

15 and I'll try to tailor my comments to the specific issues that

16 Your Honor has highlighted.

17 So with regard to the big picture issues, you know,

18 why does this matter, why are we taking this procedural step.

19 It's critical, from the City's perspective, that discovery be

20 tailored to what's actually at issue.  So if you take a look at

21 this enormous narrative that they put together, that they've

22 slightly reduced, but it's still 30 pages, it entirely relates

23 to the Jones litigation and why the City eventually needed IT

24 services.  There's nothing related to actual issues at hand,

25 specifically how Paradis obtained the two lucrative IT

1 contracts.

2          So what we're left with is Mr. Paradis attempting to

3 litigate an entirely different matter, which is the long

4 settled Jones litigation.  Being that as a straw man in an

5 attempt to distract from what he's already admitted to, which

6 is that he defrauded the City, obtained two contracts for his

7 own benefit at the  City's detriment.

8          And we quoted in the motion to strike, Your Honor's

9 already cautioned Mr. Paradis that this case is about how he

10 obtained those two contracts and not the Jones litigation, and

11 whether the City needed IT services, because that's an

12 uncontested fact.  That's in the amended complaint.  Paragraph

13 18.  It specifically says that the City undertook efforts to

14 remedy its IT issues as a result of the Jones litigation that

15 led to the -- what Mr. Paradis did with his bribery scheme and

16 obtaining the two contracts.

17          So we're litigating two different cases is the issue

18 here, and where we foresee this going, just based on the

19 history of this case is, months and months of discovery

20 disputes where Mr. Paradis is trying to conduct discovery

21 related to the Jones litigation, the Jones settlement.  All

22 these things that happened nearly a decade ago and eventually

23 gave rise to the need for IT services that then starts what's

24 actually at issue here, which is the two contracts and the

25 fraud that was committed upon the City.

1          So we just got a fundamental disagreement about

2   what's actually being litigated, and the City gets to set that

3   stage, not Mr. Paradis.  So that's why this is important here.

4   We just -- we don't want to be wading through discovery

5   disputes that don't need to be had.  With regard to the

6   narrative, that's the big issue there.

7          With regard to the affirmative defenses, why those

8   matter, why are we litigating those issues, I'll just give you

9   an example.  One of those affirmative defenses is stated as

10  that the City hasn't named all necessary parties.  So that is

11  not an affirmative defense at the outset.  And secondarily, the

12  list of parties that Mr. Paradis alleges needed to be named in

13  a non-discharge action against him include the Mayor of the

14  City of Los Angeles, among other city officials.  So what

15  Mr. Paradis is trying to do, and we've seen him do it in

16  bankruptcy case, I believe it was in the <u>Ardent</u> bankruptcy

17  case, back when it was still a debtor possession case, is an

18  attempt to bring in parties, embarrass the City in an attempt

19  to undertake litigation, and factual issues that are not

20  actually before the Court.

21          So that's -- those are among the other concerns.  But

22  if you take a look at the actual affirmative defenses, it's not

23  terribly difficult to parse through those and see that nearly

24  all of them are legally flawed, not actual affirmative

25  defenses, and could just be dismissed outright, and they

1   haven't done anything to address that issue.  And the other

2   ones simply are materially deficient --

3            THE COURT:  So the --

4            MR. JONES:  Go ahead, I'm sorry.

5            THE COURT:  Let me stop you there, Mr. Jones.  If

6   you're correct.  They're legally insufficient as an affirmative

7   defense.  It doesn't necessarily mean the issue isn't relevant,

8   does it?  So -- and I forget which one it was, there was one, I

9   think, one of the alleged affirmative defenses got to the

10  elements of the City's claim.  So not technically an

11  affirmative defense, it's certainly a defense that would be

12  raised to defeat the City's cause of action.

13           Look, I get the City's frustrated.  I get the City

14  doesn't want to be embarrassed by Mr. Paradis.  That's the

15  City's perspective.  I get that.  But it almost seems like

16  you're giving more room for Mr. Paradis to accomplish what you

17  fear he's accomplishing by these skirmishes as opposed to

18  getting to the fundamental issues.

19           So within the confines of the litigation, I'm just

20  wondering.  You think if we knock out affirmative defenses

21  because these are not affirmative defenses that somehow we'll

22  propel the litigation forward?  Because I'm not sure it does.

23  I certainly understand your discovery issue, but I don't know

24  that I can deal with those in the context of a complaint and an

25  answer.  I guess that's where I'm coming from.

1          MR. JONES:  No, that's fair.  And I guess the way I

2    would look at it is, there are going to be, unfortunately, and

3    we hope that there won't be, but it seems inevitable, there

4    will be some discovery disputes in this case.  It's just been

5    how this matter is going on different issues.  But what we're

6    going to see is discovery related to issues that have nothing

7    to do with what's actually at hand.  And I guess I'd have to

8    take a look at specifically what Your Honor is referring to,

9    whether there was something that specifically related to an

10   issue within the City's claims.  But one thing I pointed to was

11   the failure to join an indispensable party, or something along

12   those lines.  I mean, there are others, so -- and these are

13   just not affirmative defenses.

14         So where these affirmative defenses fail as a matter

15   of law, it's, from our perspective, this is the time to deal

16   with them and just have them taken out, removed, so that we're

17   not having fingers being pointed at these phantom affirmative

18   defenses that don't exist as a bases for taking depositions,

19   undertaking discovery requests that are not warranted, and

20   trying to expand things in that regard.

21         And I'll just point to one other thing.  The

22   procedural defect here related to the admitted answer, and kind

23   of what happened, and how we'd like the admitted answer to

24   proceed forward.  So we were -- we had discussions with

25   Mr. Meda.  We were told that Mr. Paradis would be responding to

1  the motion to strike.  That did not occur.  There was an

2  amended answer filed.  It was beyond the 20-day period

3  permitted under Rule 15.  So on its face, it's procedurally

4  defective.  There's an attempt to smooth that over with the

5  motion that was filed late on Friday.

6       Kind of where we are is, if there's going to be an

7  amended answer, it should address the issues.  If you take a

8  look at what they actually filed, they, Your Honor pointed out,

9  you know, that there are denials within some of the paragraphs,

10  or all the paragraphs -- I could go through all of them -- but

11  of the complaint allegations where Mr. Paradis, from our

12  perspective, failed to properly respond to the allegations.  If

13  you take the look, there are partial denials.  We pointed those

14  out in our moving papers.

15       Additionally, there will be a denial, but then it

16  will be qualified, significantly qualified with legal theories,

17  or things that just aren't relevant to, or aren't permitted, I

18  should say, under the relevant rules here.

19       Additionally, with regard to the affirmative

20  defenses, there are -- we've walked through that, but those

21  should be addressed.  I mean, if you've got affirmative

22  defenses that just can't go forward, they shouldn't be

23  permitted to go forward.  And then this giant narrative, you

24  know, which is probably the biggest issue of all, where it

25  completely relates to, self-admittedly -- I mean, if you look

1  at, there are paragraphs that just discuss exactly what they're

2  doing, which is relating everything to the Jones litigation and

3  then saying, aha, because of what happened with the Jones

4  litigation, the City needed IT services.  It's just a flawed

5  argument that has nothing to do with what's actually at hand.

6  And you can look at paragraph 132 and 169.

7          So kind of where we land on it is, if there's going

8  to be an amended answer, they should have to address the actual

9  issues rather than remove three affirmative defenses, slightly

10  shorten the narrative, but not change its nature at all, not

11  address the defective pleading responses, and then call it a

12  cure.  It's just not what it is, but it's their effort to not

13  have to address the issues and the motion to strike, but filing

14  something that is one, maybe, 50th of the way there.

15          So if there is to be an amended answer, we think it's

16  not this one, and that the amended answer should be filed very

17  quickly, and it should address all the issues, not just what

18  they picked and chose.

19          THE COURT:  Well, Mr. Jones, isn't it better for the

20  City if I hold them to this amended answer and then have them

21  respond to your motion to strike so we don't continually go

22  down the rabbit hole of amended answers and changing positions?

23  It would seem to me Mr. Meda said this is it, so now I can look

24  at this one and make determinations based on your motion, if

25  you're willing to stand on your motion to have a response in 20

1  days, and have a hearing, and be done with it.  Isn't that the

2  way to go?

3          MR. JONES:  That is fine.  And I misunderstood,

4  perhaps, so long as there is not further leave to amend related

5  to the motion to strike.  So yes, if this is going to be it,

6  and then there's a ruling on the motion to strike, and we all

7  live with it, that is the way to go.

8          THE COURT:  Okay.  Thanks.  So Mr. Meda?

9          MR. MEDA:  Thank you, Judge.

10          THE COURT:  Well --

11          MR. MEDA:  So --

12          THE COURT:  -- hold on.  I'm dismayed that there's no

13  response.  I mean I get that you filed an answer, but you filed

14  an answer with a bunch of redlines, and Mr. Paradis is leaving

15  it to me to try to figure out if this 30-page document is

16  somehow responsive to the City's pleadings.  This needs to

17  stop.  I know you --

18          MR. MEDA:  I appreciate that.

19          THE COURT:  -- I know Mr. Paradis is not happy with

20  the City, but -- and I'm guessing he's doing a lot of

21  ghostwriting here.  If he's going to ghostwrite, he needs to

22  ghostwrite responses to the correct pleadings.  I'm not --

23          MR. MEDA:  Well --

24          THE COURT:  -- putting up with this anymore,

25  Mr. Meda.



1          MR. MEDA:  I understand.

2          THE COURT:  Okay.  Go ahead.

3          MR. MEDA:  And -- yeah, I take very seriously what

4   you're saying, and you can be assured that there will be a

5   conversation with Mr. Paradis.  All I can do is urge

6   Mr. Paradis to take your comments seriously, as I do.  And I

7   assure you that will take place.

8          THE COURT:  Okay.  Now, bigger question, Mr. Meda,

9   explain to me why in the world the Jones litigation matters,

10  because I don't see it.

11         MR. MEDA:  Well, okay.  So the problem here has

12  always been that the City only wants to tell part of the story.

13  And while we -- obviously, we have a disagreement, a different

14  view of the world in terms of what is actually relevant.  The

15  City's collusive litigation scheme involved in that Jones

16  settlement is what gave rise to the Aventador contract.  And so

17  do we think that --

18         THE COURT:  Well, I hear --

19         MR. MEDA:  -- that's relevant --

20         THE COURT:  -- what you're saying, but I don't think

21  anybody -- nobody disputes, to my knowledge, in a couple of

22  years with this and the Ardent case, nobody disputes that the

23  City needed IT help, correct?

24         MR. MEDA:  Well, the City's never acknowledged that.

25         THE COURT:  I think they did.

1          MR. MEDA:  Every time I raise that issue, the City

2   tries to minimize that.

3          THE COURT:  Okay.  Let me see if I can help you here.

4          Mr. Jones, does the City acknowledge that prior to

5   the Aventador contract, the City needed IT help?

6          MR. JONES:  Yes, and that is stated in the complaint,

7   the amended complaint, paragraph 18.

8          THE COURT:  Okay.  So we just made a bunch of

9   progress, Mr. Meda.  The City's acknowledged it.  It's on the

10  record at 10:53 a.m.  It's on the docket, or will be tomorrow.

11  That issue's over.  So now, given that, why does the Jones

12  litigation matter?

13         MR. MEDA:  Well, I guess I'll have to go back and

14  take a look at this, but it just -- my initial comment is the

15  Jones litigation is really what is the genesis to the award of

16  the contract.  And so if you're going to --

17         THE COURT:  Well, here -- here's the way I look at

18  it, and I'll give you the  benefit of this, because you can

19  educate me, probably not today, but later on if you need to.  I

20  get that there's all kinds of issues that arose with the Jones

21  litigation.  I get that there was a lot of bad acting, actions,

22  and bad actors.  I get it.  I can't name for you today, as I'm

23  sitting here, who all the bad actors were.  But what occurs to

24  me, as I look at this and the narratives that thankfully

25  everyone keeps giving me, is that there was the Jones

1  litigation, and in the Jones litigation, or sometime

2  thereafter, everyone understood the City's got a problem with

3  its billing.  What I understand the City's argument here is, we

4  had a problem with our IT, and they alleged Mr. Paradis, and

5  maybe with others, then embarked on a scheme to create a nonbid

6  awarded IT contract.  That's their case as I understand it.

7         As to Ardent, they argue, that that results under a

8  California statute, the voiding of that contract because we've

9  done Mr. Paradis' position, and the position of Mr. -- it

10 starts with a W, I can't remember who he is -- but that's their

11 argument.  I understand defenses to that kind of argument.  I

12 didn't do it.  I wasn't the one who did it.  They're not

13 damaged.  I get all of that.  But I don't understand why I have

14 to go back to the beginning of time to deal with that.  And I'm

15 just telling you now --

16         MR. MEDA:  Right.

17         THE COURT:  -- this is how I'm looking at this case,

18 and we're not going to be playing those discovery games here.

19         MR. MEDA:  I understand what you're saying, and I

20 would respond this way.  The problem with that narrative is

21 that the award of the Aventador contract was all done with the

22 knowledge and direction of the City, and it was all part of the

23 collusive litigation scheme.  It wasn't like there was this

24 Jones scheme and then there was a separate event with the award

25 of the contract.  They were part and parcel of the same

1   fraudulent scheme directed by the City.  And that's what makes

2   this a little challenging to separate.

3           THE COURT:  I hear what you're saying.  So I probably

4   said more than I should today.  So here's what I'm going to ask

5   the parties to do.

6           MR. MEDA:  Can I make --

7           THE COURT:  Oh, yes --

8           MR. MEDA:  -- one other --

9           THE COURT:  -- go ahead.

10          MR. MEDA:  -- comment, Judge?  Because there was

11  just --

12          THE COURT:  Sure.

13          MR. MEDA:  -- one other thing I wanted to say.

14          THE COURT:  Go ahead.

15          MR. MEDA:  The City has raised the David Alexander

16  plea and the criminal information statement, waved that flag

17  around.  And in fact, the allegations of this complaint, at

18  least the ones that are complained of by the City in the

19  motion to the strike, and the motion to strike itself makes

20  reference to the David Alexander information statement and

21  lists actual paragraphs from that information statement into

22  the complaint.

23          Now, the City has complained that, well, Mr. Paradis

24  is now alleging in his answers that he was acting as an

25  informant of the FBI.  That's not relevant.  It is relevant.

1   It's relevant because if we're going to start waving around the

2   David Alexander information statement, which, by the way, was

3   prepared by the FBI, we have to take a look at paragraph 12 of

4   that information statement that specifically says that,

5         "On April 5, 2019, Defendant Alexander met with

6         Paradis at a restaurant in Los Angeles.  During this

7         meeting, and in all subsequent interactions with

8         Defendant Alexander referenced herein, Paradis was

9         acting at the direction of the FBI."

10         Why is that important?  That's important because that

11   goes to Mr. Paradis' state of mind and intent.  The City has no

12   way of establishing Mr. Paradis' fraudulent intent because

13   Mr. Paradis didn't have an intent from and after that time

14   frame.  He was always acting on behalf of the FBI and at the

15   direction of the FBI.  And so all of these allegations, from

16   and after this time frame, which, by the way, all kind of

17   revolve around the Ardent contract -- remember, the second of

18   the two contracts -- all of these events occurred under the

19   direction of the FBI.  And so that's why that's important.

20   It's also why it's relevant.  It's also why it's part of the

21   answer of Mr. Paradis.

22         THE COURT:  I hear you, and that's a cogent response

23   to a part of the motion to strike.  Unfortunately, it's not

24   contained in any kind of a response, because there was none

25   filed.  And that may be a relevant issue, Mr. Meda, but I

1  doesn't address, really, the whole laying out the Jones

2  litigation, and it ignores the elephant in the room, which is

3  the $30 million Aventador contract.  So I don't know where all

4  of this is going to go; I'm just trying to get there.

5          So --

6          MR. MEDA:  Yes.

7          THE COURT:  -- and I appreciate your arguments, but

8  I'm not going to take any more today, because I don't have the

9  benefit of even being prepared for them.

10          So here's what I'm going to ask Mr. Jones.  First,

11  I'm granting the motion to amend the complaint, the first

12  amended answer.  The first amended answer will be the answer,

13  and there will be no further amendments to that answer.  This

14  has gone on long enough.

15          Mr. Jones, I want to give the City whatever time it

16  thinks it needs to revise its motion to strike, if it chooses

17  to, to specifically address the first amended answer, but you

18  don't have to.  You can rest on your current motion, if you'd

19  like, but I'd still probably want some explanation of how the

20  arguments go to the new redline version.

21          So how long will it take the City to file whatever it

22  wants to file?

23          MR. JONES:  Thanks, Your Honor.  Yeah, I do suspect

24  that we'll want to tailor it to the specific issues.

25  Mr. Nicholson can weight in as well.  I think 14 days would do

 1  it.

 2          Mr. Nicholson, do you think that's appropriate, or

 3  what is your thought process?

 4          MR. NICHOLSON:  Considering where we are, Your Honor,

 5  I definitely think 14 days would be very gracious, and we'd

 6  appreciate it.

 7          MR. JONES:  That would be the 22nd.

 8          THE COURT:  Okay.  Okay.  So gentleman, you're

 9  committing yourself to the Tuesday before Thanksgiving.  Do you

10  really want to do that?

11          MR. NICHOLSON:  I suppose, Your Honor, we could do it

12  the day before Thanksgiving, if you'd like.

13          MR. JONES:  Yeah, no.  Monday the --

14          THE COURT:  Why -- no, you're being lawyers, people.

15  You have until Tuesday the 29th.

16          MR. JONES:  Thank you.

17          THE COURT:  If you want to file it early, fine.

18  Mr. Meda, I'm giving Mr. Paradis till the 13th to file whatever

19  response he's pleading.

20          MR. MEDA:  Understood.  Thank you.

21          THE COURT:  Do you want a reply, Mr. Jones?

22          MR. JONES:  Yes, Your Honor.

23          THE COURT:  Okay.  So let's go -- let's see, the

24  earliest I'm going to hear this is the last week of December,

25  so you tell me when you want your reply.



1          MR. JONES:  Your thought is the last week of December

2  will be the hearing date?

3          THE COURT:  I'd prefer to have it the first week of

4  January, so --

5          MR. JONES:  Yeah.

6          THE COURT:  -- let's do that.

7          MR. JONES:  I'm out of town for --

8          THE COURT:  But you --

9          MR. JONES:  -- around Christmas.

10          THE COURT:  Okay.  So you pick your response date,

11  and I'll work off that.

12          MR. JONES:  Okay.  And I want to accommodate the

13  hearing time.  Would that -- Your Honor, would the hearing be

14  the first week, second week of January?  What would work best

15  for you, and we'll figure it out.

16          THE COURT:  It doesn't matter, but --

17          MR. JONES:  Okay.

18          THE COURT:  -- I understand the sensitivity from your

19  all's standpoint as lawyers, wanting to let your clients know

20  you can do whatever needs to be done and move whatever matter

21  needs to be moved.

22          MR. JONES:  Sure.

23          THE COURT:  But I'm thinking all about your spouses

24  and children and grandchildren.  So your reply is going to be

25  due on January 4th.

1          Ms. Kelly (phonetic), can we have a hearing date the

2    week of the 9th?

3          THE CLERK:  Yes, Judge, we can do that.  We can do

4    that January 12th at 11 a.m.

5          THE COURT:  Okay.  January 12th at 11 a.m. will be

6    the hearing on either the current motion to strike or the

7    motion to strike as amended.  And you all have your dates.  I

8    would hope everybody will work with everyone to accommodate

9    holiday schedules.  If people need a little extra time to do

10   something, as long as everything is in by the 9th, I'll be fine

11   and be ready on the 12th.

12         MR. JONES:  Thank you, Your Honor.

13         THE COURT:  Any questions?

14         MR. MEDA:  Thank you.

15         THE COURT:  Uh-huh.  Okay.

16         MR. MEDA:  No.

17         THE COURT:  So -- oh, go ahead.

18         MR. MEDA:  No, no questions, Your Honor.

19         THE COURT:  Okay.  So with that, you all have plenty

20   to do and think about.  I probably went in more than what I

21   think -- or should have today.  I really would just like to get

22   to more of the substantive matters here, because I wonder what

23   I can really accomplish that would be case determinative in a

24   motion to strike parts of an amended answer.  But I'll leave it

25   to all of you good lawyers to figure out what I can do for you,

1 and then we'll do whatever we're going to do on the 2nd, or on

2 the 12th of January.  I hope everybody has a good holidays in

3 the meantime.

4        And with that, we're concluded.  Thank you all.

5    (Proceedings Concluded)

6

7

8    I certify that the foregoing is a correct transcript from

9 the record of proceedings in the above-entitled matter.

10

11 Dated: <u>November 11, 2022</u>        _Ashley Bennett_____

                                        eScribers, LLC
12                                      7227 N. 16th Street
                                        Suite #207
13                                      Phoenix, AZ 85020

14

15

16

17

18

19

20

21

22

23

24

25